## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
:
In re:                                              :    Chapter 11
                                                    :
CELADON GROUP, INC., *et al.*,[1]                   :    Case No. 19-_____ (___)
                                                    :
Debtors.                                            :    (Joint Administration Requested)
-------------------------------------------------------------x

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED
SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (B) ADEQUATE
PROTECTION TO CERTAIN PREPETITION LENDERS; (III) AUTHORIZING USE
OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY;
(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Celadon Group, Inc. and its affiliated debtors (collectively, the "Debtors"), by and through

their proposed counsel, DLA Piper LLP (US), hereby submit this motion (the "Motion"), pursuant

to sections 105(a), 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 4001-2 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), for entry of an interim order, substantially in the form attached

hereto as **Exhibit A** (the "Interim Order") and a final order (i) authorizing the Debtors to obtain

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); Vorbas, LLC (8936). The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

senior secured superpriority postpetition financing; (ii) granting (a) liens and superpriority administrative expense claims and (b) adequate protection to certain prepetition secured lenders; (iii) authorizing use of cash collateral; (iv) modifying the automatic stay; (v) scheduling a final hearing; and (vi) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Kathryn Wouters in Support of Chapter 11 Filings and First Day Pleadings* (the "First Day Declaration"),[2] filed contemporaneously with this Motion.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these Cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Pursuant to Local Rule 9013-1(f) the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue of these Cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364, 503 and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1(b) and 4001-2.

---

[2]      Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

**BACKGROUND**

5.       The Debtors are one of the largest North American truckload freight transportation carriers, providing point-to-point shipping, warehousing, supply chain logistics, tractor leasing and other transportation and logistics services for major customers throughout North America. Specifically, the Debtors provide long haul, regional, local, dedicated, intermodal, temperature-protect, and expedited freight services across the United States, Canada and Mexico.  Amid industry-wide headwinds, including falling freight rates, the Debtors began to experience liquidity constraints and worked with their key stakeholders to identify a solution that would maximize enterprise value for the benefit of all stakeholders.  On the date hereof (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.       The Debtors continue to be in possession of their assets and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' chapter 11 cases.  No date has been set for a meeting pursuant to section 341 of the Bankruptcy Code.

7.       Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these Cases, is set forth in detail in the First Day Declaration, which is fully incorporated into this Motion by reference.

**DEBTORS' PREPETITION DEBT**

8.       As of the Petition Date, a total of approximately $136.4 million was owed to the Debtors' prepetition secured lenders under the Prepetition Term Loan Credit Agreement and Prepetition ABL Credit Agreement.  The Debtors are also obligated for capital lease obligations,

accrued liability owed to the United States Department of Justice and deferred income taxes payable, totaling approximately $293 million, as further described in the First Day Declaration. While Debtors' generated cash from operations and asset sales, prior to the Petition Date, the Debtors were cash flow negative, and relied on liquidity that came from credit available under its Prepetition Term Loan Agreement and Prepetition ABL Agreement, both as described below.[3]

### A.    Prepetition ABL Facility

9.    Prior to the Petition Date, Celadon Group, Inc. and certain subsidiaries thereto, as borrowers (such parties, collectively, the "Prepetition ABL Obligors"), the lenders from time to time party thereto (collectively, the "Prepetition ABL Lenders"), and MidCap Funding IV Trust ("MidCap"), a Delaware statutory trust, as successor by assignment from MidCap Financial Trust, as administrative agent (in such capacity, the "Prepetition ABL Agent" and together with the Prepetition ABL Lenders, the "Prepetition ABL Secured Parties"), are parties to that certain Credit and Security Agreement, dated as of July 31, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement", and together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition ABL Secured Parties, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition ABL Loan Documents").  Pursuant to the Prepetition ABL Loan Documents, the Prepetition ABL Secured Parties provided the Prepetition ABL Obligors with an asset-based credit facility (the "Prepetition ABL Facility") with $60.0

---

[3]    The description of the loan facilities is for convenience only and any conflict or omissions shall be construed by giving effect to the Prepetition Term Loan Agreement and Prepetition ABL Agreement.

million of maximum aggregate availability, subject to a borrowing base (as reduced by reserves), as set forth in the Prepetition ABL Credit Agreement.  As of the Petition Date, the Prepetition ABL Obligors are liable for payment of the Prepetition ABL Obligations (as defined below) in an the approximate amount of $31.8 million, exclusive of accrued and accruing interest, fees, costs, expenses and other amounts accrued and accruing pursuant to the Prepetition ABL Loan Documents (all such indebtedness or obligations under the Prepetition ABL Loan Documents, including all "Obligations" as defined in the Prepetition ABL Credit Agreement and all interest, fees, costs, expenses and other amounts accrued and accruing thereon, herein referred to as the "Prepetition ABL Obligations").  The Prepetition ABL Facility is secured by (a) first priority security interests in and liens on the "ABL Priority Collateral" (as such term is defined in the Prepetition Intercreditor Agreement) (the "Prepetition ABL Priority Collateral"); and (b) second priority security interests in and liens on the "Term Priority Collateral" (as such term is defined in the Prepetition Intercreditor Agreement) (the "Prepetition Term Loan Priority Collateral" and such liens and security interests in clauses (a) and (b), the "Prepetition ABL Liens").

**B.    Prepetition Term Loan Facility**

10.    Prior to the Petition Date, Celadon Group, Inc., as borrower, certain subsidiaries designated as "Guarantors" thereto (such parties, collectively, the "Prepetition Term Loan Obligors" and together with the Prepetition ABL Obligors, the "Prepetition Obligors"), the lenders from time to time party thereto (collectively, the "Prepetition Term Loan Lenders" and together with the Prepetition ABL Lenders, the "Prepetition Lenders"), and Blue Torch, as administrative agent (in such capacity, the "Prepetition Term Loan Agent", and together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties", and together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties"), are parties to that certain

Second Amended and Restated Credit Agreement, dated as of July 31, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Term Loan Credit Agreement</u>" and together with any other related agreements, documents or security agreements, collectively, the "<u>Prepetition Term Loan Documents</u>", and collectively, the Prepetition Term Loan Documents and Prepetition ABL Loan Documents, the "<u>Prepetition Loan Documents</u>").  Pursuant to the Prepetition Term Loan Documents, the Prepetition Term Loan Secured Parties provided the Prepetition Term Loan Obligors with term loan facilities in an aggregate principal amount of $105 million (the "<u>Prepetition Term Loan Facility</u>") and under which approximately $103.6 million in principal amount was outstanding as of the Petition Date, plus interest accrued and accruing at the rates set forth in the Prepetition Term Loan Credit Agreement (together with any other amounts outstanding under the Prepetition Term Loan Facility as provided in the Prepetition Term Loan Credit Agreement, including interest, fees, and expenses, the "<u>Prepetition Term Loan Obligations</u>", and together with the Prepetition ABL Obligations, the "<u>Prepetition Obligations</u>").  The Prepetition Term Loan Facility, subject to Permitted Liens, is secured by (a) first priority security interests in and liens on the Prepetition Term Loan Priority Collateral and (b) second priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the "<u>Prepetition Term Loan Liens</u>" and, together with the Prepetition ABL Liens, the "<u>Prepetition Liens</u>").

**C.     Prepetition Intercreditor Agreement**

11.     MidCap, in its capacity as Prepetition ABL Agent, and Blue Torch, in its capacity as Prepetition Term Loan Agent, are parties to that certain Intercreditor Agreement, dated as of July 31, 2019 (the "<u>Prepetition Intercreditor Agreement</u>").  The DIP Loan Agreement and other DIP Loan Documents shall be subject to the terms of the Prepetition Intercreditor Agreement.  The

DIP Facility provided by the Term Loan Secured Parties as the Senior Secured Parties under the Intercreditor Agreement is a permitted Senior Priority DIP Financing, as such term is defined in the Prepetition Intercreditor Agreement.

12.     <u>Prepetition Obligations</u>.  The Debtors acknowledge that the Prepetition Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Obligations owing to the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

## **ALTERNATIVE FINANCING EFFORTS**

13.     Already within the last six (6) months, the Debtors had to restructure their debt and did so by entering into the Prepetition ABL Credit Agreement and the Prepetition Term Loan Agreement.  Through these agreements, the Prepetition Secured Lenders acquired liens in substantially all of the Debtors' property that was not otherwise encumbered, and the Debtors received access to additional liquidity.

14.     The Debtors needed additional funds, and also on July 31, 2019, as described in the First Day Declaration, the Debtors entered into a Warrant Purchase Agreement with one of Celadon Group, Inc.'s shareholders, Luminus Energy Partners Master Fund Ltd. ("<u>Luminus</u>"), in an effort to access more capital in exchange for equity, as their assets were all otherwise

encumbered.  Through the Warrant Purchased Agreement, Luminus increased its equity interest in Celadon Group, Inc. from approximately 17% to up to roughly 49.9%.

15.     Although the Debtors gained access to capital through the aforementioned financing transactions, it was not enough to turnaround their business, and by November, they were once again running out of funds.

16.     In November 2019, the Debtors retained AlixPartners to assist with the evaluation of options for an out-of-court restructuring, and to assist the Debtors in preparing for an in-court process to the extent that suitable alternatives could not be achieved.

17.     On or about November 14, 2019, the Company began discussions with its key stakeholders including TA Dispatch, LLC, purchaser of certain of the Debtors' transportation-logistics and brokerage-services assets pursuant to an Asset Purchase Agreement effective April 1, 2019, and the Prepetition Term Loan Agent and the Prepetition ABL Agent.  Discussions with its key stakeholders were not immediately successful.  Instead, on December 2, 2019, TA Dispatch, LLC filed suit against Debtors Celadon Group, Inc., Celadon Trucking Services, Inc., Celadon Logistics Services, Inc., and Hyndman Transport Limited, seeking approximately $6.2 million in alleged amounts owed in respect of proceeds of TA Dispatch's receivables collected by the Debtors.  The Debtors reserve all of their rights with respect to such allegations.

18.     Also on December 2, 2019, MidCap delivered a Notice of Event of Default and Reservation of Rights (the "Notice of Default") alleging that events of default under the Prepetition ABL Credit Agreement occurred and were continuing and, as a result, the Prepetition ABL Agent and the Prepetition ABL Lenders were under no obligation to make or allow any loans or other advances to or issue any letters of credit on behalf of the Prepetition ABL Obligors and are entitled to exercise all of their rights and remedies under the Prepetition ABL Credit Agreement.

19.     Upon notification of the Notice of Default, the Prepetition Term Loan Agent and the Prepetition ABL Lenders agreed to advance funds to the Debtors for payment of payroll and payroll taxes and other critical payments necessary to continue operations.  However, on December 7, 2019, the Prepetition Term Loan Agent served notice of acceleration on the Debtors.

20.     In the week immediately preceding the filing of these Cases, the Debtors experienced severe liquidity constraints, which magnified the significant challenges to the business and their operations.  The Debtors and their advisors approached several potential liquidity sources and received no interest, making further and more formal efforts futile.

21.     The Debtors, in conjunction with their advisors, continue to work diligently with the Prepetition Secured Parties to develop a solution to the liquidity constraints and identify a path forward for the business or otherwise to maximize the value of their estates.  Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Financing and use of cash collateral are the best available under the circumstances and adequately address the Debtors' liquidity needs during these Cases.  Importantly, the DIP Financing was negotiated at arms'-length with the proposed DIP Agent and DIP Lenders, and use of cash collateral was negotiated at arms'-length with the Prepetition ABL Secured Parties.

22.     The DIP Financing and use of cash collateral are necessary to effectuate the Debtors' goals in these Cases so that the Debtors may conduct an orderly, efficient and safe wind down of their operations, and generate the most value possible for the benefit of their estates and creditors.

## RELIEF REQUESTED

23.    By this Motion, the Debtors seek entry of an interim order, substantially in the form

attached hereto as **Exhibit A** (the "<u>Interim Order</u>"):

a)  authorizing Debtor Celadon Group, Inc. ("<u>Celadon</u>"), as borrower (the "<u>Borrower</u>"), to obtain, and for certain other Debtors to guarantee (in such capacities, the "<u>Guarantors</u>", and together with the Borrower, the "<u>Loan Parties</u>"), up to $8.25 million, including the additional advance to support the going concern operations of Taylor Express (the "<u>DIP Commitment</u>") in senior secured post-petition financing on a superpriority basis (the "<u>DIP Financing</u>" or "<u>DIP Facility</u>") pursuant to, and in accordance with the terms of, that certain *Debtor-In-Possession Secured Multi-Draw Term Promissory Note*, by and among the Borrower, Blue Torch Finance LLC ("<u>Blue Torch</u>"), as agent (in such capacity, the "<u>DIP Agent</u>"), and the lenders party thereto from time to time (the "<u>DIP Lenders</u>", and together with the DIP Agent, the "<u>DIP Secured Parties</u>"), substantially in the form attached hereto as **Exhibit B** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "<u>DIP Loan Agreement</u>"), the Guaranty, dated as of December 8, 2019, by each of the Guarantors, in favor of the DIP Agent for the benefit of itself, each DIP Lender, and each other holder of an Obligation under the DIP Loan Agreement, substantially in the form attached hereto as **Exhibit C** (the "<u>Guaranty</u>"), and together with the DIP Loan Agreement and all other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and the Final Order, collectively, the "<u>DIP Loan Documents</u>"), which DIP Facility shall be available as term loans (the "<u>DIP Loans</u>") to the Debtors upon entry of the Interim Order and satisfaction of the other conditions set forth in the DIP Loan Documents in an initial amount not to exceed $8.25 million (the "<u>Initial DIP Loan</u>"), and the remainder of the DIP Facility available upon entry of the Final Order and satisfaction of the other conditions set forth in the DIP Loan Documents;

b)  authorizing the Borrower and the other Debtors to enter into the DIP Loan Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents;

c)  authorizing the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), and any obligations in respect of indemnity claims, whether contingent or absolute, including, without limitation, any and all obligations in

connection with any interest rate, currency swap, or other hedging agreement or arrangement, in each case, to the extent constituting obligations of any kind under the DIP Loan Documents (such obligations, the "<u>DIP Obligations</u>"), subject to the terms of the Interim Order;

d) authorizing the Debtors to use proceeds of the Initial DIP Loan, effective immediately upon entry of the Interim Order, as expressly provided in the DIP Loan Documents and solely in accordance with this Interim Order and the applicable Approved Budget (as defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to:

    i. pay costs, premiums, fees, and expenses incurred to administer or related to these Cases or in connection with the DIP Facility; and

    ii. provide financing for working capital and for other general corporate purposes of the Debtors in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents);

e) granting approval of superpriority administrative expense claim status to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve-Out (as defined below) and Permitted Liens (as defined below);

f) granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below);

g) authorizing the Debtors to use any Cash Collateral in which any of the Prepetition Secured Parties (as defined below) may have an interest, solely in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the Interim Order) and the DIP Orders;

h) granting adequate protection to the Prepetition Secured Parties solely to the extent of any postpetition diminution in the value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral, including without limitation, the Cash Collateral, as a result of:

    i. the incurrence of the DIP Obligations;

    ii. the Debtors' use of Cash Collateral as set forth in the Interim Order;

    iii. the subordination of the Prepetition Secured Obligations to the Carve-Out or the Carve-Out Reserve, as applicable;

    iv. any other diminution in value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral arising from the Debtors'

use, sale, or disposition of such Prepetition Collateral or the proceeds thereof;

    v.    the priming of the Prepetition Liens of the Prepetition Term Loan Lenders; and

    vi.    the imposition of the automatic stay (collectively, "<u>Diminution in Value</u>");

i)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the DIP Loan Documents;

j)    waiving the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and, subject to entry of a final order granting the relief requested in the Motion on a final basis (the "<u>Final Order</u>", and with the Interim Order, the "<u>DIP Orders</u>"), (i) the Prepetition Collateral, and (ii) any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

k)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

l)    scheduling a final hearing on the Motion (the "<u>Final Hearing</u>") to consider entry of the Final Order; and

m)    granting the Debtors such other and further relief as is just and proper.

## **SUMMARY OF THE PRINCIPAL TERMS OF THE DIP FACILITY**

24.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following is a concise summary of the proposed material terms of the DIP Loan Documents.[4]

| | |
|---|---|
| **Borrower**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Celadon Group, Inc.<br><u>See</u> DIP Loan Agreement, Recitals |
| **Guarantors** | A R Management Services, Inc.; Bee Line, Inc.; Celadon Canadian Holdings, Limited; Celadon E-Commerce, Inc.; Celadon International Corporation; |

---

[4]    Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Loan Documents. This statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents, including the Interim Order. To the extent there is any inconsistency between this concise statement and the provisions of the DIP Loan Documents, the provisions of the DIP Loan Documents shall control.  To the extent there is any inconsistency between this concise statement and the provisions of the DIP Loan Documents, and the Interim Order, the provisions of the Interim Order shall control.

| | |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)* | Celadon Logistics Services, Inc.; Celadon Mexicana, S.A. de C.V.; Celadon Realty, LLC; Celadon Trucking Services, Inc.; Distribution, Inc.; Eagle Logistics Services Inc.; Hyndman Transport Limited; Jaguar Logistics, S.A. de C.V.; Leasing Servicios, S.A. de C.V.; Osborn Transportation, Inc.; Quality Companies LLC; Quality Equipment Leasing, LLC; Quality Insurance LLC; Servicios Corporativos Jaguar, S.C.; Servicios de Transportación Jaguar, S.A. de C.V.; Stinger Logistics, Inc.; Strategic Leasing, Inc.; Taylor Express, Inc.; Transportation Services Risk Retention Group, Inc.; Vorbas, LLC<br><br>See DIP Loan Guaranty, Recitals |
| **DIP Agent**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Blue Torch Finance, LLC<br><br>See DIP Loan Agreement, Recitals |
| **DIP Lenders**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Lenders party to the DIP Loan Documents from time to time<br><br>See DIP Loan Agreement, Recitals |
| **DIP Facility/Borrowing Limits**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The DIP Facility is a secured, superpriority, debtor in possession, new money, multiple draw term loan facility (in an aggregate principal amount of up to $8.25 million (the "Maximum Amount"), which will be drawn in two loans.<br><br>The initial loan, in the principal amount of $8.25 million (the "Initial DIP Loan") will be made available by the DIP Lenders to the Borrower on the Closing Date.<br><br>The second loan funded through collections and use of the DIP Agent's Cash Collateral in an aggregate principal amount of $3.5 million (the "Additional DIP Loan", and together, the "DIP", or each a "DIP Loan") will be made available by the DIP Lenders to the Borrower at any time on or after the date of entry of the Final Order.<br><br>The DIP Facility is provided for the purposes of providing working capital to the Debtors to pay for the costs of the administration of the Cases in accordance with the Budget (as defined below).<br><br>See DIP Loan Agreement, Section 1(a)–(b) |
| **Interest Rates**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The DIP Loan shall bear an interest rate on the principal amount equal to Base Rate plus 12.5% per annum. Interest on the DIP Loan shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which the applicable DIP Loan is made.<br><br>The "Default Rate" is a rate equal to the applicable interest rate on the DIP Obligations plus 2% per annum. It will be applied at the election of the DIP Agent, after an Event of Default occurred and so long as an Event of Default is continuing.<br><br>See DIP Loan Agreement, Section 4(a)–(d) |

| | |
|---|---|
| **Expenses and Fees**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Borrower shall pay to the DIP Agent for the account of the DIP Lenders the following fees:<br><br>Facility Fee.  On or prior to the date of funding of the Initial Loan, the Borrower shall pay to the DIP Agent a facility fee (the "Facility Fee") equal to 3% of the total Commitment, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.<br><br>Exit Fee.  On the earlier of (a) the date that all the Obligations under the  are paid in full in cash and (b) the Maturity Date, the Borrower shall pay to the DIP Agent an exit fee (the "Exit Fee") equal to 3% of the total Commitment, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.<br><br>Additional Fee.  On the earlier of (a) the date that all the Obligations under the DIP Loan Agreement are paid in full in cash and (b) the Maturity Date, the Borrower shall pay to the DIP Agent an additional fee (the "Additional Fee") equal to 2.50% of the Net Cash Proceeds of asset dispositions of the Loan Parties in excess of the amounts required to repay in full the Obligations (other than the Additional Fee), the Prepetition ABL Obligations and the Prepetition Term Loan Obligations with respect to the Term A Loan (as defined in the Prepetition Term Loan Credit Agreement), which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.<br><br>Extension Fee. The Extension Fee means an extension fee equal to 0.50% of the total Commitment, which shall be fully earned and non-refundable when paid.<br><br>See DIP Loan Agreement, Section 8, and Definitions |
| | The Borrower shall reimburse the DIP Agent for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Loan Documents and the obtaining of approval of the DIP Loan Documents by the Bankruptcy Court (including the reasonable fees and expenses of outside counsel for DIP Agent, all of its special local counsel, fees for one (in the absence of any conflicts of interest) financial advisor for the DIP Agent and the DIP Lenders, and auditors retained in connection with the DIP Loan Documents and advice in connection therewith).<br><br>See DIP Loan Agreement, Section 21(b) |

| | |
|---|---|
| **Maturity**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | "Maturity Date" means the earliest to occur of (i) March 31, 2020 (or, if the Borrower has (x) delivered to the DIP Agent a written election to extend the Maturity Date and (y) paid the Extension Fee to the DIP Agent in cash, in each case, on or prior to March 31, 2020), April 30, 2020, (ii) the date that is 25 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets; (iv) the substantial consummation of a plan of reorganization filed in the Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the DIP Loans are accelerated pursuant to the DIP Loan Term Agreement.<br><br><u>See</u> DIP Loan Agreement, Definitions |
| **DIP Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP "Collateral" shall mean all property of the Debtors' estates, including, without limitation, all assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the DIP Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations, including, subject to entry of the Final DIP Order, the Avoidance Action Proceeds.<br><br><u>See</u> DIP Loan Agreement, Definitions |
| **DIP Liens/Super Priority Administrative Claim Status**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(i)*<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)* | <u>DIP Liens in DIP Collateral</u>:  The DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided*, *however*, that the DIP Liens on:<br>(A)  the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or arising post-Petition Date) shall be subject to the Carve-Out and Permitted Liens, the Prepetition ABL Liens, the Prepetition ABL Adequate Protection Liens;<br>(B)  the Prepetition Term Loan Priority Collateral (whether in existence on the Petition Date or arising post-Petition Date) shall be subject to the Carve-Out and certain senior permitted senior liens that are senior, valid, enforceable, perfected and unavoidable as of the Petition Date ("<u>Permitted Liens</u>"); and<br>(C)  any unencumbered assets as of the Petition Date shall be subject to the Carve-Out and Permitted Liens.<br><br><u>See</u> Interim Order, section 2.4(b)<br><br><u>Superpriority Administrative Expenses</u>:  Subject to the priorities set forth on Exhibit C to the Interim Order and the Carve-Out, all DIP Obligations constitute an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment |

<table>
<tr>
<td></td>
<td>over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or incurred after the Petition Date by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof  (such superpriority administrative expense claim, the "<u>DIP Superpriority Claim</u>").<br><br><u>See</u> Interim Order, section 2.5</td>
</tr>
<tr>
<td><strong>Milestones</strong><br><br><em>Bankruptcy Rule 4001(c)(1)(B)</em></td>
<td>No later than the following dates, the Borrower and its Subsidiaries shall take all actions necessary to cause each of the following Milestones to occur:<br><br>12/10/2019    The Interim Order approving the DIP Financing shall be entered by the Bankruptcy Court<br><br>12/11/2019    The Loan Parties shall file one or more motions seeking entry of orders authorizing and approving bid and sale procedures for all or substantially all of the Loan Parties' assets (the "<u>Sale Motion</u>"), in form and substance reasonably acceptable to the DIP Agent<br><br>12/28/2019    The Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the DIP Agent, granting the procedural relief requested in the Sale Motion (including, if appropriate, approval of stalking horse and related protections)<br><br>1/2/2020    The Final Order approving the DIP Financing shall be entered by the Bankruptcy Court<br><br>1/22/2020    The Bankruptcy Court shall have entered one or more orders authorizing and approving the sale of all or substantially all of the Loan Parties' assets pursuant to one or a series of related or unrelated sale transactions.<br><u>See</u> DIP Loan Agreement, Section 14(h)</td>
</tr>
<tr>
<td><strong>Events of Default</strong><br><br><em>Bankruptcy Rule 4001(c)(1)(B)</em></td>
<td>The DIP Loan Documents contain events of default and remedies customary for transactions of this type, including any failure to satisfy covenants and upon the occurrence of certain bankruptcy-related events.<br><u>See</u> DIP Loan Agreement, Section 16; <u>See</u> Interim Order, Section 5</td>
</tr>
<tr>
<td><strong>Carve -Out</strong></td>
<td>The "Carve-Out" shall mean the sum of:</td>
</tr>
</table>

16

| | | |
|---|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)* | (i) | all fees required to be paid to the Clerk of the Court (or in lieu thereof, fees paid to the Debtors' Claims Agent) and to the U.S. Trustee, *plus* interest at the statutory rate; |
| | (ii) | all reasonable fees and expenses up to $25,000 incurred by a Chapter 7 if one should be appointed (the "Chapter 7 Trustee Carve-Out"); |
| | (iii) | subject to the Approved Budget, all unpaid fees, costs, disbursements and expenses (the "Allowed Professional Fees") incurred by the Debtors' professionals in these Cases (the "Debtor Professionals") and the Committee, if one is appointed (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to, on or after delivery of a Carve-Out Trigger Notice (the "Pre-Trigger Carve-Out Cap"); and |
| | (iv) | Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $250,000 incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise. |
| | (v) | The Debtors shall fund a reserve account from time to time from DIP Loan proceeds and use of Available Cash Collateral (as defined in the Interim Order) as provided in the Approved Budget for payment of the Carve-Out for Allowed Professional Fees. |
| | | See Interim Order, Section 4.9 |
| **Purposes for Use of DIP Funds and Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* | The Borrower intends to utilize the DIP Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay costs, premiums, fees, and expenses incurred to administer or related to of the Cases, including fees and expenses of professionals, in each case in accordance with the Budget, subject to any Permitted Variance.<br><br>See  DIP Loan Agreement, Recitals<br><br>Prepetition ABL Agent will allow the Borrowers to use a portion of their cash collateral (which for the avoidance of doubt does not include proceeds of TA Dispatch receivables) in an amount equal to 5% of the proceeds of Eligible Accounts and 50% of Ineligible Accounts swept through the Debtors' U.S. operations bank accounts otherwise remitted to Prepetition ABL Agent in accordance with the Interim Order, for use in accordance with the Budget.<br><br>See Interim Order, section 3.2(c) | |
| **Entities with Interests in Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | The following secured parties have an interest in Cash Collateral:<br><br>(i)    Prepetition ABL Secured Parties<br><br>(ii)   Prepetition Term Loan Secured Parties<br><br>See Interim Order, Recital E (xi) & (xii) | |

| | |
|---|---|
| **Borrowing Conditions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Bankruptcy Rule 4001-2(a)(ii)* | No DIP Lender is obligated to fund any DIP Loan, if, as of the date thereof, including:<br><br>(i)    The DIP Loan Agreement parties shall not have delivered the DIP Loan Documents;<br><br>(ii)    With respect to the Initial Loan (i) the Bankruptcy Court shall not have entered the Interim Order; or (ii) the Interim Order shall have been stayed, vacated, reversed, modified or amended without the DIP Agent's consent;<br><br>(iii)    after giving effect to any DIP Loan, the outstanding principal amount of all DIP Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount permitted to be borrowed on a cumulative basis from the date hereof through the date of such requested DIP Loan as set forth in the Budget and the DIP Orders;<br><br>(iv)    the Agent shall not have received and approved the Budget in accordance with the DIP Loan Agreement or DIP Orders;<br><br>(v)    the Loan Parties shall have filed pleadings with the Bankruptcy Court, which pleadings could adversely affect the rights or remedies of the DIP Agent and the DIP Lenders under the DIP Loan Agreement or the DIP Orders, and such pleadings shall not be in form and substance reasonably acceptable to the Agent; or<br><br>(vi)    the Bankruptcy Court shall have entered orders, which orders could materially and adversely affect the rights or remedies of the DIP Agent and the DIP Lenders under DIP Loan Agreement or DIP Orders, and such orders shall not be in form and substance reasonably acceptable to the DIP Agent.<br><br>The request and acceptance by the Borrower of the proceeds of any DIP Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower that the conditions to borrow under the DIP Loan Agreement and a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the DIP Orders.<br><br><u>See</u> DIP Loan Agreement, Section 2 |
| **Adequate Protection**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(ii)* | The Prepetition Secured Parties are entitled to receive adequate protection against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral).<br><br><u>See</u> Interim Order, Recital G<br><br><u>Adequate Protection Liens and Superpriority Claims</u>.  The Prepetition Secured Parties are entitled, *nunc pro tunc* to the Petition Date, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate Diminution in Value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral from and after the Petition Date.  On account of such adequate protection claims, the Prepetition Secured Parties are granted the following liens—which are subordinate to the Carve-Out (collectively, the "<u>Adequate</u> |

Protection"):

a. <u>Prepetition Term Loan Adequate Protection Liens</u>.  Upon entry of the Interim Order, the Prepetition Term Loan Secured Parties are granted valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "<u>Prepetition Term Loan Adequate Protection Liens</u>"), which are subject to certain priorities established in the Interim Order, and which liens shall:

    (i)    be subject and subordinate to the Carve-Out, the DIP Liens and certain existing permitted liens that had priority over the Prepetition Liens as of the Petition Date and are non-avoidable;

    (ii)    be senior to all other security interests in, liens on, or claims against the Prepetition Term Loan Priority Collateral, whether now existing or hereafter arising or acquired;

    (iii)    be junior to the security interests in, liens on, and claims against the ABL Priority Collateral, whether now existing or hereafter arising or acquired, of the Prepetition ABL Secured Parties, including on account of the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Secured Parties; and

    (iv)    be pari passu with the Prepetition ABL Adequate Protection Liens (as defined below) with respect to all assets of the Debtors that are unencumbered as of the Petition Date.

b. <u>Prepetition ABL Adequate Protection Liens</u>.  Upon entry of the Interim Order, the Prepetition ABL Secured Parties are granted valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "<u>Prepetition ABL Adequate Protection Liens</u>"), which are subject to certain priorities established in the Interim Order, and which liens shall:

    (i)    be subject and subordinate to the Carve-Out (to the extent of the Carve-Out Reserve), DIP Liens on the Term Loan Priority Collateral and certain existing permitted liens that had priority over the Prepetition Liens as of the Petition Date and are non-avoidable;

    (ii)    be senior to all other security interests in, liens on, or claims against the ABL Priority Collateral, whether now existing or hereafter arising or acquired;

    (iii)    be junior to the security interests in, liens on, and claims against the Term Loan Priority Collateral, whether now existing or hereafter arising or acquired, of the Prepetition Term Loan Secured Parties, including on account of the Prepetition Term Loan Adequate Protection Liens granted to the Prepetition Term Loan Secured Parties; and

    (iv)    pari passu with the Prepetition Term Loan Adequate Protection Liens with respect to all assets of the Debtors that are unencumbered as of the Petition Date.

|  | c.  Adequate Protection Superpriority Claims.  The Prepetition Secured Parties are granted allowed superpriority administrative expense claims (the "Adequate Protection Superpriority Claims"), which Adequate Protection Superpriority Claims shall be allowed claims against each of the Debtors (jointly and severally), with priority (except as otherwise provided in the DIP Orders) over any and all administrative expenses and all other claims against the Debtors, other than the DIP Superpriority Claim, now existing or hereafter arising, and all other administrative expenses or other claims, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.  The Adequate Protection Superpriority Claims shall be *pari passu* with each other and be payable from and have recourse to all pre- and post-petition property of the Debtors, subject and subordinate to the Carve-Out and the priorities set forth in the Interim Order.<br><br>Adequate Protection Payments for Prepetition ABL Secured Parties. Prepetition ABL Secured Parties consented to the Interim Order and are entitled to adequate protection of the interests of the Prepetition Secured Parties in the Prepetition ABL Collateral.<br><br>Fees and Expenses.  The Prepetition Secured Parties shall be entitled to payment of all reasonable and documented fees and out-of-pocket expenses incurred by such Prepetition Secured Parties that are required to be paid by the Debtors under the Prepetition Loan Documents (but no more than one set of primary counsel for each of the Prepetition ABL Secured Parties (as a whole) and the Prepetition Term Loan Secured Parties (as a whole), including, without limitation, all pre- and postpetition reasonable and documented fees and out-of-pocket expenses of the Prepetition ABL Professionals (as defined in the Interim Order) (and together with the Prepetition Term Loan Professionals, the "Adequate Protection Professionals" and such fees and expenses, collectively, the "Adequate Protection Professional Fees and Expenses").  Debtors obligation to pay Adequate Protection Fees and Expenses is limited to the extent provided in the Approved Budget.<br><br>See Interim Order, Section 4.1, 4.2 and 4.3 |
|---|---|
| **Waiver of Marshaling Doctrine and Equities of Case Exception**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | The Final Order will provide for the waiver of the "marshalling" doctrine and the "equities of the case" exception set forth in section 552(b) of the Bankruptcy Code.<br><br>See Interim Order, Section 4.22 |
| **Modification of Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | The automatic stay under Bankruptcy Code § 362 is modified to the extent necessary to permit the Debtors and each of the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, to perform any act authorized by the Interim Order, the DIP Loan Agreement, or the other DIP Loan Documents.<br><br>See Interim Order, Section 4.6 |

| | |
|---|---|
| **Modification of Authority to file a Plan**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(v)* | Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the sale without the DIP Agent's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Cases, or otherwise, that does not provide for payment in full in cash of the Obligations and the obligations under the Prepetition ABL Facility, the obligations under the Prepetition Term Loan Facility and termination of the DIP Lenders' commitment to make DIP Loans —will result in an Event of Default.<br><br>See DIP Loan Agreement, section 16(I) |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | Indemnification by Borrower to DIP Agent and DIP Lenders: The Borrower shall indemnify and hold harmless the DIP Agent and the DIP Lenders (and their respective affiliates, officers, directors, employees, attorneys, agents and representatives) (collectively, the "Indemnified Persons"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and other costs) that may be instituted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under the DIP Loan Documents; absent the Indemnified Person's gross negligence or willful misconduct as determined by a court of competent jurisdiction. However, no Indemnified Person shall be responsible or liable to any other party to any DIP Loan Document, any successor, assignee or third party beneficiary of such person or any other person asserting claims derivatively through such party, for indirect, punitive, exemplary or consequential damages that may be alleged as a result of credit having been extended, suspended or terminated under any DIP Loan Document or as a result of any other transaction contemplated hereunder or thereunder.<br><br>See DIP Loan Agreement, Section 9(a)<br><br>Borrower's Indemnification for Indemnified Taxes:  The Borrower shall indemnify the DIP Agent and DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the DIP Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the DIP Agent or any DIP Lender's overall net income.  Payment under this indemnification shall be made upon demand.<br><br>See DIP Loan Agreement, Section 10 |
| **Challenge Period**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Consistent with Local Rule 4001-2(a)(i)(B), the Debtors' Stipulations shall be binding on all entities (as defined in the Bankruptcy Code), including without limitation, each and every creditor and party in interest, including, without limitation, the Committee (if any), unless, and solely to the extent that (a) any such creditor or party in interest, including the Committee (if any), with standing and requisite authority has timely commenced an adversary proceeding or other appropriate contested matter (subject to the limitations |

21

| | |
|---|---|
| | contained herein, including, *inter alia*, in this Section 5.10) by no later than (i) with respect to the Prepetition Term Loan Lenders, the earliest of (A) if no Committee has been appointed, 75 calendar days from the date of entry of this Interim Order, (B) if a Committee has been appointed, 60 calendar days after the date of formation of such Committee, (ii) with respect to the Prepetition ABL Secured Parties, the earliest of (A) the date on which they are requested to release their liens following the discharge of the Prepetition ABL Obligations and (B) 35 days after the Petition Date, and (iii) any such later date as has been agreed to, in writing, without further order of the Court by the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable (such time period established by the foregoing clauses (i) and (ii), the "Challenge Period"). <br><br> See Interim Order, Section 5.10 |
| **Section 506(c) Waiver** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(x)* | Subject to the entry of a Final Order, no chapter 11 administrative costs or expenses shall be charged against the DIP Agent, DIP Lenders, or Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Obligations or the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget). <br><br> See Interim Order, Section 5.21 |
| **Lien on Avoidance Actions** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(xi)* | Upon the entry of the Final Order, DIP Lien shall attach to and the DIP Superpriority Claims may be paid out of avoidance action proceeds. <br><br> See Interim Order, Section 2.5 |
| **Budget** <br><br> *Bankruptcy Rule 4001(c)(1)(B)* | The Initial Budget, reflecting the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the sixth calendar week following the Petition Date (the Initial Budget and each subsequent budget approved by the DIP Lenders and the Prepetition Secured Parties then in effect, an "Approved Budget"). The Approved Budget shall be updated by the Debtors (with the consent and/or at the reasonable request of the DIP Agent, the Prepetition ABL Agent and the Prepetition Term Loan Agent) from time to time in accordance with the DIP Documents. <br><br> See Interim Order, Section F, 5.8. |
| **Reporting Information** <br><br> *Bankruptcy Rule 4001(c)(1)(B)* | on Friday of each week beginning with the first full calendar week after the Petition Date | (a) a weekly DIP variance report/reconciliation for the prior week and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts, (B) disbursements, (C) net operating cash flow, (D) outstanding loans under the Prepetition ABL Facility, (E) Term Loan balances and |

| | |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)* | with the Approved Budget except to the extent of any Permitted Variance, which shall mean: a negative variance of up to 10% between the actual net cash flow for the Applicable Testing Period and the "Net Cash Flow" line item as set forth in the Budget for the Applicable Testing Period. <br><br> <u>See</u> DIP Loan Agreement, Section 14(g), Section 18 |

## <u>Highlighted Provisions Under Local Rule 4001-2(a)(1)</u>

25.     The Interim Order includes certain terms that constitute material provisions requiring explicit disclosure under the Local Rules.[5]  The provisions described in Local Rule 4001-2(a)(i), to the extent applicable, are set forth at the following sections of the Interim Order:

a.     **Local Rule 4001-2(a)(i)(A) – Cross-Collateralization.** N/A.  The DIP Facility does not contemplate a roll-up of any Prepetition Obligations.

b.     **Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Liens**.  Subject to challenge, the liens and security interests of the Prepetition Secured Parties are stipulated to be valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order, but subject to Challenge.  *See* Interim Order ¶ 5.10.

c.     **Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver.**  Subject to the entry of a Final Order, no chapter 11 administrative costs or expenses shall be charged against the DIP Agent, DIP Lenders, or Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Obligations or the DIP Collateral or the Prepetition Collateral, without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion (including, without limitation, consent to the Carve-Out or the approval of any budget).  *See* Interim Order ¶ 5.21.

d.     **Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions.**  Subject to the entry of a Final Order, the DIP Liens shall attach to any proceeds or property recovered in respect of any avoidance actions.  *See* Interim Order ¶ F(v).

e.     **Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt.**  N/A.

f.     **Local Rule 4001-2(a)(i)(F) – Disparate Treatment of Professionals Retained by the Committee.** The Interim Order contains a provision that

---

[5]     While the Debtors have attempted to highlight the provisions required by the Bankruptcy Rules and Local Rules, as well as certain other material provisions, the Debtors reserve the right to supplement this list at the hearing to consider this Motion on an interim basis.

provides for disparate treatment for professionals retained by a creditors' committee, if any, with respect to the Carve Out.  *See* Interim Order ¶¶ 5.9(b).

g.  **Local Rule 4001-2(a)(i)(G) – Non-Consensual Priming.**  N/A.

h.  **Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case.**  Upon entry of the Final Order, neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equities of the case under section 552(b) or the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.  *See* Interim Order ¶¶ 5.22; 5.24.

## BASIS FOR RELIEF

I.    **The Dip Facility Should Be Approved**.

   A.    **Entering into the DIP Financing Documents Is an Exercise of the Debtor's Sound Business Judgment**.

26.    The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and use Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

27.      Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

28.      Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the debtor offered by a proposed postpetition facility.

29.      The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms'-length process and careful evaluation of their lack of alternatives.  Specifically, and in the face of limited cash on hand and availability under the Prepetition ABL Loan Documents, the Debtors and their advisors determined that the Debtors will require postpetition financing and use of Cash Collateral to support their liquidation activities to maximize the value of their Estates.  The DIP Agent and DIP Lenders were the only parties

willing to provide financing to the Debtors.  Accordingly, the Debtors negotiated the DIP Loan Documents with the DIP Agent and DIP Lenders in good faith, at arms'-length, and with the assistance of their advisors.  The Debtors believe that they have obtained the best and only financing available.  Entry into the DIP Facility is in the best interests of the Debtors' Estates and is an exercise of the Debtors' sound business judgment and should be approved.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

30.    The Debtors propose to obtain financing under the DIP Facility, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide the DIP Lenders with (a) a valid and perfected security interest in and lien upon all of the Debtors' current or future (i) assets constituting Prepetition Collateral, (ii) any assets of the Debtors that, as of the Petition Date, were not otherwise subject to a valid, perfected, enforceable, and unavoidable security interest, including any assets comprising Excluded Collateral (under any of the Prepetition Loan Documents), (b) fully consensual priming of the Prepetition Liens on the Term Priority Collateral, and (c) the Prepetition Secured Parties with DIP Superpriority Claims as adequate protection.

31.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim; (ii)

the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and proposed lenders. *See In re L.A. Dodgers LLC*, 457 B.R. at 312 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. at 549.

32.     As described above and as set forth in the First Day Declaration, the Debtors are in need of an immediate capital infusion, yet substantially all of the Debtors' operating assets are encumbered under their existing capital structure. Moreover, none of the existing creditors or strategic partners were willing to provide post-petition financing to the Debtors on an unsecured basis or, in fact, on any basis that would not have involved a non-consensual priming.  In light of the foregoing, the Debtors, in consultation with their advisors, have concluded that the success of the Cases hinges on whether any DIP Financing had the support of, or could be provided by, the Prepetition Secured Parties.

33.     Without DIP Financing, the Debtors lack sufficient funds to operate their businesses, continue paying their debts as they come due, pursue the sale of their assets, or cover the projected costs of the Cases. Absent the DIP Facility, which will provide the Debtors with sufficient liquidity to administer the their estates in an organized chapter 11 wind-down process, the value of the Debtors' estates would be significantly impaired to the detriment of all creditors and stakeholders.  Given the current circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are fair, reasonable and adequate. For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

**C.     The DIP Financing is Necessary to Preserve the Value of the Debtors' Estates.**

34.     Debtors have liquidity needs and require financing to fund the administration of the bankruptcy cases.  Among the Debtors' most valuable assets are their real estate interests, tractors,

28

trailers, and other equipment.  As noted in the First Day Declaration, the Debtors intend to wind

down their operations as of Monday, December 9, 2019.  Without funding to marshal back the

Debtors' valuable trucks, trailers, and other equipment, it could be left on the side of road ways or

at other unsecure locations, and subject to vandalism, theft, or other destruction.  In addition,

through the Cases, the Debtors will work to recover assets of the estates, cooperate with equipment

lessors and financiers to recover their property and sell substantially all of their assets, and resolve

all claims in an efficient and cost-effective manner.

35.     The Debtors require access to the DIP Facility to be able to continue to effectively

and safely wind down the Debtors' operations and pay their administrative expenses as they

become due.  This relief will enable the Debtors to liquidate their estates in a manner that will

maximize value for all parties in interest and avoid immediate and irreparable harm.

**D.      The Terms of the DIP Financing are Fair**, **Reasonable**, **and Appropriate.**

36.     After appropriate investigation and analysis, the Debtors have concluded that the

DIP Financing presents the best route available under the circumstances.  Bankruptcy courts

routinely defer to a debtor's business judgment on substantive business decisions, including the

decision to borrow money, unless such decisions fail the arbitrary and capricious standard.  *See*

*Ames*, 115 B.R. at 40 (court should approve borrowings pursuant to § 364(c) and (d) if the debtor

was within its business judgment); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58–59 (Bankr.

N.D.N.Y. 2005) (same); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D.

Del. 1994) (noting that approval of an interim loan, receivables facility, and asset-based facility

"reflect[ed] sound and prudent business judgement... [was] reasonable under the circumstances

and in the best interest of [the debtor] and its creditors.").  Indeed, "more exacting scrutiny would

slow the administration of the Debtor's estate and increase its cost, interference with the

Bankruptcy Code's provision for private control of administration of the estate and threaten the

court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (*citations omitted*).

37.     The terms and conditions of the DIP Financing are fair and reasonable.  As discussed above, the Debtors properly assessed their financing needs and the DIP Financing proposal, and in the sound exercise of the Debtors' business judgment, the DIP Financing represents the best option available under the circumstances.

38.     The proposed DIP Financing subjects the security interests and secured claims of the DIP Agent and DIP Lenders to the Carve-Out, thereby ensuring that, in the event of a default under the DIP Loan Agreement, the Debtors' estates and other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in these Cases.  In *Ames*, the Court found such carve-outs for professional fees not only reasonable, but necessary to ensure that official committees and the debtors' estate could retain assistance from counsel. *See Ames*, 115 B.R. at 38–40 ("Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

39.     Likewise, the DIP Milestones are a crucial element of the terms of the DIP Financing, and their inclusion in the Interim Order is important to ensure that these Cases proceed in a strategic, value-maximizing fashion.  In similar contexts, other courts in this district have entered interim financing orders that included express milestones for the progress of a debtor's case. *See, e.g. In re Horsehead Holding,* Case No. 16-10287 (CSS) (Bankr D. Del. Feb. 2, 2016) (approving case milestones in interim DIP financing order); *In re Verso Corporation*, Case No. 16-10163 (KG) (Bankr. D. Del Jan. 27, 2016); *In re Cal Dive International,* Case No. 15-10458 (CSS) (Bankr. D. Del March 9, 2015) (interim order approving DIP financing with case milestones); *In re ADI Liquidation, Inc. (f/k/a AWI Delaware, Inc.)*, Case No. 14-12092 (KJC)

(Bankr. D. Del. Sept. 9, 2014) (interim DIP financing order with case milestones); *In re Handy Hardware Wholesale, Inc.*, Case No. 13-10060 (MFW) (Bankr. D. Del Jan. 14, 2013) (approving case milestones in interim DIP financing order).  Thus, for these reasons and the reasons set forth above, the DIP Facility should be approved.

> ### E.    The Use of Cash Collateral is Appropriate.

40.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) provides that:

> The trustee may not use, sell or lease cash collateral... unless—
>
> > (A)    each entity that has an interest in such collateral consents; or
> >
> > (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.

41.    Prior to the Petition Date, the Debtors' Cash Collateral, in the form of their U.S. bank accounts collecting Accounts Receivable, was encumbered by the Prepetition ABL Lender. Prior to the Petition Date, funds from the Debtors' accounts receivable (from U.S. operations only) would sweep to Prepetition ABL Lender, which had a security over such cash collateral.  However, under the terms of the DIP Facility, the Prepetition ABL Agent shall remit to the Debtors (pursuant to wire instructions provided by the Debtors), Cash Collateral in an amount set forth in the Interim Order.

42.    Prior to the Petition Date, the Debtors relied on cash on hand, cash generated from their operations, asset sales, and most importantly, from the funds provided under the Prepetition Loans Agreements.  During these Cases, the Debtors will need access to their Cash Collateral (as well as the DIP Facility) to satisfy various critical administrative obligations, as well as to make

any other payments that are essential for the orderly wind down of the Debtors' business and to effectuate the Debtors' chapter 11 goals.  An inability to use funds during these Cases could severely impact the success of these Cases.  Indeed, without access to Cash Collateral, the Debtors and their estates will suffer immediate and irreparable harm.  Accordingly, the Debtors respectfully submit that the use of Cash Collateral is fully consensual, is in the best interests of the Debtors' estates and should be approved.

**F.      Modification of the Automatic Stay is Appropriate.**

43.      Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Loan Documents require a modification of the automatic stay to implement the terms of the DIP Financing.

44.      Stay modification provisions of this kind are ordinary and standard features of postpetition DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available.  Further, the Debtors have not been able to obtain DIP financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Financing, including the modification of stay provisions, are fair and reasonable, and were negotiated in good faith and at arms' length by parties represented by sophisticated counsel. Accordingly, in light of the circumstances and the material benefits afforded to the Debtors by the DIP Financing, the modification of the automatic stay is warranted and appropriate.

**G.      The Section 506(c) and 552(b) Waivers are Appropriate.**

45.      The Court should approve the Debtors' waivers of any right to surcharge any or all of the Prepetition Secured Parties or the DIP Lender, their respective claims, or their respective collateral and to invoke the "equities of the case" exception of section 552(b).  Agreeing to the

waivers allowed the Debtors to obtain critical financing under the DIP Facility.  Further, such waivers and provisions are standard and customary under financings between sophisticated parties.  As one court noted in discussing such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estate (including a substantial Carve Out for the benefit of administrative creditors)." *In re Molten Metal Tech., Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000); *see also Ansel Props., Inc. v. Nutri/Sys. of Fla. Assocs. (In re Nutri/Sys. of Fla. Assocs.)*, 178 B.R. 645, 649 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing).  In *In re Towne, Inc.* in 2013, the Third Circuit denied surcharge in the absence of an explicit waiver, indicating that the Bankruptcy Code's surcharge provisions are to be interpreted narrowly. *See* No. 12-3069, at *7–8 (3d Cir. Aug. 29, 2013).

### H.      A Final Hearing Should be Set.

46.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing as soon as practicable, but in no event later than thirty (30) days following the Petition Date.

47.      The Debtors request authorization to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties set forth below.  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

48.      Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one (21) days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."

49.     For the reasons discussed above, (a) authorizing the Debtors to obtain postpetition secured financing under the DIP Facility, (b) granting (i) liens and superpriority administrative expense claims and (ii) authorizing the Debtors to use Cash Collateral, (c) granting adequate protection to the Prepetition Secured Parties, (d) scheduling a Final Hearing, and (e) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Facility, as well as granting the other relief requested herein, is integral to the Debtors' ability to transition their operations into these Cases.

50.     Failure to receive such authorization and other relief during the first twenty-one (21) days of these Cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their businesses in the ordinary course and maximize the value of their estates for the benefit of all stakeholders.   Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## WAIVER OF BANKRUPTCY RULE 6004(a)

51.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a).

52.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent potentially irreparable damage to the Debtors' chapter 11 wind down efforts,

and ability to preserve, generate and recover value for the benefit of their estates and creditors. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Rule 6004(h) of the Bankruptcy Rules, to the extent it applies.

## RESERVATION OF RIGHTS

53.     Nothing contained herein is intended or should be construed as an admission regarding the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or policy under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

54.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the parties included on the Debtors' consolidated list of fifty (50) largest unsecured creditors; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) Schulte Roth & Zabel LLP, counsel to Blue Torch Finance, LLC; (vii) Landis Rath & Cobb, local counsel to Blue Torch Finance, LLC;  (viii) counsel to Luminus Energy Partners Master Fund, Ltd.; (ix) Goldberg Kohn Ltd., counsel to MidCap Funding IV Trust; (x) Morris, Nichols, Arsht & Tunnell, as local counsel to MidCap Funding IV Trust; (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (xii) any other party in interest entitled to notice of this Motion.  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion, and (ii) grant such other and further relief as the Court may deem just and proper.

Dated:  December 9, 2019
            Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
Matthew S. Sarna (DE 6578)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile:  (302) 394-2341
Email: stuart.brown@us.dlapiper.com
           matthew.sarna@us.dlapiper.com

-and-

Richard A. Chesley (*pro hac vice* admission pending)
Jamila Justine Willis (*pro hac vice* admission pending)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
Email: richard.chesley@us.dlapiper.com
           jamila.willis@us.dlapiper.com

*Proposed Counsel to the Debtors*

## Exhibit A

**(Proposed Interim Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELADON GROUP, INC., *et al.*,[1] | ) | Case No. 19-_____(   ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | **Related Docket No. __** |

## INTERIM ORDER PURSUANT TO
## 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, AND 507
## (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED
## SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND
## SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (B) ADEQUATE
## PROTECTION TO CERTAIN PREPETITION LENDERS; (III) AUTHORIZING USE
## OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY;
## (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors-in-possession

(collectively, the "<u>Debtors</u>") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2),

364(c)(3), [364(d)], 364(e), 503 and 507 of title 11 of the United States Code (the "<u>Bankruptcy</u>

<u>Code</u>"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as

amended, the "<u>Bankruptcy Rules</u>"), and Rules 4001-2 of the Local Bankruptcy Rules (the "<u>Local</u>

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); Vorbas, LLC (8936). The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Rules") for the United States Bankruptcy Court for the District of Delaware (this "Court"), *inter alia*, requesting, among other things:

(1)      authorization for the Debtors to obtain up to $8.25 million (the "DIP Commitment") in senior secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to (and in accordance with the terms of) that certain *Debtor-In-Possession Secured Multi-Draw Term Promissory Note*, by and among the Celadon Group, Inc., as the borrower, Blue Torch Finance LLC ("Blue Torch"), as agent (in such capacity, the "DIP Agent"), and the lenders party thereto from time to time (the "DIP Lenders," and, together with the DIP Agent, the "DIP Secured Parties,"), on the terms and conditions substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Loan Agreement," and the DIP Loan Agreement, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and the Final Order, collectively, the "DIP Loan Documents"), which DIP Facility shall be available as term loans (the "DIP Loans") to the Borrower and the other Debtors upon entry of this interim order (the "Interim Order") and satisfaction of the other conditions set forth in the DIP Loan Documents in an initial amount not to exceed $__ million (the "Initial DIP Loan"), and the remainder of the DIP Facility available upon entry of the Final Order and satisfaction of the other conditions set forth in the DIP Loan Documents;

(2)      authorization for the Borrower and the other Debtors to enter into the DIP Loan Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents;

(3)      authorization for the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without

2

limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, including, without limitation, any and all obligations in connection with any interest rate, currency swap, or other hedging agreement or arrangement, in each case, to the extent constituting obligations of any kind under the DIP Loan Documents (such obligations, the "DIP Obligations") subject to the terms of this Interim Order;

(4)      authorization for the Debtors, immediately upon entry of this Interim Order, to use proceeds of the Initial DIP Loan as expressly provided in the DIP Loan Documents and solely in accordance with this Interim Order and the applicable Approved Budget (as defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to: (A) pay costs, premiums, fees, and expenses incurred to administer or related to the above-captioned cases (collectively, the "Cases") or in connection with the DIP Facility; and (B) provide financing for working capital and for other general corporate purposes of the Debtors in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents);

(5)      granting and approving superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations, subject to the Carve-Out (as defined below) and Permitted Liens (defined below);

(6)      granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below),

including, without limitation, all property constituting Prepetition Collateral (as defined below), including, without limitation, any Cash Collateral (as that term is defined in section 363(a) of the Bankruptcy Code and defined below), to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth herein;

(7)       authorizing the Debtors to use, among other things, solely in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and the limitations provided herein, any Cash Collateral in which any of the Prepetition Secured Parties (as defined below) may have an interest, and granting adequate protection to the Prepetition Secured Parties solely to the extent of any postpetition diminution in the value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral, including without limitation, the Cash Collateral, as a result of (i) the incurrence of the DIP Obligations, (ii) the Debtors' use of Cash Collateral as set forth in this Interim Order, (iii) the subordination of the Prepetition Secured Obligations to the Carve-Out (but, with respect to the Prepetition ABL Secured Parties, solely to the extent of the amount of the Carve-Out Reserve), (iv) any other diminution in value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral arising from the Debtors' use, sale, or disposition of such Prepetition Collateral or the proceeds thereof, (v) the priming of the Prepetition Liens to the extent set forth herein, and (vi) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "Diminution in Value");

(8)       the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(9)    waiving the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and, subject to entry of a final order granting the relief requested in the Motion on a final basis (the "Final Order"), (a) the Prepetition Collateral, and (b) any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(10)    this Court waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(11)    scheduling a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

(12)    granting the Debtors such other and further relief as is just and proper.

The interim hearing on the Motion having been held by this Court on December __, 2019 (the "Interim Hearing"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the First Day Declaration; any exhibits in connection with the foregoing, and the filings and pleadings in these Cases, the Court having found that the interim relief requested in the Motion is fair and reasonable and is in the best interests of the Debtors, the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), their stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the [continued operation of the Debtors' businesses] and the preservation of the value of the Debtors' Estates; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; and appropriate notice of the Motion, the interim relief requested therein, and the Interim Hearing (the "Notice") having been given under the

circumstances; and the Notice having been served by the Debtors in accordance with Bankruptcy

Rules 4001 and 9014 and the Local Rules on the Notice Parties; and the opportunity for an interim

hearing on the Motion was appropriate and no other notice need be provided; and all objections, if

any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the

Court; and after due deliberation and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.   <u>Petition Date</u>.  On December 8, 2019 (the "<u>Petition Date</u>"), each Debtor filed a

voluntary petition (each, a "<u>Petition</u>") under chapter 11 of the Bankruptcy Code.  The Debtors

continue to manage their business and properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  No chapter 11 trustee or examiner has been

appointed in any of the Cases.

B.   <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these Cases, the Debtors,

property of the Debtors' Estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended

Standing Order of Reference from the United States District Court for the District of Delaware*,

dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), the Debtors consent to

the entry of a final judgment or order with respect to the Motion if it is determined that this Court,

absent consent of the parties, cannot enter final orders or judgments consistent with Article III of

the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

EAST\170823250.1

and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 9013 and 9014 and Local Rules 7007-1, 9013-1, 9013-4, and 9014-2.

C.    Committee Formation.  As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "Committee") or any other statutory committee has been appointed in the Cases.

D.    Notice.  The Notice was given in the manner described in the Motion.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing, and the relief granted under this Interim Order constitutes sufficient notice and the Notice complies with Bankruptcy Rule 4001 and the Local Rules.

E.    Parties' Acknowledgments, Agreements, and Stipulations.  In requesting the DIP Facility and use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lenders and the Prepetition Secured Parties to agree to provide, or consent to, the DIP Facility, the use of Cash Collateral, and subordination of the Prepetition Liens to the Carve-Out or the Carve-Out Reserve, as provided herein, and as a condition to providing financing under the DIP Facility and consenting to the use of Cash Collateral as set forth in this Interim Order, subject to the rights of any committee appointed in these Cases or other parties in interest (other than the Debtors) set forth in Section 5.10 of this Interim Order, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as follows:

(i)    Prepetition ABL Facility.  Celadon Group, Inc. and certain subsidiaries thereto, as borrowers, (such parties, collectively, the "Prepetition ABL Obligors"), the lenders from time to time party thereto (collectively, the "Prepetition ABL Lenders"), and MidCap Funding IV Trust, a Delaware statutory trust ("MidCap"), as successor by assignment from

MidCap Financial Trust, as administrative agent (in such capacity, the "Prepetition ABL Agent" and, together with the Prepetition ABL Lenders, the "Prepetition ABL Secured Parties"), are parties to that certain Credit and Security Agreement, dated as of July 31, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement," and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition ABL Secured Parties, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition ABL Loan Documents").  Pursuant to the Prepetition ABL Loan Documents, the Prepetition ABL Secured Parties provided the Prepetition ABL Obligors with an asset-based credit facility (the "Prepetition ABL Facility") with $60.0 million of maximum aggregate availability, subject to a borrowing base (as reduced by reserves), as set forth in the Prepetition ABL Credit Agreement. As of the Petition Date, the Prepetition ABL Obligors are liable for payment of the Prepetition ABL Obligations (as defined below) in an amount not less than $32,461,556.99, inclusive of accrued and accruing interest, fees, costs, expenses and other amounts accrued and accruing pursuant to the Prepetition ABL Loan Documents (all such indebtedness or obligations under the Prepetition ABL Loan Documents, including all "Obligations" as defined in the Prepetition ABL Credit Agreement and all interest, fees, costs, expenses and other amounts accrued and accruing thereon, herein referred to as the "Prepetition ABL Obligations").  The Prepetition ABL Obligations are secured by (a) first priority security interests in and liens on the ABL Priority

EAST\170823250.1

Collateral as such term is defined in the Prepetition Intercreditor Agreement[4] (the "ABL Priority Collateral"); and (b) second priority security interests in and liens on the Term

Priority Collateral as such term is defined in the Prepetition Intercreditor Agreement[5] (the "Term

---

[4]   "ABL Priority Collateral" shall mean all of the following assets that constitute Collateral, whether now owned or hereafter acquired (including any of the following assets acquired or created after the commencement of any Insolvency or Liquidation Proceeding) and wherever located:

(a)   all Accounts (other than Accounts arising under agreements for the Disposition of Term Priority Collateral);

(b)   all Chattel Paper (including all Electronic Chattel Paper and all Tangible Chattel Paper) to the extent evidencing, governing or otherwise relating to any of the items constituting ABL Priority Collateral under clause (a) above;

(c)   all Inventory (including, for the avoidance of doubt, Inventory that is or becomes branded, or produced through the use or other application of, any Intellectual Property);

(d)   all Deposit Accounts (other than any Asset Sale Proceeds Account) and all Money or other assets (including all cash equivalents), Financial Assets and Securities Entitlements contained in, or credited to, or arising from any such Deposit Accounts (in each case, except to the extent constituting identifiable Proceeds of Term Priority Collateral);

(e)   to the extent evidencing, governing, securing or otherwise relating to any of the items constituting ABL Priority Collateral under clauses (a) through (d) above, all General Intangibles and Intangibles (excluding Intellectual Property), Intercompany Indebtedness owing from a Mexican Subsidiary (to the extent such Mexican Subsidiary is not an ABL Obligor), an "Excluded Entity" or a "Dormant Subsidiary" (as each term is defined in the ABL Credit Agreement as in effect on the date hereof) to Celadon or a Subsidiary of Celadon that is an ABL Obligor and that arises from the sale or other disposition of ABL Priority Collateral or from the use of loan proceeds funded under the ABL Credit Agreement, Instruments (including Promissory Notes), Commercial Tort Claims, Documents and Documents of Title (in each case, except to the extent constituting identifiable Proceeds of Term Priority Collateral);

(f)   all collateral and guarantees given by any other Person with respect to any of the foregoing;

(g)   all insurance policies relating to ABL Priority Collateral (regardless of whether ABL Agent is the loss payee thereof) and all disbursements, payments of any claim and proceeds thereof, and 25% of all policies of business interruption insurance and proceeds thereof;

(h)   all Supporting Obligations (including Letter of Credit Rights) and all Proceeds of any of the foregoing, including Proceeds consisting of Commercial Tort Claims and Payment Intangibles arising from the Disposition or other collection of ABL Priority Collateral;

(i)   all books and Records to the extent relating to any of the foregoing; and

(j)   all Proceeds of each of the foregoing.

Notwithstanding the foregoing, the term "ABL Priority Collateral" shall not include any assets referred to in definition of "Term Priority Collateral".

[5]   "Term Priority Collateral" shall mean all of the following assets that constitute Collateral, whether now owned or hereafter acquired (including any of the following assets acquired or created after the commencement of any Insolvency or Liquidation Proceeding) and wherever located:

(a)   all Equipment and all real property and interests therein (including both fee and leasehold interests) and all Fixtures;

(b)   all Intellectual Property;

(c)   all Capital Stock and other Investment Property (other than Investment Property constituting ABL Priority Collateral);

(d)   except to the extent constituting ABL Priority Collateral, all Instruments, Documents and other General Intangibles and Intangibles (including goodwill, intercompany obligations between or among the Loan Parties (other than Accounts included as ABL Priority Collateral), databases, customer lists, and tax refunds);

(e)   except to the extent constituting ABL Priority Collateral under clause (h) of the definition of such term, all Commercial Tort Claims;

Loan Priority Collateral," together with the ABL Priority Collateral, the "<u>Prepetition Collateral</u>", and such liens and security interests in clauses (a) and (b), the "<u>Prepetition ABL Liens</u>").

        (ii)        <u>Prepetition Term Loan Facility</u>.  Celadon Group, Inc., as borrower, certain subsidiaries designated as "Guarantors" thereto (such parties, collectively, the "<u>Prepetition Term Loan Obligors</u>" and together with the Prepetition ABL Obligors, the "<u>Prepetition Obligors</u>"), the lenders from time to time party thereto (collectively, the "<u>Prepetition Term Loan Lenders</u>" and together with the Prepetition ABL Lenders, the "<u>Prepetition Lenders</u>"), and Blue Torch, as administrative agent (in such capacity, the "<u>Prepetition Term Loan Agent</u>" and, together with the Prepetition Term Loan Lenders, the "<u>Prepetition Term Loan Secured Parties</u>", and together with the Prepetition ABL Secured Parties, the "<u>Prepetition Secured Parties</u>"), are parties to that certain Second Amended and Restated Credit Agreement, dated as of July 31, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Term Loan Credit Agreement</u>" and together with any other related agreements, documents or security agreements, collectively, the "<u>Prepetition Term Loan Documents</u>" and collectively, the Prepetition Term Loan Documents and Prepetition ABL Loan Documents, the "<u>Prepetition Loan Documents</u>").  Pursuant to the Prepetition Term Loan Documents, the Prepetition Term Loan

---

(f)   all Asset Sale Proceeds Accounts and all Money, Financial Assets, Securities Entitlements or other assets contained in, or credited to, or arising from any such Asset Sale Proceeds Accounts (in each case, except to the extent constituting ABL Priority Collateral or identifiable Proceeds of ABL Priority Collateral);

(g)   all other Collateral not constituting ABL Priority Collateral;

(h)   all insurance policies relating to Term Priority Collateral (regardless of whether the Term Agent is the loss payee thereof) and all disbursements, payments of any claim and proceeds thereof, and 75% of all polices of business interruption insurance and proceeds thereof;

(i)   all collateral and guarantees given by any other Person with respect to any of the foregoing;

(j)   all Intercompany Indebtedness (which shall exclude, for the avoidance of doubt, Intercompany Indebtedness expressly set forth in clause (e) of the definition of the term "ABL Priority Collateral");

(k)   all Supporting Obligations (including Letter of Credit Rights) and all Proceeds of any of the foregoing;

(l)   all books and Records to the extent relating to any of the foregoing; and

(m)   all Proceeds of the foregoing.

Notwithstanding the foregoing, the term "Term Priority Collateral" shall not include any assets referred to in the definition of "ABL Priority Collateral".

Secured Parties provided the Prepetition Term Loan Obligors with term loan facilities in an aggregate principal amount of $105 million (the "Prepetition Term Loan Facility") and under which approximately $103.6 million in principal amount was outstanding as of the Petition Date, plus interest accrued and accruing at the rates set forth in the Prepetition Term Loan Credit Agreement (together with any other amounts outstanding under the Prepetition Term Loan Facility as provided in the Prepetition Term Loan Credit Agreement, including interest, fees, and expenses, the "Prepetition Term Loan Obligations" and together with the Prepetition ABL Obligations, the "Prepetition Obligations").  The Prepetition Term Loan Facility is secured by (a) first priority security interests in and liens on the Term Priority Collateral and (b) second priority security interests in and liens on the ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the "Prepetition Term Loan Liens" and, together with the Prepetition ABL Liens, the "Prepetition Liens").

(iii)    Prepetition Intercreditor Agreement.  MidCap, in its capacity as Prepetition ABL Agent, and Blue Torch, in its capacity as Prepetition Term Loan Agent, are parties to that certain Intercreditor Agreement, dated as of July 31, 2019 (the "Prepetition Intercreditor Agreement").  The Prepetition Intercreditor Agreement is a valid and enforceable "subordination agreement" under section 510(a) of the Bankruptcy Code and other non-bankruptcy applicable law and is, as of the Petition Date, binding on all parties thereto.  The DIP Loan Agreement and other DIP Loan Documents shall be and are subject to the terms of the Prepetition Intercreditor Agreement and the Prepetition Secured Parties hereby acknowledge and agree that the DIP Facility is a permitted Senior Priority DIP Financing, as such term is defined in the Prepetition Intercreditor Agreement.

(iv)    <u>Prepetition Obligations</u>.    The Prepetition Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of any insolvency laws), and no portion of the Prepetition Obligations owing to the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity. Upon entry of this Interim Order, for purposes of Sections 506(c), 507(b) and Fed. R. Bankr. P.  3012, as of the Petition Date, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties are oversecured; <u>provided</u>, however, that nothing in this Interim Order, the Motion, or the record of the Interim Hearing shall prejudice the rights of either the Prepetition ABL Agent's and any Prepetition ABL Lender or the Prepetition Term Loan Agent or any Prepetition Term Loan Lender to later assert, subject to the terms of the Prepetition Intercreditor Agreement, that their respective interests in the Prepetition Collateral lack adequate protection.

(v)    <u>Prepetition Collateral</u>.  To secure the Prepetition Obligations, the Debtors entered into certain guaranty and collateral agreements (the "<u>Guaranty</u>")[6] and certain other security documents governing the Prepetition Secured Parties' respective security interests in the Prepetition Collateral.  Pursuant to the Prepetition Collateral Documents, and on the terms set forth therein, the Debtors granted to the Prepetition Secured Parties the Prepetition Liens on the Prepetition Collateral.

---

[6]      A copy of that certain Guaranty, dated as of December 8, 2019, by each of the Guarantors, in favor of the DIP Agent for the benefit of itself, each DIP Lender, and each other holder of an Obligation under the DIP Loan Agreement, substantially in the form attached hereto as **Exhibit D** (the "<u>Guaranty</u>").

(vi)    <u>Prepetition Liens</u>.  The Prepetition Liens granted to the Prepetition Secured Parties constitute legal, valid, binding, enforceable (other than in respect of any insolvency law), and perfected security interests in and liens on the Prepetition Collateral, were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(vii)    <u>No Challenges/Claims</u>.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors and their Estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code) objections, challenges, causes of action, and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents.  The Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(viii)    Indemnity.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Prepetition Adequate Protection Liens (as defined below), and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, *provided* that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from such parties' gross negligence or willful misconduct.  No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph E(viii), in the Prepetition Loan Documents, or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders, as the case may be.

(ix)    Sale and Credit Bidding.  The Debtors admit, stipulate, acknowledge, and agree that, in connection with any sale process or sale authorized by the Court, (i) the DIP Agent and the DIP Lenders and (ii) subject to the entry of a Final Order and to the rights preserved in Section 5.10, the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties, or any assignee or designee of the foregoing, shall have the right to credit bid for the entirety of (or any portion of) of Prepetition Collateral pursuant to section 363(k) of the Bankruptcy Code,

subject in each case to the rights and duties of the parties under the Prepetition Intercreditor Agreement.

(x)   Release.  Subject to Section 5.10, each of the Debtors, their Estates, the Borrowers, the Guarantors, and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to the Prepetition Obligations or the Prepetition Loan Documents, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or common law, including, without limitation, any right to

15

assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the Prepetition Obligations, the Prepetition Loan Documents, or the Prepetition Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Prepetition Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Interim Order.

(xi)    ABL Cash Collateral.  The Debtors admit, stipulate, acknowledge, and agree that all of the cash of the Debtors, wherever located, and all cash equivalents, including any cash in deposit accounts, that either constitutes ABL Priority Collateral or which represents income, proceeds, products, rents or profits of other Prepetition ABL Priority Collateral, constitutes "cash collateral" of the Prepetition ABL Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "ABL Cash Collateral").

(xii)    Term Loan Cash Collateral.  The Debtors admit, stipulate, acknowledge, and agree that all of the cash of the Debtors, wherever located, and all cash equivalents, including any cash in deposit accounts, that constitutes identifiable proceeds of Term Loan Priority Collateral constitutes "cash collateral" of the Prepetition Term Loan Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Term Loan Cash Collateral," and, together with the ABL Cash Collateral, collectively the "Cash Collateral").

F.      Findings Regarding the Postpetition Financing and Use of Cash Collateral.

(i)    Postpetition Financing.  The Debtors have requested from each of the DIP Secured Parties, and the DIP Secured Parties are willing, subject to the terms of this Interim Order and satisfaction of the conditions set forth in the DIP Loan Agreement, to extend the DIP Loans

16

on the terms and conditions set forth in this Interim Order and the DIP Loan Documents, respectively.

(ii)    Need for Postpetition Financing and the Use of Cash Collateral.    The Debtors have an immediate and critical need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facility, in each case, as set forth in this Interim Order, in order to, among other things, to maintain, administer and preserve their businesses and maximize the value of their assets.  Without the ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties and the use of Cash Collateral as set forth in this Interim Order, the Debtors, their Estates, and parties-in-interest would be immediately and irreparably harmed. Accordingly, the Debtors have an immediate need to obtain the postpetition financing and to use Cash Collateral as set forth in this Interim Order to, among other things, minimize the disruption of their business operations and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates.

(iii)    No Credit Available on More Favorable Terms.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, or liens on property of the Estates not subject to a lien pursuant to sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors assert in the Motion, the First Day Declaration, [and in the ____ Declaration], and demonstrated at the Interim Hearing, that it would be futile under the circumstances for the Debtors to seek, and they would not obtain, the necessary postpetition financing, let alone  on terms more favorable, taken as a whole, than the financing offered by the DIP Secured Parties pursuant to the DIP Loan

Documents.  In light of the foregoing, and considering the futility of all other alternatives, the Debtors have reasonably and properly concluded, in the exercise of their business judgment, that the DIP Facility represents the best financing available to the Debtors at this time, and is in the best interests of the Debtors, their Estates, and all of their stakeholders.

(iv)    Budget.  The Debtors have prepared and delivered to the DIP Secured Parties and the Prepetition Secured Parties an initial budget (the "Initial Budget"), a copy of which is attached hereto as **Exhibit B**.  The Initial Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the [sixth] calendar week following the Petition Date (the Initial Budget and each subsequent budget approved by the DIP Lenders and the Prepetition Secured Parties then in effect, an "Approved Budget").  The Debtors believe that the Initial Budget is reasonable under the facts and circumstances.  The DIP Secured Parties and the Prepetition Secured Parties are relying upon the Debtors' agreement to comply with the terms set forth in the DIP Loan Documents, the Approved Budget, and this Interim Order in determining to enter into the postpetition financing arrangements provided for herein and to consent to the Debtors' use of Cash Collateral.

(v)     Certain Conditions to DIP Facility.  The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things:  (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the obligations thereunder, and to confer upon the DIP Secured Parties all applicable rights, powers, and remedies thereunder in each case as modified by this Interim Order; (b) the provision of adequate protection of the Prepetition Secured Parties' interests in the Prepetition Collateral pursuant to sections 361, 363, and 364 of the Bankruptcy Code; (c) the DIP Secured Parties being granted, as security for the prompt

18

payment of the DIP Facility and all other obligations of the Debtors under the DIP Loan Documents, subject to the Carve Out and Permitted Liens and the priorities described in **Exhibit C** annexed hereto, superpriority perfected security interests in and liens upon all property and assets of the Debtors, including, but not limited to, a valid and perfected security interest in and lien upon all of the now existing or hereafter arising or acquired: (i) assets constituting Prepetition Collateral, (ii) any assets of the Debtors that, as of the Petition Date, were not otherwise subject to a valid, perfected, enforceable, and unavoidable security interest, including any assets comprising Excluded Collateral (under any of the Prepetition Loan Documents) (collectively hereinafter referred to as the "DIP Collateral," and for avoidance of doubt, the DIP Collateral shall include, subject to the entry of the Final Order, the proceeds (the "Avoidance Proceeds") of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions")).

(vi)    Business Judgment and Good Faith Pursuant to Section 364(e).  Any credit extended, loans made, and other financial accommodations extended to the Debtors by the DIP Secured Parties, including, without limitation, pursuant to this Interim Order, have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facility, the DIP Liens, and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

G.    Adequate Protection.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to receive adequate protection against

any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral), to the extent set forth in this Interim Order.

H.    <u>Sections 506(c) and 552(b)</u>.  The Debtors have agreed as a condition to obtaining financing under the DIP Facility and the use of Cash Collateral as set forth in this Interim Order that as a material inducement to the DIP Secured Parties to agree to provide the DIP Facility and the Prepetition Secured Parties' consent to the use of Cash Collateral as set forth in this Interim Order, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out or the Carve-Out Reserve, as provided herein, and (c) the consensual use of Cash Collateral consistent with the Approved Budget, the terms of the  DIP Loan Agreement, and the terms of this Interim Order, each of the DIP Secured Parties (solely in their capacity as DIP Secured Parties) and, subject to entry of the Final Order, the Prepetition Secured Parties are entitled to receive (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.    <u>Good Cause</u>.  Good cause has been shown for the entry of this Interim Order.  The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' remaining operating businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their

20

assets.  The terms of the DIP Facility and this Interim Order are fair and reasonable, reflect each Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration.  The DIP Facility and this Interim Order are the product of reasonable, arm's length, good faith negotiations between the Debtors, the DIP Secured Parties and the Prepetition Secured Parties.

J.      <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  Any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

K.      <u>Interim Hearing</u>.  Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to the Notice Parties.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required for the relief to be granted in this Interim Order.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Section 1.      <u>Motion Approval</u>

1.1      <u>Interim Approval of Motion</u>.  The Motion is granted on an interim basis to the extent provided in this Interim Order.  Any objections to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein (except to the extent reserved to be presented at the Final Hearing), are hereby denied and overruled on the merits.

Section 2.      <u>DIP Facility Authorization</u>

21

2.1    <u>Authorization of DIP Facility</u>.

(a)    The Debtors are hereby authorized and empowered to immediately execute and deliver the DIP Loan Documents and to incur and perform the DIP Obligations, pursuant to the terms and conditions of the DIP Loan Agreement and this Interim Order, in an aggregate principal amount not to exceed [$8.25 million], which amount, for the avoidance of doubt, includes the Comdata DIP Payment (as defined below), with the Initial DIP Loan to be made upon entry of this Interim Order and satisfaction of other conditions set forth in the DIP Loan Documents.

(b)    The Debtors are hereby authorized to (i) borrow under the DIP Facility during the Interim Financing Period (as defined below) in accordance with, and for the purposes permitted by, the DIP Loan Documents, the Interim Order and the Approved Budget and (ii) except with respect to the Additional Fee (as such term is defined in the DIP Credit Agreement), which shall be subject to the entry of the Final Order, pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the DIP Loan Agreement and other DIP Loan Documents, all pursuant to the terms and conditions of this Interim Order, the DIP Loan Agreement, and the other DIP Loan Documents, in each case during the period commencing on the date of this Interim Order through and including the earlier to occur of (x) entry of the Final Order and (y) a DIP Termination Event (the "<u>Interim Financing Period</u>"); notwithstanding the foregoing, the Comdata DIP Payment, which was made prior to the commencement of the Interim Financing Period shall be deemed to be a DIP Obligation.  The Initial Budget is hereby approved in all respects.  The Debtors shall use the proceeds of the DIP Facility solely in a manner consistent with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and the terms and conditions of the DIP Loan Documents and this Interim Order.

(c)  On the Petition Date, the DIP Agent, on behalf of the DIP Lenders, made a payment on behalf of the Debtors to Comdata, a provider of gas cards and payroll services to the Debtors, in the amount of $[800,000] (the "Comdata DIP Payment") to (a) repay Comdata for $[400,000] in critical trade credit that it extended to the Debtors on December 7 and 8, 2019 in order to allow the Debtors' truck driver employees to continue to use their gas cards over the weekend and (b) pay $[400,000] of prepetition amounts accrued and owing by the Debtors to Comdata.  The Debtors needed the trade credit in order to (i) avoid stranding [hundreds] of their driver employees on the road over the weekend, (ii) allow for the delivery of loads already en route to their destination, which generated new receivables for the Debtors and avoided breach of contract claims and (iii) allow for an orderly marshaling and preservation of value of their tractors and trailers during the shut-down of operations.  Without the agreement to reduce Comdata's prepetition claims against the Debtors by an amount equal to the amount of trade credit extended to the Debtors over the weekend, Comdata was not willing to provide this critical trade credit to the Debtors.  All of the $[400,000] in trade credit provided by Comdata was utilized by the Debtors.  Starting on the Petition Date, Comdata has agreed to continue to provide the Debtors with payroll and gas card services for as long as they need such services as long as Comdata is paid in advance for all such services.

2.2  Financing Documents.

(a)  Authorization.  The Debtors are hereby authorized to enter into, execute, deliver, and perform all obligations under the DIP Loan Documents.  No obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or common  law (including, without limitation, under chapter 5 of the Bankruptcy

Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

(b)      <u>Approval; Evidence of Borrowing Arrangements</u>.   All terms, conditions, and covenants set forth in the DIP Loan Documents (including, without limitation, the DIP Loan Agreement) are approved.  All such terms, conditions, and covenants shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Agent, and the DIP Lenders, and (ii) each Debtor's assumption and adoption of, and agreement to comply with, all the terms, conditions, and covenants of the DIP Loan Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees, and other expenses, including, without limitation, all of the DIP Agent's and DIP Lender's closing, arranger, and administrative fees, consultant fees, professional fees, attorney's fees and legal expenses, as more fully set forth in the DIP Loan Documents.  Upon effectiveness thereof, the DIP Loan Documents shall evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in any of these Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

EAST\170823250.1

(c)     Payment of DIP Fees and Other Expenses.  Any and all fees and expenses payable pursuant to the DIP Loan Documents (collectively, any and all such fees and expenses, the "DIP Fees") are hereby approved and the Debtors are hereby authorized and directed to pay, currently in cash or as otherwise provided on the DIP Loan Documents and Approved Budget, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Agent and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents, Approved Budget and this Interim Order in accordance with Section 5.13 hereof; provided that proceeds of ABL Priority Collateral (other than Available Cash Collateral) shall not be used to pay any DIP Fees.  The DIP Fees shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

2.3     Indemnification.  The Debtors are authorized to indemnify and hold harmless the DIP Agent, each DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "Indemnified Party"), in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved; provided that proceeds of ABL Priority Collateral (other than Available Cash Collateral) shall not be used to pay any amounts on account of such indemnification.

2.4     Postpetition Liens.

(a)     Postpetition DIP Lien Granting.  To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever kind, nature, or description,

25

whether absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and are hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "DIP Liens") upon all DIP Collateral, subject to the rankings and priorities set forth in Section 2.4(b) below and as set forth on **Exhibit C** hereto.

(b)    DIP Lien Priority in DIP Collateral.  The DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided*, *however*, that the DIP Liens on (A) the ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject and subordinate to the Carve-Out, Permitted Liens (as such term is defined in the DIP Credit Agreement), the Prepetition ABL Liens, the Prepetition ABL Adequate Protection Liens; (B) the Term Loan Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject and subordinate to the Carve-Out and Permitted Liens; and (C) any unencumbered assets as of the Petition Date shall be subject and subordinate to the Carve-Out, in each case as such priorities are set forth in **Exhibit C**.

2.5    Superpriority Administrative Expenses.  Subject to the priorities set forth on **Exhibit C** and the Carve-Out, all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents, or otherwise, the DIP Agent, for the benefit of itself and the DIP Lenders, is granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all

26

other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim, the "DIP Superpriority Claim").

Section 3.    Use of Cash Collateral

3.1    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral as set forth in this Interim Order until the occurrence of a DIP Termination Event (as defined herein); provided, however, that during the Remedies Notice Period (as defined herein) the Debtors may use Available Cash Collateral solely to meet payroll obligations and pay expenses critical to the administration of the Debtors' Estates strictly in accordance with the Approved Budget, and as otherwise agreed by the Prepetition ABL Agent and the Prepetition Term Loan Agent, each in their sole discretion.

3.2    Procedure for Use of Cash Collateral.

(a)    Delivery of Cash Collateral to Postpetition Agent.  Promptly upon receipt thereof (and with respect to Cash Collateral in the Debtors' possession as of the Filing Date, within one (1) Business Day of the date that this Interim Order is entered), Debtors shall remit such Cash Collateral (other than identifiable proceeds of Term Priority Collateral and TA Dispatch) directly to Prepetition ABL Agent or shall deposit all Cash Collateral (other than

27

identifiable proceeds of Term Priority Collateral or TA Dispatch) now or hereafter in their possession or control into deposit accounts subject to a blocked account control agreement that remits amounts therein daily to the Prepetition ABL Agent (or otherwise deliver such ABL Cash Collateral to Prepetition ABL Agent in a manner satisfactory to Prepetition ABL Agent); provided that the Debtors shall be entitled to retain $[400,000] in Cash Collateral from cash on hand at the commencement of the case, which Cash Collateral may be used by the Debtors in accordance with the terms of this Interim Order.

(b)    Cash Collateral in Prepetition ABL Agent's Possession.  Prepetition ABL Agent is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its or any Prepetition ABL Lender's possession or control which constitute ABL Priority Collateral or proceeds thereof.  Prior to a DIP Termination Event, Prepetition ABL Agent will remit a portion of the Cash Collateral received by the Prepetition ABL Agent to the Debtors in accordance with paragraph 3.2(c) of this Interim Order and is authorized, subject to Section 5.10, to apply the balance of such Cash Collateral on the applicable Cash Collateral Remittance Date to permanently reduce the Prepetition ABL Obligations in accordance with the Prepetition ABL Loan Documents as adequate protection of the interests of the Prepetition ABL Secured Parties.

(c)    Remittance of Available Cash Collateral.    Commencing on December 17, 2019 (and on each Tuesday thereafter) (each, an "Eligibility Reporting Date"), the Debtors shall deliver to Prepetition ABL Agent information in form and substance acceptable to Prepetition ABL Agent that identifies the portion of the cash collections received by the Prepetition ABL Agent during the week ended as of the preceding Friday that constitutes Cash Collateral and further identifies the portion of the Cash Collateral received by the Prepetition ABL Agent as either

28

(i) proceeds of Eligible Accounts (as defined in the Prepetition ABL Credit Agreement), (ii) proceeds of Accounts (as defined in the Prepetition ABL Credit Agreement) that are not Eligible Accounts (the "Ineligible Accounts") or (iii) receivables belonging to TA Dispatch (such information, the "Eligibility Breakdown Information").  The Borrowing Base Certificate dated as of December 6, 2019 shall be used in allocating the Debtors' owned receivables between Eligible Accounts and Ineligible Accounts in order to calculate the Eligibility Breakdown Information as required pursuant to this Interim Order.  Commencing on December 18, 2019 (or such later date as the Debtors have provided Prepetition ABL Agent with Eligibility Breakdown Information satisfactory to Prepetition ABL Agent), and on each Wednesday (or Business Day thereafter if such Wednesday is not a Business Day) (each a "Cash Collateral Remittance Date"), Prepetition ABL Agent shall remit to the Debtors (pursuant to wire instructions provided by the Debtors), Cash Collateral in an amount equal to the sum of (x) five percent (5%) of the amount of Cash Collateral received by the Prepetition ABL Agent on account of Eligible Accounts, (y) fifty percent (50%) of the amount of Cash Collateral received by the Prepetition ABL Agent on account of Ineligible Accounts and (z) 100% of amount received by the Prepetition ABL Agent on account of TA Dispatch receivables, in each case during the immediately preceding week, less any amounts deducted on account of an post-petition fees or expenses allowed in accordance with Section 5.13 hereof.  The portion of such Cash Collateral to be remitted to the Debtors in accordance with this paragraph being referred to herein as the "Available Cash Collateral".

       3.3    **Application of Cash Collateral to Prepetition ABL Obligations**.  Except with respect to the Available Cash Collateral as set forth in the preceding paragraph 3.2(c), Prepetition ABL Agent at its election, is authorized to apply all Cash Collateral now or hereafter in Prepetition ABL Agent's or any Prepetition ABL Lender's possession or control to the payment

of all other Prepetition ABL Obligations in accordance with the Prepetition ABL Loan Documents. All such applications to Prepetition ABL Obligations shall be final, subject only to the right of parties in interest to seek a determination in accordance with Section 5.10 below that such applications to other Prepetition ABL Obligations resulted in the payment of any unsecured prepetition claim of the Prepetition ABL Secured Parties.

3.4     TA Dispatch Cash.  The Debtors collect certain receivables on behalf of TA Dispatch (the "TA Dispatch Receivables").  The TA Dispatch Receivables are not property of the Debtors' Estates.  The Debtors will segregate TA Dispatch Receivables and remit them to TA Dispatch on a weekly basis beginning the week of December 15, 2019 on each Cash Collateral Remittance Date.

3.5     Termination Date.  Unless extended by the Court upon the prior written agreement of Prepetition ABL Agent, upon the DIP Termination Date without further notice or order of Court: (1) Debtors' authorization to use Cash Collateral hereunder will automatically terminate; (2) Debtors shall be prohibited from using Cash Collateral for any purpose other than application to the Prepetition ABL Obligations; and (3) subject to Section 5.10 of this Order and the Prepetition Intercreditor Agreement, Prepetition ABL Agent and Prepetition ABL Lenders shall be entitled to apply any Cash Collateral coming into their possession or control to the Prepetition ABL Obligations in accordance with the Prepetition ABL Loan Documents.

Section 4.     Prepetition Secured Parties' Adequate Protection

4.1     Adequate Protection Liens and Superpriority Claims.  The Prepetition Secured Parties are entitled, pursuant to sections 361, and 363(e) of the Bankruptcy Code and *nunc pro tunc* to the Petition Date, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate Diminution in Value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral from and after

30

the Petition Date.  On account of such adequate protection claims, the Prepetition Secured Parties are hereby granted the following, in each case subject to the Carve-Out or Carve-Out Reserve, as applicable, and Permitted Liens (collectively, the "Adequate Protection"):

(a)    Prepetition Term Loan Adequate Protection Liens.  The Prepetition Term Loan Secured Parties are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Prepetition Term Loan Adequate Protection Liens"), which liens shall:  (i) be subject and subordinate to the Carve-Out, Permitted Liens (as such term is defined in the DIP Loan Agreement) and the DIP Liens; (ii) be senior to all other security interests in, liens on, or claims against the Term Loan Priority Collateral, whether now existing or hereafter arising or acquired, (iii) be junior to the security interests in, liens on, and claims against the ABL Priority Collateral, whether now existing or hereafter arising or acquired, of the Prepetition ABL Secured Parties, including on account of the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Secured Parties; (iv) be *pari passu* with the Prepetition ABL Adequate Protection Liens (as defined below) with respect to all assets of the Debtors that are unencumbered as of the Petition Date; and (v) in each case, for the avoidance of doubt, shall have the priorities set forth in **Exhibit C** hereto.

(b)    Prepetition ABL Adequate Protection Liens.  The Prepetition ABL Secured Parties are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Prepetition ABL Adequate Protection Liens"), which liens shall: (i) be subject and subordinate to the Carve-Out (to the extent of the Carve-Out Reserve), Permitted Liens (as such term is defined in the DIP Loan Agreement) and the DIP Liens;

31

(ii) be senior to all other security interests in, liens on, or claims against the ABL Priority Collateral, whether now existing or hereafter arising or acquired; (iii) be junior to the security interests in, liens on, and claims against the Term Loan Priority Collateral, whether now existing or hereafter arising or acquired, of the Prepetition Term Loan Secured Parties, including on account of the Prepetition Term Loan Adequate Protection Liens granted to the Prepetition Term Loan Secured Parties; (iv) *pari passu* with the Prepetition Term Loan Adequate Protection Liens with respect to all assets of the Debtors that are unencumbered as of the Petition Date; and (v) in each case, for the avoidance of doubt, shall have the priorities set forth in **Exhibit C** hereto.

(c)    Adequate Protection Superpriority Claims.  The Prepetition Secured Parties are hereby granted allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claims"), which Adequate Protection Superpriority Claims shall be allowed claims against each of the Debtors (jointly and severally), with priority (except they shall be junior to the Carve-Out and as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors, other than the DIP Superpriority Claim, now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.  The Adequate Protection Superpriority Claims shall be *pari passu* with each other and be payable from and have recourse to all pre- and post-petition property (including all claims and causes of action) of the Debtors, subject to the Carve-Out and the priorities set forth in **Exhibit C**.

4.2    Adequate Protection Payments for Prepetition ABL Secured Parties. Prepetition ABL Secured Parties have consented to the terms of this Interim Order and are entitled to adequate protection of the interests of the Prepetition Secured Parties in the Prepetition ABL Collateral, the Prepetition ABL Secured Parties are authorized to apply all Cash Collateral in the possession or control of the Prepetition ABL Agent (other than, prior to a DIP Termination Event, the Available Cash Collateral, and at any time, any TA Dispatch Receivables), to the Prepetition ABL Obligations in accordance with the Prepetition ABL Loan Documents.

4.3    Fees and Expenses. The Prepetition Secured Parties shall be entitled to add to Prepetition Obligations all reasonable and documented fees and out-of-pocket expenses incurred by such Prepetition Secured Parties that are required to be paid by the Debtors under the Prepetition Loan Documents (but no more than one set of primary counsel for each of the Prepetition ABL Secured Parties (as a whole) and the Prepetition Term Loan Secured Parties (as a whole), and allowed in accordance with Section 5.13 below, including the reasonable and documented pre- and post-petition fees and out-of-pocket expenses of (A)(i) Schulte Roth & Zabel LLP, (ii) Landis Rath & Cobb and (iii) FTI Consulting (together, the "Prepetition Term Loan Professionals") and (B) (i) Goldberg Kohn, counsel to MidCap, (ii) Morris, Nichols, Arnst & Taylor and (iii) MCA (together, the "Prepetition ABL Professionals", and together with the Prepetition Term Loan Professionals, the "Adequate Protection Professionals," and such fees and expenses, collectively, the "Adequate Protection Professional Fees and Expenses").

Section 5.    Provisions Common to DIP Facility and Use of Cash Collateral

5.1    Postpetition Lien Perfection.

(a)    This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, the Prepetition  Adequate Protection Liens, and the other security interests granted herein, effective as of the Petition Date, without any further act

and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a Control Agreement or other depository account consisting of DIP Collateral, or requirement to register liens on any certificates of title (a "<u>Perfection Act</u>"). Notwithstanding the foregoing, if the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by the DIP Loan Documents, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law.  Should the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(b)     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order (including the DIP Liens and the Prepetition Adequate Protection Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; *provided*, *however*, that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens.  By virtue of the terms of this Interim Order, to the extent that the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, has filed Uniform Commercial Code or PPSA financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including all Guarantors), such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Interim Order without further action by the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable.

(c)     Except as provided in section 5.9 herein and with respect to the Carve-Out, the Carve-Out Reserve and Permitted Liens, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in any of these Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their Estates, any trustee, or any other estate representative appointed or elected in these Cases or any Successor Cases and/or upon the dismissal of any of these Cases or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of the Debtors and

their Estates under section 551 of the Bankruptcy Code or otherwise; or (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

       5.2    <u>Amendments to DIP Loan Documents</u>.  Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the applicable DIP Secured Parties may make amendments, modifications, or supplements to any DIP Loan Document, and the DIP Agent and the DIP Lenders may waive any provisions in the DIP Loan Documents, without further approval of the Court; *provided* that any amendments, modifications, or supplements to any DIP Loan Documents that operate to increase the aggregate commitments, the rate of interest payable thereunder, or existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents (collectively, the "<u>Material DIP Amendments</u>"), shall be filed with the Court in advance of the effective date of such Material DIP Amendments, and the Debtors shall provide prior written notice of the Material DIP Amendment to (i) counsel for each of the Prepetition Agents, (ii) counsel to the Committee, or, in the event no such Committee is appointed at the time of such Material DIP Amendment, the 50 Largest Unsecured Creditors, and (iii) the U.S. Trustee; *provided, further*, that the consent of the foregoing parties will not be necessary to effectuate any such amendment, modification or supplement, except that any Material DIP Amendment subject to a timely and unresolved objection must be approved by the Court.  For the avoidance of doubt, the Debtors must receive written consent as to any Material DIP Amendment (i) from the DIP Secured Parties prior to filing notice thereof with the Court and (ii) from the Prepetition ABL Agent, on behalf of the Prepetition ABL Lenders, and Prepetition Term Loan Agent (together with the Prepetition ABL Agent, the "<u>Prepetition Agents</u>"), on behalf of the Prepetition Term Loan

36

Lenders, as applicable, for any amendment, modification, supplement, or waiver to the Approved Budget or that materially adversely affects any rights of applicable Prepetition Secured Parties hereunder or the treatment of the applicable Prepetition Obligations hereunder.

      5.3    <u>DIP Termination Event</u>.  The occurrence of one or more of the following shall constitute a "<u>DIP Termination Event</u>" (unless waived in writing by the DIP Secured Parties and the Prepetition Secured Parties): (i) any "Event of Default" as that term is defined in the DIP Loan Agreement; (ii) any failure to meet or satisfy any Milestone (as defined in the DIP Loan Agreement) in accordance with the DIP Loan Agreement; (iii) the Maturity Date under the  DIP Loan Agreement; (iv) solely with respect to the use of cash collateral, the failure of the Prepetition ABL Secured Obligations to be repaid in full in cash by the sixtieth (60th) day after the Petition Date); (v) Debtors' failure to comply with any of its covenants or obligations under and in strict accordance with the terms of this Interim Order; (vi) Debtors, without the consent of Prepetition ABL Agent, seek the use of ABL Cash Collateral other than in accordance with the terms of this Interim Order; (vii) the DIP Loan Documents are terminated, or if this Interim Order or DIP Loan Documents are modified in a manner adverse to Prepetition ABL Agent or the Prepetition ABL Lenders, without Prepetition ABL Agent's prior written consent; (viii) the DIP Lenders breach their obligation to make a committed advance as required to be made by the DIP Lenders pursuant to the terms of this Interim Order or DIP Loan Documents; (ix)  entry of any order authorizing any party in interest to reclaim any of the DIP Collateral, granting any party in interest relief from the automatic stay with respect to the DIP Collateral, or requiring that Debtors turnover any of the DIP Collateral, in each case prior to full, final and indefeasible repayment of all Prepetition Obligations, except to the extent permitted by the Prepetition Intercreditor Agreement; (x) any Case is converted to a case under chapter 7 of the Code; (xi) a Trustee is appointed or elected in any Case,

or an examiner with the power to operate Debtors' businesses is appointed in any Case; (xii) commencement of an adversary proceeding or contested matter objecting to the extent, validity or priority of any Prepetition Obligations and/or the Prepetition Liens; (xiii) the date that is 21 days following the entry of this Interim Order if a Final Order is not entered in form and substance acceptable to the Prepetition Secured Parties by such date; (xiv) the date of the Final Hearing, if this Interim Order is modified at the Final Hearing in a manner unacceptable to the Prepetition Secured Parties; or (xv) this Order, or any other order of this Court is modified, amended, vacated or stayed in any manner not consented to in writing by Agent.

      5.4    <u>Rights and Remedies upon a DIP Termination Event</u>.  During the period covered by this Interim Order, after five (5) calendar days following the delivery of a written notice by the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent of the occurrence of and during the continuance of a DIP Termination Event (the "<u>Remedies Notice Period</u>"), (a) the DIP Agent shall be entitled to independently take any act or exercise any right or remedy as provided in this Interim Order or any DIP Loan Document, as applicable, including, without limitation, (i) declare all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains; (iii) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) invoke the right to charge interest at the default rate under the DIP Loan Documents; and/or (v) stop lending and (b) the Prepetition ABL Agent and the Prepetition Term Loan Agent shall each have automatic and immediate relief from the automatic stay with respect to the Prepetition Collateral (without regard to the passage of time provided for in Fed. R. Bankr.

P. 4001(a)(3)), and shall be entitled to exercise all rights and remedies available under the Prepetition Loan Documents and applicable nonbankruptcy law (subject to the Prepetition Intercreditor Agreement), and the Debtors shall surrender the Prepetition Collateral and otherwise cooperate with Prepetition ABL Agent and the Prepetition Term Loan Agent in the exercise of their rights and remedies under the Prepetition Loan Documents and applicable nonbankruptcy law (subject to the Prepetition Intercreditor Agreement).  Notwithstanding the foregoing, during the five (5) calendar day period following the DIP Termination Date, Debtors may seek an order of this Court determining that the event alleged to have given rise to the DIP Termination Date did not occur; provided, however, that during such five (5) calendar day period, Prepetition ABL Agent shall have no obligation to remit any Cash Collateral to Debtors pursuant to this Interim Order but the Debtor may use any Available Cash Collateral.

       5.5     Debtors' Waivers.

       (a)     Prior to the payment in full of all Prepetition Obligations and all DIP Obligations, any request by the Debtors with respect to the following shall also constitute a DIP Termination Event:  (i) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full of the DIP Obligations and the Prepetition ABL Obligations, other than as provided in this Interim Order or, with respect to the DIP Obligations, as may be otherwise permitted pursuant to the DIP Loan Documents; (ii) to challenge the application of any payments authorized by this Interim Order pursuant to section 506(b) of the Bankruptcy Code; (iii) to propose or support any challenge by any party in interest to seek to limit or prevent the DIP Lenders or the Prepetition Secured Parties, from exercising their credit bid rights in connection with the sale of any assets of the Debtors; or (iv) to seek relief under the Bankruptcy Code, including, without limitation, under

section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair (A) the rights and remedies of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties against the Debtors as provided in this Interim Order or any of the DIP Loan Documents or Prepetition Loan Documents or (B) the exercise of such rights or remedies by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties against the Debtors in accordance with the  DIP Loan Agreement, this Interim Order or the Prepetition Loan Documents; *provided*, *however*, that the DIP Agent, the Prepetition Term Loan Agent or the Prepetition ABL Agent, as applicable, may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by DIP Agent, any DIP Lender or any Prepetition Secured Party.

(b)    It shall also be a DIP Termination Event if, prior to the payment in full of the DIP Facility or the Prepetition ABL Obligations, the Debtors propose or support any chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the payment of the DIP Obligations (other than indemnities then due and payable) and the Prepetition ABL Obligations in full in cash and the payment of the Debtors' obligations with respect to the adequate protection hereunder, in full in cash, without the written consent of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, as applicable.

5.6    <u>Modification of Automatic Stay</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to permit the Debtors and each of the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, to perform any act authorized or permitted under or by virtue of this Interim Order, the DIP Loan Agreement, or the other DIP Loan Documents, as

40

applicable, including, without limitation, (A) to execute, deliver and implement the postpetition

financing arrangements authorized by this Interim Order, (B) to take any act to create, validate,

evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (C) to

assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition

Obligations and DIP Obligations (or any portion thereof), including, without limitation, all

interests, fees, costs, and expenses permitted under any of the DIP Loan Documents, the

Prepetition ABL Loan Documents or the Prepetition Term Loan Documents and apply such

payments to the applicable obligations, and (D) subject to the Remedies Notice Period, to take any

action and exercise all rights and remedies provided to it by this Interim Order, the DIP Loan

Documents, or applicable law.

       5.7    <u>Reporting</u>.  The Debtors shall timely provide the Prepetition Secured Parties

with (x) reasonable access to the Debtors' facilities, management, books, and records required

under the Prepetition Loan Documents, (y) copies of all financial reporting provided to the DIP

Agent and DIP Lenders pursuant to the DIP Loan Documents substantially simultaneously with

such delivery to the DIP Lenders and (z) on Wednesday of each week, commencing with

December 18, 2019, an updated Borrowing Base Certificate signed by a responsible Officer (as

such terms are defined in the Prepetition ABL Credit Agreement), which Borrowing Base

Certificate shall be provided for reporting purposes only.

       5.8    <u>Budget Maintenance</u>.  The use of borrowings under the DIP Facility and the

use of Cash Collateral shall be in accordance with the Initial Budget for the first [six] week period

from and after the Petition Date, which shall be in form and substance satisfactory to, and approved

by, each of the DIP Agent, the Prepetition Term Loan Agent and the Prepetition ABL Agent, in

each's sole discretion (as so approved, the initial Approved Budget).  The Approved Budget shall

be updated by the Debtors (with the consent and/or at the reasonable request of the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent) from time to time in accordance with the DIP Documents.  No such updated, modified or supplemented budget shall be effective until so approved by each of the DIP Agent, the Prepetition ABL Agent and the Prepetition Term Loan Agent, and once approved shall be deemed the "Approved Budget"; provided, however that in the event that the DIP Agent, the Prepetition Term Loan Agent, the Prepetition ABL Agent and the Debtors cannot agree as to an updated, modified or supplemented budget, the prior Approved Budget shall continue in effect for these Cases, and such disagreement shall give rise to an Event of Default under the DIP Agreements and a DIP Termination Event under this Interim Order once the period covered by the prior Approved Budget has terminated.  A copy of any Approved Budget shall be delivered to counsel for a Committee (if appointed) and the U.S. Trustee after (or if) it has been approved by the DIP Agent, the Prepetition Term Loan Agent and the Prepetition ABL Agent.

    5.9  <u>Carve-Out Provisions</u>.

    (a)  For purposes of this Interim Order, "Carve-Out" shall mean the sum of:  (i) until the delivery of a Carve-Out Trigger Notice (as defined below) all fees required to be paid to the Clerk of the Court (or in lieu thereof, fees and expenses incurred by the Debtors to any noticing. claims and solicitation agent appointed in the Cases) and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to [$25,000] incurred by a trustee under section 726(b) of the Bankruptcy Code (the "<u>Chapter 7 Trustee Carve-Out</u>"); (iii) subject to and only to the extent such amounts are included in the Approved Budget, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, subject to the Approved Budget, all unpaid fees, costs, disbursements and expenses (the "<u>Allowed Professional Fees</u>") incurred or earned by persons or

42

firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to, on or after delivery of a Carve-Out Trigger Notice (the "Pre-Trigger Carve-Out Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $250,000 incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at any time, whether by interim order, procedural order, final order or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap" and such amounts set forth in clauses (i) through (iv), the "Carve-Out Cap"); provided that nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email by the DIP Agent, the Prepetition ABL Agent or the Prepetition Term Loan Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to each other Prepetition Agent, and counsel to the Committee, if any (collectively, the "Carve-Out Trigger Notice Parties"), which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event, and shall describe in reasonable detail such DIP Termination Event that is alleged to have occurred and be continuing and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)     By no later than _____, 2020, in accordance with the amounts budgeted for Professional Persons in the Approved Budget, and subject to availability of DIP

Loans and Available Cash Collateral, the Debtors shall be required to deposit, in a segregated account not subject to the control of the DIP Agent, the DIP Secured Parties or the Prepetition Secured Parties (the "Carve-Out Reserve"), an amount equal to the Carve-Out Cap from the proceeds of the DIP Loans and Available Cash Collateral.  The funds on deposit in the Carve-Out Account shall only be available to satisfy obligations benefiting from the Carve-Out, and the DIP Agent, the DIP Secured Parties and the Prepetition Secured Parties (x) shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of assets) of the Debtors to the extent necessary to fund the Carve-Out Account as provided above and (y) shall have a security interest upon any residual amount in the Carve-Out Account available following satisfaction in cash in full of all obligations benefiting from the Carve-Out as further described in clause (e) below.  Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been issued, the Debtors shall be permitted to pay fees to the Professional Persons and reimburse expenses incurred by Professional Persons and that are allowed or authorized by the Court and payable under sections 328, 330, 331, and 1103 of the Bankruptcy Code and compensation procedures approved by the Court, as the same may be due and payable, it being understood that the Pre-Trigger Carve-Out Cap shall be reduced by actual payments of allowed Professional Fees included in the Pre-Trigger Carve-Out Cap made after the Termination Declaration Date. Notwithstanding anything to the contrary in this Interim Order, (A) the failure of the Carve-Out Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out and (B) in no way shall the Approved Budget, the Carve-Out, the Carve-Out Trigger Notice, the Pre-Trigger Carve-Out Cap, the Post-Carve-Out Trigger Notice Cap, or any of the foregoing be construed as a cap or limitation on the amount of Allowed Professional Fees due and payable to the Professional Persons.  Any payment or reimbursement made on or after the occurrence of

the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

(c)     No portion of the Carve-Out, DIP Collateral (including Cash Collateral) or proceeds of the DIP Loans may be used to pay any fees or expenses incurred by any entity (as defined in the Bankruptcy Code), including, without limitation, the Debtors, any Committee or the Professional Persons (as well as each and every creditor or party in interest), in connection with claims or causes of action adverse to the DIP Secured Parties' or the Prepetition Secured Parties' interests in the DIP Collateral, including (1) preventing, hindering or delaying any Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral once a DIP Termination Event has occurred; (2) using or seeking to use Cash Collateral or incurring indebtedness in violation of the terms hereof, or selling any DIP Collateral without the DIP Agent's, the Prepetition ABL Agent's and the Prepetition Term Loan Agent's consent (to the extent required pursuant to the Prepetition Intercreditor Agreement); or (3) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Prepetition Obligations or any mortgages, liens or security interests with respect thereto or any other rights or interests of Prepetition Secured Parties, or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Code, against Prepetition Secured Parties; provided, however, that the foregoing shall not apply to costs and expenses, in an amount not to exceed [$50,000], incurred by the Committee's professionals in connection with the investigation of a potential Challenge in accordance with Paragraph 5.10 of this Order; provided, further, however, that the Carve-Out may be used to pay fees and expenses incurred by the Professional Persons in connection with the negotiation, preparation and entry of this Interim Order or any amendment hereto consented to by the DIP Agent and the Prepetition

Agents.

    5.10 <u>Reservation of Third Party Challenge Rights</u>.  The stipulations, releases, agreements, and admissions contained in this Interim Order, including, without limitation, paragraph E hereof, and the releases contained in clause (xii) thereof (collectively, the "<u>Debtors' Stipulations</u>"), shall be binding on the Debtors in all circumstances.  The Debtors' Stipulations shall be binding on all entities (as defined in the Bankruptcy Code), including without limitation, each and every creditor and party in interest, including, without limitation, the Committee (if any), unless, and solely to the extent that (a) any such creditor or party in interest, including the Committee (if any), with standing and requisite authority has timely commenced an adversary proceeding or other appropriate contested matter (subject to the limitations contained herein, including, *inter alia*, in this Section 5.10) by no later than (i) with respect to the Prepetition Term Loan Lenders, the earliest of (A) if no Committee has been appointed, 75 calendar days from the date of entry of this Interim Order, (B) if a Committee has been appointed, 60 calendar days after the date of formation of such Committee, (ii) with respect to the Prepetition ABL Secured Parties, the earliest of (A) the date on which they are requested to release their liens following the discharge of the Prepetition ABL Obligations and (B) 35 days after the Petition Date, and (iii) any such later date as has been agreed to, in writing, without further order of the Court by the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable (such time period established by the foregoing clauses (i) and (ii), the "<u>Challenge Period</u>"), against any Prepetition Secured Party in connection with matters related to the Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens, and the Prepetition Collateral, including by (A) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Obligations or Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent

46

transfers or conveyances, other avoidance power claims or any other claims, counterclaims, or causes of action, objections, contests, or defenses with respect to the Prepetition Obligations, Prepetition Liens or the acts or omissions of any Prepetition Secured Party (a "Challenge Proceeding") and (b) there is a final, non-appealable order in favor of the plaintiff sustaining any Challenge Proceeding in any such timely filed adversary proceeding or contested matter; *provided* that any pleadings filed in connection with any Challenge Proceeding shall set forth with specificity the basis for such Challenge and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred.  For the avoidance of doubt, a party in interest's commencement of a timely Challenge Proceeding shall preserve the Challenge Period only with respect to such party in interest commencing the Challenge Proceeding (and such Challenge shall be limited to the Challenge identified with specificity prior to the expiration of the Challenge Period).  If no such Challenge Proceeding is timely commenced, then:  (v) the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including, without limitation, those contained in paragraph E of this Interim Order, and the releases contained in clause (x) thereof, shall be binding on all parties in interest, (w) any and all Challenge Proceedings by any party (including, without limitation, the Committee, any chapter 11 trustee, or any examiner and/or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever waived, released, and barred; (x) to the extent not theretofore repaid, the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, for all purposes in these Cases and any subsequent chapter 7 case; (y) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to

47

be, legal, valid, binding, perfected and of the priority specified in paragraph E hereof, not subject

to defense, counterclaim, recharacterization, subordination or avoidance; and (z) the obligations

under the Prepetition Loan Documents and the Prepetition Liens on the Prepetition Collateral shall

not be subject to any other or further challenge by the Debtors, the Committee (if any) or any other

party in interest, each of whom shall be enjoined from seeking to exercise the rights of the Debtors'

Estates, including, without limitation, any successor thereto (including, without limitation, any

estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors

with respect thereto).  If any Challenge Proceeding is timely commenced, the stipulations, releases,

agreements, and admissions contained in paragraph E of this Interim Order, and the releases

contained in clause (x) thereof, shall nonetheless remain binding and preclusive (as provided in

this paragraph) on the Debtors, the Committee (if any), and any other person or entity, except as

to any such findings and admissions that were expressly and successfully challenged in such

Challenge Proceeding as set forth in a final, non-appealable order of a court of competent

jurisdiction.  Nothing in this Interim Order vests or confers on any entity (as defined in the

Bankruptcy Code), including the Committee (if any), standing or authority to pursue any cause of

action belonging to the Debtors or their Estates, including, without limitation, claims and defenses

with respect to the Prepetition Credit Agreements or the Prepetition Liens on the Prepetition

Collateral.  Notwithstanding the foregoing, if a chapter 11 trustee is appointed or the Cases are

converted to chapter 7 prior to the expiration of the Challenge Period, (1) the chapter 11 trustee or

chapter 7 trustee, as applicable, shall have until the later of the end of the Challenge Period or the

tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Case to

chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of

the Court for cause, and (2) if the Committee has asserted a Challenge prior to the Challenge

Deadline, the chapter 11 trustee or chapter 7 trustee will stand in the shoes of the Committee in such Challenge.

5.11    <u>No Modification or Stay of this Interim Order</u>.  The DIP Agent and the DIP Lenders have acted in good faith in connection with the DIP Facility and with this Interim Order, and their reliance on this Interim Order is in good faith, and the DIP Agent and the DIP Lenders are entitled to the protections of Bankruptcy Code section 364(e).

5.12    <u>Power to Waive Rights; Duties to Third Parties</u>.

(a)    Subject to the terms of the DIP Loan Documents, the DIP Agent shall have the right (acting at the direction of the Required Lenders (as defined in the DIP Loan Documents) if so required by the DIP Loan Documents) to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Lenders (the "<u>DIP Lender Rights</u>"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s); *provided* that the DIP Agent shall obtain the prior written consent of the Prepetition ABL Agent and the Prepetition Term Loan Agent, as applicable, for any waiver that affects any rights of the Prepetition Secured Parties, as applicable, hereunder or any treatment of the Prepetition ABL Obligations. Any waiver by the DIP Agent of any DIP Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein.  Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agent or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Lender.

EAST\170823250.1

(b)     Each of the Prepetition ABL Agent and the Prepetition Term Loan Agent shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the Prepetition ABL Secured Parties or the Prepetition Term Loan Secured Parties, respectively (as applicable, the "Prepetition Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Prepetition Lender Right(s); *provided* that the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, shall (except to the extent provided in the Prepetition Intercreditor Agreement) obtain the prior written consent of the DIP Agent for any waiver that affects any rights of the DIP Secured Parties hereunder or any treatment of the DIP Obligations.   Any waiver by either the Prepetition ABL Agent or the Prepetition Term Loan Agent of any Prepetition Lender Rights shall not be, nor shall it constitute, a continuing waiver unless otherwise expressly provided therein.   Any delay in or failure to exercise or enforce any Prepetition Lender Right shall neither constitute a waiver of such Prepetition Lender Right, subject the Prepetition Agents or any Prepetition Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the Prepetition Agents or any Prepetition Lender.

5.13   DIP and Other Expenses; Procedures for Payment of DIP Agents' and Prepetition Secured Parties' Professional Fees and Expenses.  Any time that professionals for the DIP Agent and the Adequate Protection Professionals seek payment of postpetition fees and expenses from the Debtors, each professional shall provide copies of its invoices (which shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the

extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtors, the U.S. Trustee and counsel for a Committee (if appointed).  If no written objection is received by the applicable professional by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) days after delivery of such invoice to the Debtors, the U.S. Trustee, and any Committee, such fees and expenses shall be deemed allowed in full, and with respect to a DIP Agent or DIP Lender professional, paid promptly by the Debtors.  If an objection to a professional's invoice is timely received by such professional, such fees and expenses shall be deemed allowed in the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Pending such resolution, the undisputed portion of any such invoice will be deemed allowed, and (i) with respect to a DIP Agent or DIP Lender professionals, paid promptly by the Debtors and (ii) with respect to the Adequate Protection Professionals for the Prepetition ABL Secured Parties, paid out of Available Cash Collateral that would otherwise have been remitted to the Debtors pursuant to Section 3.2(c) hereof.  Notwithstanding the foregoing, subject to and only to the extent such amounts are included in the Approved Budget, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all reasonable, undisputed and documented pre-petition fees, costs and expenses, including fees and expenses of counsel, of the DIP Agent and the Prepetition Secured Parties incurred on or prior to (including prior to the Petition Date) such date without the need for any professional engaged by the DIP Agent or the Adequate Protection Professionals to first deliver a copy of its invoice as provided for herein.  The DIP Agent professionals and the Adequate Protection Professionals shall

not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their fees or out-of-pocket expenses (other than with respect to disputed amounts).  Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination, or disgorgement.

5.14    No Unauthorized Disposition of Collateral.    The Debtors shall not sell, transfer, encumber, otherwise dispose of, or enter into any lease post-Petition Date for, any portion of the DIP Collateral (including equipment and Cash Collateral), other than in ordinary course of the Debtors' businesses or pursuant to the terms of this Interim Order or as permitted by the DIP Loan Documents or further order of the Court.

5.15    No Waiver.    The failure of the DIP Lenders or the Prepetition Lenders, as applicable, to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facility, the Prepetition Loan Documents, the Prepetition Facilities, or the Interim Order, as applicable, shall not constitute a waiver of any of the DIP Lenders' or Prepetition Lenders' rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Lenders or the Prepetition Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Lenders and the Prepetition Lenders to: (a) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lenders or the Prepetition Lenders.

5.16    Maintenance of Collateral.    Unless the DIP Agent, the Prepetition ABL Agent and the Prepetition Term Loan Agent otherwise consents in writing, until (i) the payment

in full or otherwise acceptable satisfaction of all DIP Obligations and the Prepetition ABL Obligations and (ii) the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, the Debtors shall comply with the covenants contained in the DIP Loan Documents regarding the maintenance and insurance of the DIP Collateral.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, each of the DIP Agent (on behalf of the DIP Lenders), the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) and the Prepetition Term Loan Agent (on behalf of the Prepetition Term Loan Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

5.17    Reservation of Rights.  The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of each DIP Secured Party and Prepetition Secured Party, subject to the Prepetition Intercreditor Agreement, as applicable, to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents, the Prepetition Loan Documents, or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or the Prepetition Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates.

5.18    <u>Binding Effect</u>.

(a)    All of the provisions of this Interim Order and the DIP Loan Documents, the DIP Obligations, all liens, and claims granted hereunder in favor of each of the DIP Secured Parties and the Prepetition Secured Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of the DIP Agent, DIP Lenders, and Prepetition Secured Parties set forth herein, including, without limitation, the parties' acknowledgements, stipulations, and agreements in Section E of this Interim Order, subject to Section 5.10 hereof (without each of which the DIP Secured Parties would not have entered into or provided funds under the DIP Loan Documents and the Prepetition Secured Parties would not have consented to the priming of the Prepetition Liens as set forth herein and use of Cash Collateral provided for hereunder) provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective and enforceable *nunc pro tunc* to the Petition Date immediately upon entry of this Interim Order and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, shall continue in full force and effect, and shall survive entry of any other order or action, including, without limitation, any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting one or more of the Cases to any other chapter under the Bankruptcy Code, dismissing one or more of the Cases, approving any sale of any or all of the DIP Collateral or the Prepetition Collateral, or vacating, terminating, reconsidering, revoking, or otherwise modifying this Interim Order or any provision hereof; *provided* that in the event a Final Order is entered, the terms and conditions of such Final Order shall control over this Interim Order; *provided further* that such Final Order must affirm

each of the provisions, protections, grants, statements, stipulations, and agreements in this Interim Order in order for such provisions, protections, grants, statements, stipulations, and agreements to remain in effect after entry of the Final Order.

(b)     No order dismissing one or more of the Cases under section 1112 or otherwise may impair the DIP Superpriority Claim, the Adequate Protection Superpriority Claim, and the DIP Secured Parties' and the Prepetition Secured Parties' respective liens on and security interests in the DIP Collateral and the Prepetition Collateral, respectively, and all other claims, liens, adequate protections, and other rights granted pursuant to the terms of this Interim Order, which shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and Prepetition Obligations are indefeasibly paid and satisfied in full. Notwithstanding any such dismissal, this Court shall retain jurisdiction for the purposes of enforcing all such claims, liens, protections, and rights referenced in this paragraph and otherwise in this Interim Order.

(c)     Except as set forth in this Interim Order, in the event this Court modifies, reverses, vacates, or stays any of the provisions of this Interim Order or any of the DIP Loan Documents, such modifications, reversals, vacatur, or stays shall not affect the (i) validity, priority, or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agent or Prepetition Agents, as applicable, of the effective date of such modification, reversal, vacatur, or stay, (ii) validity, priority, or enforceability of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Superpriority Claims or (iii) rights or priorities of the DIP Agent, DIP Lenders or the Prepetition Secured Parties pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations.]  All such liens, security interests, claims and other benefits shall be governed

in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein.

(d)   This Interim Order shall be binding upon the Debtors, the Prepetition Term Loan Obligors, the Prepetition ABL Obligors, all parties in interest in the Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law.  This Interim Order shall also inure to the benefit of the Debtors, DIP Agent, DIP Lenders, Prepetition Secured Parties, and each of their respective successors and assigns.

5.19   Discharge.  Subject to the entry of the Final Order, the DIP Obligations and the obligations of the Debtors with respect to adequate protection hereunder, including granting the Adequate Protection Liens and the Adequate Protection Superpriority Claims, shall not be discharged by the entry of an order confirming any plan of reorganization in any of these Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, has otherwise agreed in writing.

5.20   No Priming of Prepetition Obligations.  Notwithstanding anything to the contrary herein, from and after the entry of this Interim Order, absent the express written consent of the Prepetition Lenders, no Debtor shall seek authorization from this Court to obtain or incur any Indebtedness or enter into an alternative financing facility from a party other than the DIP

Lenders (a "<u>Competing DIP Facility</u>") seeking to impose liens on any DIP Collateral ranking on a *pari passu* or priming basis with respect to the DIP Liens held by the Prepetition Secured Parties; *provided*, *however*, that nothing herein shall preclude the Debtors from seeking authorization to incur any Indebtedness or enter into any Competing DIP Facility that provides for the payment in full of the DIP Obligations and the Prepetition Obligations at the initial closing of such Competing DIP Facility.

5.21    <u>Section 506(c) Waiver</u>.  No costs or expenses of administration which have been or may be incurred in these Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agent or the DIP Lenders upon the DIP Collateral, or by the Prepetition Secured Parties upon the Prepetition Collateral, as applicable) shall be charged against the DIP Agent, DIP Lenders, or Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Obligations or the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).   Notwithstanding the foregoing, the waiver provided in this Section as to the Prepetition Secured Parties, the Prepetition Obligations, and the Prepetition Collateral is subject to the entry of a Final Order providing such relief.

5.22    <u>Section 552(b) Waiver</u>.  The Debtors have agreed as a condition to obtaining financing under the DIP Facility and using Cash Collateral as provided in this Interim Order that, subject to entry of the Final Order, the Prepetition Secured Parties are and shall each be entitled to

all of the rights and benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception under section 552(b) shall not apply to the DIP Agent, the DIP Lenders, the DIP Obligations, and, subject to entry of the Final Order, the Prepetition Secured Parties, or the Prepetition Obligations.

      5.23   <u>No Marshaling/Application of Proceeds</u>.

      (a)   In no event shall the DIP Agent, the DIP Lenders, or, subject to the entry of the Final Order, the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with the DIP Loan Documents and the Prepetition Loan Documents (including the Prepetition Intercreditor Agreement), as applicable.

      (b)   Notwithstanding anything to the contrary in this Interim Order, but subject in all respects to the priorities set forth on **<u>Exhibit C</u>** hereto, the DIP Obligations shall be satisfied from the proceeds of DIP Collateral.

      5.24   <u>Relief Subject to a Final Order</u>.  For the avoidance of doubt, nothing in this Interim Order shall be deemed to grant or approve (a) a waiver of the Debtors' ability to surcharge against any Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code; (b) any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code with respect to any of the Prepetition Secured Parties; (c) except as provided in Section 5.23 hereof, the application of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral; or (d) a lien on or superpriority claim against the Avoidance Proceeds.

5.25     Limits on Lender Liability.

(a)     Subject to entry of the Final Order and Section 5.10 hereof, in determining to make any loan under the  DIP Loan Agreement, authorizing the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not be deemed to (i) be in control of the operations of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors, so long as the such party's actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

(b)     Nothing in this Interim Order or the DIP Loan Documents shall permit the Debtors to violate 28 U.S.C. § 959(b).

(c)     As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the DIP Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

5.26    Release.  Subject to section 4.10 of this Interim Order, each of the Debtors, their Estates, the Borrowers, the Guarantors, and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the DIP Secured Parties and the Prepetition Secured Parties and (in such capacity) each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to (i) the DIP Facility or the DIP Loan Documents or (ii) the Prepetition Loan Documents, as applicable, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section

105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the DIP Obligations, the DIP Loan Documents, or the DIP Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the DIP Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or released to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Interim Order.

5.27   <u>Release of Liens</u>.   Subject to entry of the Final Order and Section 5.10 hereof, upon the date that the Discharge of ABL Obligations (as defined in the Prepetition Intercreditor Agreement) occurs and prior to the release of the Prepetition ABL Liens, Debtors shall execute and deliver to Prepetition ABL Agent and Prepetition ABL Lenders a general release of any and all claims and causes of action that could have been asserted or raised under or in connection with the Prepetition ABL Loan Documents.

5.28   <u>Survival</u>.   The provisions of this Interim Order, the validity, priority, and enforceability of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of these Cases, (b) converting any or all of these Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of these Cases, (d) terminating the joint administration of these Cases or any other act or omission, (e) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents or the Prepetition Intercreditor Agreement), or

(f) pursuant to which the Court abstains from hearing any of these Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of these Cases, following dismissal of any of these Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated, and (ii) in respect of the Prepetition Obligations, all of the adequate protection obligations owed to the Prepetition Secured Parties provided for in this Interim Order and under the Prepetition Credit Agreements have been indefeasibly paid in full in cash.

5.29    Proofs of Claim.  None of the Prepetition Secured Parties shall be required to file proofs of claim in any of these Cases or subsequent cases of any of the Debtors under any chapter of the Bankruptcy Code, and the Debtors' Stipulations in this Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s).  Notwithstanding the foregoing, any Prepetition Agent (on behalf of itself and the Prepetition Lenders) is hereby authorized and entitled, in its discretion, but not required, to file (and amend and/or supplement, as applicable) a master proof of claim for any claims of any of the Prepetition Secured Parties arising from the Prepetition Loan Documents or in respect of the Prepetition Obligations; *provided*, *however*, that nothing in this Order shall waive the right of any Prepetition Lender to file its own proof of claim against any of the Debtors.

5.30    No Third Party Rights. Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

5.31    No Avoidance.  Subject to Section 5.10 hereof, no obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facility shall be avoidable or recoverable from the DIP Agent or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law.

5.32    Reliance on Order.   All postpetition advances under the DIP Loan Documents are made in reliance on this Interim Order.

5.33    Payments Free and Clear.  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Secured Parties or, subject to Section 5.10 hereof, the Prepetition Agents on behalf of the applicable Prepetition Secured Parties, pursuant to the provisions of this Interim Order, any subsequent order of this Court or the DIP Loan Documents, shall, subject to the terms of this Section 5.35, be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve-Out in all respects.

5.34    Limited Effect.  In the event of a conflict between the terms and provisions of any of the DIP Loan Documents and this Interim Order, the terms and provisions of this Interim Order shall govern.

EAST\170823250.1

5.35    Headings.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

5.36    Bankruptcy Rules.  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

5.37    General Authorization.  The Debtors, the DIP Secured Parties, and the Prepetition Secured Parties are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

5.38    Retention of Exclusive Jurisdiction.  This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the  DIP Loan Agreement, and the other DIP Loan Documents.

5.39    Final Hearing and Response Dates.  The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) will be held on _____, 20__, at__:__ _.m., prevailing Eastern Time.  The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or the Committee's counsel if same shall have filed a request for notice.  The Debtors may serve the Motion and the Interim Order without the exhibits attached thereto as such exhibits are voluminous and available, free of charge, at [KCC], and such notice is deemed good and sufficient and no further notice need be given.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) [TO BE INSERTED BY THE DEBTORS]; and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in each case, to allow actual receipt of the foregoing no later than 4:00 p.m. (prevailing Eastern Time), on _____, 20__.

# **EXHIBIT A**

**DIP Loan Agreement**

EAST\170823250.1

## DEBTOR IN POSSESSION SECURED
## MULTI-DRAW TERM PROMISSORY NOTE

$[_____]¹

New York, New York
December [__], 2019

      On December [9], 2019 (the "Petition Date"), CELADON GROUP, INC., a Delaware corporation (the "Borrower") and certain of its affiliates² commenced Chapter 11 Cases, which cases are being jointly administered under Chapter 11 Case No. [19-_____] (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The Borrower has requested that Blue Torch Finance, LLC, as agent (in such capacity, the "Agent") for the lenders (the "DIP Lenders") from time to time party to this Debtor in Possession Secured Multi-Draw Term Promissory Note (as amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, this "Note"), make term loans (the "Term Loans") from time to time evidenced by this Note.  Certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors"), and are simultaneously executing Guarantees in favor of the Agent.  The Borrower intends to utilize such Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay costs, premiums, fees, and expenses incurred to administer or related to of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, subject to any Permitted Variance.  Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

      1.    Term Loans.

      (a)    Subject to the terms and conditions hereof including the Agent's receipt of a Borrowing Request (as defined below), the DIP Lenders agree to provide the Borrower with a

---

¹ Total DIP Term Loan amount TBD.

² The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); Vorbas, LLC (8936).  The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

term loan on the Closing Date in the principal amount of $[_____] (the "Initial Loan"). Subject to the terms and conditions hereof, at any time on or after the date of entry of the Final Order and upon the Agent's receipt of a Borrowing Request, the DIP Lenders agree to provide the Borrower with one additional loan in an aggregate principal amount not to exceed $[_____] (the "Additional Loan").  The Borrower may request the Initial Loan and the Additional Loan pursuant to written notice (which may be by email) delivered to the Agent (x) one (1) Business Day prior to the proposed borrowing day of the Initial Loan and (y) three (3) Business Days prior to the proposed borrowing date of the Additional Loan (or, in each case, such shorter period as the Agent may agree) (a "Borrowing Request").  The Borrowing Request shall be in a form reasonably satisfactory to the Agent.  Each DIP Lender shall provide each Term Loan in an aggregate amount not to exceed its Commitment with respect to such Term Loan and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several.  Upon receipt of a Borrowing Request with respect to any Term Loan, subject to the satisfaction of the conditions set forth in this Note, each DIP Lender shall simultaneously and proportionately to its Pro Rata Share of  its Commitment with respect to such Term Loan, make the proceeds of such Term Loan available to the Borrower or the Agent on the applicable date of funding of such Term Loan by transferring immediately available funds equal to such proceeds to an account designated in writing by the Borrower consistent with its existing cash management system (or to the Agent, which will then transfer such funds to the Borrower).  The relevant Commitment of each DIP Lender shall be permanently reduced upon the making of the relevant Term Loan in an amount equal to such Term Loan advanced by such DIP Lender.  Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

(b)     The aggregate principal amount of Terms Loans outstanding shall not exceed $[_____] , subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c)     The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent to be genuine.  The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)     The Borrower shall utilize the proceeds of Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay costs, premiums, fees, and expenses incurred to administer or related to  the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, subject to any Permitted Variance, this Note, the Bankruptcy Code, and the Financing Orders); provided, that, unless otherwise provided in the Budget, subject to any Permitted Variance, or approved by the Agent, no portion of any Term Loan shall be used, directly or indirectly: (a) except as permitted by Section 15(e), to make any payment on Prepetition Secured Debt or to finance or make any Restricted Payment, (b) to pay any fees or similar amounts payable to any Person who has proposed or may propose to purchase interests in any of the Borrower or any of its respective

_____

Subsidiaries or affiliates or who otherwise has proposed or may propose to invest in the Borrower or any of its respective Subsidiaries or affiliates (including so-called "topping fees," "exit fees," and similar amounts), or (c) to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the Borrower.

2.      <u>Certain Conditions to Each Term Loan</u>.  No DIP Lender shall be obligated to fund any Term Loan, if, as of the date thereof:

(a)      The Borrower shall not have paid any Obligations then payable hereunder (including the fees and expenses of counsel to the Agent) or under any other DIP Document;

(b)      The Loan Parties shall not have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance reasonably satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(c)      The Loan Parties shall not have delivered guarantees of each of the Guarantors, each in form and substance reasonably satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(d)      any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(e)      with respect to the Initial Loan (i) the Bankruptcy Court shall not have entered the Interim Order; or (ii) the Interim Order shall have been stayed, vacated, reversed, modified or amended without Agent's consent;

(f)      with respect to the Additional Loan (i) the Bankruptcy Court shall not have entered the Final Order; or (ii) the Final Order shall have been stayed, vacated, reversed, modified or amended without Agent's consent;

(g)      [reserved];

(h)      any Default or Event of Default shall have occurred and be continuing or would result after giving effect to any Term Loan;

(i)      after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount permitted to be borrowed on a cumulative basis from the date hereof through the date of such requested Term Loan as set forth in the Budget and the Financing Orders;

(j)      the Agent shall not have received and approved the Budget in accordance with this Note and the Financing Orders;

(k)     [reserved];

(l)     the Loan Parties shall not have provided reasonable access for, and reasonable cooperation with, FTI Consulting, as financial advisor to the Agent;

(m)     the Loan Parties shall have filed pleadings with the Bankruptcy Court, which pleadings could adversely affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders, and such pleadings shall not be in form and substance reasonably acceptable to the Agent; or

(n)     the Bankruptcy Court shall have entered orders, which orders could materially and adversely affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders, and such orders shall not be in form and substance reasonably acceptable to the Agent.

The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Orders.

3.     Payment of Principal.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, the lesser of (x) $[_____] and (y) the unpaid principal amount of all Term Loans made by the Agent on behalf of the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent provided in this Note.

4.     Payment of Interest.

(a)     Subject to the terms of this Note, the Term Loan or any portion thereof shall be a Base Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until repaid, at a rate per annum equal to the Base Rate plus 12.50%.

(b)     Interest on the Term Loan shall be payable monthly, in arrears, on the last Business Day of each month, commencing on the last Business Day of the month in which the applicable Term Loan is made.  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(d)     So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent, the interest rate applicable to the Obligations shall

be increased by two percentage points (2.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(e)     It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower).  If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(e) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).

(f)     If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loan hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the

Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

        5.        <u>Payments</u>.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the account as shall be designated in a written notice delivered by the Agent to the Borrower. Each payment made hereunder shall be credited first to interest then due and payable and the remainder of such payment shall be credited to principal, and interest shall thereupon cease to accrue upon the principal so repaid.  The Borrower shall make each payment required under this Note prior to 12:00 noon New York City time on the date when due, in immediately available funds.  Any amounts received after such time on any date may, in the sole discretion of the Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.

        6.        <u>Optional Prepayments</u>.  Subject to the terms and conditions of the Financing Orders, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' written notice to the Agent; <u>provided</u> that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment.

        7.        <u>Mandatory Prepayments</u>.  In each case, subject to the terms and conditions of the Financing Orders and the Budget, upon not less than one (1) Business Day prior written notice by the Borrower to the Agent by 1:00 p.m. New York City time:

        (a)      [Reserved].

        (b)      Immediately upon receipt by any Loan Party of cash proceeds of any asset disposition, unless the Agent agrees otherwise, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (1) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), (2) transfer, sales, or similar taxes, and (3) amounts required to be applied to the repayment of debt secured by such assets sold and secured by a Lien that is senior to the Liens securing the Obligations under this Note (such net proceeds, the "<u>Net Cash Proceeds</u>").

        (c)      If any Loan Party issues any debt securities not permitted under this Note, no later than the Business Day following the date of receipt of the cash proceeds thereof, the

Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.

(d)    Upon the receipt by any Loan Party or any of their Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of any expenses incurred in collecting such Extraordinary Receipts.

(e)    No Implied Consent.  Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of this Note or the other DIP Documents.

8.    Fees.  Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

(a)    Facility Fee.  On or prior to the date of funding of the Initial Loan, the Borrower shall pay to the Agent a facility fee (the "Facility Fee") equal to $[_____][4], which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(b)    Administration Fee.  On or prior to the date of funding of the Initial Loan, the Borrower shall pay to the Agent an administration fee (the "Administration Fee") equal to $50,000, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(c)    Exit Fee.  On the earlier of (1) the date that all the Obligations under this Note are paid in full in cash and (2) the Maturity Date, the Borrower shall pay to the Agent an exit fee (the "Exit Fee") equal to $[_____][5], which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(d)    Additional Fee.  On the earlier of (1) the date that all the Obligations under this Note are paid in full in cash and (2) the Maturity Date, the Borrower shall pay to the Agent an additional fee (the "Additional Fee") equal to 2.50% of the Net Cash Proceeds of asset dispositions of the Loan Parties in excess of the amounts required to repay in full the Obligations (other than the Additional Fee), the Prepetition ABL Obligations and the Prepetition Term Loan Obligations with respect to the Term A Loan (as defined in the Prepetition Term Loan Credit Agreement), which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

9.    Indemnity.

(a)    The Borrower shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers,

---

[4] 3% of the total commitment.

[5] 3% of the total commitment.

directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited in each case to one firm of outside counsel for all similarly situated Indemnified Parties) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the Agent and the DIP Lenders on the one hand and the Loan Parties on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.  **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10. <u>Adjustments for Withholding, Capital Adequacy Etc.</u>  All payments to the Agent by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrower shall make such deductions or withholdings, and (C) the Borrower shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central

bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrower agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower shall indemnify the Agent and each of the DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income.  Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrower pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrower has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower), two properly completed and executed copies of IRS Forms W-8 or W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction (if any) required to be made.  In addition, any such Recipient, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

11.     <u>Priority of Obligations and DIP Lenders' Liens</u>.

(a)     To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrower and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders, having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), and, except as set forth in the Financing Orders, shall at all times be senior to the rights of the Borrower or any domestic or foreign Subsidiary of the Borrower, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case, (ii) pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, Liens in favor of the Prepetition ABL Agent (including adequate protections liens) and Liens in favor of the Prepetition Term Loan Agent (including adequate protections liens), with the priority as set forth in the Financing Orders.  The security interests and Liens granted to the Agent hereunder pursuant to Sections 364(c)(2) shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties' estate under Section 551 of the Bankruptcy Code, or (ii) except as set forth in the Financing Orders, subordinated to or made <u>pari passu</u> with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)     The priority of the Agent's Liens on the Collateral shall be as set forth in the Financing Orders.

(c)     Notwithstanding anything herein to the contrary (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the Carve Out and Permitted Prior Liens, and (ii) no Person entitled to the Carve Out shall be entitled to sell, or otherwise dispose, or seek or object to the sale or other disposition of, any Collateral, subject to any such Person's fiduciary obligations.

(d)     Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

(e)     The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations and the Guaranteed Obligations shall be subject to the Carve Out, in accordance with the Financing Orders.

12.     <u>Further Assurances</u>.  The Borrower agrees that it shall, at the Borrower's expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be

duty executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Borrower such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents confirming and perfecting the granting to the Agent, on behalf of the DIP Lenders, of the Liens (subject to the Financing Orders) in the Collateral to secure the Obligations.

13.    <u>Reports and Notices</u>.  The Borrower agrees that it shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Schedule 13 no later than the times specified therein.  The Borrower agrees not to, and agrees to cause each of its Subsidiaries not to, change its fiscal year.

14.    <u>Affirmative Covenants</u>.

The Borrower agrees that:

(a)    Upon reasonable request of the Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Borrower will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)    (A) The Borrower and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) the Borrower and its Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Sale Motion or the Financing Orders.

(c)    The Borrower and its Subsidiaries will pay or discharge, when due, (i) all material taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary and (2) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this Note, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all

lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrower and its Subsidiaries.

(d)    (i) The Borrower and each of its Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, the Sale Motion or the Financing Orders, (ii) the Borrower and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, and (iii) the Borrower and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances.

(e)    The Borrower and its Subsidiaries will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may be required by the Prepetition Term Loan Facility whether or not such facility remains in effect. Without limiting the generality of the foregoing, the Borrower and its Subsidiaries will at all times keep all tangible Collateral insured against such risks as may be required by the Prepetition Term Loan Facility whether or not such facility remains in effect, with any loss payable to the Agent to the extent of its interest and subject to the Financing Orders, and shall use commercially reasonable efforts to provide within 10 days of the Closing Date (as may be extended by the Agent) that all policies of such insurance shall contain a loss payable endorsement in favor of the Agent and subject to the Financing Orders, in form and substance acceptable to the Agent.  The Loan Parties shall use commercially reasonable efforts to provide within 10 days of the Closing Date (as may be extended by the Agent) that all policies of liability insurance required hereunder shall name the Agent as an additional insured.

(f)    The Borrower and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Budget, the Sale Motion or the Financing Orders.

(g)    The Borrower and its Subsidiaries shall at all times operate their business in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)    The Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

(1)    no later than 2 days after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court;

(2)    no later than 3 days following the Petition Date, the Loan Parties shall file one or more motions seeking entry of orders authorizing and approving bid and sale procedures for all or substantially all of the Loan Parties' assets (the "Sale Motion"), in form and substance reasonably acceptable to the Agent;

(3)    no later than 25 days after the Petition Date, the Final Order approving this Note shall be entered by the Bankruptcy Court;

(4)     no later than 20 days after the Petition Date the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, granting the relief requested in the Sale Motion (including, if appropriate, approval of stalking horse and related protections); and

(5)     no later than 45 days after the Petition Date the Bankruptcy Court shall have entered one or more orders authorizing and approving the sale of all or substantially all of the Loan Parties' assets pursuant to one or a series of related or unrelated sale transactions.

15.    <u>Negative Covenants</u>.

The Borrower and its Subsidiaries each agree that, without the prior written consent of the Agent:

(a)     Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or Equity Interests of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Agent (which consent shall not be unreasonably withheld), other than, in each case, any such action approved by an order of the Bankruptcy Court.

(b)     Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)     [Reserved].

(d)     Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(e)     Neither the Borrower nor any of its Subsidiaries shall (a) make any Restricted Payment, except dividends and distributions by Subsidiaries of the Borrower paid to the Borrower or other wholly-owned Subsidiaries of the Borrower and (b) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders.

(f)     Neither the Borrower nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Borrower or any of its Subsidiaries), except the endorsement of negotiable instruments by Borrower and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(g)     Neither the Borrower nor any of its Subsidiaries will convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (a) the sale of Inventory in the ordinary course of

business, (b) the sale or disposition of obsolete equipment, (c) the sale of other property on terms acceptable to the Agent, and (d) the transfer, sale or disposition of assets approved by an order of the Bankruptcy Court.

(h)     Neither the Borrower nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (a) the Financing Orders or (b) the Prepetition Secured Debt.  Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, and (ii) payments permitted by the Financing Orders and the Budget, subject to Permitted Variance, neither the Borrower nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Agent in writing.

(i)     Neither the Borrowers nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person (other than another Loan Party), through the direct or indirect lending of money, holding of securities or otherwise.

16.     Events of Default; Rights and Remedies.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.     The Borrower (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

B.     Any Loan Party shall fail to comply with any of the provisions of (i) Sections 13, 14(b), 14(d), 14(e) or 14(f) of this Note and such failure shall remain uncured for a period of one (1) Business Day, or (ii) Section 14(a) of this Note and such failure shall remain uncured for a period of three (3) Business Days, or (iii) Section 15 of this Note or any material provision of the Guaranty.

C.     Any Loan Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section 16) and the same, if capable of being remedied, shall remain unremedied for ten (10) Business Days after the earlier of the date a senior officer or any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent to such Loan Party.

D.     Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any other agreement, document or instrument to which any Loan Party

is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $50,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $50,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

E.    Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

F.    Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full all of the Obligations under this Note; (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing secured by such Lien would be used to repay in full all of the Obligations under this Note; (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions adverse to the Agent or the DIP Lenders, or the Agent's rights and remedies hereunder or their interests in the Collateral.

G.    The entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations under this Note, the obligations under the Prepetition Term Loan Facility and the obligations under the Prepetition ABL Facility on or before the effective date of such plan or plans.

H.    The filing of any motion by the Borrower or any Loan Party seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

I.    The sale without the Agent's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for payment in full in cash of the Obligations and the obligations under the Prepetition ABL Facility, the obligations under the Prepetition Term Loan Facility and termination of the DIP Lenders' commitment to make Term Loans.

J.    After receiving written notice from the Agent requesting that the Loan Parties retain a chief restructuring officer of the Loan Parties on terms and conditions (including scope of authority) reasonably acceptable to the Agent from a list of three Persons

identified by the Agent in such written notice, the Loan Parties fail to retain such chief restructuring officer within four (4) Business Days of such written notice;

K.      The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

L.      The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

M.      The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

N.      The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claim or Lien permitted by the Financing Orders), unless (i) consented to by the Agent or (ii) the Obligations, the obligations under the Prepetition ABL Facility and the obligations under the Prepetition Term Loan Facility are paid in full in cash and the DIP Lenders' commitment to make Term Loans is terminated.

O.      The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $50,000.

P.      The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Agent's prior written consent.

Q.      There shall commence any suit or action against the Agent or any DIP Lender by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than Borrower or any Subsidiary, officer, or employee of Borrower, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

R.      Failure of the Loan Parties to comply with any Milestone set forth in Section 14(h).

S.      Any provision of any DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any DIP Document shall cease to be a valid and perfected first priority Lien

(except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

        T.     Termination of the use of Cash Collateral pursuant to the terms of the Financing Orders.

        U.     Assets of any Loan Party with a fair market value of $200,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

        V.     A breach by any Loan Party of the terms of the Financing Orders.

        W.     A Material Adverse Deviation shall have occurred.

        X.     Entry of an order authorizing and/or directing the reclamation of goods pursuant to section 546(c) of the Bankruptcy Code.

        If any Event of Default shall have occurred and be continuing, then the Agent may, upon written notice to the Borrower and subject to the terms of the Financing Orders: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Orders.  Upon the occurrence of an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders, each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

        Except as otherwise provided for in this Note or by applicable law, the Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

        To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent

exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

17.    <u>Reference Agreements</u>.  This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $[_____] and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.    <u>Definitions</u>.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>Administration Fee</u>" shall have the meaning given such term in Section 8 of this Note.

"<u>Bankruptcy Code</u>" shall have the meaning given such term in the recital to this Note.

"<u>Applicable Testing Period</u>" means the four-week period up to and through the Friday of the most recent week then ended, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Friday of the most recent week then ended

"<u>Bankruptcy Court</u>" shall have the meaning given such term in the recital to this Note.

"<u>Base Rate</u>" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"<u>Base Rate Loan</u>" means each portion of a Term Loan that bears interest at a rate determined by reference to the Base Rate.

"<u>Borrower</u>" shall have the meaning given such term in the recital to this Note.

"<u>Budget</u>" means a rolling six (6) week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive 6 weeks after the date of delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the Agent, the Prepetition Term Loan Agent and the Prepetition ABL Agent and shall be approved by the foregoing Persons, in each's sole discretion.  The initial Budget (the "<u>Initial Budget</u>") is attached hereto as <u>Exhibit A</u>.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"<u>Carve Out</u>" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall mean "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Closing Date" means the Business Day when each of the conditions applicable to the Initial Funding and listed in Section 2 of this Note shall have been satisfied or waived in a manner satisfactory to the Agent.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations.  Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, including the Financing Orders and the Guaranty.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on the signature page to the Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"DIP Documents" shall mean the Note, the Collateral Documents, the Guaranty, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent in connection with this Note and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Agent in connection with this Note or the transactions contemplated thereby.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Lenders" shall have the meaning given such term in the recital to this Note.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Equity Interests" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Event of Default" shall have the meaning given such term in Section 16 of this Note.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loan or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

"Exit Fee" shall have the meaning given such term in Section 8 of this Note.

"Extension Fee" means an extension fee equal to $[_____]$^6$, which shall be fully earned and non-refundable when paid.

"Extraordinary Receipts" means any cash received by Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"Facility Fee" shall have the meaning given such term in Section 8 of this Note.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations

---

[6] 0.50% of the total commitment.

or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent, together with all extensions, modifications and amendments thereto, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Orders" shall mean, collectively, the Interim Order and the Final Order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean a guaranty of the Guarantors, in form and substance satisfactory to the Agent, with respect to the Obligations.

"Indebtedness" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents.

"Inventory" shall have the meaning given such term in the Prepetition ABL Credit Agreement whether or not such agreement remains in effect.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or

encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan Party" means Borrower and any Guarantor.

"Material Adverse Deviation" means, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the "Net Cash Flow" line items of the Budget for the Applicable Testing Period.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business, assets, properties or condition (financial or otherwise) of the Loan Parties taken as a whole, (ii) the ability of the Loan Parties to perform payment or other material obligations under any DIP Document, (iii) the legality, validity or enforceability of this Note or any other DIP Document, (iv) the rights and remedies of the Agent and the DIP Lenders under any DIP Document, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any of the Collateral.

"Maturity Date" means the earliest to occur of (i) March 31, 2020 (or, if the Borrower has (x) delivered to the Agent a written election to extend the Maturity Date and (y) paid the Extension Fee to the Agent in cash, in each case, on or prior to March 31, 2020), April 30, 2020, (ii) the date that is 25 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section 16.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 14 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to DIP Lenders arising under the Note or any of the other DIP Documents, and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under the Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Note or any of the other DIP Documents.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 21 of this Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code); (i) Liens in favor of the Prepetition Secured Parties and other Liens granted pursuant to the Financing Order (including, to the extent constituting a Lien, the Carve-Out); and (j) to the extent constituting Liens, Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) Prepetition Secured Debt; (d) deferred taxes and other expenses incurred in the ordinary course of business; (e) any Indebtedness existing on the Petition Date; and (f) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall mean certain permitted senior liens as expressly set forth in the Financing Orders.

"Permitted Variance" means a negative variance of up to 10% between the actual net cash flow for the Applicable Testing Period and the "Net Cash Flow" line item as set forth in the Budget for the Applicable Testing Period.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning given such term in the recital to this Note.

"Prepetition ABL Agent" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Facility" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Loan Documents" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Obligations" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Debt" means, collectively, the Prepetition ABL Obligations and the Prepetition Term Loan Obligations.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Agent" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Facility" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Documents" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Obligations" shall have the meaning given such term in the Financing Orders.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Recipient" means the Agent or any DIP Lender, as applicable.

"Register" shall have the meaning given such term in Section 21 of this Note.

"Registered Loan" shall have the meaning given such term in Section 21 of this Note.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Related Parties" shall mean, with respect to any specified Person, such Person's affiliates and the respective managers, administrators, trustees, partners, investors, directors, officers, employees, agents, advisors, sub-advisors or other representatives of such Person and such Person's affiliates.

"Required Lenders" shall mean, at any time, DIP Lenders whose aggregate Pro Rata Shares exceed 50%.

"Restricted Payment" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Sale Motion" shall have the meaning given such term in Section 14 of this Note.

"Stockholder" shall mean with respect to any Person, each holder of Equity Interests of such Person.

"Subsidiary" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

19.    Representations and Warranties.  The Borrower and each of its Subsidiaries represent as follows:

(a)    the Borrower and each of its Subsidiaries are duly formed and/or organized and validly existing under the laws of their jurisdictions of incorporation or formation;

(b)    upon entry of the Financing Orders, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its Subsidiaries or any of their properties;

(c)    the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)    upon entry of the Financing Orders, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms except as limited by equitable principles relating to enforceability.

(e)    the Borrower and its Subsidiaries have good and marketable title to, or valid leasehold interests in, all of its material property and assets; none of the properties and assets of the Borrower and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)    no information contained in this Note, any of the other DIP Document, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note or otherwise, when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of all of the circumstances under which they were made;

(g)    the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Prior Liens or other Liens permitted to have such priority under the Financing Orders;

(h)    except for proceedings in the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower of its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrower or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)    [reserved];

(j)    [reserved]; and

(k)    except for the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting any Loan Party, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect.

(l)    the Borrower and its Subsidiaries have filed all material federal, state and other tax returns and reports required to be filed, and have paid all material federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable.

20.    <u>Agent</u>.

(a)    <u>Appointment</u>.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans

outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.  The Agent may perform any of its duties hereunder or under the other DIP Documents by or through any one or more sub-agents or attorneys-in-fact appointed by the Agent.  The Agent and any such sub-agent or attorney-in-fact may perform any and all of its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions set forth in this Section 20 shall apply to any such sub-agent or attorney-in-fact and the Related Parties of the Agent, any such sub-agent and any such attorney-in-fact and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

(b) <u>Nature of Duties</u>.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.

(c) <u>Rights, Exculpation, Etc</u>.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(d) <u>Reliance</u>.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e) <u>Indemnification</u>.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under

this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

    (f) <u>Collateral Matters</u>.

      (1) The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

      (2) Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (f)(1) above.

    The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

    21. <u>Miscellaneous</u>.

    (a) All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

      If to Borrower:    Celadon Group, Inc.
                   9503 East 33rd Street
                   Indianapolis, Indiana 46235
                   Attn: General Counsel
                   Email: cwelsh@celadontrucking.com

      with copies to:    DLA Piper LLP (US)
                   444 West Lake Street
                   Chicago, Illinois 60606
                   Attn:  Rick Chesley

|                      | Email: richard.chesley@dlapiper.com |
|----------------------|--------------------------------------|
| If to Agent or any Lender: | Blue Torch Finance, LLC<br>c/o Blue Torch Capital LP<br>430 Park Avenue, Suite 1202<br>New York, New York 10022<br>Email:  BlueTorchAgency@cortlandglobal.com |
| with copies to:      | SEI- Blue Torch Capital Loan Ops<br>1 Freedom Valley Drive<br>Oaks, Pennsylvania 19456<br>Email:  bluetorch.loanops@seic.com |
|                      | Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attn:  Adam Harris and Frederic L. Ragucci<br>Email: adam.harris@srz.com<br>          frederic.ragucci@srz.com |

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by email be effective when confirmation is received.

(b)     The Borrower shall reimburse the Agent for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including the reasonable fees and expenses of outside counsel for Agent, all of its special local counsel, fees for one (in the absence of any conflicts of interest) financial advisor for the Agent and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith).  Subject to the foregoing, the Borrower shall reimburse the Agent for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(1)     any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)     the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

(3)     any litigation, contest, dispute, suit, proceeding or action

(whether instituted by the Agent, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)     any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5)     any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)     any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrower or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Borrower to the Agent on behalf of the DIP Lenders.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges;; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to the Financing Orders).

(c)     No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of

the Agent to any other or further action in any circumstances without notice or demand.

(d)    Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)    If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)    **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF TUE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

(h)    **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED**

**EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i)     The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(j)     The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent.  The DIP Lenders may assign to one or more entitles all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder.  An assigning DIP Lender shall notify the Borrower of any such assignment (other than an assignment to an affiliate of such DIP Lender or a Related Fund) which notice shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee.

(k)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon (the "Registered Loans") owing to each DIP Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note.  The Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(l)     Upon receipt by the Agent of an assignment notice, the Agent shall accept such assignment and record the information contained therein in the Register.

(m)     A Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.  Any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register.  Prior to the registration of assignment or sale of any Registered Loan, the Agent shall treat the Person in whose name such Registered Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(n)     In the event that a DIP Lender sells participations in a Registered Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of

the participation (the "Participant Register").  A Registered Loan may be participated in whole or in part only by registration of such participation on the Participant Register.  Any participation of such Registered Loan may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(o)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower and the Agent.

(p)     Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(q)     This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees.  The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(r)     In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

(s)     THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*     *     *     *     *

IN WITNESS WHEREOF, the Borrower have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

<div style="margin-left: 40%;">

CELADON GROUP, INC., as Debtor and Debtor in Possession

By: _____

    Name:

    Title

</div>

Acknowledged and Agreed

BLUE TORCH FINANCE, LLC, as Agent

By: _____

    Name:

    Title:

[_____], as DIP Lender

By: _____

    Name:

    Title:

    Commitment Amount:

    Initial Loan $[_____]

    Additional Loan $[_____]

[_____], as DIP Lender

By: _____
     Name:
     Title:


     Commitment Amount:
     Initial Loan $[_____]
     Additional Loan $[_____]

Schedule 13

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the monthly reports, quarterly reports, annual reports and compliance certificates required by Section 5.1 of the Prepetition Term Loan Credit Agreement and each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to the Agent:

| on Friday of each week beginning with the first full calendar week after the Petition Date | (a)    a weekly DIP variance report/reconciliation for the prior week and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts, (B) disbursements, (C) net operating cash flow, (D) outstanding loans under the Prepetition ABL Facility, (E) Term Loan balances and outstanding loans under the Prepetition Term Loan Facility and (F) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by an authorized officer of the Borrower, |
|---|---|
| | (b)    a weekly report of sales results (including detail on gross recoveries and expenses) with respect to the sales of the Loan Parties' real properties, |
| | (c)    a weekly report from Ritchie Bros. Auctioneers (America) Inc. with respect to equipment stored at their locations, |
| on the date that is four full weeks after the Petition Date and every second week thereafter | (d)    a revised proposed budget (it being understood that upon written approval of such proposed budget by the Agent, in its sole discretion, such proposed budget shall become the "Budget") and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the Agent and DIP Lenders, |
| promptly, to the extent reasonably feasible, | (e)    copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; provided that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, but in any event within 5 Business Days after Borrower has knowledge of | (f)    notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |

| | |
|---|---|
| any event or condition that constitutes a Default, | |
| upon the reasonable request of Agent, | (g)      any other information reasonably requested relating to the financial condition of Borrower or its Subsidiaries, and |
| upon notice of Agent, | (h)      reasonable access to the advisors to the Loan Parties at all times during the Chapter 11 Cases. |

# **EXHIBIT B**

## **Initial Budget**

DOC ID - 33118700.3

Celadon
13 Week Cash Flow Forecast

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Weeks |
|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 12/8/19 | 12/15/19 | 12/22/19 | 12/29/19 | 1/5/20 | 1/12/20 | 1/19/20 | 1/26/20 | 1-8 |
| Week Ending | 12/14/19 | 12/21/19 | 12/28/19 | 1/4/20 | 1/11/20 | 1/18/20 | 1/25/20 | 2/1/20 | |
| **Receipts** | | | | | | | | | |
| Initial Cash Collateral Contribution from Mid-Cap | $ 400 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 400 |
| 5% of Weekly A/R Collections to Fund Estate | - | 219 | 387 | 426 | 306 | 306 | 306 | 77 | 2,026 |
| 50% Collection of Ineligibles | - | - | - | - | - | - | 183 | 183 | 366 |
| Additional Use of Cash Collateral After Mid-Cap Payoff | - | - | - | - | - | - | - | 750 | 750 |
| **Total Receipts** | **400** | **219** | **387** | **426** | **306** | **306** | **489** | **1,009** | **3,542** |
| **Operating Disbursements** | | | | | | | | | |
| Driver Payroll | 1,903 | - | - | - | - | - | - | - | 1,903 |
| OO/Agency Payroll | 528 | - | - | - | - | - | - | - | 528 |
| G&A Payroll | 1,333 | 44 | 466 | 9 | 67 | 9 | 67 | 9 | 2,003 |
| Fuel | 590 | - | - | - | - | - | - | - | 590 |
| Intercompany | 1,050 | - | - | - | - | - | - | - | 1,050 |
| Funding to Taylor | 450 | - | - | - | - | - | - | - | 450 |
| Liability Insurance & Claims | - | - | - | 150 | - | - | - | 150 | 300 |
| Information Technology | 36 | 185 | 25 | 25 | 25 | 25 | 13 | 13 | 346 |
| Medical | 9 | 11 | 3 | 4 | 5 | 6 | 7 | 8 | 54 |
| Other Operating | 300 | 100 | 50 | 50 | 50 | 50 | 25 | 25 | 650 |
| **Total Operating Disbursements** | **6,198** | **340** | **544** | **237** | **147** | **90** | **111** | **205** | **7,873** |
| **Operating Cash Flow** | **(5,798)** | **(121)** | **(158)** | **189** | **159** | **216** | **377** | **805** | **(4,331)** |
| **Other Receipts** | | | | | | | | | |
| Asset Sales | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | 200 | - | - | - | 200 | 400 |
| **Total Other Receipts** | **-** | **-** | **-** | **200** | **-** | **-** | **-** | **200** | **400** |
| **Other Disbursements** | | | | | | | | | |
| DIP Loan Interest and Fees | 298 | - | - | 82 | - | - | - | 109 | 489 |
| Professional Fees | 500 | - | - | - | - | - | - | 1,875 | 2,375 |
| U.S. Trustee Fees | - | - | - | - | - | - | 275 | - | 275 |
| Driver Return Bonus and Bus Tickets | 1,015 | - | - | - | - | - | - | - | 1,015 |
| **Total Other Disbursements** | **1,813** | **-** | **-** | **82** | **-** | **-** | **275** | **1,984** | **4,154** |
| **Net Cash Flow** | **$ (7,611)** | **$ (121)** | **$ (158)** | **$ 307** | **$ 159** | **$ 216** | **$ 102** | **$ (980)** | **$ (8,085)** |
| **DIP Financing** | | | | | | | | | |
| Beginning Balance | $ - | $ 8,250 | $ 8,250 | $ 8,250 | $ 8,250 | $ 8,250 | $ 8,250 | $ 8,250 | $ - |
| + Borrowings | 8,250 | - | - | - | - | - | - | - | 8,250 |
| - Application of Cash Collateral After Mid-Cap Payoff | - | - | - | - | - | - | - | (2,525) | (2,525) |
| Ending DIP Balance | $ 8,250 | $ 8,250 | $ 8,250 | $ 8,250 | $ 8,250 | $ 8,250 | $ 8,250 | $ 5,725 | $ 5,725 |
| **Cash** | | | | | | | | | |
| Beginning Balance | 240 | 879 | 758 | 601 | 907 | 1,067 | 1,282 | 1,385 | 240 |
| + DIP Borrowings | 8,250 | - | - | - | - | - | - | - | 8,250 |
| +/- Net Cash Flow | (7,611) | (121) | (158) | 307 | 159 | 216 | 102 | (980) | (8,085) |
| Ending Cash | $ 879 | $ 758 | $ 601 | $ 907 | $ 1,067 | $ 1,282 | $ 1,385 | $ 405 | $ 405 |

**EXHIBIT C**
**Lien and Claim Priority**

| Order of Priority | Prepetition ABL Priority Collateral (whether in existence on the Petition Date or thereafter arising) | Prepetition Term Loan Priority Collateral (whether in existence on the Petition Date or thereafter arising) | Unencumbered Assets |
|---|---|---|---|
| 1st | Carve-Out Reserve and Permitted Liens | Carve-Out and Permitted Liens | Carve-Out and Permitted Liens |
| 2nd | Prepetition ABL Facility (and adequate protection with respect thereto) | DIP Term Loan Facility | DIP Term Loan Facility |
| 3rd | DIP Term Loan Facility | Prepetition Term Loan Facility (and adequate protection with respect thereto) | Adequate protection lien for Prepetition Term Loan Facility and the Prepetition ABL Facility |
| 4th | Prepetition Term Loan Facility (and adequate protection with respect thereto) | Prepetition ABL Facility (and adequate protection with respect thereto) | |

| Order of Priority | Superpriority Claims |
|---|---|
| 1st | Carve-Out |
| 2nd | DIP Superpriority Claim |
| 3rd | Adequate Priority Superpriority Claims (*pari passu* with each other) |

# **EXHIBIT D**

**(Guaranty)**

# GUARANTY

GUARANTY, dated as of December [__], 2019 (this "*Guaranty*"), by each of the entities set forth on the signature pages to this Guaranty (each, a "*Guarantor*" and, collectively, the "*Guarantors*"), in favor of the Agent for the benefit of itself, each DIP Lender and each other holder of an Obligation (as each such term is defined in the DIP Note referred to below) (each, a "*Guaranteed Party*" and, collectively, the "*Guaranteed Parties*").

## WITNESSETH:

WHEREAS, on December[__], 2019 (the "<u>Petition Date</u>"), CELADON GROUP, INC. (the "<u>Borrower</u>") and certain of its affiliates filed voluntary petitions for reorganization relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "<u>Bankruptcy Code</u>"). The Borrower and its debtor affiliates continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower, the Agent and the DIP Lenders are parties to a Debtor in Possession Secured Multi-Draw Term Promissory Note, dated as of the date hereof, (such agreement, as amended, restated, supplemented or otherwise modified from time to time, being hereinafter referred to as the "<u>DIP Note</u>"; capitalized terms defined therein and used herein having the meanings given to them in the DIP Note);

WHEREAS, pursuant to the DIP Note, the DIP Lenders have agreed to extend credit to the Borrower consisting of term loans in the aggregate principal amount of up to $[____] (the "<u>Loans</u>"), the proceeds of which are to be used (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget;

WHEREAS, each Guarantor will receive substantial direct and indirect benefits from the making of the Loans and the granting of the other financial accommodations to the Borrower under the DIP Note; and

WHEREAS, a condition precedent to the obligation of the DIP Lenders to make their respective extensions of credit to the Borrower under the DIP Note is that the Guarantors shall have executed and delivered this Guaranty for the benefit of the Guaranteed Parties;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## Section 1       Guaranty

(a)     To induce the DIP Lenders to make the Loans pursuant to the terms and conditions of the Financing Orders and the DIP Documents, each Guarantor hereby absolutely, unconditionally and irrevocably guarantees, jointly with the other Guarantors and severally, as primary obligor and not merely as surety, the full and punctual payment when due and in the

currency due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance herewith, any other DIP Document and the Financing Orders, of all the Obligations, whether or not recovery may be or hereafter may become barred by any statute of limitations, including principal, interest, and reasonable and documented fees and costs of collection. This Guaranty constitutes a guaranty of payment and not of collection.

(b)     Each Guarantor further agrees that, if (i) any payment made by Borrower or any other Person and applied to the Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or (ii) the proceeds of Collateral are required to be returned by any Guaranteed Party to the Borrower, its estate, trustee, receiver or any other party, including any Guarantor, under any bankruptcy law, equitable cause or any other Requirement of Law (as defined in the Prepetition Term Loan Agreement whether or not such agreement remains in effect), then, to the extent of such payment or repayment, any such Guarantor's liability hereunder (and any Lien or other Collateral securing such liability) shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, this Guaranty shall have been cancelled or surrendered (and if any Lien or other Collateral securing such Guarantor's liability hereunder shall have been released or terminated by virtue of such cancellation or surrender), this Guaranty (and such Lien or other Collateral) shall be reinstated in full force and effect, and such prior cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Guarantor in respect of the amount of such payment (or any Lien or other Collateral securing such obligation).

**Section 2**     **[Intentionally Omitted]**

**Section 3**     **Contribution**

To the extent that any Guarantor shall be required hereunder to pay a portion of the Obligations exceeding the greater of (a) the amount of the economic benefit actually received by such Guarantor from the Loans and the other financial accommodations provided to the Borrower under the DIP Documents and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Obligations (excluding the amount thereof repaid by the Borrower) in the same proportion as such Guarantor's net worth at the date enforcement is sought hereunder bears to the aggregate net worth of all the Guarantors at the date enforcement is sought hereunder, then such Guarantor shall be reimbursed by such other Guarantors for the amount of such excess, pro rata, based on the respective net worths of such other Guarantors at the date enforcement hereunder is sought.

**Section 4**     **Authorization; Other Agreements**

The Guaranteed Parties are, as and to the extent permitted under the DIP Note and the Financing Orders, hereby authorized, without notice to, or demand upon, any Guarantor, which notice and demand requirements each are expressly waived hereby, and without discharging or otherwise affecting the obligations of such Guarantor hereunder (which obligations shall remain absolute and unconditional notwithstanding any such action or omission to act), from time to time, to do each of the following:

(a)      supplement, renew, extend, accelerate or otherwise change the time for payment of or other terms relating to, the Obligations, or any part of them, or otherwise modify, amend or change the terms of any agreement, document or instrument (including the DIP Documents) now or hereafter executed by the Borrower and delivered to the Guaranteed Parties or any of them, including any increase or decrease of principal or the rate of interest thereon;

(b)      waive or otherwise consent to noncompliance with any provision of any instrument evidencing the Obligations, or any part thereof, or any other instrument or agreement in respect of the Obligations (including the DIP Documents) now or hereafter executed by the Borrower and delivered to the Guaranteed Parties or any of them;

(c)      accept partial payments on the Obligations;

(d)      receive, take and hold additional security or collateral for the payment of the Obligations or any part of them and exchange, enforce, waive, substitute, liquidate, terminate, abandon, fail to perfect, subordinate, transfer, otherwise alter and release any such additional security or collateral;

(e)      settle, release, compromise, collect or otherwise liquidate the Obligations or accept, substitute, release, exchange or otherwise alter, affect or impair any security or collateral for the Obligations or any part of them or any other guaranty therefor, in any manner;

(f)      add, release or substitute any one or more other guarantors, makers or endorsers of the Obligations or any part of them and otherwise deal with the Borrower or any other guarantor, maker or endorser;

(g)      apply to the Obligations any payment or recovery (x) from the Borrower, from any other guarantor, maker or endorser of the Obligations or any part of them or (y) from any Guarantor in such order as provided herein, in each case whether such Obligations are secured or unsecured or guaranteed or not guaranteed by others;

(h)      apply to the Obligations any payment or recovery from any Guarantor of the Obligations or any sum realized from security furnished by such Guarantor upon its indebtedness or obligations to the Guaranteed Parties or any of them, in each case whether or not such indebtedness or obligations relate to the Obligations; and

(i)      refund at any time any payment received by any Guaranteed Party in respect of any Obligation, and payment to such Guaranteed Party of the amount so refunded shall be fully guaranteed hereby even though prior thereto this Guaranty shall have been cancelled or surrendered (or any release or termination of any Collateral by virtue thereof), and such prior cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any Guarantor hereunder in respect of the amount so refunded (and any Collateral so released or terminated shall be reinstated with respect to such obligations);

even if any right of reimbursement or subrogation or other right or remedy of any Guarantor is extinguished, affected or impaired by any of the foregoing (including any election of remedies by reason of any judicial, non-judicial-or other proceeding in respect of the Obligations that impairs any subrogation, reimbursement or other right of such Guarantor).

**Section 5**        **Guaranty Absolute and Unconditional**

Each Guarantor hereby waives any defense of a surety or guarantor or any other obligor on any obligations arising in connection with or in respect of any of the following and hereby agrees that its obligations under this Guaranty are absolute and unconditional and shall not be discharged or otherwise affected as a result of any of the following:

(a)        the invalidity or unenforceability of any of the Borrower's obligations under the Financing Orders, the DIP Note or any other DIP Document, the Guarantors' obligations hereunder, or any other agreement or instrument relating thereto, or any security for, or other guaranty of the Obligations or any part of them, or the lack of perfection or continuing perfection or failure of priority of any security for the Obligations or any part of them;

(b)        the absence of any attempt to collect the Obligations or any part of them from the Borrower or any other Guarantor or other action to enforce the same;

(c)        failure by any Guaranteed Party to take any steps to perfect and maintain any Lien on, or to preserve any rights to, any Collateral;

(d)        any Guaranteed Party's election, in any proceeding instituted under Chapter 11 of the Bankruptcy Code (including the Chapter 11 Cases), of the application of Section 1111(b)(2) of the Bankruptcy Code or any applicable provisions of comparable state or foreign law;

(e)        the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of any Guaranteed Party's claim (or claims) for repayment of the Obligations ;

(f)        any use of cash collateral under Section 363 of the Bankruptcy Code;

(g)        any agreement or stipulation as to the provision of adequate protection in any bankruptcy proceeding (including the Chapter 11 Cases);

(h)        the avoidance of any Lien in favor of the Guaranteed Parties or any of them for any reason;

(i)        failure by any Guaranteed Party to file or enforce a claim against the Borrower or any other Guarantor or its estate in any bankruptcy or insolvency case or proceeding (including the Chapter 11 Cases);

(j)        any action taken by any Guaranteed Party if such action is authorized hereby;

(k)        any election following the occurrence of an Event of Default by any Guaranteed Party to proceed separately against the personal property Collateral in accordance with such Guaranteed Party's rights under the UCC, the DIP Note and the Financing Orders or, if the Collateral consists of both personal and real property, to proceed (in accordance with the DIP Note and the Financing Orders) against such personal and real property in accordance with such Guaranteed Party's rights with respect to such real property;

(l)     any change in the corporate existence or structure of the Borrower or any other Loan Party;

(m)     any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Guarantor or any other Person against any Guaranteed Party;

(n)     any Requirement of Law affecting any term of any Guarantor's obligations under this Guaranty; or

(o)     any other circumstance that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor or any other obligor on any obligations, other than the payment in full of the Obligations.

**Section 6     Waivers**

Each Guarantor hereby waives, to the full extent permitted by law, diligence, promptness, presentment, demand for payment or performance and protest and notice of protest, notice of acceptance and any other notice in respect of the Obligations or any part of them (in each case other than those that are expressly provided for or required in the Financing Orders, the DIP Note or any other applicable DIP Document), and any defense arising by reason of any disability or other defense of the Borrower or other Guarantor. Each Guarantor shall not, as long as any Obligation (other than unasserted contingent indemnity obligations) remains outstanding, assert any claim or counterclaim it may have against the Borrower or other Guarantor or set off any of its obligations to the Borrower against any obligations of the Borrower or other Guarantor to it. In connection with the foregoing, each Guarantor covenants that its obligations hereunder shall not be discharged, except by complete payment or performance.

**Section 7     Reliance**

Each Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of the Borrower and any endorser and other guarantor of all or any part of the Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Obligations, or any part thereof, that diligent inquiry would reveal, and each Guarantor hereby agrees that no Guaranteed Party shall have any duty to advise any Guarantor of information known to it regarding such condition or any such circumstances. In the event any Guaranteed Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Guarantor, such Guaranteed Party shall be under no obligation (a) to undertake any investigation not a part of its regular business routine, (b) to disclose any information that such Guaranteed Party, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) to make any other or future disclosures of such information or any other information to any Guarantor.

**Section 8     Waiver of Subrogation and Contribution Rights**

As long as any Obligation (other than unasserted contingent indemnity obligations) remains outstanding, the Guarantors shall not enforce or otherwise exercise any right of subrogation to any of the rights of the Guaranteed Parties or any part of them against the Borrower

or other Guarantor or any right of reimbursement or contribution or similar right against the Borrower or other Guarantor by reason of this Guaranty or by any payment made by any Guarantor in respect of the Obligations.

### Section 9        Subordination

Each Guarantor hereby agrees that any Indebtedness of the Borrower now or hereafter owing to such Guarantor, whether heretofore, now or hereafter created (the "*Guarantor Subordinated Debt*"), is hereby subordinated to all of the Obligations and that the Guarantor Subordinated Debt shall not be paid in whole or in part as long as an Event of Default shall have occurred and is continuing. No Guarantor shall accept any payment of or on account of any Guarantor Subordinated Debt at any time in contravention of the foregoing. Upon the occurrence and during the continuance of an Event of Default, subject to the DIP Note and the Financing Orders, the Borrower shall pay to the Agent any payment of all or any part of the Guarantor Subordinated Debt and, subject to the DIP Note and the Financing Orders, any amount so paid to the Agent shall be applied to payment of the Obligations. Each payment on the Guarantor Subordinated Debt received in violation of any of the provisions hereof shall be deemed to have been received by such Guarantor as trustee for the Guaranteed Parties and shall be paid over to the Agent immediately on account of the Obligations, but without otherwise affecting in any manner such Guarantor's liability hereof.

### Section 10        Default; Remedies

The obligations of each Guarantor hereunder are independent of and separate from the Obligations. Subject to the DIP Note and the Financing Orders, if any Obligation is not paid when due, or upon any Event of Default under the DIP Note or under any other DIP Document, the Agent may, at its sole election, proceed directly and at once, without notice, against any Guarantor to collect and recover the full amount or any portion of the Obligations then due, without first proceeding against the Borrower or any other guarantor of the Obligations, or against any Collateral under the DIP Documents or joining the Borrower or any other guarantor in any proceeding against any Guarantor. Subject to the DIP Note and the Financing Orders, at any time after maturity of the Obligations, the Agent may (as long as any Obligation, other than unasserted contingent indemnity obligations, remains outstanding), without notice to any Guarantor and regardless of the acceptance of any Collateral for the payment hereof, appropriate and apply toward the payment of the Obligations (a) any indebtedness due or to become due to any Guaranteed Party from such Guarantor and (b) any moneys, credits or other property belonging to such Guarantor at any time held by or coming into the possession of any Guaranteed Party or any of its respective Affiliates.

### Section 11        Irrevocability

This Guaranty shall be irrevocable as to the Obligations (or any part thereof) until all Obligations (other than unasserted contingent indemnification obligations) then outstanding have been irrevocably repaid in cash, at which time this Guaranty shall automatically be cancelled, all without delivery of any instrument or performance of any act by any Person. Upon such cancellation or the release as described in the succeeding paragraph and at the written request of any Guarantor or its successors or assigns, and at the cost and expense of such Guarantor or its

successors or assigns, the Agent shall execute in a timely manner a satisfaction of this Guaranty and such instruments, documents or agreements as are necessary or desirable to evidence the termination of this Guaranty or the release of such Guarantor, as the case may be.

A Guarantor shall be released from its obligations hereunder upon a sale or other disposition of such Guarantor (or all or substantially all of its assets) permitted by the DIP Note and the Financing Orders; provided, however, that the Borrower shall have delivered to the Agent, at least five Business Days prior to the date of the proposed release (or such later date as the Agent may agree), a written request for release identifying the relevant Grantor and, if applicable, the sale or other disposition in reasonable detail, including the price thereof, together with a certification by the Borrower in form and substance reasonably satisfactory to the Agent stating that such transaction is in compliance with DIP Note and the Financing Orders.

### Section 12    Setoff

Upon the occurrence and during the continuance of an Event of Default, each Guaranteed Party and each Affiliate of a Guaranteed Party may, without notice to any Guarantor and regardless of the acceptance of any security or collateral for the payment hereof, appropriate and apply toward the payment of all or any part of the Obligations (a) any indebtedness due or to become due to such Guaranteed Party or Affiliate from such Guarantor and (b) any moneys, credits or other property belonging to such Guarantor, at any time held by, or coming into, the possession of such Guaranteed Party or Affiliate, in the case of each of the foregoing, subject to the DIP Note and the Financing Orders.

### Section 13    No Marshaling

Each Guarantor consents and agrees that no Guaranteed Party or Person acting for or on behalf of any Guaranteed Party shall be under any obligation to marshal any assets in favor of any Guarantor or against or in payment of any or all of the Obligations.

### Section 14    Enforcement; Waivers; Amendments

(a)    No delay on the part of any Guaranteed Party in the exercise of any right or remedy arising under this Guaranty, the DIP Note, any other DIP Document, the Financing Orders or otherwise with respect to all or any part of the Obligations, the Collateral or any other guaranty of or security for all or any part of the Obligations shall operate as a waiver thereof, and no single or partial exercise by any such Person of any such right or remedy shall preclude any further exercise thereof. Failure by any Guaranteed Party at any time or times hereafter to require strict performance by the Borrower, any Guarantor, any other guarantor of all or any part of the Obligations or any other Person of any provision, warranty, term or condition contained in the Financing Orders or any DIP Document now or at any time hereafter executed by any such Persons and delivered to any Guaranteed Party shall not waive, affect or diminish any right of any Guaranteed Party at any time or times hereafter to demand strict performance thereof and such right shall not be deemed to have been waived by any act (except by a written instrument) or knowledge of any Guaranteed Party, or its respective agents, officers or employees. No waiver of any Event of Default by any Guaranteed Party shall operate as a waiver of any other Event of Default or the same Event of Default on a future occasion, and no action by any Guaranteed Party

permitted hereunder shall in any way affect or impair any Guaranteed Party's rights and remedies or the obligations of any Guarantor under this Guaranty. Any determination by a court of competent jurisdiction of the amount of any principal or interest owing by the Borrower to a Guaranteed Party shall be conclusive and binding on each Guarantor irrespective of whether such Guarantor was a party to the suit or action in which such determination was made. Notwithstanding anything to the contrary in this Guaranty, the rights of the Guaranteed Parties under this Guaranty may be enforced only by the Agent acting upon the instructions of the DIP Lenders, and no Guaranteed Party shall have any right individually to seek to enforce or to enforce this Guaranty, it being understood and agreed that such rights and remedies may be exercised by the Agent for the benefit of the Guaranteed Parties in accordance with the terms of the DIP Note.

(b)    None of the terms or provisions of this Guaranty may be waived, amended, supplemented or modified except in accordance with the DIP Note.

### Section 15    Successors and Assigns

This Guaranty shall be binding upon each Guarantor and upon the successors and assigns of such Guarantors and shall inure to the benefit of the Guaranteed Parties and their respective successors and assigns; all references herein to the Borrower and to the Guarantors shall be deemed to include their respective successors and assigns. The successors and assigns of the Guarantors and the Borrower shall include, without limitation, their respective receivers, trustees and debtors-in-possession. All references to the singular shall be deemed to include the plural where the context so requires.

### Section 16    Representations and Warranties; Covenants

Each Guarantor hereby (a) represents and warrants that the representations and warranties as to it made by the Borrower in Section 19 the DIP Note are true and correct in all material respects on each applicable date as required by Section 2(d) of the DIP Note, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date, and except in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, and (b) agrees to take, or refrain from taking, as the case may be, each action necessary to be taken or not taken, as the case may be, so that no Default or Event of Default is caused by the failure to take such action or to refrain from taking such action by such Guarantor.

### Section 17    Governing Law

This Guaranty and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

### Section 18    Submission to Jurisdiction; Service of Process

(a)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York,

and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Guaranty or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

### Section 19    Waiver of Judicial Bond

To the fullest extent permitted by applicable law, each Guarantor waives the requirement to post any bond that otherwise may be required of any Guaranteed Party in connection with any judicial proceeding to enforce such Guaranteed Party's rights to payment hereunder, security interest in or other rights to the Collateral or in connection with any other legal or equitable action or proceeding arising out of, in connection with, or related to this Guaranty and the DIP Documents to which it is a party.

### Section 20    Certain Terms

The following rules of interpretation shall apply to this Guaranty: (a) the terms *"herein,"* *"hereof"*, *"hereto"* and *"hereunder"* and similar terms refer to this Guaranty as a whole and not to any particular Article, Section, subsection or clause in this Guaranty, (b) unless otherwise indicated, references herein to an Exhibit, Article, Section, subsection or clause refer to the appropriate Exhibit to, or Article, Section, subsection or clause in this Guaranty and (c) the term *"including"* means *"including without limitation"* except when used in the computation of time periods.

### Section 21    Waiver of Jury Trial

*EACH OF THE AGENT, THE OTHER GUARANTEED PARTIES AND EACH GUARANTOR IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY AND ANY OTHER DIP DOCUMENT.*

### Section 22    Notices

Any notice or other communication herein required or permitted shall be given as provided in Section 21(a) of the DIP Note and, in the case of any Guarantor, to such Guarantor in care of the Borrower.

### Section 23    Severability

Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

**Section 24**      **[Intentionally Omitted]**

**Section 25**      **Collateral**

Each Guarantor hereby acknowledges and agrees that its obligations under this Guaranty are secured pursuant to the terms and provisions of the Financing Orders, and covenants that it shall not grant any Lien with respect to its assets in favor, or for the benefit, of any Person other than the Agent, for the benefit of the Guaranteed Parties except as otherwise permitted by the DIP Note and the Financing Orders.

**Section 26**      **Costs and Expenses**

In accordance with and subject to the provisions of Section 21(b) of the DIP Note, each Guarantor agrees to pay or reimburse the Agent and each of the other Guaranteed Parties upon demand for all reasonable and documented out-of-pocket costs and expenses, including outside attorneys' fees, incurred by the Agent and such other Guaranteed Parties in enforcing this Guaranty against such Guarantor or any security therefor or exercising or enforcing any other right or remedy available in connection herewith or therewith.

**Section 27**      **Waiver of Consequential Damages**

*EACH GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGE IN ANY LEGAL ACTION OR PROCEEDING IN RESPECT OF THIS GUARANTY OR ANY OTHER DIP DOCUMENT.*

**Section 28**      **Entire Agreement**

This Guaranty, taken together with the Financing Orders and all of the other DIP Documents executed and delivered by the Guarantors, represents the entire agreement and understanding of the parties hereto and supersedes all prior understandings, written and oral, relating to the subject matter hereof.

**Section 29**      **Counterparts**

This Guaranty may be executed in any number of separate counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple counterparts and attached to a single counterpart so that all signature pages are attached to the same document. Delivery of an executed counterpart by facsimile transmission or electronic mail shall be effective as delivery of a manually executed counterpart.

<div align="center">[SIGNATURE PAGES FOLLOW]</div>

IN WITNESS WHEREOF, the Guarantors have caused this Guaranty to be executed by an officer thereunto duly authorized, as of the date first above written.

CELADON E-COMMERCE, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


CELADON TRUCKING SERVICES, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


CELADON REALTY, LLC


By:_____
    Name: Chase Welsh
    Title: Secretary


TAYLOR EXPRESS, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


OSBORN TRANSPORTATION, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


CELADON LOGISTICS SERVICES, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary

DOC ID - 33096768.3

EAGLE LOGISTICS SERVICES INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


BEE LINE, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


VORBAS, LLC


By:_____
    Name: Chase Welsh
    Title: Secretary


DISTRIBUTION, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


QUALITY COMPANIES LLC


By:_____
    Name: Chase Welsh
    Title: Secretary


QUALITY EQUIPMENT LEASING, LLC


By:_____
    Name: Chase Welsh
    Title: Secretary

QUALITY INSURANCE LLC


By:_____
    Name: Chase Welsh
    Title: Secretary


SERVICIOS DE TRANSPORTACIÓN JAGUAR,
S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary


CELADON MEXICANA, S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary


SERVICIOS CORPORATIVOS JAGUAR, S.C.


By:_____
    Name: Chase Welsh
    Title: Secretary


JAGUAR LOGISTICS S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary


LEASING SERVICIOS, S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary

CELADON MEXICANA, S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary


CELADON CANADIAN HOLDINGS, LIMITED


By:_____
    Name: Chase Welsh
    Title: Secretary


HYNDMAN TRANSPORT LIMITED


By:_____
    Name: Chase Welsh
    Title: Secretary


CELADON INTERNATIONAL CORPORATION


By:_____
    Name: Chase Welsh
    Title: Secretary


STINGER LOGISTICS, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


A R MANAGEMENT SERVICES, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary

STRATEGIC LEASING, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


TRANSPORTATION SERVICES RISK
RETENTION GROUP, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary

**<u>Exhibit B</u>**

**(DIP Loan Agreement)**

# DEBTOR IN POSSESSION SECURED
# MULTI-DRAW TERM PROMISSORY NOTE

$[_____]¹

New York, New York
December [__], 2019

On December [9], 2019 (the "Petition Date"), CELADON GROUP, INC., a Delaware corporation (the "Borrower") and certain of its affiliates² commenced Chapter 11 Cases, which cases are being jointly administered under Chapter 11 Case No. [19-_____] (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The Borrower has requested that Blue Torch Finance, LLC, as agent (in such capacity, the "Agent") for the lenders (the "DIP Lenders") from time to time party to this Debtor in Possession Secured Multi-Draw Term Promissory Note (as amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, this "Note"), make term loans (the "Term Loans") from time to time evidenced by this Note.  Certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors"), and are simultaneously executing Guarantees in favor of the Agent.  The Borrower intends to utilize such Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay costs, premiums, fees, and expenses incurred to administer or related to of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, subject to any Permitted Variance.  Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

     1.    Term Loans.

     (a)    Subject to the terms and conditions hereof including the Agent's receipt of a Borrowing Request (as defined below), the DIP Lenders agree to provide the Borrower with a

---

¹ Total DIP Term Loan amount TBD.

² The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); Vorbas, LLC (8936).  The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

term loan on the Closing Date in the principal amount of $[_____] (the "Initial Loan"). Subject to the terms and conditions hereof, at any time on or after the date of entry of the Final Order and upon the Agent's receipt of a Borrowing Request, the DIP Lenders agree to provide the Borrower with one additional loan in an aggregate principal amount not to exceed $[_____] (the "Additional Loan").  The Borrower may request the Initial Loan and the Additional Loan pursuant to written notice (which may be by email) delivered to the Agent (x) one (1) Business Day prior to the proposed borrowing day of the Initial Loan and (y) three (3) Business Days prior to the proposed borrowing date of the Additional Loan (or, in each case, such shorter period as the Agent may agree) (a "Borrowing Request").  The Borrowing Request shall be in a form reasonably satisfactory to the Agent.  Each DIP Lender shall provide each Term Loan in an aggregate amount not to exceed its Commitment with respect to such Term Loan and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several.  Upon receipt of a Borrowing Request with respect to any Term Loan, subject to the satisfaction of the conditions set forth in this Note, each DIP Lender shall simultaneously and proportionately to its Pro Rata Share of  its Commitment with respect to such Term Loan, make the proceeds of such Term Loan available to the Borrower or the Agent on the applicable date of funding of such Term Loan by transferring immediately available funds equal to such proceeds to an account designated in writing by the Borrower consistent with its existing cash management system (or to the Agent, which will then transfer such funds to the Borrower).  The relevant Commitment of each DIP Lender shall be permanently reduced upon the making of the relevant Term Loan in an amount equal to such Term Loan advanced by such DIP Lender.  Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

(b)     The aggregate principal amount of Terms Loans outstanding shall not exceed $[_____] , subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c)     The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent to be genuine.  The Agent may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)     The Borrower shall utilize the proceeds of Term Loans to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay costs, premiums, fees, and expenses incurred to administer or related to  the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, subject to any Permitted Variance, this Note, the Bankruptcy Code, and the Financing Orders); provided, that, unless otherwise provided in the Budget, subject to any Permitted Variance, or approved by the Agent, no portion of any Term Loan shall be used, directly or indirectly: (a) except as permitted by Section 15(e), to make any payment on Prepetition Secured Debt or to finance or make any Restricted Payment, (b) to pay any fees or similar amounts payable to any Person who has proposed or may propose to purchase interests in any of the Borrower or any of its respective

Subsidiaries or affiliates or who otherwise has proposed or may propose to invest in the Borrower or any of its respective Subsidiaries or affiliates (including so-called "topping fees," "exit fees," and similar amounts), or (c) to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the Borrower.

      2.    <u>Certain Conditions to Each Term Loan</u>.  No DIP Lender shall be obligated to fund any Term Loan, if, as of the date thereof:

      (a)    The Borrower shall not have paid any Obligations then payable hereunder (including the fees and expenses of counsel to the Agent) or under any other DIP Document;

      (b)    The Loan Parties shall not have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance reasonably satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

      (c)    The Loan Parties shall not have delivered guarantees of each of the Guarantors, each in form and substance reasonably satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

      (d)    any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

      (e)    with respect to the Initial Loan (i) the Bankruptcy Court shall not have entered the Interim Order; or (ii) the Interim Order shall have been stayed, vacated, reversed, modified or amended without Agent's consent;

      (f)    with respect to the Additional Loan (i) the Bankruptcy Court shall not have entered the Final Order; or (ii) the Final Order shall have been stayed, vacated, reversed, modified or amended without Agent's consent;

      (g)    [reserved];

      (h)    any Default or Event of Default shall have occurred and be continuing or would result after giving effect to any Term Loan;

      (i)    after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount permitted to be borrowed on a cumulative basis from the date hereof through the date of such requested Term Loan as set forth in the Budget and the Financing Orders;

      (j)    the Agent shall not have received and approved the Budget in accordance with this Note and the Financing Orders;

(k)      [reserved];

(l)      the Loan Parties shall not have provided reasonable access for, and reasonable cooperation with, FTI Consulting, as financial advisor to the Agent;

(m)      the Loan Parties shall have filed pleadings with the Bankruptcy Court, which pleadings could adversely affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders, and such pleadings shall not be in form and substance reasonably acceptable to the Agent; or

(n)      the Bankruptcy Court shall have entered orders, which orders could materially and adversely affect the rights or remedies of the Agent and the DIP Lenders under this Note and the Financing Orders, and such orders shall not be in form and substance reasonably acceptable to the Agent.

The request and acceptance by the Borrower of the proceeds of any Term Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by the Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower of the granting and continuance of the Liens granted in favor of the Agent on behalf of the DIP Lenders, pursuant to the Financing Orders.

3.      Payment of Principal.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, the lesser of (x) $[_____] and (y) the unpaid principal amount of all Term Loans made by the Agent on behalf of the DIP Lenders to the Borrower, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent provided in this Note.

4.      Payment of Interest.

(a)      Subject to the terms of this Note, the Term Loan or any portion thereof shall be a Base Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until repaid, at a rate per annum equal to the Base Rate plus 12.50%.

(b)      Interest on the Term Loan shall be payable monthly, in arrears, on the last Business Day of each month, commencing on the last Business Day of the month in which the applicable Term Loan is made.  If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)      All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(d)      So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent, the interest rate applicable to the Obligations shall

be increased by two percentage points (2.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(e)     It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower).  If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(e) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).

(f)     If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loan hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the

Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

       5.     <u>Payments</u>.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the account as shall be designated in a written notice delivered by the Agent to the Borrower. Each payment made hereunder shall be credited first to interest then due and payable and the remainder of such payment shall be credited to principal, and interest shall thereupon cease to accrue upon the principal so repaid.  The Borrower shall make each payment required under this Note prior to 12:00 noon New York City time on the date when due, in immediately available funds.  Any amounts received after such time on any date may, in the sole discretion of the Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.

       6.     <u>Optional Prepayments</u>.  Subject to the terms and conditions of the Financing Orders, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' written notice to the Agent; <u>provided</u> that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds which are not received.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment.

       7.     <u>Mandatory Prepayments</u>.  In each case, subject to the terms and conditions of the Financing Orders and the Budget, upon not less than one (1) Business Day prior written notice by the Borrower to the Agent by 1:00 p.m. New York City time:

       (a)     [Reserved].

       (b)     Immediately upon receipt by any Loan Party of cash proceeds of any asset disposition, unless the Agent agrees otherwise, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (1) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), (2) transfer, sales, or similar taxes, and (3) amounts required to be applied to the repayment of debt secured by such assets sold and secured by a Lien that is senior to the Liens securing the Obligations under this Note (such net proceeds, the "<u>Net Cash Proceeds</u>").

       (c)     If any Loan Party issues any debt securities not permitted under this Note, no later than the Business Day following the date of receipt of the cash proceeds thereof, the

Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.

(d)     Upon the receipt by any Loan Party or any of their Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of any expenses incurred in collecting such Extraordinary Receipts.

(e)     No Implied Consent.  Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of this Note or the other DIP Documents.

8.     Fees.  Borrower shall pay to the Agent for the account of the DIP Lenders the following fees:

(a)     Facility Fee.  On or prior to the date of funding of the Initial Loan, the Borrower shall pay to the Agent a facility fee (the "Facility Fee") equal to $[_____][4], which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(b)     Administration Fee.  On or prior to the date of funding of the Initial Loan, the Borrower shall pay to the Agent an administration fee (the "Administration Fee") equal to $50,000, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(c)     Exit Fee.  On the earlier of (1) the date that all the Obligations under this Note are paid in full in cash and (2) the Maturity Date, the Borrower shall pay to the Agent an exit fee (the "Exit Fee") equal to $[_____][5], which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(d)     Additional Fee.  On the earlier of (1) the date that all the Obligations under this Note are paid in full in cash and (2) the Maturity Date, the Borrower shall pay to the Agent an additional fee (the "Additional Fee") equal to 2.50% of the Net Cash Proceeds of asset dispositions of the Loan Parties in excess of the amounts required to repay in full the Obligations (other than the Additional Fee), the Prepetition ABL Obligations and the Prepetition Term Loan Obligations with respect to the Term A Loan (as defined in the Prepetition Term Loan Credit Agreement), which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

9.     Indemnity.

(a)     The Borrower shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers,

---

[4] 3% of the total commitment.

[5] 3% of the total commitment.

directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited in each case to one firm of outside counsel for all similarly situated Indemnified Parties) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the Agent and the DIP Lenders on the one hand and the Loan Parties on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.  **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

   10. Adjustments for Withholding, Capital Adequacy Etc.  All payments to the Agent by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrower shall make such deductions or withholdings, and (C) the Borrower shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

   If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central

bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrower agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower shall indemnify the Agent and each of the DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income.  Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrower pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrower has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower), two properly completed and executed copies of IRS Forms W-8 or W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction (if any) required to be made.  In addition, any such Recipient, if reasonably requested by the Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower as will enable the Borrower to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower in writing of its legal inability to do so.

11.    <u>Priority of Obligations and DIP Lenders' Liens</u>.

(a)    To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrower and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders, having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), and, except as set forth in the Financing Orders, shall at all times be senior to the rights of the Borrower or any domestic or foreign Subsidiary of the Borrower, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case, (ii) pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, Liens on, and security interests in, the Collateral, subject only to the Carve Out, Permitted Prior Liens, Liens in favor of the Prepetition ABL Agent (including adequate protections liens) and Liens in favor of the Prepetition Term Loan Agent (including adequate protections liens), with the priority as set forth in the Financing Orders.  The security interests and Liens granted to the Agent hereunder pursuant to Sections 364(c)(2) shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties' estate under Section 551 of the Bankruptcy Code, or (ii) except as set forth in the Financing Orders, subordinated to or made <u>pari passu</u> with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)    The priority of the Agent's Liens on the Collateral shall be as set forth in the Financing Orders.

(c)    Notwithstanding anything herein to the contrary (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the Carve Out and Permitted Prior Liens, and (ii) no Person entitled to the Carve Out shall be entitled to sell, or otherwise dispose, or seek or object to the sale or other disposition of, any Collateral, subject to any such Person's fiduciary obligations.

(d)    Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

(e)    The Agent's Liens on the Collateral and the super-priority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations and the Guaranteed Obligations shall be subject to the Carve Out, in accordance with the Financing Orders.

12.    <u>Further Assurances</u>.  The Borrower agrees that it shall, at the Borrower's expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be

duty executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Borrower such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents confirming and perfecting the granting to the Agent, on behalf of the DIP Lenders, of the Liens (subject to the Financing Orders) in the Collateral to secure the Obligations.

13.    <u>Reports and Notices</u>.  The Borrower agrees that it shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Schedule 13 no later than the times specified therein.  The Borrower agrees not to, and agrees to cause each of its Subsidiaries not to, change its fiscal year.

14.    <u>Affirmative Covenants</u>.

The Borrower agrees that:

(a)    Upon reasonable request of the Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Borrower will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)    (A) The Borrower and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) the Borrower and its Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Sale Motion or the Financing Orders.

(c)    The Borrower and its Subsidiaries will pay or discharge, when due, (i) all material taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary and (2) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this Note, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all

lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrower and its Subsidiaries.

(d)    (i) The Borrower and each of its Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, the Sale Motion or the Financing Orders, (ii) the Borrower and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, and (iii) the Borrower and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances.

(e)    The Borrower and its Subsidiaries will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may be required by the Prepetition Term Loan Facility whether or not such facility remains in effect. Without limiting the generality of the foregoing, the Borrower and its Subsidiaries will at all times keep all tangible Collateral insured against such risks as may be required by the Prepetition Term Loan Facility whether or not such facility remains in effect, with any loss payable to the Agent to the extent of its interest and subject to the Financing Orders, and shall use commercially reasonable efforts to provide within 10 days of the Closing Date (as may be extended by the Agent) that all policies of such insurance shall contain a loss payable endorsement in favor of the Agent and subject to the Financing Orders, in form and substance acceptable to the Agent.  The Loan Parties shall use commercially reasonable efforts to provide within 10 days of the Closing Date (as may be extended by the Agent) that all policies of liability insurance required hereunder shall name the Agent as an additional insured.

(f)    The Borrower and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Budget, the Sale Motion or the Financing Orders.

(g)    The Borrower and its Subsidiaries shall at all times operate their business in a manner consistent with the Budget except to the extent of any Permitted Variance.

(h)    The Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur (each a "Milestone" and collectively, the "Milestones"):

(1)    no later than 2 days after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court;

(2)    no later than 3 days following the Petition Date, the Loan Parties shall file one or more motions seeking entry of orders authorizing and approving bid and sale procedures for all or substantially all of the Loan Parties' assets (the "Sale Motion"), in form and substance reasonably acceptable to the Agent;

(3)    no later than 25 days after the Petition Date, the Final Order approving this Note shall be entered by the Bankruptcy Court;

(4)      no later than 20 days after the Petition Date the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, granting the relief requested in the Sale Motion (including, if appropriate, approval of stalking horse and related protections); and

(5)      no later than 45 days after the Petition Date the Bankruptcy Court shall have entered one or more orders authorizing and approving the sale of all or substantially all of the Loan Parties' assets pursuant to one or a series of related or unrelated sale transactions.

15.   <u>Negative Covenants</u>.

The Borrower and its Subsidiaries each agree that, without the prior written consent of the Agent:

(a)      Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or Equity Interests of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Agent (which consent shall not be unreasonably withheld), other than, in each case, any such action approved by an order of the Bankruptcy Court.

(b)      Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)      [Reserved].

(d)      Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(e)      Neither the Borrower nor any of its Subsidiaries shall (a) make any Restricted Payment, except dividends and distributions by Subsidiaries of the Borrower paid to the Borrower or other wholly-owned Subsidiaries of the Borrower and (b) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders.

(f)      Neither the Borrower nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Borrower or any of its Subsidiaries), except the endorsement of negotiable instruments by Borrower and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(g)      Neither the Borrower nor any of its Subsidiaries will convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (a) the sale of Inventory in the ordinary course of

business, (b) the sale or disposition of obsolete equipment, (c) the sale of other property on terms acceptable to the Agent, and (d) the transfer, sale or disposition of assets approved by an order of the Bankruptcy Court.

(h)     Neither the Borrower nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (a) the Financing Orders or (b) the Prepetition Secured Debt.  Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, and (ii) payments permitted by the Financing Orders and the Budget, subject to Permitted Variance, neither the Borrower nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Agent in writing.

(i)     Neither the Borrowers nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person (other than another Loan Party), through the direct or indirect lending of money, holding of securities or otherwise.

16.     Events of Default; Rights and Remedies.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.     The Borrower (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

B.     Any Loan Party shall fail to comply with any of the provisions of (i) Sections 13, 14(b), 14(d), 14(e) or 14(f) of this Note and such failure shall remain uncured for a period of one (1) Business Day, or (ii) Section 14(a) of this Note and such failure shall remain uncured for a period of three (3) Business Days, or (iii) Section 15 of this Note or any material provision of the Guaranty.

C.     Any Loan Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section 16) and the same, if capable of being remedied, shall remain unremedied for ten (10) Business Days after the earlier of the date a senior officer or any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent to such Loan Party.

D.     Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any other agreement, document or instrument to which any Loan Party

is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $50,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $50,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

E.    Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

F.    Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full all of the Obligations under this Note; (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing secured by such Lien would be used to repay in full all of the Obligations under this Note; (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions adverse to the Agent or the DIP Lenders, or the Agent's rights and remedies hereunder or their interests in the Collateral.

G.    The entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations under this Note, the obligations under the Prepetition Term Loan Facility and the obligations under the Prepetition ABL Facility on or before the effective date of such plan or plans.

H.    The filing of any motion by the Borrower or any Loan Party seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

I.    The sale without the Agent's consent, of all or substantially all of Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for payment in full in cash of the Obligations and the obligations under the Prepetition ABL Facility, the obligations under the Prepetition Term Loan Facility and termination of the DIP Lenders' commitment to make Term Loans.

J.    After receiving written notice from the Agent requesting that the Loan Parties retain a chief restructuring officer of the Loan Parties on terms and conditions (including scope of authority) reasonably acceptable to the Agent from a list of three Persons

identified by the Agent in such written notice, the Loan Parties fail to retain such chief restructuring officer within four (4) Business Days of such written notice;

K.      The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

L.      The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

M.      The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

N.      The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claim or Lien permitted by the Financing Orders), unless (i) consented to by the Agent or (ii) the Obligations, the obligations under the Prepetition ABL Facility and the obligations under the Prepetition Term Loan Facility are paid in full in cash and the DIP Lenders' commitment to make Term Loans is terminated.

O.      The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $50,000.

P.      The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Agent's prior written consent.

Q.      There shall commence any suit or action against the Agent or any DIP Lender by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than Borrower or any Subsidiary, officer, or employee of Borrower, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

R.      Failure of the Loan Parties to comply with any Milestone set forth in Section 14(h).

S.      Any provision of any DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any DIP Document shall cease to be a valid and perfected first priority Lien

(except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

T.      Termination of the use of Cash Collateral pursuant to the terms of the Financing Orders.

U.      Assets of any Loan Party with a fair market value of $200,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

V.      A breach by any Loan Party of the terms of the Financing Orders.

W.      A Material Adverse Deviation shall have occurred.

X.      Entry of an order authorizing and/or directing the reclamation of goods pursuant to section 546(c) of the Bankruptcy Code.

If any Event of Default shall have occurred and be continuing, then the Agent may, upon written notice to the Borrower and subject to the terms of the Financing Orders: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents or at law or in equity, all in accordance with the Financing Orders.  Upon the occurrence of an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders, each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

Except as otherwise provided for in this Note or by applicable law, the Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent

exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

17.    Reference Agreements.  This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $[___ _____] and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18.    Definitions.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"Administration Fee" shall have the meaning given such term in Section 8 of this Note.

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Applicable Testing Period" means the four-week period up to and through the Friday of the most recent week then ended, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Friday of the most recent week then ended

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Base Rate" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Base Rate Loan" means each portion of a Term Loan that bears interest at a rate determined by reference to the Base Rate.

"Borrower" shall have the meaning given such term in the recital to this Note.

"Budget" means a rolling six (6) week forecast of projected receipts, disbursements, net cash flow, liquidity, loans and availability for the immediately following consecutive 6 weeks after the date of delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the Agent, the Prepetition Term Loan Agent and the Prepetition ABL Agent and shall be approved by the foregoing Persons, in each's sole discretion.  The initial Budget (the "Initial Budget") is attached hereto as Exhibit A.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Carve Out" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall mean "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Closing Date" means the Business Day when each of the conditions applicable to the Initial Funding and listed in Section 2 of this Note shall have been satisfied or waived in a manner satisfactory to the Agent.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations.  Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, including the Financing Orders and the Guaranty.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on the signature page to the Note for each DIP Lender, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"DIP Documents" shall mean the Note, the Collateral Documents, the Guaranty, and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent in connection with this Note and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Agent in connection with this Note or the transactions contemplated thereby.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Lenders" shall have the meaning given such term in the recital to this Note.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Equity Interests" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Event of Default" shall have the meaning given such term in Section 16 of this Note.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Term Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loan or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

"Exit Fee" shall have the meaning given such term in Section 8 of this Note.

"Extension Fee" means an extension fee equal to $[_____]$^6$, which shall be fully earned and non-refundable when paid.

"Extraordinary Receipts" means any cash received by Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described Sections 7(b) and (c) hereof), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"Facility Fee" shall have the meaning given such term in Section 8 of this Note.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations

---

[6] 0.50% of the total commitment.

or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent, together with all extensions, modifications and amendments thereto, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Financing Orders" shall mean, collectively, the Interim Order and the Final Order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean a guaranty of the Guarantors, in form and substance satisfactory to the Agent, with respect to the Obligations.

"Indebtedness" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents.

"Inventory" shall have the meaning given such term in the Prepetition ABL Credit Agreement whether or not such agreement remains in effect.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or

encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan Party" means Borrower and any Guarantor.

"Material Adverse Deviation" means, as of any date of determination, an adverse deviation of more than the Permitted Variance from the aggregate amount set forth in the "Net Cash Flow" line items of the Budget for the Applicable Testing Period.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business, assets, properties or condition (financial or otherwise) of the Loan Parties taken as a whole, (ii) the ability of the Loan Parties to perform payment or other material obligations under any DIP Document, (iii) the legality, validity or enforceability of this Note or any other DIP Document, (iv) the rights and remedies of the Agent and the DIP Lenders under any DIP Document, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any of the Collateral.

"Maturity Date" means the earliest to occur of (i) March 31, 2020 (or, if the Borrower has (x) delivered to the Agent a written election to extend the Maturity Date and (y) paid the Extension Fee to the Agent in cash, in each case, on or prior to March 31, 2020), April 30, 2020, (ii) the date that is 25 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the consummation of a sale of all or substantially all of the Loan Parties' assets; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section 16.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Milestones" shall have the meaning given such term in Section 14 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to DIP Lenders arising under the Note or any of the other DIP Documents, and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under the Note or any of the other DIP Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Note or any of the other DIP Documents.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 21 of this Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code); (i) Liens in favor of the Prepetition Secured Parties and other Liens granted pursuant to the Financing Order (including, to the extent constituting a Lien, the Carve-Out); and (j) to the extent constituting Liens, Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) Prepetition Secured Debt; (d) deferred taxes and other expenses incurred in the ordinary course of business; (e) any Indebtedness existing on the Petition Date; and (f) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall mean certain permitted senior liens as expressly set forth in the Financing Orders.

"Permitted Variance" means a negative variance of up to 10% between the actual net cash flow for the Applicable Testing Period and the "Net Cash Flow" line item as set forth in the Budget for the Applicable Testing Period.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning given such term in the recital to this Note.

"Prepetition ABL Agent" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Facility" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Loan Documents" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Obligations" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Debt" means, collectively, the Prepetition ABL Obligations and the Prepetition Term Loan Obligations.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Agent" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Facility" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Documents" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Obligations" shall have the meaning given such term in the Financing Orders.

"Pro Rata Share" means with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Recipient" means the Agent or any DIP Lender, as applicable.

"Register" shall have the meaning given such term in Section 21 of this Note.

"Registered Loan" shall have the meaning given such term in Section 21 of this Note.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Related Parties" shall mean, with respect to any specified Person, such Person's affiliates and the respective managers, administrators, trustees, partners, investors, directors, officers, employees, agents, advisors, sub-advisors or other representatives of such Person and such Person's affiliates.

"Required Lenders" shall mean, at any time, DIP Lenders whose aggregate Pro Rata Shares exceed 50%.

"Restricted Payment" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Sale Motion" shall have the meaning given such term in Section 14 of this Note.

"Stockholder" shall mean with respect to any Person, each holder of Equity Interests of such Person.

"Subsidiary" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

19.    Representations and Warranties.  The Borrower and each of its Subsidiaries represent as follows:

(a)    the Borrower and each of its Subsidiaries are duly formed and/or organized and validly existing under the laws of their jurisdictions of incorporation or formation;

(b)    upon entry of the Financing Orders, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its Subsidiaries or any of their properties;

(c)    the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)    upon entry of the Financing Orders, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms except as limited by equitable principles relating to enforceability.

(e)    the Borrower and its Subsidiaries have good and marketable title to, or valid leasehold interests in, all of its material property and assets; none of the properties and assets of the Borrower and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)    no information contained in this Note, any of the other DIP Document, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note or otherwise, when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of all of the circumstances under which they were made;

(g)    the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Prior Liens or other Liens permitted to have such priority under the Financing Orders;

(h)    except for proceedings in the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower of its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrower or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)    [reserved];

(j)    [reserved]; and

(k)    except for the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting any Loan Party, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect.

(l)    the Borrower and its Subsidiaries have filed all material federal, state and other tax returns and reports required to be filed, and have paid all material federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable.

20.    <u>Agent</u>.

(a)    <u>Appointment</u>.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans

outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.  The Agent may perform any of its duties hereunder or under the other DIP Documents by or through any one or more sub-agents or attorneys-in-fact appointed by the Agent.  The Agent and any such sub-agent or attorney-in-fact may perform any and all of its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions set forth in this Section 20 shall apply to any such sub-agent or attorney-in-fact and the Related Parties of the Agent, any such sub-agent and any such attorney-in-fact and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

(b)     Nature of Duties.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.

(c)     Rights, Exculpation, Etc.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.

(d)     Reliance.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)     Indemnification.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under

this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

        (f)    <u>Collateral Matters</u>.

        (1)    The DIP Lenders hereby irrevocably authorize the Agent, at its option and in its discretion, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

        (2)    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (f)(1) above.

        The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

        21.    <u>Miscellaneous</u>.

        (a)    All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

|  |  |
|---|---|
| If to Borrower: | Celadon Group, Inc.<br>9503 East 33rd Street<br>Indianapolis, Indiana 46235<br>Attn: General Counsel<br>Email: cwelsh@celadontrucking.com |
| with copies to: | DLA Piper LLP (US)<br>444 West Lake Street<br>Chicago, Illinois 60606<br>Attn:  Rick Chesley |

| | Email: richard.chesley@dlapiper.com |
|---|---|
| If to Agent or any Lender: | Blue Torch Finance, LLC<br>c/o Blue Torch Capital LP<br>430 Park Avenue, Suite 1202<br>New York, New York 10022<br>Email:  BlueTorchAgency@cortlandglobal.com |
| with copies to: | SEI- Blue Torch Capital Loan Ops<br>1 Freedom Valley Drive<br>Oaks, Pennsylvania 19456<br>Email:  bluetorch.loanops@seic.com |
| | Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attn:  Adam Harris and Frederic L. Ragucci<br>Email: adam.harris@srz.com<br>         frederic.ragucci@srz.com |

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by email be effective when confirmation is received.

(b)    The Borrower shall reimburse the Agent for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court (including the reasonable fees and expenses of outside counsel for Agent, all of its special local counsel, fees for one (in the absence of any conflicts of interest) financial advisor for the Agent and the DIP Lenders, and auditors retained in connection with the DIP Documents and advice in connection therewith).  Subject to the foregoing, the Borrower shall reimburse the Agent for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(1)    any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)    the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

(3)    any litigation, contest, dispute, suit, proceeding or action

(whether instituted by the Agent, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)     any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5)     any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)     any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrower or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 20(b), all of which shall be payable, on demand, by the Borrower to the Agent on behalf of the DIP Lenders.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges;; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to the Financing Orders).

(c)     No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of

the Agent to any other or further action in any circumstances without notice or demand.

(d)    Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)    If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)    **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF TUE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

(h)    **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED**

**EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

       (i)     The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

       (j)     The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent.  The DIP Lenders may assign to one or more entitles all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder.  An assigning DIP Lender shall notify the Borrower of any such assignment (other than an assignment to an affiliate of such DIP Lender or a Related Fund) which notice shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee.

       (k)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon (the "Registered Loans") owing to each DIP Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note.  The Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

       (l)     Upon receipt by the Agent of an assignment notice, the Agent shall accept such assignment and record the information contained therein in the Register.

       (m)     A Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.  Any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register.  Prior to the registration of assignment or sale of any Registered Loan, the Agent shall treat the Person in whose name such Registered Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

       (n)     In the event that a DIP Lender sells participations in a Registered Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of

the participation (the "<u>Participant Register</u>").  A Registered Loan may be participated in whole or in part only by registration of such participation on the Participant Register.  Any participation of such Registered Loan may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(o)      No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower and the Agent.

(p)      Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(q)      This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective assigns, transferees and endorsees.  The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(r)      In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

(s)      THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*      *      *      *      *

        IN WITNESS WHEREOF, the Borrower have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

                                    CELADON GROUP, INC., as Debtor and Debtor
                                    in Possession

                                    By:  _____
                                          Name:
                                          Title

Acknowledged and Agreed

BLUE TORCH FINANCE, LLC, as Agent

By:  _____
      Name:
      Title:

[_____], as DIP Lender

By:  _____
      Name:
      Title:

      Commitment Amount:
      Initial Loan $[_____]
      Additional Loan $[_____]

[_____], as DIP Lender

By: _____
    Name:
    Title:


    Commitment Amount:
    Initial Loan $[_____]
    Additional Loan $[_____]

Schedule 13

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the monthly reports, quarterly reports, annual reports and compliance certificates required by Section 5.1 of the Prepetition Term Loan Credit Agreement and each of the financial statements, reports, or other items set forth below at the following times in form satisfactory to the Agent:

| | |
|---|---|
| on Friday of each week beginning with the first full calendar week after the Petition Date | (a)    a weekly DIP variance report/reconciliation for the prior week and for the period from the commencement of the Initial Budget to the end of the prior week in each case (i) showing actual results for the following items: (A) receipts, (B) disbursements, (C) net operating cash flow, (D) outstanding loans under the Prepetition ABL Facility, (E) Term Loan balances and outstanding loans under the Prepetition Term Loan Facility and (F) professional fees and expenses, noting therein variances from values set forth for such periods in both the Initial Budget and the most recent Budget and (ii) an explanation for all material variances, certified by an authorized officer of the Borrower,<br><br>(b)    a weekly report of sales results (including detail on gross recoveries and expenses) with respect to the sales of the Loan Parties' real properties,<br><br>(c)    a weekly report from Ritchie Bros. Auctioneers (America) Inc. with respect to equipment stored at their locations, |
| on the date that is four full weeks after the Petition Date and every second week thereafter | (d)    a revised proposed budget (it being understood that upon written approval of such proposed budget by the Agent, in its sole discretion, such proposed budget shall become the "Budget") and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the Agent and DIP Lenders, |
| promptly, to the extent reasonably feasible, | (e)    copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; provided that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, but in any event within 5 Business Days after Borrower has knowledge of | (f)    notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |

| any event or condition that constitutes a Default, | |
|---|---|
| upon the reasonable request of Agent, | (g)      any other information reasonably requested relating to the financial condition of Borrower or its Subsidiaries, and |
| upon notice of Agent, | (h)      reasonable access to the advisors to the Loan Parties at all times during the Chapter 11 Cases. |

**<u>Exhibit C</u>**

**(Guaranty)**

## GUARANTY

GUARANTY, dated as of December [__], 2019 (this "*Guaranty*"), by each of the entities set forth on the signature pages to this Guaranty (each, a "*Guarantor*" and, collectively, the "*Guarantors*"), in favor of the Agent for the benefit of itself, each DIP Lender and each other holder of an Obligation (as each such term is defined in the DIP Note referred to below) (each, a "*Guaranteed Party*" and, collectively, the "*Guaranteed Parties*").

## WITNESSETH:

WHEREAS, on December[__], 2019 (the "Petition Date"), CELADON GROUP, INC. (the "Borrower") and certain of its affiliates filed voluntary petitions for reorganization relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code").  The Borrower and its debtor affiliates continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower, the Agent and the DIP Lenders are parties to a Debtor in Possession Secured Multi-Draw Term Promissory Note, dated as of the date hereof, (such agreement, as amended, restated, supplemented or otherwise modified from time to time, being hereinafter referred to as the "DIP Note"; capitalized terms defined therein and used herein having the meanings given to them in the DIP Note);

WHEREAS, pursuant to the DIP Note, the DIP Lenders have agreed to extend credit to the Borrower consisting of term loans in the aggregate principal amount of up to $[____] (the "Loans"), the proceeds of which are to be used (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay administrative expenses of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget;

WHEREAS, each Guarantor will receive substantial direct and indirect benefits from the making of the Loans and the granting of the other financial accommodations to the Borrower under the DIP Note; and

WHEREAS, a condition precedent to the obligation of the DIP Lenders to make their respective extensions of credit to the Borrower under the DIP Note is that the Guarantors shall have executed and delivered this Guaranty for the benefit of the Guaranteed Parties;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### Section 1       Guaranty

(a)       To induce the DIP Lenders to make the Loans pursuant to the terms and conditions of the Financing Orders and the DIP Documents, each Guarantor hereby absolutely, unconditionally and irrevocably guarantees, jointly with the other Guarantors and severally, as primary obligor and not merely as surety, the full and punctual payment when due and in the

currency due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance herewith, any other DIP Document and the Financing Orders, of all the Obligations, whether or not recovery may be or hereafter may become barred by any statute of limitations, including principal, interest, and reasonable and documented fees and costs of collection. This Guaranty constitutes a guaranty of payment and not of collection.

(b)    Each Guarantor further agrees that, if (i) any payment made by Borrower or any other Person and applied to the Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or (ii) the proceeds of Collateral are required to be returned by any Guaranteed Party to the Borrower, its estate, trustee, receiver or any other party, including any Guarantor, under any bankruptcy law, equitable cause or any other Requirement of Law (as defined in the Prepetition Term Loan Agreement whether or not such agreement remains in effect), then, to the extent of such payment or repayment, any such Guarantor's liability hereunder (and any Lien or other Collateral securing such liability) shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, this Guaranty shall have been cancelled or surrendered (and if any Lien or other Collateral securing such Guarantor's liability hereunder shall have been released or terminated by virtue of such cancellation or surrender), this Guaranty (and such Lien or other Collateral) shall be reinstated in full force and effect, and such prior cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Guarantor in respect of the amount of such payment (or any Lien or other Collateral securing such obligation).

**Section 2**    **[Intentionally Omitted]**

**Section 3**    **Contribution**

To the extent that any Guarantor shall be required hereunder to pay a portion of the Obligations exceeding the greater of (a) the amount of the economic benefit actually received by such Guarantor from the Loans and the other financial accommodations provided to the Borrower under the DIP Documents and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Obligations (excluding the amount thereof repaid by the Borrower) in the same proportion as such Guarantor's net worth at the date enforcement is sought hereunder bears to the aggregate net worth of all the Guarantors at the date enforcement is sought hereunder, then such Guarantor shall be reimbursed by such other Guarantors for the amount of such excess, pro rata, based on the respective net worths of such other Guarantors at the date enforcement hereunder is sought.

**Section 4**    **Authorization; Other Agreements**

The Guaranteed Parties are, as and to the extent permitted under the DIP Note and the Financing Orders, hereby authorized, without notice to, or demand upon, any Guarantor, which notice and demand requirements each are expressly waived hereby, and without discharging or otherwise affecting the obligations of such Guarantor hereunder (which obligations shall remain absolute and unconditional notwithstanding any such action or omission to act), from time to time, to do each of the following:

(a)    supplement, renew, extend, accelerate or otherwise change the time for payment of or other terms relating to, the Obligations, or any part of them, or otherwise modify, amend or change the terms of any agreement, document or instrument (including the DIP Documents) now or hereafter executed by the Borrower and delivered to the Guaranteed Parties or any of them, including any increase or decrease of principal or the rate of interest thereon;

(b)    waive or otherwise consent to noncompliance with any provision of any instrument evidencing the Obligations, or any part thereof, or any other instrument or agreement in respect of the Obligations (including the DIP Documents) now or hereafter executed by the Borrower and delivered to the Guaranteed Parties or any of them;

(c)    accept partial payments on the Obligations;

(d)    receive, take and hold additional security or collateral for the payment of the Obligations or any part of them and exchange, enforce, waive, substitute, liquidate, terminate, abandon, fail to perfect, subordinate, transfer, otherwise alter and release any such additional security or collateral;

(e)    settle, release, compromise, collect or otherwise liquidate the Obligations or accept, substitute, release, exchange or otherwise alter, affect or impair any security or collateral for the Obligations or any part of them or any other guaranty therefor, in any manner;

(f)    add, release or substitute any one or more other guarantors, makers or endorsers of the Obligations or any part of them and otherwise deal with the Borrower or any other guarantor, maker or endorser;

(g)    apply to the Obligations any payment or recovery (x) from the Borrower, from any other guarantor, maker or endorser of the Obligations or any part of them or (y) from any Guarantor in such order as provided herein, in each case whether such Obligations are secured or unsecured or guaranteed or not guaranteed by others;

(h)    apply to the Obligations any payment or recovery from any Guarantor of the Obligations or any sum realized from security furnished by such Guarantor upon its indebtedness or obligations to the Guaranteed Parties or any of them, in each case whether or not such indebtedness or obligations relate to the Obligations; and

(i)    refund at any time any payment received by any Guaranteed Party in respect of any Obligation, and payment to such Guaranteed Party of the amount so refunded shall be fully guaranteed hereby even though prior thereto this Guaranty shall have been cancelled or surrendered (or any release or termination of any Collateral by virtue thereof), and such prior cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any Guarantor hereunder in respect of the amount so refunded (and any Collateral so released or terminated shall be reinstated with respect to such obligations);

even if any right of reimbursement or subrogation or other right or remedy of any Guarantor is extinguished, affected or impaired by any of the foregoing (including any election of remedies by reason of any judicial, non-judicial-or other proceeding in respect of the Obligations that impairs any subrogation, reimbursement or other right of such Guarantor).

**Section 5          Guaranty Absolute and Unconditional**

Each Guarantor hereby waives any defense of a surety or guarantor or any other obligor on any obligations arising in connection with or in respect of any of the following and hereby agrees that its obligations under this Guaranty are absolute and unconditional and shall not be discharged or otherwise affected as a result of any of the following:

(a)     the invalidity or unenforceability of any of the Borrower's obligations under the Financing Orders, the DIP Note or any other DIP Document, the Guarantors' obligations hereunder, or any other agreement or instrument relating thereto, or any security for, or other guaranty of the Obligations or any part of them, or the lack of perfection or continuing perfection or failure of priority of any security for the Obligations or any part of them;

(b)     the absence of any attempt to collect the Obligations or any part of them from the Borrower or any other Guarantor or other action to enforce the same;

(c)     failure by any Guaranteed Party to take any steps to perfect and maintain any Lien on, or to preserve any rights to, any Collateral;

(d)     any Guaranteed Party's election, in any proceeding instituted under Chapter 11 of the Bankruptcy Code (including the Chapter 11 Cases), of the application of Section 1111(b)(2) of the Bankruptcy Code or any applicable provisions of comparable state or foreign law;

(e)     the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of any Guaranteed Party's claim (or claims) for repayment of the Obligations ;

(f)     any use of cash collateral under Section 363 of the Bankruptcy Code;

(g)     any agreement or stipulation as to the provision of adequate protection in any bankruptcy proceeding (including the Chapter 11 Cases);

(h)     the avoidance of any Lien in favor of the Guaranteed Parties or any of them for any reason;

(i)     failure by any Guaranteed Party to file or enforce a claim against the Borrower or any other Guarantor or its estate in any bankruptcy or insolvency case or proceeding (including the Chapter 11 Cases);

(j)     any action taken by any Guaranteed Party if such action is authorized hereby;

(k)     any election following the occurrence of an Event of Default by any Guaranteed Party to proceed separately against the personal property Collateral in accordance with such Guaranteed Party's rights under the UCC, the DIP Note and the Financing Orders or, if the Collateral consists of both personal and real property, to proceed (in accordance with the DIP Note and the Financing Orders) against such personal and real property in accordance with such Guaranteed Party's rights with respect to such real property;

(l)    any change in the corporate existence or structure of the Borrower or any other Loan Party;

(m)    any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Guarantor or any other Person against any Guaranteed Party;

(n)    any Requirement of Law affecting any term of any Guarantor's obligations under this Guaranty; or

(o)    any other circumstance that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor or any other obligor on any obligations, other than the payment in full of the Obligations.

**Section 6    Waivers**

Each Guarantor hereby waives, to the full extent permitted by law, diligence, promptness, presentment, demand for payment or performance and protest and notice of protest, notice of acceptance and any other notice in respect of the Obligations or any part of them (in each case other than those that are expressly provided for or required in the Financing Orders, the DIP Note or any other applicable DIP Document), and any defense arising by reason of any disability or other defense of the Borrower or other Guarantor. Each Guarantor shall not, as long as any Obligation (other than unasserted contingent indemnity obligations) remains outstanding, assert any claim or counterclaim it may have against the Borrower or other Guarantor or set off any of its obligations to the Borrower against any obligations of the Borrower or other Guarantor to it. In connection with the foregoing, each Guarantor covenants that its obligations hereunder shall not be discharged, except by complete payment or performance.

**Section 7    Reliance**

Each Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of the Borrower and any endorser and other guarantor of all or any part of the Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Obligations, or any part thereof, that diligent inquiry would reveal, and each Guarantor hereby agrees that no Guaranteed Party shall have any duty to advise any Guarantor of information known to it regarding such condition or any such circumstances. In the event any Guaranteed Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Guarantor, such Guaranteed Party shall be under no obligation (a) to undertake any investigation not a part of its regular business routine, (b) to disclose any information that such Guaranteed Party, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) to make any other or future disclosures of such information or any other information to any Guarantor.

**Section 8    Waiver of Subrogation and Contribution Rights**

As long as any Obligation (other than unasserted contingent indemnity obligations) remains outstanding, the Guarantors shall not enforce or otherwise exercise any right of subrogation to any of the rights of the Guaranteed Parties or any part of them against the Borrower

or other Guarantor or any right of reimbursement or contribution or similar right against the Borrower or other Guarantor by reason of this Guaranty or by any payment made by any Guarantor in respect of the Obligations.

### Section 9      Subordination

Each Guarantor hereby agrees that any Indebtedness of the Borrower now or hereafter owing to such Guarantor, whether heretofore, now or hereafter created (the "*Guarantor Subordinated Debt*"), is hereby subordinated to all of the Obligations and that the Guarantor Subordinated Debt shall not be paid in whole or in part as long as an Event of Default shall have occurred and is continuing. No Guarantor shall accept any payment of or on account of any Guarantor Subordinated Debt at any time in contravention of the foregoing. Upon the occurrence and during the continuance of an Event of Default, subject to the DIP Note and the Financing Orders, the Borrower shall pay to the Agent any payment of all or any part of the Guarantor Subordinated Debt and, subject to the DIP Note and the Financing Orders, any amount so paid to the Agent shall be applied to payment of the Obligations. Each payment on the Guarantor Subordinated Debt received in violation of any of the provisions hereof shall be deemed to have been received by such Guarantor as trustee for the Guaranteed Parties and shall be paid over to the Agent immediately on account of the Obligations, but without otherwise affecting in any manner such Guarantor's liability hereof.

### Section 10      Default; Remedies

The obligations of each Guarantor hereunder are independent of and separate from the Obligations. Subject to the DIP Note and the Financing Orders, if any Obligation is not paid when due, or upon any Event of Default under the DIP Note or under any other DIP Document, the Agent may, at its sole election, proceed directly and at once, without notice, against any Guarantor to collect and recover the full amount or any portion of the Obligations then due, without first proceeding against the Borrower or any other guarantor of the Obligations, or against any Collateral under the DIP Documents or joining the Borrower or any other guarantor in any proceeding against any Guarantor. Subject to the DIP Note and the Financing Orders, at any time after maturity of the Obligations, the Agent may (as long as any Obligation, other than unasserted contingent indemnity obligations, remains outstanding), without notice to any Guarantor and regardless of the acceptance of any Collateral for the payment hereof, appropriate and apply toward the payment of the Obligations (a) any indebtedness due or to become due to any Guaranteed Party from such Guarantor and (b) any moneys, credits or other property belonging to such Guarantor at any time held by or coming into the possession of any Guaranteed Party or any of its respective Affiliates.

### Section 11      Irrevocability

This Guaranty shall be irrevocable as to the Obligations (or any part thereof) until all Obligations (other than unasserted contingent indemnification obligations) then outstanding have been irrevocably repaid in cash, at which time this Guaranty shall automatically be cancelled, all without delivery of any instrument or performance of any act by any Person. Upon such cancellation or the release as described in the succeeding paragraph and at the written request of any Guarantor or its successors or assigns, and at the cost and expense of such Guarantor or its

successors or assigns, the Agent shall execute in a timely manner a satisfaction of this Guaranty and such instruments, documents or agreements as are necessary or desirable to evidence the termination of this Guaranty or the release of such Guarantor, as the case may be.

A Guarantor shall be released from its obligations hereunder upon a sale or other disposition of such Guarantor (or all or substantially all of its assets) permitted by the DIP Note and the Financing Orders; provided, however, that the Borrower shall have delivered to the Agent, at least five Business Days prior to the date of the proposed release (or such later date as the Agent may agree), a written request for release identifying the relevant Grantor and, if applicable, the sale or other disposition in reasonable detail, including the price thereof, together with a certification by the Borrower in form and substance reasonably satisfactory to the Agent stating that such transaction is in compliance with DIP Note and the Financing Orders.

**Section 12    Setoff**

Upon the occurrence and during the continuance of an Event of Default, each Guaranteed Party and each Affiliate of a Guaranteed Party may, without notice to any Guarantor and regardless of the acceptance of any security or collateral for the payment hereof, appropriate and apply toward the payment of all or any part of the Obligations (a) any indebtedness due or to become due to such Guaranteed Party or Affiliate from such Guarantor and (b) any moneys, credits or other property belonging to such Guarantor, at any time held by, or coming into, the possession of such Guaranteed Party or Affiliate, in the case of each of the foregoing, subject to the DIP Note and the Financing Orders.

**Section 13    No Marshaling**

Each Guarantor consents and agrees that no Guaranteed Party or Person acting for or on behalf of any Guaranteed Party shall be under any obligation to marshal any assets in favor of any Guarantor or against or in payment of any or all of the Obligations.

**Section 14    Enforcement; Waivers; Amendments**

(a)    No delay on the part of any Guaranteed Party in the exercise of any right or remedy arising under this Guaranty, the DIP Note, any other DIP Document, the Financing Orders or otherwise with respect to all or any part of the Obligations, the Collateral or any other guaranty of or security for all or any part of the Obligations shall operate as a waiver thereof, and no single or partial exercise by any such Person of any such right or remedy shall preclude any further exercise thereof. Failure by any Guaranteed Party at any time or times hereafter to require strict performance by the Borrower, any Guarantor, any other guarantor of all or any part of the Obligations or any other Person of any provision, warranty, term or condition contained in the Financing Orders or any DIP Document now or at any time hereafter executed by any such Persons and delivered to any Guaranteed Party shall not waive, affect or diminish any right of any Guaranteed Party at any time or times hereafter to demand strict performance thereof and such right shall not be deemed to have been waived by any act (except by a written instrument) or knowledge of any Guaranteed Party, or its respective agents, officers or employees. No waiver of any Event of Default by any Guaranteed Party shall operate as a waiver of any other Event of Default or the same Event of Default on a future occasion, and no action by any Guaranteed Party

permitted hereunder shall in any way affect or impair any Guaranteed Party's rights and remedies or the obligations of any Guarantor under this Guaranty. Any determination by a court of competent jurisdiction of the amount of any principal or interest owing by the Borrower to a Guaranteed Party shall be conclusive and binding on each Guarantor irrespective of whether such Guarantor was a party to the suit or action in which such determination was made. Notwithstanding anything to the contrary in this Guaranty, the rights of the Guaranteed Parties under this Guaranty may be enforced only by the Agent acting upon the instructions of the DIP Lenders, and no Guaranteed Party shall have any right individually to seek to enforce or to enforce this Guaranty, it being understood and agreed that such rights and remedies may be exercised by the Agent for the benefit of the Guaranteed Parties in accordance with the terms of the DIP Note.

(b)   None of the terms or provisions of this Guaranty may be waived, amended, supplemented or modified except in accordance with the DIP Note.

### Section 15   Successors and Assigns

This Guaranty shall be binding upon each Guarantor and upon the successors and assigns of such Guarantors and shall inure to the benefit of the Guaranteed Parties and their respective successors and assigns; all references herein to the Borrower and to the Guarantors shall be deemed to include their respective successors and assigns. The successors and assigns of the Guarantors and the Borrower shall include, without limitation, their respective receivers, trustees and debtors-in-possession. All references to the singular shall be deemed to include the plural where the context so requires.

### Section 16   Representations and Warranties; Covenants

Each Guarantor hereby (a) represents and warrants that the representations and warranties as to it made by the Borrower in Section 19 the DIP Note are true and correct in all material respects on each applicable date as required by Section 2(d) of the DIP Note, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date, and except in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, and (b) agrees to take, or refrain from taking, as the case may be, each action necessary to be taken or not taken, as the case may be, so that no Default or Event of Default is caused by the failure to take such action or to refrain from taking such action by such Guarantor.

### Section 17   Governing Law

This Guaranty and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

### Section 18   Submission to Jurisdiction; Service of Process

(a)   Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York,

and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Guaranty or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

### Section 19     Waiver of Judicial Bond

To the fullest extent permitted by applicable law, each Guarantor waives the requirement to post any bond that otherwise may be required of any Guaranteed Party in connection with any judicial proceeding to enforce such Guaranteed Party's rights to payment hereunder, security interest in or other rights to the Collateral or in connection with any other legal or equitable action or proceeding arising out of, in connection with, or related to this Guaranty and the DIP Documents to which it is a party.

### Section 20     Certain Terms

The following rules of interpretation shall apply to this Guaranty: (a) the terms *"herein,"* *"hereof"*, *"hereto"* and *"hereunder"* and similar terms refer to this Guaranty as a whole and not to any particular Article, Section, subsection or clause in this Guaranty, (b) unless otherwise indicated, references herein to an Exhibit, Article, Section, subsection or clause refer to the appropriate Exhibit to, or Article, Section, subsection or clause in this Guaranty and (c) the term *"including"* means *"including without limitation"* except when used in the computation of time periods.

### Section 21     Waiver of Jury Trial

*EACH OF THE AGENT, THE OTHER GUARANTEED PARTIES AND EACH GUARANTOR IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY AND ANY OTHER DIP DOCUMENT.*

### Section 22     Notices

Any notice or other communication herein required or permitted shall be given as provided in Section 21(a) of the DIP Note and, in the case of any Guarantor, to such Guarantor in care of the Borrower.

### Section 23     Severability

Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

**Section 24**      **[Intentionally Omitted]**

**Section 25**      **Collateral**

Each Guarantor hereby acknowledges and agrees that its obligations under this Guaranty are secured pursuant to the terms and provisions of the Financing Orders, and covenants that it shall not grant any Lien with respect to its assets in favor, or for the benefit, of any Person other than the Agent, for the benefit of the Guaranteed Parties except as otherwise permitted by the DIP Note and the Financing Orders.

**Section 26**      **Costs and Expenses**

In accordance with and subject to the provisions of Section 21(b) of the DIP Note, each Guarantor agrees to pay or reimburse the Agent and each of the other Guaranteed Parties upon demand for all reasonable and documented out-of-pocket costs and expenses, including outside attorneys' fees, incurred by the Agent and such other Guaranteed Parties in enforcing this Guaranty against such Guarantor or any security therefor or exercising or enforcing any other right or remedy available in connection herewith or therewith.

**Section 27**      **Waiver of Consequential Damages**

*EACH GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGE IN ANY LEGAL ACTION OR PROCEEDING IN RESPECT OF THIS GUARANTY OR ANY OTHER DIP DOCUMENT.*

**Section 28**      **Entire Agreement**

This Guaranty, taken together with the Financing Orders and all of the other DIP Documents executed and delivered by the Guarantors, represents the entire agreement and understanding of the parties hereto and supersedes all prior understandings, written and oral, relating to the subject matter hereof.

**Section 29**      **Counterparts**

This Guaranty may be executed in any number of separate counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple counterparts and attached to a single counterpart so that all signature pages are attached to the same document. Delivery of an executed counterpart by facsimile transmission or electronic mail shall be effective as delivery of a manually executed counterpart.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Guarantors have caused this Guaranty to be executed by an officer thereunto duly authorized, as of the date first above written.

CELADON E-COMMERCE, INC.

By:_____
    Name: Chase Welsh
    Title: Secretary

CELADON TRUCKING SERVICES, INC.

By:_____
    Name: Chase Welsh
    Title: Secretary

CELADON REALTY, LLC

By:_____
    Name: Chase Welsh
    Title: Secretary

TAYLOR EXPRESS, INC.

By:_____
    Name: Chase Welsh
    Title: Secretary

OSBORN TRANSPORTATION, INC.

By:_____
    Name: Chase Welsh
    Title: Secretary

CELADON LOGISTICS SERVICES, INC.

By:_____
    Name: Chase Welsh
    Title: Secretary

EAGLE LOGISTICS SERVICES INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


BEE LINE, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


VORBAS, LLC


By:_____
    Name: Chase Welsh
    Title: Secretary


DISTRIBUTION, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


QUALITY COMPANIES LLC


By:_____
    Name: Chase Welsh
    Title: Secretary


QUALITY EQUIPMENT LEASING, LLC


By:_____
    Name: Chase Welsh
    Title: Secretary

QUALITY INSURANCE LLC


By:_____
    Name: Chase Welsh
    Title: Secretary


SERVICIOS DE TRANSPORTACIÓN JAGUAR, S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary


CELADON MEXICANA, S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary


SERVICIOS CORPORATIVOS JAGUAR, S.C.


By:_____
    Name: Chase Welsh
    Title: Secretary


JAGUAR LOGISTICS S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary


LEASING SERVICIOS, S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary

CELADON MEXICANA, S.A. DE C.V.


By:_____
    Name: Chase Welsh
    Title: Secretary


CELADON CANADIAN HOLDINGS, LIMITED


By:_____
    Name: Chase Welsh
    Title: Secretary


HYNDMAN TRANSPORT LIMITED


By:_____
    Name: Chase Welsh
    Title: Secretary


CELADON INTERNATIONAL CORPORATION


By:_____
    Name: Chase Welsh
    Title: Secretary


STINGER LOGISTICS, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary


A R MANAGEMENT SERVICES, INC.


By:_____
    Name: Chase Welsh
    Title: Secretary

STRATEGIC LEASING, INC.

By:_____
    Name: Chase Welsh
    Title: Secretary


TRANSPORTATION SERVICES RISK
RETENTION GROUP, INC.

By:_____
    Name: Chase Welsh
    Title: Secretary