**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x
                                                             :
In re:                                                       :  Chapter 11
                                                             :
     CELADON GROUP, INC., *et al.*,[1]                       :  Case No. 19-12606 (KBO)
                                                             :
     Debtors.                                                :  (Jointly Administered)
                                                             :
                                                             :  **Hr'g. Date: January 3, 2020 at 10:00 a.m. (ET)**
                                                             :  **Obj. Deadline: December 27, 2019 at 4:00 p.m. (ET)**
-------------------------------------------------------------x

**MOTION OF THE DEBTORS FOR THE ENTRY OF ORDERS: (I)(A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF THE REMAINING ASSETS AND
SETTING BID PROTECTIONS GUIDELINES, (B) PERMITTING DEBTORS TO
DESIGNATE STALKING HORSE PURCHASER(S) AND GRANT BID PROTECTIONS,
(C) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE OF
ASSETS, (D) APPROVING FORM AND MANNER OF NOTICE OF SALE, AND
(E) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING AND APPROVING
THE SALE OF SUBSTANTIALLY ALL ASSETS OF CERTAIN OF THE DEBTORS
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES,
(B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (C) GRANTING RELATED RELIEF**

Celadon Group, Inc. and its affiliated debtors (collectively, the "Debtors"), by and through

their proposed counsel, DLA Piper LLP (US), hereby submit this motion (the "Motion") for entry

of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures

Order") and following the conclusion of one or more Auctions (as defined below) and the Sale

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); Vorbas, LLC (8936). The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

Hearings (as defined below), one or more orders, substantially in the form attached to this Motion as **Exhibit B** (the "Sale Order"): (a) authorizing and approving the Bidding Procedures (defined below) attached to the Bidding Procedures Order as **Exhibit 2** (the "Bidding Procedures"), authorizing and approving certain assumption and assignment procedures, scheduling an auction and a hearing to consider approval of the sale of certain assets of certain of the Debtors, in accordance with and subject to the Bidding Procedures, approving the form and manner of notice of the foregoing (the "Notice Procedures"), in the event the Debtors designate one or more stalking horse bidders (a "Designated Stalking Horse Bidder"), authorizing and approving Bid Protections in the form of (i) a break-up fee in an amount not in excess of three percent (3%) of such Designated Stalking Horse Bidder's proposed purchase price in its stalking horse bid, (ii) expense reimbursement not in excess of one and one half percent (1.5%) of such Designated Stalking Horse Bidder's proposed purchase price in its stalking horse bid, both conditioned on funding of a good faith deposit, and (iii) an initial overbid at least in an amount equal to half of one percent (0.5%) of the sum of the initial bid amount or proposed purchase price in its stalking horse bid plus any break-up fee plus any expense reimbursement (collectively, "Bid Protections"), and granting related relief; (b) authorizing the sale of certain assets of the Debtors free and clear of all liens, claims, interests, and encumbrances, authorizing the assumption, sale and assignment of certain executory contracts and unexpired leases related to the proposed purchased assets, as applicable, and granting related relief; and (c) approving procedures for sale of de minimis assets.  In support of this Motion, the Debtors rely upon, and incorporate by reference, the *Declaration of Kathryn Wouters in Support of Chapter 11 Filings and First Day Pleadings* [D.I. 3] (the "First Day

EAST\170841967.6

<u>Declaration</u>"),[2] filed on the Petition Date (as defined below).  In further support of this Motion, the Debtors respectfully state as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      As described in the First Day Declaration, the Debtors commenced these cases to wind-down their operations and effectuate a sale of substantially all assets of Taylor Express, Inc. ("<u>Taylor</u>") as a going concern.  To support their efforts to wind down their business operations, by this Motion, the Debtors seek to sell their remaining assets in one or multiple sales (collectively, the "<u>Remaining Assets</u>") and to establish procedures for the sale of assets with a fair market value of under $100,000 (collectively, the "<u>De Minimis Assets</u>").  The Remaining Assets and the De Minimis Assets constitute substantially all of the assets of the Debtors.

2.      Following the commencement of these cases, the Debtors have received a number of inbound expressions of interest from myriad parties seeking to acquire, among other assets, certain operating businesses (including Taylor), real estate, rolling stock and other related assets. Most of the parties are well known to the Debtors, either as contract counterparties, competitors or parties having conducted prior diligence of the Debtors' assets.

3.      Recognizing the Debtors' limited liquidity and fragile operational state, the Debtors and their advisors have already commenced an initial marketing process that seeks to: (i) identify the assets that individual buyers wish to acquire, (ii) the purchase price and other consideration for these assets, (iii) any material conditions to a purchase and (iv) the diligence required by the respective buyers.  Confidentiality agreements are being provided to prospective buyers and diligence materials prepared.  Further, the Debtors will make available, if necessary, a form of asset purchase agreement (an "<u>Asset Purchase Agreement</u>"),  similar to that made available to

---

[2]      Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

EAST\170841967.6

potential purchasers of Taylor.  Finally, all potential bidders have been made aware that the Debtors intend to move forward expeditiously with the marketing and sale of their assets, subject to higher and otherwise better bids, consistent with the milestones sought in this Motion, and their obligations to maximize the value of their assets.

4.      In addition, to incentivize any potential bidder to serve as a Designated Stalking Horse Bidder in the sale process with respect to any of the Remaining Assets, the Debtors seek authority to grant the Bid Protections, as set forth in more detail below, in consultation with the Office Committee of Unsecured Creditors, if appointed, and the DIP Agent (collectively, the "Consultation Parties"), to any Designated Stalking Horse Bidder without further order of the Court.

5.      The relief requested in this Motion will best position the Debtors to maximize the value of the Remaining Assets and the De Minimis Assets for the benefit of the Debtors, the Debtors' estates, creditors of the Debtors' estates, and other parties in interest.

## JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these chapter 11 cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is

determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

8.      Venue of these chapter 11 cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested by this Motion are sections 105, 363, 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and Local Rules 6004-1.

## BACKGROUND

10.      Celadon Group, Inc. and its affiliated debtors are one of the largest North American truckload freight transportation carriers, providing point-to-point shipping, warehousing, supply chain logistics, tractor leasing and other transportation and logistics services for major customers throughout North America.  Specifically, the Debtors provide long haul, regional, local, dedicated, intermodal, temperature-protect, and expedited freight services across the United States, Canada and Mexico.  Amid industry-wide headwinds, including falling freight rates, the Debtors began to experience liquidity constraints and worked with their key stakeholders to identify a solution that would maximize enterprise value for the benefit of all stakeholders.  On December 8, 2019 (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

11.      The Debtors continue to be in possession of their assets and to manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been

appointed in the Debtors' chapter 11 cases.  No date has been set for a meeting pursuant to section 341 of the Bankruptcy Code.

12.      Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, which is fully incorporated into this Motion by reference.

## RELIEF REQUESTED

13.      By this Motion, the Debtors seek entry of: (i) the Bidding Procedures Order (a) approving the Bidding Procedures, (b) authorizing the Debtors to grant Designated Stalking Horse Bidder status and Bid Protections to potential bidders, (c) authorizing the Debtors to schedule one or more auctions, (d) setting hearings to consider approval of a sale or the sales of the Remaining Assets, (e) approving the Assumption Procedures (as defined below), (f) approving the form of Notices and Notice Procedures, and (g) granting related relief; (ii) the Sale Order (x) authorizing the sales of all or a portion of the Remaining Assets free and clear of all liens, claims, interests, and encumbrances, (y) authorizing the assumption, sale and assignment of executory contracts and unexpired leases designated by the bidder submitting the highest or otherwise best bids to acquire assets and assume and purchase related contracts and leases, and (z) granting related relief; and (iii) establishing procedures to sell De Minimis Assets.

## BACKGROUND REGARDING MARKETING AND SALE EFFORTS

14.      Prior to the commencement of these cases, the Debtors engaged in two separate marketing processes for the sale of all or substantially all of their assets.  While neither of these efforts were successful, more than 30 parties were contacted during these processes, many of whom conducted diligence on the Debtors' assets and operations.  The Debtors believe that these

prior efforts and their continuing, expansive marketing efforts with respect to the Debtors' assets will sufficiently expose the assets to the market, ensuring maximum recoveries for the Debtors, the Debtors' estates, creditors of the Debtors' estates, and all parties in interest.

I.     **The Assets**

15.     By this Motion, the Debtors seek authority to sell the Remaining Assets and the De Minimis Assets.  The Debtors' Remaining Assets include various business units in the United States, Canada and Mexico, tractors, trailers and other rolling stock, leases, and other assets relating to the operation of their businesses (other than owned real estate).[3]  The De Minimis Assets constitute all assets of the Debtor for which the fair market value is $100,000 or less, including furniture, fixtures and equipment, computers and other technological items and office supplies. Together, the Remaining Assets and De Minimis Assets consist of substantially all assets of the Debtors, other than owned real estate.

II.     **Asset Purchase Agreement; Market-Testing.**

16.     Prior to the Petition Date, the Debtors' assets were extensively marketed through business discussions, including telephone calls, and in-person meetings, between and among senior management, the parties' legal teams, and the parties' various advisors, which marketing efforts are still ongoing.  Based on the discussions with potential purchasers to date, the Debtors, in consultation with their advisors have determined that proceeding with an open bidding and auction process, and selling, pursuant to and in accordance with the Bidding Procedures, the Remaining Assets to the bidders submitting the highest or otherwise best bid for the subject assets is in the best interest of all stakeholders. As set forth in the Bidding Procedures, to the extent the

---

[3]     The Debtors intend to file separate motions seeking to retain brokers to sell the owned real estate and for approval of procedures with respect to such sales.

Debtors receive one or more Qualified Bids (as defined below) for the Remaining Assets or any portion thereof, an auction will be conducted subject to approval by this Court.

17.    Based upon the Debtors' business judgment, after consultation with the Debtors' various advisors, the Debtors believe the proposed process will maximize recoveries from the Remaining Assets for the benefit of the Debtors, their estates, creditors of their estates, and all parties in interest.

<u>**SUMMARY OF PROPOSED BIDDING, AUCTION, AND SALE PROCESS**</u>

**I.**    <u>**Material terms of the Template Asset Purchase Agreement**</u>

18.    In accordance with Local Rule 6004-1(b)(i), a true and correct copy of the Asset Purchase Agreement will be filed with the Court in advance of the hearing on the Motion based upon the various classes of assets being marketed and sold.

19.    In accordance with Local Rule 6004-1(b)(iv), the Debtors disclose the following:

(a)    <u>Sale to insider</u>. Any Designated Stalking Horse Bidder will not be an insider of the Debtors, within the meaning of section 101(31) of the Bankruptcy Code.

(b)    <u>Agreements with management</u>. Any Designated Stalking Horse Bidder will not have discussed or entered into any agreements with Debtors' management or key employees regarding future compensation or employment.

(c)    <u>Releases</u>. Absent further disclosure, no sale or Asset Purchase Agreement will include a release in favor of any entity.

(d)    <u>Sale of the Remaining Assets will be by auction</u>. The Debtors are seeking approval for the sale of the Remaining Assets to a Successful Bidder, pursuant to and in accordance with the proposed Bidding Procedures, which provide for one or more auctions. No Asset Purchase Agreement or the  Bidding Procedures will contain any provisions pursuant to which the Debtors have agreed not to solicit competing offers for the Remaining Assets, any portion of the Remaining Assets, or to otherwise limit marketing of the Remaining Assets or any portion of the Remaining Assets.

(e)    <u>Closing and other deadlines</u>. The consummation of the transactions contemplated by this Motion shall take place no later than forty-five (45) days after the Petition Date.

(f)    <u>Good Faith Deposit</u>. The Asset Purchase Agreement contemplates a good faith deposit in the amount of not less than 10% of the purchase price.[4]

(g)    <u>Interim arrangements with any Potential Bidder</u>. The Debtors do not have any interim management or other agreement with any Potential Bidder (defined below) and will not have such with any Designated Stalking Horse Bidder.

(h)    <u>Use of sale proceeds</u>. The proceeds from any sale will provide for a distribution of the proceeds of the sale of the Remaining Assets in accordance with the final order entered in these chapter 11 cases approving the Debtors' post-petition financing agreement or otherwise in accordance with the Debtors' prepetition contractual obligations to the Prepetition ABL Lenders and the Prepetition Term Loan Lenders.

(i)    <u>Tax exemption</u>. The Debtors are not seeking, pursuant to this Motion, to have the sale of the Remaining Assets declared exempt from taxes under section 1146(a) of the Bankruptcy Code.

(j)    <u>Record retention</u>. The Debtors will retain, or have reasonable access to, all records needed to administer these Chapter 11 Cases and in compliance with applicable non-bankruptcy law.

(k)    <u>Sale of avoidance actions</u>. The Remaining Assets do not include causes of action under chapter 5 of the Bankruptcy Code.

(l)    <u>Requested findings as to successor liability</u>. The Debtors are seeking to sell the Remaining Assets free and clear of successor liability claims.

(m)    <u>Free of any and all encumbrances</u>. The proposed sale or sales of the Remaining Assets will be free and clear of all liens, claims, encumbrances, and interests, with such liens, claims, encumbrances, and interests attaching to the net proceeds of the sale or sales of the Remaining Assets and De Minimis Assets with the same validity and in the same priority, subject to any and all rights, claims, defenses, and objections of the Debtors, the Debtors' estates, and the Committee with respect to such asserted liens, claims, encumbrances, and interests and all such rights, claims, defenses, and objections of the Debtors, the Debtors' estates, and the Committee with respect to such asserted liens, claims, encumbrances, and interests are expressly reserved and preserved.

(n)    <u>Sale free and clear of unexpired leases</u>. The Debtors do not seek to sell the Remaining Assets free and clear of any unexpired leasehold interests or other rights encumbering assets otherwise owned by the Sellers.

(o)    <u>Credit bidding</u>. The Debtors are not seeking to disallow or affect in any manner credit bidding pursuant to section 363(k) of the Bankruptcy Code.

---

[4]    Neither the DIP Agent nor the Prepetition Term Loan Agent shall be required to provide a good faith deposit.

(p)    <u>Relief from Rule 6004(h) of the Bankruptcy Rules</u>. The Debtors are seeking relief from the fourteen day stay imposed by Rule 6004(h) of the Bankruptcy Rules.

(q)    <u>Indemnification</u>. Absent further disclosure, no Asset Purchase Agreement or any other sale will provide for indemnification by either party.

(r)    <u>Consent to jurisdiction</u>. Any Designated Stalking Horse Bidder or Successful Bidder will consent to the core and exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any and all disputes relating to, arising from, or connected with the purchase and sale of the Remaining Assets, and the construction and enforcement of any Asset Purchase Agreement.

## II.    **The Bidding Procedures and Bid Protections.**

20.    To ensure the Debtors obtain the highest and otherwise best offer for the Remaining Assets, any Asset Purchase Agreements or other offer for the Debtors' assets will be subjected to higher and better offers. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Remaining Assets.

21.    A true and correct copy of the proposed Bidding Procedures is attached as **Exhibit 1** to the Bidding Procedures Order.

22.    If the Debtors designate a Designated Stalking Horse Purchaser, and prior to the bid deadline, after consulting with the Consultation Parties, the Debtors will file a notice identifying the subject assets, naming the Designated Stalking Horse Bidder and its consideration for the subject assets, and attaching a copy of the executed asset purchase agreement.

23.    In accordance with Local Rule 6004-1(c)(i), the Debtors disclose the following:

(a)    <u>Provisions governing qualification of Bidders</u>. To participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity interested in consummating a sale for any portion of the Remaining Assets (each, a "<u>Potential Bidder</u>") must deliver or have previously delivered an executed confidentiality agreement on terms acceptable to the Debtors (a "<u>Confidentiality Agreement</u>"), in consultation with the Consultation Parties, and the most current audited and latest unaudited financial statements (collectively, the "<u>Financials</u>") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Remaining

Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure is as acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, and (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable sale. A "Qualified Bidder" is a Potential Bidder: (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate a sale for the Remaining Assets, as determined in the Debtors' business judgment (in consultation with the Consultation Parties); and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below). On or before the date that is one (1) Business Day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder, and shall provide a copy of each Qualified Bid to any Designated Stalking Horse Bidder shall be deemed a Qualified Bidder that has submitted a Qualified Bid at all times. For the avoidance of doubt, two or more Potential Bidders may submit a Bid for any or all of the Remaining Assets, provided that such Bids, when taken as a whole (collectively, a "Joint Bid"), are determined by the Debtors, in consultation with the Consultation Parties and in accordance with Section 3(a) of the Bidding Procedures, to constitute a Qualified Bid; provided, however, that any Joint Bid must comply with section 363(n) of the Bankruptcy Code and Potential Bidders must first seek the Debtors' permission before they contact each other. The Debtors shall consult with the Consultation Parties regarding any request for permission to contact another Potential Bidder. In addition, any Potential Bidder may submit a Bid for any or all of the Remaining Assets, provided that such Bid is determined by the Debtors, in consultation with the Consultation Parties and in accordance with Section 3(a) of the Bidding Procedures, to constitute a Qualified Bid. If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, in consultation with the Consultation Parties, the Debtors will refund such Potential Bidder's Deposit (as defined below) and all accumulated interest thereon, if any, the later of on or within three (3) Business Days after the Bid Deadline and the date the Debtors determine, in consultation with the Consultation Parties, such Potential Bidder not to be a Qualified Bidder.

(b)     Provisions governing due diligence. Only Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors, including the Sellers. **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement.** The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. For all Potential Bidders (other than any Designated Stalking Horse Bidder), the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information. The Debtors shall not furnish any confidential information relating to the Remaining Assets, the Debtors' liabilities, or the sale of any or all of the Remaining Assets ("Confidential Sale Information") to any person, except to a Potential Bidder that has

11

entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; provided that the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the sale of all or a portion of the Remaining Assets. The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder, who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors as a Potential Bidder. All due diligence requests shall be directed to the Debtors' financial advisor.

(c)    Provisions governing Qualified Bids. A proposal, solicitation, or offer (each, a "Bid") by a Potential Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "Bid Requirements"), as determined by the Debtors in their business judgment (after consultation with the Consultation Parties) shall constitute a "Qualified Bid." The Bid Requirements are as follows:

   i.    **Assets**. Each Bid must clearly state (i) which Remaining Assets the Potential Bidder is offering to purchase and (ii) whether the Potential Bidder intends to operate all or a portion of the Debtors' business as a going concern, or to liquidate the business.

   ii.    **Assumption of liabilities.** Each Bid must expressly identify the liabilities it proposes to (i) assume or (ii) satisfy, including Cure Amounts, as defined in the Asset Purchase Agreement.

   iii.    **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "Purchase Price"). With respect to any Remaining Assets that are the subject of a Designated Stalking Horse Bidder's bid, the Bid must propose a Purchase Price for the subject Remaining Assets, including any assumption of liabilities, that exceeds the value of such bid, plus the Bid Protections, plus an amount at least greater than 0.5% of the initial bid amount or proposed purchase price (a "Minimum Bid"), as determined one week prior to the Bid Deadline in consultation with the Consultation Parties: provided, however, in the event that a Bid is for a combination of Remaining Assets different from those set forth in a, such consideration shall reasonably represent a premium, as determined by the Debtors in consultation with the Consultation Parties, to an approximate allocation of the Designated Stalking Horse Bidder's Bid; provided, further, that in determining the value of any such Bid, the Debtors will not be limited to evaluating the dollar value of the consideration but may also consider other factors, including, without limitation, the speed, certainty, and value of the proposed transaction. Subject to the immediately preceding sentence, the Purchase Price contained in a

12

Bid may be structured in whatever form the Potential Bidder desires (*e.g.*, a Potential Bidder may propose an all cash Bid). Any Designated Stalking Horse Bidder's offer and any Qualified Bidder's offer will remain subject to higher and better bids, in accordance with and subject to the Bidding Procedures.

      iv.        **Deposit**. With a Bid, a Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount not less than 10% of the aggregate Purchase Price set forth in the Bid, to be held in a noninterest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

      v.        **Same or better terms**. Each Bid must be on terms that are not more burdensome to the Debtors than the terms of an Asset Purchase Agreement or other proposal for the Debtors' assets, as determined by the Debtors (in consultation with the Consultation Parties). Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the sale contemplated by the Bid and shall include a schedule of executory contracts and unexpired leases proposed to be assumed by the Debtors and assigned and sold to the Potential Bidder ("Assumed Contracts"), and a copy of the purchase agreement representing the Bid clearly marked to show all changes requested by the Potential Bidder from a template Asset Purchase Agreement, including those related to the respective Purchase Price and assets to be acquired by such Potential Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors (in consultation with the Consultation Parties) that the Potential Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "Qualified Bid Documents").

      vi.        **Contingencies; No financing or diligence outs**. A Bid shall not be conditioned on (i) obtaining financing, (ii) shareholder, board of directors, or other internal approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the sale of specified representations and warranties or (ii) the satisfaction at the closing of the sale of specified conditions, which shall not be more burdensome to the Debtors, as determined by the Debtors (in consultation with the DIP Agent), than those set forth in an Asset Purchase Agreement.

      vii.       **Identity**. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating a sale of the Remaining Assets), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid. Each Bid must also disclose any past or present connections or agreements with the Debtors, any other Potential Bidder

and its affiliates, and/or any officer or director of the foregoing (including any current officer or director of the Debtors).

viii.        **Demonstrated financial capacity**.  A Potential Bidder must have, in the Debtors' business judgment (in consultation with the Consultation Parties), the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all Assumed Contracts to be assumed by such Bid.

ix.        **Committed financing**.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors (in consultation with the Consultation Parties), which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors (in consultation with the Consultation Parties).

x.        **Binding and irrevocable**.  A Potential Bid must include a signed writing stating that: (i) the Potential Bid is irrevocable until two (2) Business Days after the closing of the sale to a person or entity other than the Potential Bidder; and (ii) the Potential Bidder agrees to serve as a Backup Bidder upon the terms and conditions set forth in the Bidding Procedures, if such Potential Bidder is not a Successful Bidder.

xi.        **Expenses; Disclaimer of fees**.  Each Potential Bid other than a Designated Stalking Horse Bid, if received,  must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation or bid protection.  For the avoidance of doubt, no Potential Bidder (other than any Designated Stalking Horse Bidder) will be permitted to request, or be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation or bid protection, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

xii.        **Authorization**.  Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors in consultation with the Consultation Parties) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

xiii.    **As-Is, Where-Is**.    Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Remaining Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Remaining Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Remaining Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

xiv.    **Adherence to Bidding Procedures**.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction. Each Bid must expressly state that the Potential Bidder agrees to serve as a Backup Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise next best bid after the Successful Bid.

xv.    **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval needed to consummate the transaction contemplated by such Bid (to the extent there are any) and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following the Bid Deadline, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible). A Bid must also state that all necessary filings under applicable regulatory, antitrust, and other laws will be made and that payment of the fees associated therewith shall be made by the Potential Bidder.

xvi.    **Documents Evidencing Financing**.  Each Potential Bidder must provide copies of any documents evidencing any financing commitments necessary to consummate the transaction.

xvii.    **Consent to Jurisdiction**.  Each Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the sale, as applicable.

xviii.    **Bid Deadline**.  Each Bid must be transmitted via email (in .pdf or similar format) as to be **actually received** on or before **[January 13, 2020]** (the "Bid Deadline") by the Bid Notice Parties.

(d)    Provisions providing Bid Protections.  Pursuant to the Bidding Procedures, in the event any Designated Stalking Horse Bidder is not the Successful Bidder for all of the

Remaining Assets (or otherwise does not purchase all of the subject Remaining Assets as a Backup Bidder), the Designated Stalking Horse Bidder may be provided an expense reimbursement for its actual, reasonable and documented expenses not to exceed 1.5% of the Designated Stalking Horse Bidder's Purchase Price and a break-up fee in an amount not to exceed 3% of the Designated Stalking Horse Bidder's Purchase Price.

(e) <u>Minimum Bid Increments</u>. During the Auction, the minimum bid increments shall be 0.5% of the initial bid amount or proposed purchase price for a specific asset subject to sale. When bidding, any Designated Stalking Horse Bidder is entitled to credit an amount equal to the Bid Protections, assuming the full extent of the Expense Reimbursement.

(f) <u>Modification of the Bidding Procedures</u>. Without prejudice to the rights of any Qualified Bidder, or the rights of the DIP Agent in respect of any sale-related milestones set forth in the Final DIP Order, the Debtors reserve their rights to modify these Bidding Procedures in their business judgment (in consultation with the Consultation Parties) in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Remaining Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (including, without limitation, time limits for the submission of bids or changing the floor of bids); (d) canceling the Auction; and (e) rejecting any and all Bids.

(g) <u>Provisions governing closing with a Backup Bidder</u>. Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for any portion of or all of the Remaining Assets, as determined by the Debtors in their discretion and in consultation with the Consultation Parties (the "<u>Backup Bid</u>"), shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors, in consultation with the Consultation Parties. The identity of the Backup Bidder(s) and the amount and material terms of the Backup Bid(s) shall be the highest or otherwise best bid submitted by the Backup Bidder and announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder(s). A Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the sale of the applicable Remaining Assets with the Successful Bidder(s) for such Remaining Assets. A Backup Bidder's Deposit shall be held in escrow until the closing of a transaction with the Successful Bidder(s) and shall thereafter be returned within five (5) Business Days. If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may designate (in consultation with the Consultation Parties) the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further

16

order of the Court or notice to any party (counterparties to the Assumed Contracts shall receive notice of the closing with the Backup Bidder). In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies against any defaulting Successful Bidder, including with respect to specific performance.

(h)     Provisions governing the Auction. If the Debtors receive one or more Qualified Bids (in addition to the Asset Purchase Agreement), the Debtors will conduct an auction (the "Auction") on **[January 15, 2020]** at DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (or at such other location as the Debtors may designate upon written notice to all parties entitled to participate in the auction under the Bidding Procedures). Prior to and during the Auction, each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or otherwise in connection with the sale of the Remaining Assets. The Auction will be conducted openly and all creditors will be permitted to attend. Each round of bidding at the Auction will be transcribed.

## III.   **The Notice Procedures**

24.     Within three (3) business days following entry of the Bidding Procedures Order, the Debtors will provide notice to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Remaining Assets during the past twenty-four (24) months; (b) all entities known to have asserted any interest in or upon any of the Remaining Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to a Successful Bidder; (e) the Office of the United States Trustee for the District of Delaware; (f) counsel to the Committee; (g) counsel to the DIP Agent; (h) the Office of the United States Attorney General for the District of Delaware; (i) the Internal Revenue Service; (j) the U.S. Department of Justice; (k) the offices of the attorneys general for the states in which the Debtors operate; (1) all of the Debtors' insurers; (m) all parties entitled to notice pursuant to Rule 2002 of the Bankruptcy Rules or Local Rule 2002-1(B); and (o) other persons reasonably requesting notice of a potential purchase of the Remaining Assets (collectively, the "Notice Parties").

25.     To this end, the Debtors seek approval of the notice attached to the Bidding Procedures Order as **Exhibit 3** (the "Notice of Auction and Sale Hearing"), which the Debtors will file within three (3) business days of the entry of the Bidding Procedures Order.

## IV.    The Assumption Procedures.

26.     In connection with the sale of the Remaining Assets, the Debtors anticipate that they will assume and sell and assign to one or more Successful Bidders certain of their executory contracts and unexpired leases and propose the following Assumption Procedures:

(a)     Notice of Potential Assumption and Assignment.  No later than three (3) business days after entry of the Bidding Procedures Order, the Debtors shall serve a notice of potential assumption, assignment, or transfer of executory contracts and unexpired leases, substantially in the form attached to the Bidding Procedures Order as **Exhibit 4** (a "Notice of Potential Assumption"), on all parties to executory contracts or unexpired leases that may be assumed in connection with the sale of the Remaining Assets.

(b)     Objection Period.  Each Notice of Potential Assumption shall provide for the cure amounts the Debtors believe must be paid to cure all defaults outstanding under the applicable executory contracts or unexpired leases, and any objections to the assumption and assignment of such executory contracts or unexpired leases, including to the cure amount (a "Contract Objection"), must be in writing, filed with the Court, and **actually received** by the Objection Notice Parties (as defined below) no later than **[January 15, 2020]** as noted in each Notice of Potential Assumption (the "Assumption Objection Deadline").

(c)     Objection Procedures.  If a contract counterparty files a Contract Objection in a manner consistent with the requirements set forth above, and the Debtor and the contract counterparty are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, in consultation with the Successful Bidder, or such other date determined by this Court.

(d)     Notice of Assumption and Assignment.  No later than five (5) calendar days prior to the closing of a sale of all or a portion of the Remaining Assets (a "Closing"), the Debtors shall serve a notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 5** (a "Notice of Assumption and Assignment"), identifying the Assumed Contracts, the executory contracts or unexpired leases that will be assumed and assigned to the applicable Successful Bidder upon the Closing; provided, however, to the extent a counterparty to an Assumed Contract has filed a Contract Objection and such Contract Objection is not resolved at or before the Sale Hearing, the Debtors shall be permitted to

18

serve a Notice of Assumption and Assignment with respect to such Assumed Contract(s) at such time as the Contract Objection is resolved.

(e)    Excluded Contracts.  A Successful Bidder may determine to exclude any executory contract or unexpired lease at any time prior to the applicable Closing, notwithstanding such executory contract or unexpired lease having been identified in a Notice of Potential Assumption.  The Debtors will notify any non-Debtor party or parties to an excluded contract or lease by written notice as soon as practicable after such determination, which may be after the Sale Hearing or the Closing.

## V.    **Request for a Sale Hearing.**

27.    Regardless of whether the Debtors conduct an auction, the Debtors request that this Court schedule a hearing to approve the sale of the Remaining Assets (the "Sale Hearing").

28.    The Debtors currently propose [**January 21, 2020**] for the Sale Hearing.

## VI.    **Proposed Objection Procedures.**

29.    To the extent the Debtors conduct an Auction and select one or more Successful Bids, within one (1) business day of determining the Successful Bid(s) and completion of the Auction, the Debtors shall file on the Court's docket a notice setting forth the Successful Bidder(s), Backup Bidder(s) (if any), Successful Bid(s), and Backup Bid(s).

30.    The Debtor request that this Court require all objections to the results of the Auction or otherwise to the sale of any portion of the Remaining Assets (a) be in writing, (b) be signed by counsel or *pro se* party, (c) conform to the requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (d) state with particularity the legal and factual basis for the objection, (e) be filed with this Court by no later than [**January 17, 2020**] (the "Sale Objection Deadline"), and (f) be served in accordance with the Local Rules **so as to be actually received** on or before the Sale Objection Deadline by: (i) counsel to the Debtors; (ii) counsel to the Committee; (iii) counsel to the Designated Stalking Horse Bidder(s) (if one or more is designated); (iv) counsel to the DIP Agent; (v) the Office of the United States Trustee, J. Caleb Boggs Federal Building,

844 King Street, Lockbox 35, Wilmington, Delaware 19801, Attn: Brya Keilson; and (vi) counsel to any Successful Bidder and Backup Bidder as identified in accordance with the Bidding Procedures (collectively, the "Objection Notice Parties").

31.     The failure of any objecting person or entity to file an objection by the Sale Objection Deadline and in accordance with the procedures above should act as a bar to the assertion of any objection to the sale of the Remaining Assets and should be deemed to constitute consent to entry of an order approving the sale of the Remaining Assets and consummation of such sale, pursuant to section 363 of the Bankruptcy Code, and assumption, sale and assignment of the Assumed Contracts, pursuant to sections 363 and 365 of the Bankruptcy Code.

**VII.    De Minimis Asset Sale Procedures.**

32.     Notwithstanding the sale of the Remaining Assets, the Debtors propose to sell or transfer each of the De Minimis Assets for the highest or otherwise best offer received, taking into consideration the circumstances of each such sale or transfer, under the following procedures (the "De Minimis Asset Sale Procedures"):

(a)     With regard to sales or transfers of the De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with an aggregate selling price[5] equal to or less than $100,000:

(i)     The Debtors are authorized to consummate such transaction(s) if the Debtors determine in the reasonable exercise of their business judgment that such sales or transfers are in the best interest of their estates without further order of the Court or notice to any party; and

(ii)    Any such transaction(s) shall be free and clear of all liens, with such liens attaching only to the sale or transfer proceeds, if any, with the same validity, extent, and priority as had attached to the De Minimis Assets immediately prior to such sale or transfer.

---

[5]     For purposes of these De Minimis Asset Sale Procedures, "selling price" shall refer to the gross sale price or value set forth in the applicable purchase and sale agreement.

(iii)    The Debtors shall give written notice of each sale (the "De Minimis Sale Notice") to (a) the U.S. Trustee; (b) counsel to the Official Committee of Unsecured Creditors, if one is appointed; (c) counsel to Blue Torch Finance, LLC; (d) counsel to Luminus Energy Partners Master Fund, Ltd.; (e) counsel to MidCap Funding IV Trust as revolving agent under the Credit and Security Agreement dated as of July 31, 2019; and (f) any known affected creditor asserting a lien on the De Minimis Asset subject to sale (collectively, the "De Minimis Notice Parties").

(iv)    The content of the De Minimis Sale Notice shall consist of (a) identification of the De Minimis Assets being sold or transferred, (b) identification of the purchaser or transferee of the assets and their relationship (if any) to the Debtors, (c) the selling price, (d) the significant terms of the sale or transfer agreement, including, but not limited to, any payments to be made by the Debtors on account of commission fees to agents, brokers, auctioneers, and liquidators, (e) the intended use of the proceeds of such sale or transfer;

(v)    If no written objections from the De Minimis Notice Parties are filed with the Court within seven (7) days after service of such De Minimis Sale Notice, then the Debtors are authorized to immediately consummate such sale or transfer;

(vi)    If any De Minimis Notice Party files a written objection to any such sale or transfer with the Court within seven (7) days after service of such De Minimis Sale Notice, then the relevant De Minimis Asset shall only be sold or transferred upon submission of a consensual form of order resolving the objection as between the Debtors and the objecting party or further order of the Court after notice and a hearing.

33.    Additionally, during these chapter 11 cases, the Debtors will provide a written report or reports, within thirty (30) days after each calendar quarter (to the extent De Minimis Asset Sales were consummated for the relevant quarter), concerning any such sales or transfers made in accordance with the relief requested in this Motion (including the names of the purchasing parties and the types of amounts of the sales) to the De Minimis Notice Parties and those parties requesting notice under Bankruptcy Rule 2002.

## BASIS FOR RELIEF REQUESTED

**I.    The Bidding Procedures are Fair and Equitable, and are Designed to Maximize Recovery from the Remaining Assets.**

21

34.    The implementation of bidding and sale procedures, including bid protections, to facilitate the sale of a debtor's assets outside of the ordinary course of business is regularly approved by bankruptcy courts as a means of ensuring that a sale will generate the highest and best recovery for a debtor's estate.

35.    The Debtors submit that the Bidding Procedures are designed to maximize the value of the Remaining Assets and, as a result, will generate the highest or otherwise best offer for the Remaining Assets.

36.    The Bid Protections provided in the Bidding Procedures are an integral part to the successful implementation of the Bidding Procedures and sale process contemplated by the Debtors.

37.    As noted above, pursuant to the Bidding Procedures, and subject to whether the Debtors designate a Designated Stalking Horse Purchaser, in the event any Designated Stalking Horse Bidder is not the Successful Bidder for all of the Remaining Assets (or otherwise does not purchase all of the Remaining Assets as a Backup Bidder), the Designated Stalking Horse Bidder may be provided protections by way of an expense reimbursement not to exceed 1.5% of the Designated Stalking Horse Bidder's Purchase Price and a break-up fee in an amount equal to 3% of the Designated Stalking Horse Bidder's Purchase Price.

38.    The Bid Protections are necessary to induce a Potential Bidder to become a Designated Stalking Horse Bidder and benefit the estates by including certain of the Remaining Assets in a bid and setting a floor value for such assets.  The presence of a Designated Stalking Horse Bidder sets a floor for the value of the Remaining Assets and attracts other potential buyers to bid for such assets, thereby maximizing the realizable value of the Remaining Assets for the benefit of the Debtors' estates, their creditors and all other parties in interest.

22

39.     Approval of the Bid Protections is governed by standards for determining the appropriateness and extent of bid protections in the bankruptcy context.  Courts have identified at least two instances in which bid protections may benefit the estate.  First, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 537 (3d Cir. 1999).  Second, "if the availability of a break-up fee was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206–08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

40.     Here, the Bid Protections are designed to promote, not stifle, bidding for the Remaining Assets.  Further, the Debtors and their advisors believe that a sale of the Remaining Assets through a stalking horse process and auction is the best and most efficient way to effectuate a sale of the Remaining Assets while assuring the Debtors obtain the highest or otherwise best offer for the Remaining Assets.

41.     The Bidding Procedures, including the Bid Protections, are typical and customary in this district and are designed to be fair and equitable, to encourage parties with adequate interest in the Remaining Assets to participate in a competitive bidding process. *See, e.g.*, *In re Bayou Steel BD Holdings, L.L.C.*, Case No. 19-12153 (KBO) [D.I. 224] (Bankr. D. Del. Nov. 8, 2019) (approving break-up fee of 3% of the purchase price and expense reimbursement up to $250,000); *In re*

*ATopTech, Inc.*, Case No. 17-10111 (MFW) [D.I. 234] (Bankr. D. Del. Apr. 21, 2017) (approving break-up fee and expense reimbursement equal to 5% of the purchase price); *In re Phoenix Brands LLC*, Case No. 16-11242 (BLS) [D.I. 136] (Bankr. D. Del. June 8, 2016) (approving break-up fee and expense reimbursement equal to 5.3% of the purchase price); *In re American Hospice Management Holdings, LLC*, Case No. 16-10670 (LSS) [D.I. 75] (Bankr. D. Del. Apr. 7, 2016) (approving break-up fee and expense reimbursement equal to 5% of the purchase price); *In re F-Squared Investment Management LLC*, Case No. 15-11469 (LSS) [D.I. 75] (Bankr. D. Del. July 28, 2015) (approving break-up fee and expense reimbursement equal to 10% of the purchase price); *In re Citadel Watford City Disposal Partners, L.P.*, Case No. 15-11323 (KJC) [D.I. 184] (Bankr. D. Del. Jan. 14, 2016) (approving break-up fee and expense reimbursement equal to 9.90% of the purchase price); *In re Vertellus Specialties, Inc.*, Case No. 16-11290 (CSS) (Bankr. D. Del. June, 28, 2016) (approving 3% break-up fee and $500,000 expense reimbursement); *see also  In re Appvion, Inc.,* Case No. 17-12082 (KJC) [D.I. 565] (Bankr. D. Del. Mar. 12, 2018) (approving expense reimbursement up to $500,000).

42.     Based upon the foregoing, the Debtors, in their business judgment, submit that the Bidding Procedures, including the Bid Protections, are fair, equitable, reasonably designed to facilitate a competitive marketing process, and are due to be approved by this Court.

## II.    A Sale of the Remaining Assets is Appropriate Under Section 363(b)(1) of the Bankruptcy Code.

43.     The Debtors respectfully submit that the proposed sale of the Remaining Assets meets the standard set forth in section 363(b) for sales outside of the ordinary course of a debtor's business.  Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

24

44.    This Court's power under section 363 is supplemented by section 105(a), which provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title…." § 105(a).  As set forth below, the Debtors submit that they have satisfied the requirements of sections 105 and 363 as those sections have been construed by courts in the Third Circuit.

45.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan of reorganization if it demonstrates a sound business purpose for doing so.  *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (finding that the sale of substantially all of debtor's assets outside of a plan of reorganization is appropriate when a sound business reason justifies such a sale); *Myers v. Martin* (*In re Martin),* 91 F.3d 389, 394–95 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070–71 (2d Cir. 1983).

46.    Courts have applied the following four factors in determining whether a sound business justification exists: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. *See In re Del. & Hudson Ry. Co.*, 124 B.R. at 175–76 (adopting *Lionel* factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business in this District); *Lionel Corp.*, 722 F.2d at 1071 (setting forth the "sound business" purpose test); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147–49 (3d Cir. 1986) (implicitly adopting the articulated business justification test set forth in *Lionel* and adding the "good faith" requirement).

25

47.     Once debtors articulate a valid business justification, their decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest, or gross negligence," as courts are loath to interfere with corporate decisions absent such a showing.  *See id.* at 656.

48.     The Debtors have exercised sound business judgment and set forth sound business justifications for pursuing a sale of the Remaining Assets, pursuant to the factors discussed above. The Debtors have marketed the Remaining Assets extensively and believe that the process of putting forth the template Asset Purchase Agreement and allowing Potential Bidders to mark it up and accordingly submit their own proposed asset purchase agreements will allow the Debtors, in consultation with the Consultation Parties, to select the highest or otherwise best offer for the Remaining Assets.

49.     In short, the Debtors believe that a sale of the Remaining Assets pursuant to and in accordance with the Bidding Procedures as outlined in this Motion will allow for the greatest possible consideration for the Remaining Assets while minimizing the potential downside for the Debtors' and their estates.

50.     Accordingly, the Debtors believe that the Asset Purchase Agreement, when finalized, will represent the highest and otherwise best offer for the Remaining Assets and the Bidding Procedures provide a fair, reasonable, and prudent method of subjecting the Asset

Purchase Agreement to the market to ensure the Debtors maximize their recovery for the benefit

of their estates, creditors of their estates, and other parties in interest is a fair.

### III.    Any Sale Should be Approved Free and Clear of Liens, Claims, Interests, and Encumbrances.

51.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell

property free and clear of any lien, claim, interest, or encumbrance in such property if, among

other things:

> (1)     Applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     Such entity consents;
>
> (3)     Such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4)     Such interest is in bona fide dispute; or
>
> (5)     Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

52.     Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five

requirements will suffice to warrant approval of the proposed sale. *See In re Collins*, 180 B.R. 447,

450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the

enumerated conditions must be met in order for the Court to approve the proposed sale."); *Scherer

v. Fed. Nat'l Mortg. Ass'n* (*In re Terrace Chalet Apts., Ltd.*), 159 B.R. 821, 827 (N.D. Ill. 1993)

(sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

53.     The Debtors will serve notice of the Motion to all creditors of the Debtors and each

will have an opportunity to object to the relief sought in this Motion, including the Bidding

Procedures, Assumption Procedures, Notice Procedures, and proposed sale of the Remaining

Assets.  The Debtors expect to obtain the consent of the DIP Agent such that section 363(f)(2) will

apply.  Accordingly, to the extent any party contends that it holds a valid lien on the Remaining

Assets, such lien is subject to bona fide dispute, and the Debtors may sell the Remaining Assets

free and clear of such purported lien, under section 363(f)(4) of the Bankruptcy Code.  Therefore,

the Debtors request that the sale of the Remaining Assets be approved free and clear of all liens,

claims, encumbrances, and others interests, with the proceeds of the sale of the Remaining Assets

being distributed in accordance with the terms of the Final DIP Order.

## IV.    The Sale will be Proposed in Good Faith.

54.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection
> (b) or (c) of this section of a sale or lease of property does not affect the validity
> of a sale or lease under such authorization to an entity that purchased or leased
> such property in good faith, whether or not such entity knew of the pendency
> of the appeal, unless such authorization and such sale or lease were stayed
> pending appeal.

55.    Section 363(m) "reflects the… 'policy of not only affording finality to the judgment

of the bankruptcy court, but particularly to give finality to those orders and judgments upon which

third parties rely.'" *Abbotts Dairies of Penn., Inc.*, 788 F.2d at 147 (quoting *Hoese Corp. v. Vetter

Corp.* (*In re Vetter Corp.*), 724 F.2d 52, 55 (7th Cir. 1983)); *see also United States v. Salerno*,  932

F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of finality in

bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such

proceedings."); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) (same).

56.    While the Bankruptcy Code does not define "good faith," some courts have held

that a good faith purchaser is one who "purchases the assets for value, in good faith, and without

notice of adverse claims."  *Hardage v. Herring Nat'l Bank*, 837 F.2d 1319, 1323 (5th Cir. 1988)

(quoting *Willemain v. Kivitz* (*In re Willemain*), 764 F.2d 1019, 1023 (4th Cir. 1985)). Furthermore,

28

the good faith status of a purchaser can be destroyed with evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *TMT Procurement Corp. v. Vantage Drilling Co.* (*In re TMT Procurement Corp.*), 764 F.3d 512, 521 (5th Cir. 2014).

57.     Any sale of the Remaining Assets will be proposed in good faith. The Debtors represent and submit that the sale of the Remaining Assets pursuant to the terms and conditions set forth in this Motion will not be the product of collusion or bad faith.

58.     Moreover, if an Auction is conducted, all Qualified Bidders will be required to confirm that no collusion has taken place with respect to the sale of or bidding on the Remaining Assets.  In connection with approval of the sale of the Remaining Assets, the Debtors request that this Court make a finding that any Successful Bidder or Backup Bidder, as applicable, is a good faith purchaser and entitled to the protections of section 363(m) of the Bankruptcy Code.

**V.     Assumption and Assignment of Contracts is Warranted Under Section 365 of the Bankruptcy Code.**

    **A.     Assumption and Assignment of Contracts is Within the Debtors' Business Judgment.**

59.     As likely to be required by several, if not all of the proposed asset purchase agreements, the Debtors will be required to seek to assume and assign certain executory contracts and unexpired leases and the obligations thereunder, and to subsequently assign such executory contracts and unexpired leases to any Designated Stalking Horse Bidder or Potential Bidder.

60.     Section 365 of the Bankruptcy Code provides as follows:

> (a) Except as provided in… subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a), (b)(1). Accordingly, section 365 authorizes the proposed assumption of executory contracts and unexpired leases by debtors. The assumption of a contract by a debtor is subject to review under the business judgment standard. *In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases."). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of the contracts. *See, e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (holding that the "resolution of [the] issue of assumption or rejection will be a matter of business judgment.").

61.     The business judgment rule shields a debtor's management from judicial second-guessing. *Id.*; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Indeed, when applying the business judgment rule, courts show great deference to a debtor's decision to assume a contract. *See Summit Land Co. v. Allen* (*In re Summit Land Co.*), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume an executory contract "should be granted as a matter of course."). Thus, this Court should approve the assumption of the executory contracts and unexpired leases identified by any

30

Designated Stalking Horse Bidder or a Successful Bidder, as applicable, if the Debtors are able to demonstrate a sound business justification for doing so. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

62.    As set forth above, the assumption of certain executory contracts and unexpired leases may be required by proposed asset purchase agreements so that they may be assigned to any Designated Stalking Horse Bidder or Successful Bidder, pursuant to such proposed asset purchase agreement or other Successful Bid or Backup Bid.  In addition, any Designated Stalking Horse Bidder is—and any other Successful Bidder likely will be—responsible for cure amounts associated with assuming any executory contracts and unexpired leases.  If such is the case, the Debtors will carefully review the economic benefits of assumption and assignment of such executory contracts and unexpired leases identified and the Debtors will exercise their sound business judgment to ensure that any assumption and assignment will benefit the Debtors and their estates, while avoiding any further liability under the executory contracts and unexpired leases that are assumed.

## VI.    The De Minimis Asset Sale Procedures are Appropriate Under Section 363(b) of the Bankruptcy Code.

63.    As discussed above, while section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.

64.    Here, the Debtors have identified and continue to identify assets, the sale or transfer of which may not add substantial value to the Debtors' estates.  To that end, the Debtors have proposed the De Minimis Asset Sale Procedures to efficiently effectuate the disposal of such De Minimis Assets.  If the requested relief is granted, the Debtors will be able to avoid many

31

unnecessary administrative costs associated with maintaining the De Minimis Assets, and also will provide parties in interest and any known affected creditor asserting a lien on a De Minimis Asset the opportunity to object to its sale and obtain a hearing, if necessary.

65.    In connection therewith, the Debtors submit that the De Minimis Asset Sale Procedures are appropriate under section 363 of the Bankruptcy Code, including sections 363(b), (f) and (m).

## WAIVER OF BANKRUPTCY RULE 6004(h) AND 6006(d)

66.    Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Order is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) an admission that any contract is executory or any lease is unexpired or a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver or limitation of the Debtors' or any other party-in-interest's right under the Bankruptcy Code or any other applicable law.

## NOTICE

67.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the parties included on the Debtors' consolidated list of fifty (50) largest unsecured creditors; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) Schulte Roth & Zabel LLP, counsel to Blue Torch Finance, LLC, as term loan administrative agent under the

Second Amended and Restated Credit Amendment dated as of July 31, 2019; (vii) counsel to Luminus Energy Partners Master Fund, Ltd. as term loan lender under the Second Amended and Restated Credit Amendment dated as of July 31, 2019; (viii) counsel to MidCap Funding IV Trust as revolving agent under the Credit and Security Agreement dated as of July 31, 2019; (ix) the Taxing Authorities; (x) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (xi) any other party in interest entitled to notice of this Motion.  Due to the circumstances surrounding this Motion and the nature of the relief in it, the Debtors respectfully submit that no further notice of this Motion is required.

68.    The Debtors respectfully submit that no further or other notice of this Motion is required.

## NO PRIOR REQUEST

69.    No prior request for the relief sought in this Motion respecting the assets that are the subject of this Motion has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request: (a) entry an order, substantially in the form attached to this Motion as **Exhibit A**, (i) authorizing the Debtors to enter into the Asset Purchase Agreement, when finalized, (ii) approving the Bidding Procedures and Bid Protections, (iii) scheduling the Auction and setting a hearing to consider approval of the sale of the Remaining Assets, in accordance with and subject to the Bidding Procedures, (iv) approving the Assumption Procedures, (v) approving the Notice Procedures, and (vi) granting related relief; and (b)  entry of an order, substantially in the form attached to this Motion as **Exhibit B**, (i) authorizing the sale of the Remaining Assets free and clear of all liens, claims, interests, and encumbrances, (ii) authorizing the assumption and assignment of certain related executory contracts and

unexpired leases, and (iii) granting related relief; and (c) entry of such other and further relief as this Court deems just and proper.

| | |
|---|---|
| Dated:   December 14, 2019<br>            Wilmington, Delaware | Respectfully submitted,<br><br>**DLA PIPER LLP (US)**<br><br>*/s/ Stuart M. Brown*<br>Stuart M. Brown (DE 4050)<br>Matthew S. Sarna (DE 6578)<br>1201 North Market Street, Suite 2100<br>Wilmington, Delaware 19801<br>Telephone: (302) 468-5700<br>Facsimile:  (302) 394-2341<br>Email: stuart.brown@us.dlapiper.com<br>          matthew.sarna@us.dlapiper.com<br><br>-and-<br><br>Richard A. Chesley (admitted *pro hac vice*)<br>Jamila Justine Willis (admitted *pro hac vice*<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 335-4500<br>Facsimile:  (212) 335-4501<br>Email:  richard.chesley@us.dlapiper.com<br>          jamila.willis@us.dlapiper.com<br><br>-and-<br><br>*Proposed Counsel to the Debtors* |