**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CELADON GROUP, INC., *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 19-12606 (KBO)<br>(Jointly Administered)<br><br>**Hearing Date: January 3, 2020 at 10:00 a.m. (ET)**<br>**Obj. Deadline: Dec. 27, 2019 at 4:00 p.m. (ET)**<br><br>**Related Docket Nos: 11, 61, 85** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION
FINANCING; (II) GRANTING (A) LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN
PREPETITION LENDERS; (III) AUTHORIZING USE OF CASH COLLATERAL;
(IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL
HEARING; AND (VI) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") of Celadon Group, Inc.

and its affiliated debtors and debtors-in-possession (the "Debtors"), by and through its undersigned

proposed counsel, hereby submits this objection (the "Objection") to the Debtors' motion (the

"Motion")[2] [Docket No. 11] for a Final Order, *inter alia*, (i) authorizing the Debtors to obtain

senior secured superpriority postpetition financing (the "DIP Facility"); (ii) granting (a) liens and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); Vorbas, LLC (8936). The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

[2] Capitalized terms not expressly defined herein shall be given the meanings ascribed to them in the Motion or the *Declaration of Kathryn Wouters in Support of Chapter 11 Filings and First Day Pleadings* [Docket No. 3] (the "First Day Declaration"), as applicable.

superpriority administrative expense claims and (b) adequate protection to certain prepetition secured lenders; (iii) authorizing use of cash collateral; (iv) modifying the automatic stay; (v) scheduling a final hearing; and (vi) granting related relief.   In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

The vast majority of funds advanced under the proposed DIP Facility were spent during the first week of the case to fund accrued payroll, with a small remainder reserved to cover certain, but not all, administrative expenses to be incurred through February 1, 2020.  By that point, the DIP Milestones and mandatory repayment provisions in the DIP Credit Agreement require the DIP Obligations to be repaid with proceeds from the sale of the Taylor business, the Budget will have expired, and the Debtors will have no committed agreement for liquidity to fund these cases going forward.  Accordingly, if the DIP Facility is approved in its current form, the Debtors' secured lenders will have extracted every possible concession from the estates *before* the Debtors have obtained access to a long term budget and plan to maximize the value of the remainder of their assets (including real estate that is not even the subject of an existing sale motion).  Such result should not be permitted.

Moreover, while the DIP Financing was necessary to preserve the value of the lenders' purported collateral by avoiding a collapse into chapter 7 and the attendant loss of institutional knowledge and relationships that could cripple the estates' ability to collect on receivables and monetize other assets, it does not provide adequate funding to (i) maximize the value of trucks, trailers, real estate, and potential litigation claims, among other assets, certain of which may not have been subject to properly perfected liens as of the Petition Date, or (ii) unlock the value of the Debtors' Jaguar business in Mexico, which is on the verge of being abandoned despite its significant profitability over the last twelve months.

2

Despite the severe limitations imposed on the estates by the Budget, the proposed DIP Facility provides the Debtors' secured lenders with a litany of benefits and protections. Specifically, the Debtors seek to:

- Waive their rights under sections 506(c) and 552(b), notwithstanding that the proposed Budget expires on February 1, 2020 and does not provide a path to administrative solvency.

- Grant the DIP Lenders and Prepetition Secured Parties liens on all unencumbered assets of the Debtors, including the proceeds of avoidance actions. Although the Committee's investigation is in its preliminary stages, documents reviewed to date suggest that the Debtors may possess valuable assets not subject to properly perfected liens that could be monetized for the benefit of unsecured creditors, including real estate (some of which may have only become subject to a mortgage in the weeks prior to the Petition Date), trucks, and trailers.[3]

- Repay the DIP Loans with any and all sale proceeds, potentially prior to funding the Carve-Out.

- Pay $725,000 in cash fees to the DIP Lenders. These fees come on top of the approximately $8 million in closing fees and original issue discount that the DIP Lenders extracted from the Debtors only six months ago in connection with a refinancing that conferred only $8 million in additional liquidity after the payment of closing costs.

- Pay above-market interest of 17.5% to the DIP Lenders.

- Pay an "Additional Fee" equal to 2.5% of net sale proceeds to the DIP Lenders. As if this equity-like kicker was not expensive enough, as currently constructed, the DIP Lenders would receive payment of this fee before Luminous Capital, the last-out lender under the Prepetition Term Loan Facility, would receive payment on account of its Prepetition Term Loans, further subordinating potential recoveries to administrative and general unsecured creditors under this onerous fee structure.

- Waive the equitable doctrine of marshaling, despite the fact that the Prepetition Term Loan Lenders may not have had properly perfected liens on certain of the Debtors' assets prior to the Petition Date and equity demands that the Prepetition Term Loan Lenders should recover from previously encumbered assets before recovering out of the assets that would otherwise be available for unsecured creditors.

- Grant the Prepetition Secured Parties a sweeping release of any and all claims after the expiration of the Challenge Period, including related to (i) the allowability of claims for

---

[3] The DIP Facility is also guaranteed by five entities (one of which is not a Debtor) that did not guarantee the Prepetition Obligations.

unmatured interest under the Prepetition Loan Documents, (ii) the 2019 Refinancing Transactions, or (iii) equitable subordination, recharacterization, and lender liability. In short, the Debtors propose to grant the Prepetition Secured Parties a full Plan release after a short challenge period and a token $50,000 investigation budget.

- Potentially enhance the Prepetition Term Loan Lenders' indemnification rights beyond what is provided for in the Prepetition Loan Documents.

- Modify the applicable standards for determining what constitutes diminution in value in order to give the Prepetition Term Loan Lenders improper recourse to previously unencumbered assets.

- Repay the Prepetition Term Loan Obligations from the $3 million interest reserve account.

- Repay the Prepetition ABL Obligations on a rolling basis from the proceeds of accounts receivable.

- Agree to sell substantially all of their assets by January 22, 2020. The DIP Milestone requiring a sale of substantially all assets by January 22, 2020 would be incredibly value destructive. While it will undoubtedly be extended, particularly for real estate (which is not even subject to the existing sale motions), the DIP Lenders should not be able to declare a default at whim based on this arbitrary and value destructive deadline.

The fees, liens, claims, and other protections sought by the Debtors' secured lenders are simply inappropriate in the absence of a real budget that (i) allows the estates to preserve the value of and monetize assets other than the Taylor business, including litigation claims, tractors and trailers, real estate, and the Jaguar business, (ii) pays all known administrative expense claims, and (iii) provides sufficient funding for the Committee to fulfill its statutory duties. Falling into bankruptcy and unable to make payroll, the Debtors' leverage to negotiate financing was obviously limited, and the Committee does not oppose reasonable fees and protections for the new money provided. But the Committee respectfully submits that the Court should not bless a DIP Facility that grants the Debtors' secured lenders a benefit package so wildly disproportionate to the consideration being provided to the estates. Accordingly, it is respectfully submitted that the Motion be denied absent the modifications discussed herein.

217545739 v5

# BACKGROUND

## I.      The Cases

1.       On December 9, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and their properties as debtors-in-possession. No trustee or examiner has been appointed in this case.

2.       On December 18, 2019, the Committee was appointed in these cases by the Office of the US Trustee, consisting of the following three members:  (i) Comdata, Inc.; (ii) Transport Enterprise Leasing, LLC; and (iii) Master Fleet National LLC.  That same day, the Committee met and decided that it wished to employ the firms of Cooley LLP and Potter Anderson & Corroon LLP as its counsel and Dundon Advisors LLC as its financial advisor to advise and represent it in this proceeding *nunc pro tunc* to December 9, 2019.

## II.      The Prepetition Term Loan Facility

3.       On July 31, 2019, in connection with the Refinancing Transactions as described in the First Day Declaration, the Debtors entered into that certain Second Amended and Restated Credit Agreement (as amended, the "Prepetition Term Loan Agreement") dated July 31, 2019. Under the Prepetition Term Loan Agreement, the Prepetition Term Loan Lenders provided term loans to the Debtors in the aggregate principal amount of $105 million in two tranches,[4] comprised of (i) approximately $77.1 million in debt that was already outstanding under the Former Credit

---

[4] The "Tranche A" Prepetition Term Loan Lenders are same parties now providing the DIP Financing.  Under the Prepetition Term Loan Agreement, the right of payment of the "Tranche B" Prepetition Term Loan Lender, Luminous Capital, is subordinate to the right of payment of the "Tranche A" Prepetition Term Loan Lenders.

217545739 v5

Agreement (which was amended and restated)[5] and (ii) approximately $27.9 million of new term loans. Of the $27.9 million in new term loans, only $12.9 million was advanced to the Debtors in cash, $4.3 million of which was then promptly used to pay professional fees, expenses, and other closing costs. The rest was used to fund an approximately $7 million interest reserve account for the benefit of the Prepetition Term Loan Lenders and approximately $8 million was allocated to the Prepetition Term Loan Lenders' closing fees and original issue discount. *See* First Day Declaration, ¶¶ 13-15. Interest under the Prepetition Term Loan Agreement would be at least 12% per annum, a more than 20% increase on the interest rate charged under the Former Credit Agreement.

4.      Approximately $103.6 million in principal amount was purportedly outstanding under the Prepetition Term Loan Facility as of the Petition Date. *See* Interim DIP Order, § E(ii).

## III.     The Prepetition ABL Facility

5.      On July 31, 2019, also in connection with the Refinancing Transactions, the Debtors entered into the Revolving Credit Agreement with MidCap Financial Trust, as administrative agent and lender. The Revolving Credit Agreement provides a $60 million revolving credit facility intended to fund the Debtors' working capital requirements. As of the Petition Date, approximately $32.5 million is reportedly outstanding under the Prepetition ABL Facility. *Id.* at § E(i).

## IV.     The Proposed DIP Facility

6.      The Debtors seek approval of an $11.25 million DIP Facility to be provided by the

---

[5] The Committee has not been provided sufficient information to determine whether the Prepetition Term Loan Lenders acquired the interest in the Former Credit Agreement at par, but it is likely that they acquired the indebtedness at a substantial discount.

DIP Lenders.[6]  The Debtors originally sought $9.05 million in DIP Financing; however, the DIP Lenders later agreed to increase this amount to $11.25 million after they became aware of parties interested in purchasing Debtor Taylor Express, Inc.'s ("Taylor") business as going concern, because the original DIP Facility did not provide for sufficient funding to preserve the value of the Taylor business pending the sale.

7.      The proposed DIP Facility matures on the earlier of (i) March 31, 2020 (or, if the Debtors have delivered to the DIP Agent a written election to extend the maturity date and have paid the extension fee, April 30, 2020), (ii) the date that is 25 days following the date of entry of the Interim Order if the Final Order has not been entered, (iii) the consummation of a sale of all or substantially all of the Debtors' assets; (iv) the substantial consummation of a plan of reorganization, or (v) the date on which the DIP Loans are accelerated pursuant to the DIP Loan Agreement.  *See* DIP Loan Agreement, Definitions.

8.      The Court entered the Interim Order approving the $9.05 million DIP Facility on December 10, 2019 [Doc. No.61].  On December 16, 2019, the Court entered an order approving a supplement to the Interim Order that authorized the additional $2.2 million Taylor DIP financing sub-facility (the "Supplemental Interim Order") [Doc. No. 85].  Pursuant to the Interim Order and Supplemental Interim Order, the Debtors were authorized to borrow $9.25 million of the $11.25 million in total DIP Financing on an interim basis.

**B.      The Budget**

9.      Notwithstanding the stated Maturity Date, the Budget spans only 8 weeks and expires on February 1, 2020, which is conveniently one week after the Taylor sale is required to

---

[6] The DIP Credit Agreement is guaranteed by five entities (one of which is not a Debtor) that did not otherwise guarantee the Prepetition Obligations.

close.  The Budget contemplates that over $8.5 million in disbursements will have been made during the first week of the case to fund critical operating expenses, primarily payroll.  While this funding helped reduce the Debtors' directors and officers potential liability for unpaid payroll obligations, the Debtors have not as of the filing hereof provided any information on how they will fund the continuation of these chapter 11 cases beyond the Taylor sale.

10.     If the Debtors and the DIP Lenders are unable to negotiate a new budget by February 1, 2020—by which point the DIP will have likely been repaid from the proceeds of the Taylor sale—the Debtors will be in default under the DIP Credit Agreement and their authorization to use cash collateral will terminate.  *See* Interim Order, § 5.8.

### C.     The DIP Fees and Interest

11.     In connection with the DIP Facility, the DIP Lenders seek to be paid:

- 17.5% interest;

- Cash fees of $725,000, comprised of a (i) $271,500 Facility Fee; (ii) $50,000 Administration Fee; (iii) $337,500 Exit Fee; and (iv) $66,000 Supplemental Loan Fee;

- A $56,250 Extension Fee, payable in the event the Debtors request to extend the DIP Facility pursuant to the terms of the DIP Credit Agreement;

- An Additional Fee equal to 2.5% of net sale proceeds in excess of the amounts required to repay the DIP Obligations, the Prepetition ABL Obligations, and the Prepetition Term Loan Obligations solely with respect to the "Tranche A" Prepetition Term Loans; and

- Payment of fees (including professional fees) and expenses.

### D.     Waivers of Section 506(c), Section 552(b), and Marshaling

12.     In connection with the DIP Facility, the Debtors seek to waive their rights (i) to surcharge the collateral pursuant to section 506(c) of the Bankruptcy Code, (ii) under the "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code, and (iii) under the equitable doctrine of marshaling.  *See* Interim DIP Order, §§ 5.21-5.23.

### E.      Events of Default

13.      The Interim Order and DIP Credit Agreement provide for certain events of default that are either out of the Debtors' control or subjective and could result in hair trigger defaults, including:

- If the "DIP Lenders breach their obligation to make a committed advance as required to be made by the DIP Lenders pursuant to the terms of this Interim Order or DIP Loan Documents[.]"  *Id.* at § 5.3;

- The Committee, or any other party in interest, commences a challenge against the Prepetition Secured Parties.  *Id.*; and

- The Debtors fail to keep the DIP Collateral in "good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, the Sale Motion or the Financing Orders" and do not cure within one business day.  *See* DIP Credit Agreement, §§ 16.B, 14(d).

### F.      The DIP Liens and DIP Collateral

14.      The Debtors seek to grant the DIP Lenders liens on, and superpriority claims with recourse to, any and all owned and hereafter acquired assets and real and personal property of the Debtors (the "DIP Collateral").  The DIP Collateral includes, among other things, all previously unencumbered assets, including proceeds of Avoidance Actions.  *See* Interim DIP Order, § 2.4. As of the date hereof, the Committee has not been provided with evidence that the Prepetition Term Loan Secured Parties held properly perfected liens on the Debtors' owned or leased trucks and trailers—assets which could collectively have significant value.  In addition, the Committee is investigating transfers of the Debtors' interests in property—including mortgages on certain real property—made to the Prepetition Term Loan Secured Parties during the 90-day preference period.

### G.      Adequate Protection to the Prepetition First Lien Parties and Prepetition Second Lien Secured Parties

15.      The Debtors seek to grant the following adequate protection to the Prepetition Term Loan Secured Parties:

217545739 v5

- Replacement liens on and security interests in the DIP Collateral and an allowed superpriority administrative expense claim against the Debtors' estates;

- Payments of the reasonable and documented fees and expenses incurred by the Prepetition Term Loan Secured Parties, including professional fees; and

- Authorization for the Debtors to apply $3 million held in a segregated interest reserve to reduce the Prepetition Term Loan Obligations.

*Id.* at §§ 4.1, 4.2.

16.    The Debtors seek to grant the following adequate protection to the Prepetition ABL

Secured Parties:

- Replacement liens on and security interests in the DIP Collateral and an allowed superpriority administrative expense claim against the Debtors' estates;

- Payments of the reasonable and documented fees and expenses incurred by the Prepetition ABL Secured Parties, including professional fees; and

- Authorization for the Debtors to paydown the Prepetition ABL Obligations with the proceeds of accounts receivable on a rolling basis, as set forth in the Interim Order.

*Id.* §§ at 4.1, 4.3.

### H.    The DIP Milestones

17.    The DIP Facility requires the Debtors to comply with the following milestones

(collectively, the "DIP Milestones"):

- By December 28, 2019, the Court shall have entered an order granting the procedural relief requested in the Sale Motion;

- By January 2, 2020, the Court shall have entered the Final Order approving the DIP Financing; and

- By January 22, 2020, the Court shall have entered an order approving the sale of all or substantially all of the Debtors' assets.

### I.    Committee Investigation Restrictions

18.    Pursuant to the Interim Order, the Debtors have stipulated as to the aggregate

amount of prepetition debt and the validity, enforceability and priority of the liens and security

interests securing the obligations of the Prepetition Secured Parties, subject to any contested matter or adversary proceeding brought during the Challenge Period.  The Interim Order provides the Committee with an investigation budget of $50,000 and a (i) truncated, 35-day Challenge Period to assert any claims against the Prepetition ABL Secured Parties, and (ii) a 60-day Challenge Period to assert any claims against the Prepetition Term Loan Secured Parties.  The Interim Order requires the Committee to both obtain standing and file an adversary proceeding within the Challenge Period.  Further, the Challenge Period applies *to any and all claims* that could be brought against the Prepetition Secured Parties, and is not limited to the extent, validity, and perfection of their liens and security interests.  *Id.* at § 5.10.

## OBJECTION

### V.    The Proposed DIP Financing Should Not Be Approved

#### A.    Legal Standard

19.    It is well-settled that a court should only approve proposed debtor-in-possession financing if such financing is fair, reasonable, and adequate.  *See In re Ames Dep't Stores*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) (citing *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (E.D. Pa. 1987)).  In determining the fairness, reasonableness, and adequacy of the terms of a postpetition financing facility, courts routinely consider whether: (1) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code; (2) the credit transaction benefits are necessary to preserve estate assets; and (3) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *In re Republic Airways Holdings Inc*., No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016) (citing *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011)); *see also In re Farmland Indus., Inc*., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (evaluating similar factors, including whether the financing agreement

11

was negotiated in good faith and at arm's length).

20.     Courts recognize that "[d]ebtors-in-possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a pre-petition lien on cash collateral." *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38. Thus, bankruptcy courts have not approved financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole (or primary) benefit of a single lender. *See id.* (citing *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989)) (holding that the terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit [of one creditor]"). As discussed in more detail below, the Debtors have failed to demonstrate that the terms of the proposed DIP Facility are fair, reasonable, and adequate in accordance with applicable law.

## B.     The Proposed Waiver of the Estates' Rights Under Sections 506(c) and 552(b) of the Bankruptcy Code is Inappropriate Under the Circumstances

21.     Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself. This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured creditor recoveries. Courts have widely recognized that Bankruptcy Code section 506(c) waivers are not to be granted lightly. *See, e.g.*, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000) (finding that section 506(c) is a rule of fundamental fairness for all parties in interest, authorizing the surcharge of a secured lender's collateral where reasonable and appropriate). At its core, section 506(c) "is designed to prevent a windfall to the secured creditor . . . [Section 506(c)] understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . ." *Precision Steel Shearing, Inc. v. Fremont*

12

*Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (emphasis added).

22.     It is wholly inappropriate for the Debtors to waive their rights under section 506(c) at this juncture in the cases given the skeletal, 8-week Budget filed in connection with DIP Facility. The Budget makes clear that the Debtors contemplate spending $9.45 million of $11.25 available funding under the DIP Facility prior to January 3, 2020—most of which was spent in the first week of the case to fund critical operating expenses that if left unpaid, would have potentially exposed the Debtors' directors and officers to millions of dollars in personal liability for unpaid payroll, and resulted in the continued abandonment of trucks and other equipment on the roadside. The current Budget is provisional. It does not provide a path to administrative solvency, does not allow the Debtors to preserve the value of and monetize potentially other valuable assets such as litigation claims, real estate, and rolling stock, and does not provide sufficient funding for the estate professionals to administer these cases in Chapter 11. Instead, it is a Budget designed to maximize the Prepetition Secured Parties' control over this case and ensure that it is run solely for their benefit. The Court should not allow the Debtors to waive their surcharge rights under section 506(c) in connection with a temporary and provisional Budget that terminates the Debtors' authorization to use cash collateral three weeks after the final DIP hearing.

23.     Bankruptcy courts in this jurisdiction have denied waivers of surcharge rights absent any reasonable chance of an administratively solvent estate. *See In re Constar International Holdings LLC*, Case No. 13-13281 (CSS), Hr'g. Tr. [Docket No. 118] (Bankr. D. Del. Dec. 20, 2013) (refusing to approve financing that did not budget for section 503(b)(9) claims); *In re Townsends, Inc.*, Case No. 10-14092 (CSS), Hr'g. Tr. at 23-25 [Docket No. 338] (Bankr. D. Del. Jan. 21, 2011) (refusing to approve financing for a sale process that would leave the estate administratively insolvent); *In re NEC Holdings Corp.*, Case No. 10-11890 (PJW), Hr'g. Tr. at

13

100 [Docket No. 224] (Bankr. D. Del. July 13, 2010) (requiring that secured creditors pay the "freight" of the bankruptcy by ensuring an administratively solvent estate). Furthermore, bankruptcy courts routinely reject the waiver of surcharge rights under section 506(c) where the costs of the administration of the cases are not included in the budget. *See, e.g.*, *In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005); *Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998); *McAlpine v. Comerica Bank-Detroit (In re Brown Bros, Inc.)*, 136 B.R. 470, 474 (W.D. Mich. 1991). In this district, courts also refuse to enforce waivers of section 506(c) surcharge rights when a creditors' committee objects to the waiver. *See, e.g.*, *In re Mortg. Lenders Network USA, Inc.*, No. 07-10146 (PJW), Hr'g Tr. at 20-21 (Bankr. D. Del. Mar. 27, 2007) [Docket No. 346] ("Well, let me tell you what the law in this Court's been for at least the last five years. If the Committee doesn't agree with the waiver, it doesn't happen."); *see also In re Energy Future Holdings Corp*., No. 14-10979 (CSS), Hr'g Tr. at 212:12-22 (Bankr. D. Del. June 5, 2014) [Docket No. 3927] (declining to approve a 506(c) waiver over objection and stating that "Judge Walsh once told me that he'd never approve a 506(c) waiver on a non-consensual basis"); *In re NEC Holdings Corp.*, No. 10-11890 (PJW), Hr'g Tr. at 101:7-9, (Bankr. D. Del. July 13, 2010) [Docket No. 224] (stating that "you don't give a 506 waiver over an objection by the committee"). This Court should similarly deny or condition the Debtors' proposed waiver of surcharge rights under section 506(c) of the Bankruptcy Code because there is no evidence that the Budget will poise these cases to be administratively solvent when the Budget expires on February 1.

24. For the same reasons, the Debtors should not also be permitted to waive their rights under the "equities of the case" exception under section 552(b) of the Bankruptcy Code. That provision allows a Court to exclude postpetition proceeds from prepetition collateral on equitable

grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure. The Court should not permit the Debtors to waive their section 552(b) rights at this highly uncertain juncture in the cases.

### C. No Liens or Superpriority Claims Should Extend to Previously Unencumbered Assets

#### (i) The DIP Lenders Are Not Entitled to Liens and Superpriority Claims with Respect to Avoidance Actions

25.     Under the proposed DIP Facility, the DIP Lenders will receive liens on and superpriority claims with recourse to the proceeds of avoidance actions. This is inappropriate for a number of reasons.

26.     First, avoidance actions (and the proceeds thereof) are unique in that such actions are not property of the estate that can be pledged, but instead are statutory rights the Debtor hold in trust for the benefit of creditors. *See In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"); *Bethlehem Steel Corp. v. Moran Towing Corp.* (*In re Bethlehem Steel Corp.*), 390 B.R. 784, 786-87 (Bankr. S.D.N.Y. 2008) ("Avoidance actions . . . never belonged to the Debtor, but rather were creditor claims that could only be brought by a trustee or debtor in possession . . . ."); *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 567 (3d Cir. 2000) (noting that the underlying intent of the avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245, 250 (3d Cir. 2000) (stating, "when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"). As a result, bankruptcy courts customarily restrict the ability of debtors in possession to pledge avoidance actions and their proceeds as security. *See, e.g., Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics*

15

*Corp.*), 1993 WL 408366 (N.D. Ill. Sept. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions).  Courts in this District have expressed hesitation to grant liens on previously unencumbered assets of a debtor's estate, where such assets would otherwise inure to the benefit of unsecured creditors.  *See In re SFX Entm't, Inc.*, No. 16-10238 (MFW), Hr'g Tr. at 21:17-20, 26:9-23 (Bankr. D. Del. Mar. 4, 2016) [Docket No. 198] (refusing to grant liens to DIP lenders on unencumbered assets, but permitting DIP lenders to retain liens on commercial tort claims to the extent such lenders had existing interests in such claims).  Hence, avoidance actions and the net proceeds thereof should remain unencumbered for the benefit of the unsecured creditors.  *See, e.g.*, *In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) (Bankr. S.D.N.Y. Aug. 6, 2013) [Docket No. 133] (granting the use of cash collateral and adequate protection but excluding avoidance actions and proceeds thereof from property that could be used to pay super-priority claims under § 507(b) and from the scope of adequate protection liens).

27.     In addition, the facts and circumstances of these cases do not justify granting the DIP Lenders liens and superpriority claims with respect to proceeds of avoidance actions.  Only six months ago, the Prepetition Term Loan Lenders reportedly enhanced their collateral position through the July 31, 2019 Refinancing Transactions in exchange for providing minimal new liquidity to the estates.  Now, the same lenders are again providing minimal money to the estates solely to avoid a chaotic chapter 7 filing that would destroy the value of their collateral and the Court should not permit them to again enhance their collateral package at the expense of unsecured creditors in exchange for so little consideration to the estates.

28.     Furthermore, the Committee is currently investigating potential preferential transfers made to the Prepetition Term Loan Secured Parties (the same parties providing the DIP

Financing) prior to the Petition Date.  The DIP Facility should not provide the Prepetition Term Loan Lenders with a backdoor release from or defense to a potential preference by granting those same parties liens on those assets.

> ### (ii) The Prepetition Secured Parties Are Not Entitled to Adequate Protection Replacement Liens or Superpriority Claims with Respect to Any Unencumbered Assets

29.     The Prepetition Secured Parties are not entitled to adequate protection in the form of replacement liens on and superpriority claims with recourse to unencumbered assets because neither the Debtors nor the Prepetition Secured Parties have offered proof of the decline in the value of Prepetition Secured Parties' collateral or that the Prepetition Secured Parties are not adequately protected by the cash payments they are receiving, the sale timeline, and the extremely limited Budget.

30.      The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy."  *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987). Adequate protection is, therefore, a protection for the creditor to assure its collateral is not depreciating or diminishing in value and is made on a case-by-case basis.  *Id*. at 1397; *see also United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370 (1988) (an "interest is not adequately protected if the security is depreciating during the term of the stay"); *In re Saypol*, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence *vel non* of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection.").

31.     The Committee submits that the Prepetition Secured Parties are adequately protected by (i) the provisions in the DIP Facility that authorize the pay-down of the Prepetition ABL Facility (with proceeds of accounts receivable) and the Prepetition Term Loan Facility (with the $3 million held in the interest reserve account) during the 8-week sale process, (ii) the DIP

Milestones, and (iii) the Budget.  Given the substantial repayment of the Prepetition Secured Obligations authorized by the DIP Facility (in addition to the payment of professional fees and expenses) to occur over the next 8 weeks, the Prepetition Secured Parties should not also be allowed to improve their prepetition collateral position with replacement liens on unencumbered assets.  Although the Committee's investigation is in its preliminary stages, the Committee has already identified potentially valuable estate assets such as real estate, rolling stock, and litigation claims that may not be subject to valid, properly-perfected, non-avoidable prepetition liens.  The Prepetition Secured Parties should not be allowed to grab these additional assets merely in exchange for permitting the Debtors to take the minimum actions necessary to preserve the value of the Prepetition Secured Parties' collateral.

32.     At a minimum, in the event the Court decides to grant liens on previously unencumbered assets, the Final Order should not permit the Debtors to (i) grant any liens and claims that would re-encumber assets for which the prepetition liens are subject to avoidance or (ii)  waive their rights under the equitable doctrine of marshaling, and should instead require the DIP Lenders and Prepetition Secured Parties to recover from all other collateral before having recourse to any previously unencumbered assets.

**D.     Certain Events of Default Under the DIP Facility are Arbitrary and Increase the Risk of Administratively Insolvency**

33.     The Committee's concerns regarding the risk of administratively insolvency in these cases are exacerbated by certain arbitrary and hair-trigger default provisions in the proposed DIP Facility.  For example, the DIP Lenders are permitted to declare an Event of Default in the event they breach their obligation to lend to the Debtors under the DIP Documents.  *See* Interim Order, § 5.3.  Such provision essentially renders the DIP Facility terminable at will by the DIP Lenders.  Further, the Debtors will be in default if they do not maintain the DIP Collateral in "good

18

condition" and do not cure such default within one business day.  This highly discretionary default provision is inappropriate given the Debtors' fragile operational state and ignores that the Debtors' failure to maintain the collateral may be due the lack of sufficient postpetition financing for adequate oversight and safeguarding of the assets.  Simply put, the DIP Lenders should not be allowed to declare a default caused by their own actions or omissions.

### E.    The DIP Fees and Interest Rates are Excessive

34.    In addition to all of the aforementioned protections and benefits, the DIP Facility also entitles the DIP Lenders to a substantial return on their investment in the form of 17.5% interest, $725,000[7] in cash fees, and an Additional Fee equal to 2.5% of net sale proceeds.  The 17.5% interest rate is above-market, and the Debtors have offered no evidence that such rate is in-line with interest charged in other postpetition financing facilities approved by this Court.  Likewise, the $725,000 in cash fees appears to be excessive, particularly given the modest liquidity provided under the DIP Facility and the limited nature of the Budget.  Finally, the "Additional Fee" that entitles the DIP Lenders to 2.5% of any sale proceeds after repayment of the Prepetition ABL Obligations and the "Tranche A" Prepetition Term Loan Obligations is inappropriate.  It would be patently unfair to allow the DIP Lenders—who may participate in the sale process and credit bid in their capacity as the Prepetition Term Loan Lenders—to share in any upside from a sale process being run for their exclusive benefit.  Given that these same lenders recouped more than $8 million in original issue discount and fees from the estates less than 6 months ago in exchange for $8 million in net cash to the estates, any fees and interest charged by the DIP Lenders should be carefully scrutinized and reduced if not market-rate.

---

[7] In the event the Debtors properly exercise their option to extend the Maturity Date, total fees would be $781,250 after accounting for the Extension Fee.

217545739 v5

**F.     The DIP Facility Inappropriately Grants the Prepetition Secured Parties a Sweeping Release and Unduly Restricts the Committee's Investigation Rights**

35.     The DIP unreasonably restricts the Committee's ability to challenge the Debtors' stipulations regarding the Prepetition Obligations and assert any claims against the Prepetition Secured Parties.  The Committee is the last line of defense for these estates and as it stands, the Interim Order includes a number of hoops which the Committee must jump through to challenge what the Debtors had no choice but to accept.  The integrity of the bankruptcy process dictates that the Committee's professionals be permitted to investigate and litigate on behalf of its constituents without being subject to the control of the very targets of such litigation.

36.     First, the Interim Order requires the Committee to commence a Challenge with respect to any claims against the Prepetition Secured Parties—including potential equitable subordination claims, recharacterization claims, and lender liability claims—within the designated Challenge Period.  Granting the Prepetition Secured Parties a sweeping Plan-style release after the expiration of the Challenge Period is wholly inappropriate given the limited nature of the DIP Facility and Budget, the complexity of these cases, and the nature of the Debtors' assets.  Instead, the Challenge Period should apply solely to claims related to the priority, extent, perfection of the Prepetition Secured Parties' liens and security interests.

37.     Second, the Interim Order requires the Committee to both obtain a Court order granting standing and initiate an adversary proceeding within the designated Challenge Period.  Such a provision is unduly burdensome and works to further insulate the Prepetition Secured Parties from a legitimate investigation by the Committee.  The Final Order should provide that the filing of a motion for standing to prosecute the underlying claim, with a draft complaint attached, is sufficient to toll the expiration of the Challenge Period until the earlier of (i) the Court's denial of the standing motion or (ii) 5-days after the Court grants the standing motion.  Courts frequently

approve DIP financing arrangements providing that the filing of a standing motion satisfies the requirement of commencing an adversary proceeding within a specified time period. *See, e.g.*, *In re Swift Energy Co.*, No. 15-12670 (MFW) (Bankr. D. Del. Feb. 2, 2016) [Docket No. 224] (providing that the challenge period was tolled as to the Committee from the date the Committee seeks standing until ten business days after entry of order by the court with respect to such motion); *In re RS Legacy Corp. (f/k/a RadioShack Corp.)*, No. 15-10197 (BLS) (Bankr. D. Del. Mar. 12, 2015) [Docket No. 947] (providing challenge period tolled as to moving party until earlier of (a) withdrawal of standing motion or (b) entry of dispositive order by the court with respect to such motion); *In re EWGS Intermediary, LLC*, No. 13-12876 (MFW) (Bankr. D. Del. Nov. 20, 2013) [Docket No. 89] (same); *In re Centaur, LLC*, No. 10-10799 (KJC) (Bankr. D. Del. Apr. 30, 2010) [Docket No. 205] (same).  Further, the Final Order should provide that (i) the Challenge Period can be extended for cause and (ii) in the event these cases convert to cases under chapter 7 before the Challenge Period expires, any chapter 7 trustee should be permitted to conduct its own investigation of the Prepetition Secured Parties and should not be constrained by an unreasonably short challenge deadline.

38.     Second, the Challenge Period with respect to any claims against the Prepetition ABL Secured Parties is unnecessarily short and expires on January 13, 2020—35 days after the Petition Date and only 26 days after the Committee was appointed.  Neither the Debtors nor the Prepetition ABL Secured Parties have provided any justification for curtailing the standard, 60-day investigation period contemplated by Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware.  Forcing the Committee to conduct and conclude its investigation of any claims against the Prepetition ABL Secured Parties in approximately 3 weeks restricts the Committee's ability to fulfill its statutory duties, flouts precedent established

by courts in this circuit, and should not be permitted.

39.     Third, the DIP Financing provides the Committee with an insufficient investigation budget of only $50,000.  There are 26 debtor-entities in this case (several of which are Mexican entities) that own multiple real property assets and vehicles—assets that cannot be perfected through a routine UCC filing.  In light of the complexity of these cases and the nature of the Debtors' business, the Committee's investigation budget with respect to the validity of the Prepetition Secured Parties' liens should be increased to $150,000.

## G.     The Budget Improperly Restricts the Committee's Ability to Fulfill its Statutory Duties

40.     Fees for the Committee's professionals are not materially included in the current Budget.  The Court should not approve a postpetition financing facility that unduly restricts the Committee's ability to fulfill its statutory duties by failing to provide adequate funding for Committee professionals.   Postpetition financing should not be permitted if it destroys the adversary system at the core of the chapter 11 process.  Indeed, courts have held that postpetition financing should not be approved if the purpose is simply to "pervert the reorganization process from one designed to accommodate all classes of creditors and equity interests to one specifically crafted for the benefit of the bank[.]"  *In re Ames Dept. Stores, Inc.,* 115 B.R. at 38; *see also In re Tenney Village Co.,* 104 B.R. at 568 (same).  Disparate treatment of Committee professionals should not be tolerated, and any budget approved in connection with the DIP Facility should provide sufficient funding for the Committee to fulfill its statutory mandate to maximize recoveries to unsecured creditors.

217545739 v5

### H.     Technical Modifications

41.     In addition to the foregoing, the Committee requests the following technical

modifications and clarifications be made to the Final Order:

- The Final Order should clarify that any adequate protection to the Prepetition Secured Parties will be limited solely to the extent of any diminution in value and the Final Order should not pre-determine what constitute diminution in value.  *See* Interim Order, §§ (7); 4.1, 4.2

- The Final Order should clarify that the Prepetition Secured Parties retain the burden of proving any claims for diminution of value, via a motion on notice, and that all parties rights to object to such a motion on all grounds are preserved.

- The Final Order should require the Carve-Out to be funded immediately upon the Debtors' receipt of sale proceeds and before any repayment of the DIP Obligations. *See id.* at § 5.9.  Without this modification, the Carve-Out is potentially illusory.

- The Debtors' stipulation in the Final Order indemnifying the Prepetition Secured Parties should be stricken.  *See id.* at § E(viii).  The Final Order should not expand the Prepetition Secured Parties' indemnification rights beyond what is provided for in the Prepetition Loan Documents.

- The Final Order should be amended to provide that any party in interest, not just the Debtors, is entitled to seek an emergency hearing with the Court after the DIP Lenders declare an Event of Default.  *See id.* at § 5.4.

- To the extent a 506(c) waiver is granted, the Final Order should provide that the Prepetition Secured Parties are consenting to a surcharge for the costs and expenses provided for in the Budget and that the 506(c) waiver shall not limit the Court's ability to conclude that costs and expenses that would otherwise be surchargeable under Section 506(c) do not constitute diminution in value.

- In the event of a default, the DIP Lenders should not be permitted to exercise remedies until after entry of an order authorizing the same for cause.

- In the event of a default, accrued but unpaid obligations included in the Budget should still be satisfied.

- The DIP Lenders should not be permitted to declare an event of default or terminate the use of cash collateral due to any failure by the Debtors located in Mexico to comply with covenants or other requirements in the DIP Loan Agreement or any related guarantees.

- All parties in interest should have the opportunity to object to any material amendment to the Budget.

217545739 v5

- The Final Order should require the Debtors to provide the Committee with the same reporting as the DIP Lenders.

## **RESERVATION OF RIGHTS**

42.     This Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement and amend this Objection, including the filing of a declaration in support thereof, to introduce evidence at any hearing relating to this Objection, and to further object to the Motion, on any grounds that may be appropriate.

*[Remainder of Page Left Intentionally Blank]*

**WHEREFORE**, the Committee requests that the Court deny the Motion absent the

Committee's requested modifications and provide the Committee such other and further relief as

the Court may deem just, proper and equitable.

Dated: December 27, 2019                    Respectfully submitted,
       Wilmington, Delaware

                                         */s/ Aaron H. Stulman*
                                         Christopher M. Samis (No. 4909)
                                         L. Katherine Good (No. 5101)
                                       Aaron H. Stulman (No. 5807)
                                       POTTER ANDERSON & CORROON LLP
                                       1313 N. Market Street, 6th Floor
                                       Wilmington, Delaware 19801-3700
                                       Telephone: (302) 984-6000
                                       Facsimile:  (302) 658-1192
                                       Email:  csamis@potteranderson.com
                                           kgood@potteranderson.com
                                         astulman@potteranderson.com

                                       – and –

                                       Seth Van Aalten Esq.
                                         Robert Winning, Esq.
                                         Sarah Carnes, Esq.
                                         COOLEY LLP
                                         55 Hudson Yards
                                         New York, New York 10001-2157
                                         Telephone: (212) 479-6000
                                         Facsimile:  (212) 479-6275
                                         Email:   svanaalten@cooley.com
                                         rwinning@cooley.com
                                         scarnes@cooley.com

                                       *Proposed Counsel for the Official Committee of*
                                       *Unsecured Creditors*