IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
In re:                                                   :  Chapter 11
                                                         :
                                                         :  Case No. 19-12606 (KBO)
   CELADON GROUP, INC., *et al.*,[1]                     :
                                                         :  (Jointly Administered)
         Debtors.                                        :
                                                         :  **Proposed Obj. Deadline: TBD**
                                                         :  **Proposed Hr'g Date: TBD**
---------------------------------------------------------x

# APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING SALES AGREEMENT AND AUTHORIZING THE DEBTORS TO RETAIN AND EMPLOY RITCHIE BROS. AUCTIONEERS (AMERICA) INC. AS AUCTIONEER AND BROKER, *NUNC PRO TUNC* TO FEBRUARY 10, 2020; (II) AUTHORIZING THE SALE OF THE FLEET FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF

Celadon Group, Inc. and its affiliated debtors (collectively, the "Debtors"), by and through their counsel, DLA Piper LLP (US), hereby submit this application (the "Application") for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order") (i) approving the Agreement (as defined below) and authorizing the Debtors to retain and employ Ritchie Bros. Auctioneers (America) Inc. and certain of its affiliates ("RB Group") as auctioneer and broker and for related services as to the Fleet (defined below), *nunc pro tunc* to February 10, 2020; (ii) authorizing the sale of the Fleet free and clear of all liens, claims and encumbrances; and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); Vorbas, LLC (8936). The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

(iii) granting related relief. In support of this Application, the Debtors submit the *Declaration of Don Nash in Support of Retention Application* (the "Nash Declaration"), a copy of which is attached to this Application as Exhibit B, and incorporated by reference, and the *Declaration of Kathryn Wouters in Support of Chapter 11 Filings and First Day Pleadings* [D.I. 3] (the "First Day Declaration"). In further support of this Application, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these chapter 11 cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3. Venue of these chapter 11 cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested in this Application are sections 105(a), 327(a), 328(a), 363, and 1107(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014(a), 6004 and 6005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2014-1 and 6004-1.

## BACKGROUND

5.  Celadon Group, Inc. and its affiliated debtors were one of the largest North American truckload freight transportation carriers, providing point-to-point shipping, and specifically, long haul, regional, local, dedicated, intermodal, temperature-protect, and expedited freight services across the United States, Canada and Mexico. Amid industry-wide headwinds, including falling freight rates, the Debtors began to experience liquidity constraints and worked with their key stakeholders to identify a solution that would maximize enterprise value for the benefit of all stakeholders. On December 8, 2019 (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.  The Debtors continue to be in possession of their assets, oversee their businesses, and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On December 18, 2019, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee"). As of the date hereof, no trustee or examiner has been appointed in the Debtors' chapter 11 cases. The meeting pursuant to section 341 of the Bankruptcy Code, initially scheduled to be held on January 22, 2020, has been continued to February 28, 2020.

7.  The Debtors operated their business utilizing a fleet of approximately 13,300 tractors and trailers. Of this fleet, the Debtors own approximately 350 tractors and 1,800 trailers (the "Fleet"), most of which are situated in the United States and some of which are situated in Canada.[2] A schedule of all trailers and tractors included in the Fleet is attached to the Agreement as Exhibit A.

---

[2] With respect to any tractors and trailers in the Fleet that are owned by a Canadian entity, the Debtors will seek an order from a Canadian court authorizing their sale free and clear of any and all registered and unregistered liens, security interests, tax or duty obligations or other encumbrances or contrary claims whatsoever.

8. On January 6, 2020, the Court entered (i) the *Order: (I)(A) Approving Bidding Procedures and Bid Protections, (B) Permitting Debtors to Designate Stalking Horse Purchaser(s) and Grant Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice of Sale, and (E) Granting Related Relief; and (II)(A) Authorizing and Approving the Sale of Substantially All Assets of Taylor Express, Inc. Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 218], and (ii) the *Order: (I)(A) Approving Bidding Procedures and Bid Protections, (B) Permitting Debtors to Designate Stalking Horse Purchaser(s) and Grant Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice of Sale, and (E) Granting Related Relief; and (II)(A) Authorizing and Approving the Sale of Substantially All Assets of Certain of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 219] (the "Sale Procedures Orders"). Subsequently, the Court has approved the sales consummated pursuant to the Sale Procedures Orders. *See, e.g.*, D.I. 408, 409, 419, 420, and 421.

9. However, the Fleet was not included in these sales, and the tractors and trailers of the Fleet remain the property of the Debtors' estates, burdening them with storage and insurance costs. Because the trailers and tractors of the Fleet are no longer used by or useful to business operations, and because the Fleet is imposing administrative costs on the Debtors' estates, the Debtors have determined, in their business judgment, that selling the Fleet as expeditiously as possible would be in the best interest of their estates and their creditors.

10. Given the numbers of tractors and trailers in the Fleet and the specialized market for such tractors and trailers, among other things, the Debtors determined that the most efficient method for disposing of the Fleet would be with the assistance of an auctioneer experienced with and well-known in the trailer and tractor markets. RB Group has been in the business of, among other things, refurbishing and selling heavy equipment and trucks since 1958. With a global network that includes over forty permanent auction sites around the world and operations in more than fifteen countries, RB Group sells billions of dollars of heavy equipment and trucks each year and helps thousands of people around the world appraise, sell, inspect, buy, refurbish, ship and finance heavy equipment, trucks, and other assets every month.

11. The Debtors selected RB Group not only because of RB Group's market access, selling platform and its experience with Section 363 and bankruptcy proceedings, but also because RB Group is already familiar with the Debtors through that certain Storage Agreement dated December 7, 2019. Pursuant to the Storage Agreement, RB Group agreed to permit the Debtors to park the Fleet on RB Group's yards, pending ultimate disposition, and to provide to the Debtors discounted insurance to cover the portion of the Fleet that would be parked on RB Group's yards. In addition, RB Group agreed that if it were to be retained to sell the Fleet, then all storage fees would be waived and the insurance costs accrued by RB Group would be paid out of the sale proceeds. Therefore, approval of this Application will save the Debtors' estates time and money in connection with the disposition of the Fleet. A copy of the Storage Agreement is attached hereto as Exhibit C.

12. On February 10, 2020, the Debtors and RB Group entered into the Sales Agreement (the "Agreement"), engaging RB Group to ready the Fleet for sale and to dispose of the Fleet through any combination of commercial sales, arms' length transactions, public unreserved

auctions and on-line sales (each, a "Disposition") under strategies approved by the Debtors, in consultation with their secured creditors and the Committee (collectively, the "Consultation Parties") in order to maximize the realizable value of the Fleet. A copy of the Agreement is attached to the Proposed Order as Exhibit 1.

13. Several tractors and trailers in the Fleet are not centrally located or are not parked on property under the Debtors' or their agent's control. Some have been involved in accidents or have been vandalized. Some may be the subject to towing or garagemen possessory liens. In addition to the auctioneer and broker services, RB Group has agreed to retrieve and refurbish as many of such tractors and trailers as is commercially reasonable and within the agreed upon budget of up to $2,000,000, unless the parties agree to increase the budget. Based upon assurances of support from certain interested parties (including the Debtors and their secured creditors), as well as the Debtors' agreement to ensure that RB Group is provided access to tractors and trailers in the Fleet, RB Group will immediately take the actions set forth in this paragraph in order to preserve and enhance the value of the assets of the estate.

14. Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, which is fully incorporated into this Motion by reference.

**RELIEF REQUESTED**

15. Pursuant to sections 105(a), 327(a), 328(a), 363 and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a), 6004 and 6005, and Local Rules 2014-1 and 6004-1, the Debtors respectfully request entry of the Proposed Order, attached to this Application as Exhibit A, (i) approving the Agreement and authorizing the sale of the Fleet free and clear of all liens, claims

and encumbrances; (ii) authorizing the Debtors to employ and retain RB Group as auctioneer and broker to perform the scope of services set forth in the Agreement, *nunc pro tunc* to February 10, 2020; and (iii) granting related relief.  With respect to any tractors and trailers in the Fleet that are owned by a Canadian entity, the Debtors will seek an order from a Canadian court authorizing their sale free and clear of any and all registered and unregistered liens, security interests, tax or duty obligations or other encumbrances or contrary claims whatsoever.

## BASIS FOR RELIEF

**Sale of the Fleet Free and Clear Under § 363**

16. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  This Court's power under section 363 is supplemented by section 105(a), which provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title…."  § 105(a).

17. A debtor should be authorized to sell assets out of the ordinary course of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan of reorganization if it demonstrates a sound business purpose for doing so.  *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (finding that the sale of substantially all of debtor's assets outside of a plan of reorganization is appropriate when a sound business reason justifies such a sale); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394–95 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983).

18. Courts have applied the following four factors in determining whether a sound business justification exists: (a) whether a sound business reason exists for the proposed

transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided.  *See In re Del. & Hudson Ry. Co.*, 124 B.R. at 175–76 (adopting *Lionel* factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business in this District); *Lionel Corp.*, 722 F.2d at 1071 (setting forth the "sound business" purpose test); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147–49 (3d Cir. 1986) (implicitly adopting the articulated business justification test set forth in *Lionel* and adding the "good faith" requirement).

19.     Here, the Debtors have exercised sound business judgment and set forth sound business justifications for pursuing sales of the Fleet by RB Group, pursuant to the factors discussed above.  RB Group is best positioned to market the Fleet extensively, thereby ensuring that the Debtors receive the highest or otherwise best offer possible.  Moreover, RB Group is already familiar with the Debtors, these chapter 11 cases, and the Fleet, by virtue of its preexisting relationship with the Debtors under the Storage Agreement.  In short, the Debtors believe that a sale of the Fleet pursuant to and in accordance with the procedures proposed by RB Group will allow for the greatest possible consideration for the Fleet while minimizing the potential downside for the Debtors' and their estates.  Accordingly, the Debtors believe that the retention of RB Group will provide a fair, reasonable, and prudent method of selling the Fleet to ensure the Debtors maximize their recovery for the benefit of their estates, creditors of their estates, and other parties in interest.

20.     Once debtors articulate a valid business justification, their decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest

belief that the action taken was in the best interests of the company." *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest, or gross negligence," as courts are loath to interfere with corporate decisions absent such a showing. *See id.* at 656.

21. As discussed above, the Debtors entered into the Agreement because they believe that RB Group will be able to obtain the highest prices for the Fleet at the least cost to the Debtors' estates. Any Disposition will be conducted in good faith. The Debtors are prohibited from making a bid or offer for all or any part of the Fleet, whether directly, indirectly, through an agent or otherwise. Moreover, if an auction is conducted, all bidders will be required to confirm that no collusion has taken place with respect to the sale of or bidding on the Fleet.

22. The Debtors respectfully submit that they have satisfied the requirements of sections 105 and 363 as those sections have been construed by courts in the Third Circuit and that the sale of the Fleet by RB Group, whether by auction or private sale, meets the standard set forth in section 363(b) for sales outside of the ordinary course of a debtor's business.

23. Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, interest, or encumbrance in such property if, among other things:

(1) Applicable non-bankruptcy law permits sale of such property free and clear of such interest;
(2) Such entity consents;
(3) Such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
(4) Such interest is in bona fide dispute; or
(5) Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

24. Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale."); *Scherer v. Fed. Nat'l Mortg. Ass'n* (*In re Terrace Chalet Apts., Ltd.*), 159 B.R. 821, 827 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

25. The Debtors stipulate that the Fleet is subject to the liens of the Prepetition Term Loan Agent or DIP Agent, as defined in the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (i) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (ii) Granting (a) Liens and Superpriority Administrative Expense Claims and (b) Adequate Protection to Certain Prepetition Lenders; (iii) Authorizing Use of Cash Collateral; (iv) Modifying the Automatic Stay; and (v) Granting Related Relief* [D.I. 230] (the "<u>Final DIP Order</u>"). Such liens will attach to the proceeds of each Disposition in accordance with the Final DIP Order and the Prepetition Term Loan Agent or DIP Agent have consented to the Dispositions. Therefore, the Fleet may be sold free and clear under section 363(f)(2).

26. The Debtors dispute that any party other than the Prepetition Term Loan Agent or DIP Agent hold a valid lien on the Fleet. Therefore, any such lien is subject to bona fide dispute, and the Debtors, through RB Group, may sell the Fleet free and clear of such purported lien, under section 363(f)(4) of the Bankruptcy Code. Any party that disagrees and believes that it holds a valid lien on any part of the Fleet will have received notice of the Application and may assert its interest. Finally, to the extent there is a mechanics lien or other such lien right asserted against any item in the Fleet, and the value of each item exceeds the lien (which should be true in every case), section 363(f)(3) of the Bankruptcy Code provides the basis for a free and clear sale. To the

extent there are any valid liens against any items in the Fleet, those liens will attach to the net proceeds received by the estate for any such item with the same validity and priority as exist in such item. Therefore, the Debtors respectfully request that any Dispositions of the Fleet be free and clear of all liens, claims, encumbrances and other interests.

**Retention of RB Group**

27. Section 327(a) of the Bankruptcy Code provides that a debtor, subject to court approval, "may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor's] duties under this title." 11 U.S.C. § 327(a). Section 328(a) permits, with a court's approval, "the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including . . . on a fixed or percentage fee basis . . . [,]" and Bankruptcy Rule 6005 provides that the "order of the court approving the employment of an appraiser or auctioneer shall fix the amount or rate of compensation."

28. Bankruptcy Rule 2014 requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

FED. R. BANKR. P. 2014.

29. The Debtors respectfully submit that the retention and employment of RB Group as auctioneer and broker under the terms of the Agreement in connection with these chapter 11 cases is permitted by sections 327(a) and 328(a) of the Bankruptcy Code, and this Application

meets the requirements of Bankruptcy Rule 2014. As described above, RB Group has the ability to maximize the amounts realized from the Dispositions, given its access to markets and experience with selling heavy equipment, tractors, and trailers, particularly since RB Group can and will immediately take steps to recover, protect, and refurbish the Fleet. Such retention and employment is reasonable under the circumstances and is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. By entering into this Agreement, RB Group will forgive the accrued storage costs, thereby saving money for the Debtors' estates.

*Services to be Provided*

30. Pursuant to the Agreement, RB Group has agreed to provide the following services to the Debtors and their estates, subject to further order of the Court:

- Determination of the best method for selling the Fleet, whether by unreserved auctions, live or online,[3] or negotiated sales;
- Establishment of prices for the Fleet sold through negotiated sales;
- Disposition of the Fleet;
- For online auctions, the use of RB Group's proprietary online bidding service;
- Collection and transportation of the Fleet for purposes of conducting sales;
- Repairs, restoration, or refurbishment of the Fleet as needed and in consultation with the Debtors and Consultation Parties;
- Transfer of title with the support of the Debtors; and
- Collection of sale proceeds on behalf of the Debtors and deduction of Costs under the Agreement.

*Professional Compensation and Expense Reimbursement*

31. RB Group's decision to enter into the Agreement and provide auctioneer and brokerage services to the Debtors is conditioned upon its ability to be retained in accordance with its customary terms and conditions of employment, including its standard compensation structure

---

[3] For items of the Fleet sold at live or online unreserved auctions, and due to the nature of unreserved auctions, neither RB Group, nor the Debtors, have any control over the final sale price paid for such items.

and reimbursement of out-of-pocket expenses incurred in accordance with its customary billing practices.

32.  RB Group may determine, in its sole discretion, the method of sale to use for each Disposition in order to maximize the sale value of each item in the Fleet. RB Group shall receive a commission of 8.25% of the gross sale price of each item in the Fleet (the "Commission"), regardless of the method of sale. In addition, RB Group shall be reimbursed from the first dollars received from any Disposition for all transportation, titling, insurance and refurbishment costs incurred in connection with the Dispositions (the "Costs"), plus 10% of such Costs (the "Premiums"), totaling, in the aggregate, not more than $2,000,000 of such Costs and Premiums. Any Costs and Premiums incurred in excess of $2,000,000 shall be subject to approval by the Consultation Parties. In addition, and consistent with its standard practices, RB Group will impose a transaction fee upon buyers of items in the Fleet (the "Transaction Fee"), which is comprised of: (a) 10% on all lots selling for $10,000 or less, (b) 3.85% on all lots selling for more than $10,000 up to $33,500, with a minimum fee of $1,000 per lot or, (c) $1,290 on all lots selling for over $33,500 (in the currency of the auction). The Transaction Fee will apply to on-site, online, and proxy purchases. For avoidance of doubt, neither the Debtors nor their estates will be charged for any portion of the Transaction Fee.

33.  The Debtors respectfully request that they be permitted to compensate RB Group in accordance with the Agreement, at such time as amounts owed to RB Group become due and payable under the Agreement, without the need for RB Group to file applications for compensation and without further order of the Court. In connection therewith, the Debtors submit that cause exists for this Court to waive the information requirements imposed by Local Rule 2016-2(d) and (e). Specifically, the Debtors respectfully request that, in lieu of requiring RB Group to maintain

time records and to submit monthly, interim, or final fee applications pursuant to sections 330 and 331 of the Bankruptcy Code, a modified procedure, as set forth below, be established to compensate RB Group and comply with Bankruptcy Rule 6004 and Local Rule 6004-1 allowing RB Group to file a final fee statement after the Fleet is sold with a summary of the fees earned and reimbursable expenses incurred (the "Fee Statement"). The Fee Statement shall be in full satisfaction of any and all requirements for the filing of an application for the payment of fees and expenses and other filings required of professionals (the "Notice and Compensation Procedures").

34. Based on industry practices and the circumstances of these chapter 11 cases, the Debtors submit that the Notice and Compensation Procedures are reasonable and are in the best interests of the Debtors, their estates, RB Group, and other parties in interest.

*RB Group's Disinterestedness*

35. To the best of the Debtors' knowledge, RB Group (i) does not hold any interest materially adverse to the Debtors' estates; (ii) has no material connection with the Debtors, their creditors, equity security holders, any other party in interest, or related parties herein outside of these chapter 11 cases; and (iii) is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code, except as may be set forth in the Nash Declaration.

36. To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of RB Group's retention are discovered or arise, RB Group will use reasonable efforts to promptly file a supplemental declaration.

*Indemnification and Other Relevant Provisions*

37. The Agreement contains the following language regarding indemnification:

> Seller will defend, indemnify and save RB Group, its subsidiaries and affiliates, and each of their officers, directors, shareholders, employees and agents, harmless against any and all claims, demands, suits, actions, causes of action, damages, costs or charges whatsoever arising from: (a) any breach of the representations, warranties or covenants set out in this Agreement; (b) hazardous materials associated with the Assets or contamination resulting from any leakage, spills, or malfunction of the Assets unless due to RB Group negligence; (c) [reserved]; (d) [reserved]; (e) payments by RB Group on account of any registered or unregistered charges, liens, or other interests claimed by creditors or any person or authority in respect of the Assets, whether or not disclosed, in order to clear title to the Assets, incurred following and upon the consent of the Consultation Parties; (f) any deficiency in compliance with any applicable environmental rules or regulations; (g) any tax, cost or expense arising from your failure to satisfy any laws or regulations in relation to a transaction; and (h) any negligence, unlawful act, or willful misconduct by you in connection with the Agreement but not for RB gross negligence or willful misconduct.

Agreement, Section 1.6.

38. The Debtors and RB Group believe that the indemnification provisions contained in the Agreement, as may be amended by the Proposed Order, are customary and reasonable for RB Group and comparable firms providing auctioneering and brokerage services, and as would be modified pursuant to the foregoing limitations, reflect the qualifications and limitations on indemnification provisions that are customary in this district and others. Moreover, the terms and conditions of the indemnification provisions were negotiated by the Debtors and RB Group at arm's length and in good faith.

39. The provisions contained in the Agreement are reasonable and in the best interests of the Debtors, their estates, and creditors in light of the fact that the Debtors require RB Group's services to assist in the sale of the Debtors' rolling stock and to recover the highest price for the Fleet. Accordingly, as part of this Application, the Debtors request that this Court approve these provisions of the Agreement.

### *NUNC PRO TUNC* RELIEF IS APPROPRIATE

40. Pursuant to the Agreement, RB Group is providing services to the Debtors including the retrieval, refurbishment, and/or repair of certain rolling stock in the Fleet. The Debtors submit that no party in interest will be prejudiced by the grant of *nunc pro tunc* relief. In fact, all parties in interest will benefit from *nunc pro tunc* relief, as these services are necessary for ensuring that the Debtors receive the highest and best offers for the Fleet, and RB Group has the experience and expertise to perform these services efficiently.

### NOTICE

41. Notice of this Application will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) counsel to the Committee; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) Schulte Roth & Zabel LLP and Landis Rath & Cobb LLP, counsel to Blue Torch Finance, LLC; (vii) King & Spalding LLP, counsel to Luminus Energy Partners Master Fund, Ltd.; (viii) Goldberg Kohn Ltd. and Morris, Nichols, Arsht & Tunnell LLP, counsel to MidCap Funding IV Trust; (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (x) any other party in interest entitled to notice of this Motion. Due to the nature of the relief requested in this Application, the Debtors respectfully submit that no further notice of this Application is required.

[*Remainder of Page Intentionally Left Blank*]

## NO PRIOR REQUEST

42. No prior request for the relief sought herein has been made by the Debtors to this or any other court.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order, attached hereto as Exhibit A, granting the relief requested in this Application, and grant such other and further relief as the Court may deem just and proper.

Dated: February 11, 2020

**Celadon Group, Inc.**

_____
By: Kathryn Wouters
Title: Vice President of Finance and Treasurer