# **EXHIBIT A**

**(Proposed Order)**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x
: Chapter 11
In re: :
: Case No. 19-12606 (KBO)
CELADON GROUP, INC., *et al.*,[1] :
: (Jointly Administered)
Debtors. :
: **Related D.I.: ___**
---------------------------------------------------------x

## ORDER (I) AUTHORIZING THE DEBTORS TO RETAIN AND EMPLOY JONES LANG LASALLE BROKERAGE, INC. AS REAL ESTATE BROKER, *NUNC PRO TUNC* TO THE PETITION DATE AND (II) GRANTING RELATED RELIEF

This matter coming before the court upon the *Application of the Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Employ Jones Lang LaSalle Brokerage, Inc. as Real Estate Broker, Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief* (the "Application"),[2] (i) authorizing the Debtors to retain and employ Jones Lang LaSalle Brokerage, Inc. ("JLL") as real estate broker, *nunc pro tunc* to the Petition Date and (ii) granting related relief; all as further described in the Application; and upon the Seitz Declaration; and upon the record of these chapter 11 cases; and this Court having found that (i) this Court has jurisdiction over the Debtors, their estates, property of their estates and to consider the Application and the relief

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); Transportation Insurance Services Risk Retention Group, Inc. (7197); Vorbas, LLC (8936). The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

[2] Capitalized terms used but not otherwise defined in this Order shall have the meanings ascribed to them in the Application.

requested therein under 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012, (ii) this Court may enter a final order consistent with Article III of the United States Constitution, (iii) this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (iv) venue of the Application in this district is proper under 28 U.S.C. §§1408 and 1409, and (v) no further or other notice of the Application is required under the circumstances; and this Court having reviewed the Application and having heard the statements in support of the relief requested in the Application at a hearing before this Court (the "Hearing"); and having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted in this Order; and this Court having found and determined that the relief sought in the Application is in the best interests of the Debtors' estates, their creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Application is GRANTED, as set forth in this Order.

2. Subject to the limitations of this Order, the Debtors are authorized to retain and employ JLL as real estate broker in these chapter 11 cases, pursuant to section 327(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1, on the terms and conditions set forth in the Services Agreement, a copy of which is attached to this Order as **Exhibit 1**, *nunc pro tunc* to the Petition Date.

3. The terms of the Services Agreement are approved in all respects, except as limited or modified explicitly in this Order.

4. The Compensation Procedures, as set forth below, are approved, pursuant to sections 105, 327, 328, 330 and 331 of the Bankruptcy Code, and subject to further order of the Court:

(a) Upon the occurrence of a Disposition, JLL and the Debtors will prepare a notice (a "Notice of Disposition") to be filed and served upon the U.S. Trustee, counsel to the Committee, the Debtors' lenders, any party that has requested notice pursuant to Bankruptcy Rule 2002, and any other party whose rights are affected by such occurrence;

(b) Any such Notice of Disposition will specify the Remaining Property in question, the sale price, and the calculated commission for JLL and any previously-identified co-broker;

(c) Such Notice of Disposition will provide that parties in interest may object to such commission for JLL for a period of the shorter of ten (10) calendar days after the filing and serve of the Notice of Disposition or the applicable closing date (the "Objection Deadline"). Upon the expiration of the Objection Deadline, all parties in interest shall be barred from contesting the Debtors' payment of such commission to JLL or any previously-identified co-broker; and

(d) Immediately following the expiration of the Objection Deadline, the Debtors shall be authorized to pay to JLL and any previously identified co-broker the commission(s) set forth in the Notice of Disposition, without further order of the Court.

(e) Notwithstanding the foregoing, any commission(s) paid to JLL and any previously identified co-broker shall be subject to any future order of the Court disallowing or reducing such payment for cause.

5. JLL is hereby exempt from the information and reporting requirements of Local Rule 2016-2(d) and shall not be required to file applications for allowance and payment of compensation, so long as JLL complies with the Compensation Procedures.

6. Notwithstanding anything to the contrary in the Application or this Order, the Services Agreement, or the Declaration attached to the Application, any reimbursement provisions allowing for the reimbursement of fees and expenses incurred in connection with participating in, preparing for, or responding to any action, claim, suit, or proceeding brought by or against any

party that relates to the services provided under the Engagement Letter and fees for defending any objection to JLL's entitlement to compensation under the Bankruptcy Code are hereby not approved.

7. The indemnification provisions included in the Services Agreement are approved, subject to the following:

(a) No party shall be entitled to indemnification, contribution, or reimbursement pursuant to the Services Agreement for services, unless such services and the indemnification, contribution, or reimbursement therefore are approved by this Court.

(b) The Debtors shall have no obligation to indemnify any party, or provide contribution, or reimbursement to any party, for any claim or expense to the extent it is either: (i) judicially determined (the determination having become final and no longer subject to appeal) to have arisen from the party's gross negligence, willful misconduct, or bad faith; (ii) for a contractual dispute in which the Debtors allege breach of an a party's contractual obligations, unless this Court determines that indemnification, contribution, or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to subparagraph (c) hereof to be a claim or expense for which the party should not receive indemnity, contribution or reimbursement under the terms of the Services Agreement, as modified by this Order.

(c) If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these chapter 11 cases (that order having become a final order no longer subject to appeal) and (ii) the entry of an order closing these chapter 11 cases, a party believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, and/or reimbursement obligations under the Services Agreement (as modified by this Order), including without limitation, the advancement of defense costs, the party must file an application therefor in this Court, and the Debtors may not pay any such amounts to the party before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which this Court shall have jurisdiction over any request for fees and expenses by any party for indemnification, contribution and/or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify, or make contributions or reimbursements to, the party. All parties in interest shall

retain the right to object to any demand by any party for indemnification, contribution and/or reimbursement.

8. Any limitation of liability pursuant to the terms and conditions set forth in the Services Agreement, or otherwise, are hereby eliminated for the duration of these chapter 11 cases.

9. The relief granted herein shall be binding upon any chapter 11 trustee appointed in these chapter 11 cases, or upon any chapter 7 trustee appointed in the event of a subsequent conversion of these chapter 11 cases to cases under chapter 7.

10. To the extent of any inconsistency between the Services Agreement and this Order, this Order shall control.

11. The Debtors and JLL are authorized to take all steps necessary or appropriate to carry out the provisions of this Order.

12. The terms and conditions of this Order shall be effective immediately and enforceable upon its entry.

13. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

# EXHIBIT 1

**(Services Agreement)**

# SERVICES AND COMPENSATION AGREEMENT

THIS SERVICES AND COMPENSATION AGREEMENT is entered into as of the 30 day of August, 2018, by and between **Celadon Group, Inc., and or affiliates,** ("Principal"), and JONES LANG LASALLE BROKERAGE, INC., a Texas corporation (hereinafter "Jones Lang LaSalle").

## WITNESSETH:

WHEREAS, Principal desires to employ Jones Lang LaSalle as agent for the purpose of providing Principal with land and or building acquisition and disposition services in various markets throughout North America, as set forth below; and

WHEREAS, Jones Lang LaSalle is willing to assist Principal on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual promises set forth herein, Principal and Jones Lang LaSalle hereby agree as follows:

1. **Services -** Jones Lang LaSalle will provide Principal with the following services:

    a.) **Property Disposition** – provide Principal with standard listing agreement and market research to obtain a market based listing price. *\*A copy of a standard exclusive listing agreement (ELA) is attached as Exhibit A. (It may be necessary to modify ELA slightly based on local laws and fees.*

    b.) **Assess markets** - work with Principal to assess various markets throughout the United States and Canada for acquisition/disposition/tenant representation of land and/or properties. The Initial Applicable Markets are listed in Exhibit B and Applicable Markets will be provided by Principal and become a part of this Agreement via Addendum from time to time.

    c.) **Identify site alternatives** – provide Principal a survey of relevant options identifying land or existing structures that meet specified criteria and or broker opinion of values of existing owned or leased real estate.

    d.) **Hold site tours**

    e.) **Prepare and distribute a Request for Proposal (RFP) to short-listed sites.**

    f.) **Prepare financial and qualitative analysis** – prepare a financial analysis based on responses to the RFP's and compare the qualitative factors (access, pricing, current zoning, etc.) of the short-listed options.

    g.) **Negotiate Letter of Intent** – Jones Lang LaSalle will use Principal's form of LOI and will consult with Principal and Principal's counsel during the LOI negotiation process. Additionally, Jones Lang LaSalle will present all offers to and from Principal in a timely manner and keep Principal fully informed.

    h.) **Negotiate Purchase and Sale Agreement** – Principal's counsel will draft and lead the Purchase Agreement negotiations with assistance from Jones Lang LaSalle.

    i.) **Disclosure** – disclose all material facts actually known by Jones Lang LaSalle.

2. <u>Designated Representatives</u>. Brian Seitz and Jake Sturman of Jones Lang LaSalle will be responsible to Principal for the supervision, coordination and direction of Jones Lang LaSalle services under this Agreement. Brian Seitz will be the primary contact to Principal under this agreement. Jones Lang LaSalle reserves the right to designate another member of its firm to act in that capacity should Jones Lang LaSalle deem it necessary. Bryan Smith and Jon Russell are designated by Principal to act for and on behalf of Principal pursuant to this Agreement, provided Principal may designate another person in writing from time to time to act on behalf of Principal. Additionally, in order to provide the Services throughout the United States and Canada, it will be necessary for Jones Lang LaSalle to delegate its responsibilities to its state and country licensed affiliates and hire best in market co-brokers when needed.

3. <u>Compensation</u>

Commissions. In the event Principal executes a purchase agreement or lease for the purchase or lease of property during the term of this Agreement (or after the termination/expiration pursuant to Section 5 below), Jones Lang LaSalle will be entitled to receive from the owner of such property or its agent a commission in accordance with the negotiated market rate for the area. Jones Lang LaSalle's right to receive a commission shall be conditioned upon the closing of property pursuant to a purchase agreement or fully executed lease agreement.

In the event of an acquisition or new lease, Jones Lang LaSalle will use its good faith effort to cause the owner or Landlord to pay Jones Lang LaSalle the commission, and Jones Lang LaSalle will advise Principal in advance of any offer for which the fee provided by the owner is less than a market commission and if Principal agrees prior to submitting offer Principal will pay Jones Lang LaSalle the difference directly.

In the event of a disposition, Jones Lang LaSalle will look to Principal to pay a market based commission based on the size and location of the project.

Rebate. To the extent not prohibited by law, Jones Lang LaSalle agrees to rebate back to Principal any commissions earned on land/property/lease acquisitions under the terms of this Agreement based on the following annual amounts of commission earned by Jones Lang LaSalle:

    **$0 - $150,000 – 0% rebate to Principal**
    **$150,001 - $250,000 – 10% rebate to Principal**
    **$250,001 - $500,000 – 25% rebate to Principal**
    **$500,001 and above – 35% rebate to Principal**
**\*Commissions paid to any "buyer broker" or any broker that JLL hires in each local market will not contribute towards the above rebate structure.**

4. <u>Indemnities</u>. Principal agrees to and will defend (with counsel reasonably acceptable to Jones Lang LaSalle), indemnify and hold harmless Jones Lang LaSalle, its affiliates and subsidiaries and each and all of their officers, directors, employees, shareholders and agents from and against all claims, losses, liabilities and expenses (including reasonable legal fees, expert witness fees and court costs), arising out of or in connection with any of the activities described in this Agreement, except to the extent such claims, losses, liabilities and expenses arise by virtue of Jones Lang LaSalle's negligence or intentional misconduct hereunder.

Jones Lang LaSalle agrees to and will defend (with counsel reasonably acceptable to Principal), indemnify and hold harmless Principal, its affiliates and subsidiaries and each and all of their officers, directors, employees, partners and agents from and against all claims, losses, liabilities and expenses (including reasonable legal fees, expert witness fees and court costs), arising out of or in connection with any of the activities described in this Agreement, except to the extent such claims, losses, liabilities and expenses arise by virtue of Principal's negligence or intentional misconduct hereunder .

5. Term. This Agreement shall commence on June 1, 2018 ("Commencement Date") and shall remain in full force and effect thereafter through June 30, 2019. The commissions earned calculator shall reset to $0.00 and the agreement shall renew annually on each July 1 thereafter unless terminated by either party. After 180 days from the commencement of this Agreement, either party may terminate this Agreement by providing 30 days' written notice to the other party of such termination. Such termination will be with respect to Jones Lang LaSalle's further representation of Principal, but will not affect Principal's responsibility hereunder for the payment of any commission, fees or reimbursable expenses to which Jones Lang LaSalle may be entitled in accordance with this Agreement for Services prior to the termination.

Notwithstanding anything in this Agreement to the contrary, Jones Lang LaSalle shall be entitled to a commission with respect to any purchase agreement or other transaction that is contracted for within 12 months after the expiration or termination of this Agreement if:

A. Prior to such expiration or termination Jones Lang LaSalle has (i)contacted the landlord, owner or developer of the relevant property or the agent of any such party regarding the possibility of a purchase agreement or other transaction with Principal; (ii) has informed Principal of the availability of the property as an alternative (such locations referred to below as "Protected Locations"); (iii) Principal has approved the Protected Location in writing; and (iv) Jones Lang LaSalle and Principal have begun written negotiations of a LOI with the owner of said Protected Location(s); and

Jones Lang LaSalle will remain available to perform the Services for all Protected Locations after the expiration or termination of this Agreement, up to the stated twelve (12) month period. However, if Principal elects to not have Jones Lang LaSalle involved in the transaction, such election will not impact the commissions to be paid to Jones Lang LaSalle under this Agreement.

6. Confidentiality; Publicity. Jones Lang LaSalle shall maintain confidentiality with respect to any and all non-public information obtained from Principal relating to the Services. In addition, any and all information, data, studies, etc., collected or created in connection with the Services performed for Principal shall be and remain Principal's property. Copies of such information shall be delivered to Principal upon request.

Jones Lang LaSalle shall not issue or release for publication any articles or advertising or publicity materials relating to the work performed hereunder or mentioning or implying the name of Principal, its affiliated companies, or any of their personnel, unless prior written consent is granted by Principal. In the event that Principal elects to publicize or authorizes publicity of matters performed hereunder, Principal shall use its best efforts to have Jones Lang LaSalle referenced in such publicity.

7. Limited Liability. Each party's liability hereunder shall be limited to its assets; and no partner, director, officer, agent, servant, employee, representative or affiliate of either party shall have any personal liability in connection with this Agreement. Neither party shall be liable to the other for, and each party hereby waives any and all rights to claim against the other, any special, indirect, incidental, consequential, punitive or exemplary damages in connection with this Agreement.

8. Other Services. While other real estate services including, but not limited to, development, construction management, property management and property financing may be provided by Jones Lang LaSalle and/or its affiliates, they are not within the scope of this Agreement. These services may be provided by Jones Lang LaSalle and/or its affiliates pursuant to the terms of separate agreements between Principal and the appropriate Jones Lang LaSalle entity.

While Jones Lang LaSalle may be doing a survey of building systems for tenant comfort purposes at any property Principal intends to purchase, Principal acknowledges and agrees that Jones Lang LaSalle is not an expert in and would not be doing an in-depth review of any environmentally hazardous materials (including but not limited to, asbestos and/or PCB's), engineering matters (structural or otherwise) or legal, regulatory or other technical issues and that Jones Lang LaSalle is not providing any advice with respect to such materials, matters or issues. Principal

agrees to hire such experts as it deems necessary to investigate any environmental matters, engineering matters, legal or regulatory matters or other technical matters at any property it intends to lease, purchase or occupy. Jones Lang LaSalle, however, will, if requested, assist Principal in identifying, selecting, and negotiating for these services.

9. Taxes. Principal shall be responsible for all taxes due and payable on the Commission or any other payments to Jones Lang LaSalle in connection with the Services to the extent such taxes are not paid by the Owner, including any sales tax, value-added tax or gross receipts tax; provided, however, in no event shall Principal be responsible for any net income, franchise or property tax assessed against Jones Lang LaSalle, all of which shall be the responsibility of Jones Lang LaSalle.

10. Legal Fees; JURY WAIVER. If either party shall institute any action or proceeding against the other relating to the provisions of this Agreement, the unsuccessful party in the action or proceeding shall be entitled to recover reasonable expenses and attorneys' fees as deemed appropriate by the court, and if the court requires a contractual agreement between the parties for such award, this Section 10 will serve as the agreement. THE PARTIES HEREBY WAIVE TRIAL BY JURY.

11. Miscellaneous. This Agreement represents the complete and final understanding between Jones Lang LaSalle and Principal with respect to the subject matter hereof and may not be waived, amended, or modified by either party, unless such waiver, amendment or modification is in writing and signed by both parties. If any provision of this Agreement is invalid under applicable law, such invalidity shall not affect the other provisions of this Agreement. This Agreement shall be governed by the laws of the state where the property to be leased or purchased is located, if the dispute concerns multiple properties, or the Agreement as a whole, the laws of the State of Illinois will govern. This Agreement is binding upon the parties hereto and their respective successors and assigns; provided, however, this Agreement may not be assigned by either party except to any other entity which acquires all or substantially all of the business and employees of such party.

**REST OF PAGE INTENTIONALLY BLANK**

**SIGNATURES ON FOLLOWING PAGE**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

JONES LANG LASALLE BROKERAGE, INC., a Texas corporation (Jones Lang LaSalle)

By: _____

Name: _____

Title: **Adam Broderick**

Address: **Managing Director**
8900 Keystone Xing #1150 Indianapolis, IN 46240

CELADON GROUP, INC.

By: _____

Name: Dennis L. Elschide

Title: Corporate Attorney

Address: 9503 E 33rd, Indianapolis, IN 46235

# EXHIBIT A
## EXCLUSIVE LISTING AGREEMENT

**JONES LANG LASALLE BROKERAGE, INC.** with office located at 8900 Keystone Crossing Suite 1150, Indianapolis, IN 46240. (hereinafter "Agent") agrees to act as exclusive sales agent for **CELADON REALTY, LLC** (hereinafter "Owner") for approximately 157,000 SF on +/-28.86 acres of land located at **2847 E 600 S in Warren, IN** on the following terms and conditions:

1. This agreement shall be for a term of six (6) months commencing on December 15, 2017 and shall continue thereafter until cancelled by either party giving thirty (30) days' prior written notice to the other.

2. During the term of this agreement, Agent will bring the availability of the space to the attention of other licensed real estate brokers. Owner agrees to refer all inquiries with respect to the available space to Agent, who shall use reasonable efforts to negotiate a purchase and sale agreement for Owner on terms and conditions satisfactory to Owner. Owner reserves the right to approve or disapprove any prospective purchaser and all terms and conditions of the respective leases of such approved purchaser.

3. Agent agrees to advise and consult with Owner regarding promotional and advertising materials. Owner shall reimburse Agent for all pre-approved out-of-pocket expenses, if any, directly related to negotiating purchase and sales agreements for space in the Property, or the sale of the Property as the case may be, including, without limitation, all reasonable attorneys' fees incurred in connection therewith.

4. Agent will prepare a monthly status report which will include a list of all prospects who have been shown space and have requirements for new space.

5. Owner shall pay to Agent a fee in accordance with Schedule A for any purchase and sale agreements entered into by Owner during the term of this agreement.

6. In the event of termination of this agreement for any reason, Owner agrees to recognize Agent on prospects whom Agent has identified in writing at, or prior to, such time of notification, and which prospects has physically visited the property with Agent. Agent will be entitled to a fee computed in accordance with Schedule A, for any identified prospect who demonstrated a continued interest in the property until executing a purchase and sale agreement, provided such prospect has entered into a purchase and sale agreement within one year from the termination of the agreement.

7. Indemnification
Owner will indemnify, defend and hold Agent, its directors, officers, agents, servants and employees harmless from and against any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including attorneys' fees and court costs, arising out of claims, demands, or causes of action by third parties to which Agent may become liable or subject in connection with the performance or nonperformance of Agent's duties and activities within the scope of this Agreement or arising from any action or activity on, or the condition of, any Property; except if and to the extent caused by or arising out of Agent's negligence or willful misconduct. Agent shall indemnify, defend and hold Owner harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorney's fees and court costs arising out of claims, demands or causes of action by third parties (except to the extent covered by any liability insurance required to be maintained by Owner with respect to the Property (without regard to any deductible or self-insurance retention amounts), sustained or incurred by or asserted against Owner by reason of or arising out of Agent's negligence or willful misconduct.

8. Limited Liability

    Each party's liability hereunder shall be limited to its assets; and no partner, director, officer, agent, servant, employee, representative or affiliate of either party shall have any personal liability. Neither party shall be liable to the other for, and each party hereby waives any and all rights to claim against the other party, any special, indirect, incidental, consequential, punitive or exemplary damages in connection with this Agreement, including, but not limited to, lost revenue or profits, even if a party has knowledge of the possibility of such damages. Agent's liability with respect to any particular purchase and sale agreement shall not exceed an amount equal to the total amount of compensation paid to Agent hereunder with respect to such transaction.

9. Attorney's Fees; JURY WAIVER.

    If either party shall institute any action or proceeding against the other relating to the provisions of this Agreement, the unsuccessful party in the action or proceeding shall reimburse the prevailing party for all reasonable expenses and attorneys' fees and disbursements. THE PARTIES HEREBY WAIVE TRIAL BY JURY.

10. Notices. All notices, demands, consents and reports provided for in this Agreement shall be in writing and shall be given to the Owner or Agent at the address set forth above or at such other address as they individually may specify thereafter in writing. For Agent, a copy of any notice shall also be sent to Agent at 200 E. Randolph Dr., Chicago, IL 60601, Attn: General Counsel – Americas. Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the Post Office. Such notices, demands, consents and reports may also be delivered by hand, by overnight courier service or by any other method or means permitted by law. For purposes of this Agreement, notices will be deemed to have been given upon receipt whether given by personal delivery, overnight courier service or the United States mails as provided above.

11. Agency Disclosures. The following represents Agent's policy on agency relationships. ***Brian Seitz, Jake Sturman and Sarah Morey*** shall be the employees of Agent responsible for the day to day obligations of Agent under this Agreement ("Listing Team").

    A. Agency Relationship. Owner acknowledges that Agent has advised Owner that the Property may be sold with the assistance of licensees of other brokers operating as purchaser's agents.

        The Listing Team represents the interest of Owner as his/her agent to sell the Property. Listing Team owes duties of trust, loyalty, confidentiality, accounting and disclosure to Owner. However, Listing Team must deal honestly with a purchaser and disclose information about the Property.

        Purchaser's agents are brokers and licensees who show the Property to respective purchasers, but who represent only the interests of the purchaser. Purchaser's agents owe duties of trust, loyalty, confidentiality, accounting and disclosure to such purchasers. Representations made by purchaser's agents about the Property are not made as the agent of Owner.

    B. Informed Consent to Limited Agency. Listing Team may represent purchaser as purchaser's agent. If such purchaser wishes to see the Property, the Listing Team has agency duties to both Owner and purchaser, and those duties may be different or even adverse. Owner hereby consents to Listing Team acting as a limited agent for such showings.

If limited agency arises, Listing Team shall not disclose the following without the informed consent, in writing, of both Owner and purchaser:

1. Any material or confidential information, except adverse material facts or risks actually known by Listing Team concerning the physical condition of the Property or space therein and facts required by statute, rule or regulation to be disclosed and that could not be discovered by a reasonable and timely inspection of the Property by the parties.

2. That a purchaser will pay more than the offered sale price for the Property or space therein.

3. That Owner will accept less than the listed price of the Property.

4. Other terms that would create a contractual advantage for one party over another party.

In a limited agency situation, the parties agree that there will be no imputation of knowledge or information between any party and the limited agent or among the Listing Team.

Owner understands that he or she does not have to consent to Listing Team acting as a limited agent, and Broker will notify Owner of any limited agency relationship prior to showing the Property to any prospective purchaser.

11. <u>No Assignment</u>. This Agreement and all rights hereunder shall not be assignable by either party hereto, (except as may be required by a surety company in a matter of subrogation and to any party holding a first mortgage lien on the Property), and except that Agent may assign this Agreement to any affiliate of Agent or any entity which acquires all or substantially all of Agent's assets through merger, consolidation or otherwise.

12. The foregoing constitutes the entire agreement between the parties and may not be changed or modified except in writing, signed by the parties.

| OWNER: | **CELADON REALTY, LLC** |
|---|---|
| By (signature): | _____ |
| Name (print): | _____ |
| Title (print): | _____ |

| AGENT: | **JONES LANG LASALLE BROKERAGE, INC.** |
|---|---|
| By (signature): | _____ |
| Name (print): | John R. Robinson |
| Title (print): | Managing Director |

## SCHEDULE A

*Fees: The following fee schedule shall apply to transactions executed for space in the premises:*

**SALES COMMISSIONS**
If the building is sold the Owner is to pay a total commission of 6% (six percent).
Commission is to be paid at closing.
Agent will share commission with outside broker if buyer is represented by outside broker.

**EXHIBIT B**

APPLICABLE MARKETS

- Mt. Comfort, IN
- Angola, IN
- Winnipeg, MB
- Kernersville, NC
- Warren, IN
- Romulus, MI