**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------x
                                         :  Chapter 11
In re:                                   :
                                         :  Case No. 19-12606 (KBO)
     CELADON GROUP, INC., et al.,¹       :
                                         :  (Jointly Administered)
     Debtors.                            :
                                         :  Obj. Deadline: March 17, 2021 at 4:00 p.m. (ET)
                                         :  Hearing Date:  March 25, 2021 at 11:00 a.m. (ET)
------------------------------------------------------------x
```

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) APPROVING PROCEDURES FOR THE DISMISSAL AND**
**CLOSING OF THESE CHAPTER 11 CASES; (II) DISMISSING THE DEBTORS'**
**CHAPTER 11 CASES; (III) CLOSING EACH OF THESE CHAPTER 11 CASES**
**EFFECTIVE AS OF MARCH 31, 2021; AND (IV) GRANTING RELATED RELIEF**

Celadon Group, Inc. ("Celadon") and its affiliated debtors (collectively, the "Debtors") in

the above-captioned chapter 11 cases (these "Chapter 11 Cases"), by and through their counsel,

DLA Piper LLP (US), hereby submit this motion (this "Motion") for entry of an order,

substantially in the form attached to this Motion as **Exhibit A** (the "Proposed Order"), (i)

approving procedures for the dismissal and closing (the "Dismissal Procedures") of these Chapter

11 Cases; (ii) dismissing these Chapter 11 Cases; (iii) closing each of these Chapter 11 Cases

effective as of March 31, 2021; and (iv) granting related relief.  In support of this Motion, the

Debtors respectfully state as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celadon Group, Inc. (1050); A R Management Services, Inc. (3604); Bee Line, Inc. (5403); Celadon Canadian Holdings, Limited (2539); Celadon E-Commerce, Inc. (2711); Celadon International Corporation (5246); Celadon Logistics Services, Inc. (0834); Celadon Mexicana, S.A. de C.V. (6NL7); Celadon Realty, LLC (2559); Celadon Trucking Services, Inc. (6138); Distribution, Inc. (0488); Eagle Logistics Services Inc. (7667); Hyndman Transport Limited (3249); Jaguar Logistics, S.A. de C.V. (66D1); Leasing Servicios, S.A. de C.V. (9MUA); Osborn Transportation, Inc. (7467); Quality Companies LLC (4073); Quality Equipment Leasing, LLC (2403); Quality Insurance LLC (7248); Servicios Corporativos Jaguar, S.C. (78CA); Servicios de Transportación Jaguar, S.A. de C.V. (5R68); Stinger Logistics, Inc. (3860); Strategic Leasing, Inc. (7534); Taylor Express, Inc. (9779); and Vorbas, LLC (8936).  The corporate headquarters and the mailing address for the Debtors listed above is 9503 East 33rd Street, One Celadon Drive, Indianapolis, IN 46235.

## PRELIMINARY STATEMENT

1.      The Debtors commenced these Chapter 11 Cases with the objective of effectuating the sales of substantially all of their assets, with the end-goal of developing and confirming a plan of liquidation.  The Debtors have largely realized this objective, having sold over the course of these Chapter 11 Cases substantially all of their assets, including the going concern sales of the Debtors' Taylor Express and Mexican businesses, through a combination  of Court-supervised auctions and private sales.  Notably, the going concern sales of the Debtors' Mexican and Taylor Express business have saved hundreds of jobs and preserved business relationships for vendors, landlords and customers during some of the most tumultuous circumstances in a century. However, despite the Debtors' and their professionals' best efforts, and after consultation with the Committee, the Debtors were unable to develop a confirmable liquidating plan.

2.      In connection with the wind down of the Debtors' estates and the monetization of the Debtors' assets, in February 2020, the Debtors were able to repay their DIP Facility, which had been extended by the Debtors' Prepetition Term Loan Agent.  As the Debtors still had a substantial amount of assets to sell or otherwise monetize, in accordance with the Final DIP Order, as amended, and the Approved Budget, as amended, the Prepetition Term Loan Agent approved the Debtors' use of Cash Collateral during the wind down of these proceedings.

3.      To date, the Debtors' use of such cash collateral, subject to the applicable Approved Budget, has generated additional cash proceeds through piecemeal dispositions of assets, settlements, and recovery of accounts receivable, such that the Debtors have paid down their obligations under the Prepetition Term Loan Agreement by approximately $75 million.  However, there still is more than $45 million of debt under the Prepetition Term Loan Agreement outstanding.  Moreover, the remaining assets to collect are much smaller in number and amount,

the cash collateral approved for use under the Approved Budget is nearly depleted, and the Debtors have no further access to funds to continue the administration of these Chapter 11 Cases.

4.     Simultaneously with the filing of this Motion, the Debtors filed a motion to approve the Settlement Agreement, by and among the Debtors, the Secured Creditors, and the Committee, which if approved, will resolve the following remaining issues in these Chapter 11 Cases:  (i) the transfer of the Debtors' remaining assets – the Remaining Prepetition Collateral – in exchange for the satisfaction of the Debtors' remaining obligations under the Prepetition Term Loan Agreement and DIP Obligations (as defined in the Final DIP Order); (ii) the waiver of Preference Actions (as defined below); (iii) the withdrawal with prejudice of the Committee's Standing Motion and waiver of challenge rights; and (iv) mutual releases in favor of the Prepetition Term Loan Agent, DIP Agent, Lenders, Committee and the Debtors.

5.     The value of the Debtors' Remaining Prepetition Collateral only satisfies a portion of the debts owed under the Prepetition Term Loan Agreement and DIP Obligations.  Therefore, even if the Court does not approve the Settlement Agreement, the Debtors will have exhausted all available means to generate unencumbered cash proceeds for the benefit of its  creditors. The Committee, as a signatory to the Settlement Agreement, has come to the same conclusion as the Debtors.

6.     For these reasons, and those further set forth herein, there is no reasonable prospect of distributions from any Debtor's estate to any holder of unsecured claims against the Debtors.

7.     While the Debtors have considered alternative options to conclude these Chapter 11 Cases, under the present circumstances, the Debtors have determined that a dismissal is the most expeditious and cost-effective mechanism to wind down these Chapter 11 Cases.  In reaching this conclusion, the Debtors, as well as the Creditors Committee, determined that a dismissal will

have no negative impact on unsecured creditors because there are no remaining assets of any value available for distribution except to the Secured Creditors, or to support the costs of administering the bankruptcy cases.

8.      Other than the approval of the Settlement Agreement, as of the hearing on this Motion, the only material remaining matters anticipated to require resolution in connection with these Chapter 11 Cases are final fee applications for the Debtors' and the Committee's professionals, which will be heard concurrently with this Motion.

9.      Accordingly, the Debtors, with the support of the DIP Agent, Secured Creditors, and the Committee, seek to dismiss these Chapter 11 Cases and close these Chapter 11 Cases as of March 31, 2021.

## JURISDICTION AND VENUE

10.      The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over these Chapter 11 Cases, the Debtors, property of the Debtors' estates, and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

11.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

12.      Venue of these Chapter 11 Cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

13.     The statutory bases for the relief requested in this Motion are sections 105(a), 305(a), 327, 330, 350(a), 554 and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 1017, 2002, 2016, 3022 and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 3002-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

**A.      The Commencement of these Chapter 11 Cases**

14.     On December 8, 2019 (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Shortly after the Petition Date, the Debtors ceased all remaining operations, except for the operations of Taylor Express and the Mexican business.

15.     The Debtors continue to be in possession of their assets and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On December 18, 2019, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors in these Chapter 11 Cases (the "Committee").  As of the date hereof, no trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

16.     Subject to the entry of an order ("9019 Order") approving the Settlement Agreement (the "Settlement Agreement"),[2] by and among the Debtors, Blue Torch Finance, LLC, in its capacity as the administrative agent (the "Prepetition Term Loan Agent") and in its capacity

---

[2]     Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in Settlement Agreement.

EAST\179285357.14

as lender (through its affiliates, BTC Holdings Fund I, LLC, BTC Holdings Fund I-B, LLC and BTC Holdings SC Fund LLC) under the Prepetition Term Loan Agreement, Luminus Energy Master Fund, Ltd., in its capacity as lender under the Prepetition Term Loan Agreement (collectively with its affiliates, "Luminus", and together with the other lenders to the Prepetition Term Loan Agreement, the "Secured Creditors"), and the Committee (together with the Debtors, the Prepetition Term Loan Agent, and Secured Creditors, the "Parties", and each a "Party"), as requested by *Motion of the Debtors to Approve the Settlement Agreement By and Among the Debtors, Secured Creditors, and the Official Committee of Unsecured Creditors* (the "9019 Motion"), filed contemporaneously herewith, the Debtors will have disposed of all of their remaining assets.

17.     Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of Kathryn Wouters in Support of Chapter 11 Filings and First Day Pleadings* [D.I. 3], filed with this Court on the Petition Date, which is fully incorporated into this Motion by reference.

**B.     Background Regarding the Debtors' Prepetition Debt, the DIP Facility and the Debtors' Use of Cash Collateral, the Parties' Preference Analyses, and the Committee's Challenge Rights**

   ***i.   Prepetition Debt and Prepetition Collateral***

18.     Prior to the Petition Date, Celadon, as borrower, certain of its subsidiaries, as guarantors, the Prepetition Term Loan Agent, and the Secured Creditors entered into that certain Second Amended and Restated Credit Agreement, dated as of July 31, 2019 (as amended, restated, or otherwise modified from time to time, the "Prepetition Term Loan Agreement").  In connection

6

with the Prepetition Term Loan Agreement,[3] the Prepetition Term Loan Agent holds a security interest in substantially all of the Debtors' assets, including but not limited to the following assets, whether then owned by or owing to, or at any time thereafter acquired:  (i) accounts; (ii) cash, currency and cash equivalents; (iii) chattel paper; (iv) commercial tort claims; (v) deposit accounts; (vi) documents; (vii) equipment; (viii) fixtures; (ix) general intangibles; (x) goods; (xi) instruments; (xii) intellectual property; (xiii) inventory; (xiv) investment property; (xv) letter of credit rights; (xvi) payment intangibles; (xvii) pledged equity; (xviii) securities accounts; (xix) software; (xx) supporting obligations; (xxi) vehicles; (xxii) books and records; and (xxiii) proceeds of all of the foregoing (collectively, the "Prepetition Collateral").

### ii. DIP Financing and Use of Prepetition Collateral to Finance the Administration of these Chapter 11 Cases

19.    On December 9, 2019, the Debtors sought entry of interim and final orders authorizing debtor in possession financing (the "DIP Loans" or "DIP Facility") to provide the Debtors with $8.25 million[4] from the Prepetition Term Loan Agent as agent (the "DIP Agent") and the lenders from time to time party thereto (the "DIP Lenders") and use of cash collateral in accordance with an agreed budget (the "Approved Budget") in order that the Debtors would have sufficient liquidity to allow the Debtors successfully to administer the liquidation of their assets and the wind down of these Chapter 11 Cases.  Without such funding and use of cash collateral the Debtors would not have been able to pursue and ultimately consummate the Sales (as defined below), recover outstanding receivables, and otherwise defend litigation.

---

[3]    For the sake of clarity, the security interests described in this paragraph were granted under the terms of that certain Security and Pledge Agreement, dated as of December 12, 2014 (as amended on May 1, 2017, March 30, 2018, and July 31, 2019), among Celadon, as the borrower under the Prepetition Term Loan Agreement, and certain of its Debtor subsidiaries, as guarantors, and the Prepetition Term Loan Agent.

[4]    As amended by the First Material DIP Amendment [D.I. 72] to be $11.25 million.

20.    On January 7, 2020, the Court entered that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [D.I. 230] (as amended from time to time, the "Final DIP Order").

21.    The DIP Loans were secured by priming, first priority liens and security interests, subject to a Carve-Out (as defined in the Final DIP Order) for payment of professional fees, in the following collateral (the "DIP Collateral"):  (i) the Prepetition Collateral, and (ii) any assets of the Debtors that, as of the Petition Date, were not otherwise subject to a valid, perfected, enforceable, and unavoidable security interest, subject to certain limitations.  Subject to the Carve-Out for professionals' fees, the DIP Agent and DIP Lender also received DIP superpriority claims for any unpaid obligations under the DIP Loans.

22.    In the Final DIP Order, subject to the Carve-Out for professional fees, among other things, the Secured Creditors were also granted as adequate protection for any diminution in value of their collateral valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Prepetition Term Loan Adequate Protection Liens").

23.    In the Final DIP Order, subject to the Committee's challenge rights, the Debtors stipulated that as of the Petition Date the aggregate principal amount outstanding under the Prepetition Term Loan Facility was $103,600,000, plus applicable interest and a make-whole amount of $9,900,000.[5]

---

[5]    *See* Final DIP Order § E(ii).

24.     In February 2020, the DIP Loans were paid off and satisfied in full with proceeds realized from certain of the Sales (as defined below).  The Debtors have continued to use the Secured Creditors' cash collateral in accordance with the Approved Budget.

25.     Throughout these Chapter 11 Cases, the Debtors faced unanticipated costs and expenses that were not provided for in the original Approved Budget and for which the funding provided in accordance with the Final DIP Order, including the use of cash collateral, was insufficient.  Once the DIP Loans were paid off, to prevent these Chapter 11 Cases from coming to a sudden halt without having liquidated all of the assets of the estates, and to avoid substantial costs that would have been inherent in litigating disputes caused by such business disruption, the Debtors and the Prepetition Term Loan Agent engaged in good faith, arm's length negotiations to seek modifications of the Approved Budget so that the Debtors could continue to utilize cash collateral in order to orderly winddown these cases.  The Prepetition Term Loan Agent agreed to increases to the Carve-Out for professional fees, as approved by the *Supplemental Order* to the Final DIP Order [D.I. 893], and a subsequent increase of the Carve-Out for professional fees, as approved by the *Second Supplemental Order* to the Final DIP Order [D.I. 1240], subject to a modified Approved Budget.  The cash collateral has been used to continue the administration of these estates, defend the Debtors in various litigation, pay professional fees under the Carve-Out pursuant to the Approved Budget and to continue liquidating or otherwise monetizing the Debtors' remaining assets.

C.     **Sales of the Debtors' Assets to Date**

26.     By the end of February 2021, the Debtors shall have consummated the sale of substantially all of their assets in these Chapter 11 Cases through a mix of Court-approved private sales and auctions (collectively, the "Sales").  Through the Sales, the Debtors have sold

substantially all of their assets, and with the services of RCC (defined below), the Debtors have collected a substantial amount of their accounts receivable and through the services of UHY (defined below) the Debtors have and will collect certain tax refunds.  As of the date hereof, the aggregate outstanding amount owed by the Debtors to the Secured Creditors under the Prepetition Term Loan Agreement is not less than $45 million.

### i.   *Real Estate and De Minimis Assets*

27.     On January 6, 2020, this Court entered an order approving bidding procedures [D.I. 219] (the "Bidding Procedures Order") for the sale of the Debtors' remaining assets that were not related to the Debtors' going concern sale of its Taylor Express business ("Remaining Assets") and procedures for sale of the Debtors assets with a fair market value of less than $100,000 ("De Minimis Assets").

28.     The Bidding Procedures Order scheduled an auction for certain of the Debtors' Remaining Assets for January 22, 2020, and further scheduled a hearing to consider and approve sales to successful bidders for January 30, 2020.  At the sale hearing held on January 30, 2020, the Court approved the sale of seven[6] of the Debtors' non-residential real estate properties.

29.     On February 4, 2020, the Court entered the Remaining Assets Sale Procedures Order [D.I. 431], which approved cost-effective procedures to govern the sale of the Debtors' non-residential real estate that had not previously been sold during the auction held on January 22,

---

[6]     The Court entered orders approving the sale of the following non-residential real estate properties following the January 30, 2020 hearing; the individual docket identification number of the sale order being noted after the property address: (i) 13601 Mercury Drive, Laredo, TX (Laredo) [D.I. 409]; (ii) 9503 East 33rd Street, Indianapolis, IN (Maintenance Facility) [D.I. 419]; (iii) 9420 East 30th Street, Indianapolis, IN (Drop Lot) [D.I. 421]; (iv) 101 Dollar Street, Ottoville, OH (Ottoville) [D.I. 420]; (v) 3400 West Market Street, York, Pennsylvania (York) [D.I. 415]; (vi) 2616 Cedar Creek Road, Ayr, ON, N0B 1E0 (Ayr) [D.I. 418]; and (vii) 50 Omands Creek Blvd., Winnipeg, MB, R2R 1V7 (Winnipeg) [D.I. 417].  Please note that at this time the Court also approved the sale of the Debtors' non-residential real estate located in Lima, Ohio, although this sale was completed later pursuant to the Remaining Assets Sale Procedures Order.

10

2020.  Through these procedures, the Debtors have sold ten[7] non-residential real estate properties (including one property for which the January 22, 2020 auction sale was not completed).

### ii. *Rolling Stock Recoveries and Sales*

30.     After the Debtors filed the Chapter 11 Cases, the Debtors' rolling stock was largely left scattered throughout the United States, Canada, and Mexico.  The Debtors retained Ritchie Bros.  Auctioneers (America) Inc. and certain of its affiliates ("<u>RB Group</u>") to recover rolling stock and sell it at auctions for the Debtors.  RB Group has assisted the Debtors in recovering and monetizing nearly $20 million from their rolling stock.  The Debtors, with the assistance of RB Group, have also assisted the Debtors' rolling stock lenders and lessors in the recovery of their rolling stock and helped facilitate the smooth transfer of title.

### iii. *Going Concern Business Sales*

31.     On January 6, 2020, this Court entered an order [D.I. 218] that approved bidding procedures, scheduled an auction for the going concern sale of the Debtors' Taylor Express business for January 22, 2020, and further scheduled a hearing to consider and approve the sale to a successful bidder for January 30, 2020.  Following the sale hearing held on January 30, 2020, the Court entered an order [D.I. 408] approving the going concern sale of the Debtors' Taylor Express business to an affiliate of Luminus.

---

[7]     The following non-residential real estate properties were sold pursuant to the Remaining Assets Sale Procedures Order, with the individual docket identification number of the sale order being noted after the property address:  (i) 112 Garford Avenue, Lima, Ohio (Lima) [D.I. 1145]; (ii) 10010 Conveyor Drive, Indianapolis, IN (Conveyor Drive) [D.I.657]; (iii) 9702 East 30th Street, Indianapolis, IN (9702) [D.I. 659]; (iv) 9920 E. 30th Street, Indianapolis, Indiana (9902) [D.I. 658]; (v) 5600 Midlothian Turnpike, Richmond, VA (Richmond) [D.I. 1144]; (vi) 221 Cockeysville Road, Hunt Valley / Cockeysville, MD (Cockeysville Road) [D.I. 742]; (vii) 110 East Butler Street, Butler, IN (Butler) [D.I. 744]; (viii) 1001 Belmore Line, Wroxeter, ON, N0G 2X0 (Wroxeter) [D.I. 1326]; (ix) 9503 E. 33rd Street, Indianapolis, Indiana (Headquarters Facility) [D.I. 1380]; and (x) 9050 E. 33rd Street, Indianapolis, IN (Training Facility) [D.I. 1463], with the sale of the Training Facility having closed on February 19, 2021.

32.     On May 22, 2020, the Court entered an order approving sale procedures for the Debtors' Mexican business (the "Mexican Assets Sale Procedures Order") [D.I. 978] (these procedures and sale follow the failed prior attempts to the sell the Mexican business).    In accordance with the Mexican Assets Sale Procedures Order, following an auction and sale hearing, on June 15, 2020 the Court entered an order [D.I. 1026] approving the sale of the Debtors' Mexican business, subject to the terms of that certain Share and Asset Purchase Agreement, dated as of June 12, 2020, by and among Jaguar Transportation Inc. ("Jaguar") and certain of the Debtors (as amended from time to time, the "Mexican Business SAPA").    Pursuant the Mexican Business SAPA and Transaction Documents (as defined in the Mexican Business SAPA), throughout 2021 and into 2022, the Debtors or their assignee shall receive periodic payments from Jaguar of (i) installment payments of the purchase price (see Section 3.2 of the Mexican Business SAPA) and (ii) the proceeds of VAT refunds, after certain allowed expenses are deducted by Jaguar (see Section 6.4(c) of the Mexican Business SAPA).    The Debtors have received the scheduled payments on time to date.

**D.     The Debtors' Other Efforts to Monetize Assets**

33.     In addition to the Sales which were approved and closed between January 2020 and February 2021, as described above, the Debtors have worked diligently since the Petition Date to pursue all paths to recovery for the benefit of the estates and the Debtors' stakeholders.

### *i.    Collection and Settlement of Outstanding Accounts Receivable*

34.     On October 30, 2020, the Bankruptcy Court entered that certain *Order (I) Authorizing the Employment of Receivables Control Corporation as the Debtors' Receivables Management Agent, Effective as of the Engagement Date, (II) Waiving the Timekeeping and Monthly Fee Application Requirements Under Local Rule 2016-2; (III) Approving Procedures for*

12

*the Settlement of Claims Related to Accounts Receivable; and (IV) Granting Related Relief* [D.I. 1322] (the "<u>A/R Settlement Procedures Order</u>"), which, among other things, approved (i) the Debtors' retention of Receivables Control Corporation ("<u>RCC</u>") as its accounts receivable collections agent and (ii) streamlined procedures for approving settlements of claims asserted by the Debtors to collect outstanding accounts receivable.  To date, RCC recovered, on behalf of the Debtors, nearly $2 million in accounts receivable.  Despite the Debtors' Professionals' and advisors' best efforts, the remaining outstanding accounts receivable, which amount to approximately $1.62 million, will likely necessitate litigation to monetize.

### ii.  Tax Returns and Refunds

35.     The Debtors retained two tax consultants, Investment Recovery Group, LLC ("<u>IRG</u>") [D.I. 1269] and UHY Advisors NY, Inc. ("<u>UHY</u>") [D.I. 865] to assist them in the recovery of potential tax assets.

36.     UHY has assisted the Debtors with collecting tax refunds, tax rebates, overpayments, or other tax attributes identified by and owed to the Debtors from various taxing authorities.  Specifically, under the Tax Cuts and Jobs Act (TCJA), the corporate alternative minimum tax ("<u>AMT</u>") was repealed, thereby allowing a corporation to treat a portion of its prior year AMT credit carryover as refundable over a five-year period.  Certain Debtors had carryover AMT that allowed them to claim in their federal tax return and, as a result thereof, the estates are eligible to receive approximately $633,000 in refunds.

37.     Since its retention, IRG has conducted diligence to identify, recover and collect other tax refunds, tax rebates, overpayments, or other tax attributes due to the Debtors from various U.S. taxing authorities (collectively, the "<u>IRG Tax Assets</u>").  IRG is still in the process of calculating and filing returns for IRG Tax Assets, and the Debtors propose, subject to the approval

of the Settlement Agreement, to transfer the IRG Tax Assets to Luminus, as the designee of the Prepetition Term Loan Agent.

### *iii. Estate Claim Settlements*

38.     Throughout these Chapter 11 Cases, the Debtors have worked with claimants who were pursuing litigation or other recovery against the estates related to workers' compensation, bodily injury and property damage claims.  The Debtors' professionals have worked to settle such claims and to enter into stipulations that such claimants would only seek to collect from the Debtors' applicable insurance program.  As the Debtors were self-insured for bodily injury and property damage claims, the Debtors were required to obtain letters of credit and surety bonds, with the latter being issued by Westchester Fire Insurance Company.  To the extent that the claims can be settled for less than the amount of the letters of credit or surety bonds, the balance is payable to the Debtors' estates.  Likewise, the Debtors obtained a letter of credit, held by Chubb, to support their workers' compensation liability program.  To the extent that a balance of the proceeds of the letter of credit is available after workers' compensation claims have been resolved, the balance will revert to the estates.  Pursuant to the Settlement Agreement, the Debtors seek to transfer the right to receive any such payments to Luminus, as the designee of the Prepetition Term Loan Agent.

### E.     Remaining Collateral

39.     The Debtors have identified the following non-exhaustive list of DIP Collateral (which is subject to the Prepetition Term Loan Adequate Protection Liens) and Prepetition Collateral  that comprise the Debtors' remaining assets (collectively, with all other assets and properties, real and personal, owned or hereafter acquired by the Debtors, the "Remaining Collateral"):

14

a.     The real property constituting the "Osborn Drop Lot" located at the cross-section of Tallahassee Street and Crenshaw Avenue in Gadsden, Alabama;

b.     The balance of proceeds from the Debtors' Canadian asset sales, which are currently being held by the Canadian receivership;

c.     Remaining rolling stock and equipment owned by the Debtors, whether or not in the Debtors' control, including, without limitation, all trucks, tractors, "yard dogs" and trailers;

d.     Accounts receivable owed to the Debtors and all settlement amounts to be paid to the Debtors on account of disputes related thereto;

e.     Settlement amounts to be paid by Goodyear to the Debtors or their designee to settle accounts receivable, claims and asserted rights of setoff, as set forth in the Goodyear Stipulation;

f.     All amounts payable to the Debtors under (i) the Mexican Business SAPA, and (ii) the Transaction Documents (as defined in the Mexican Business SAPA), including, without limitation, all amounts set forth in Section 3.2 of the Mexican Business SAPA;

g.     All VAT Refunds (as defined in the Mexican Business SAPA) and, if applicable, the VAT Backstop Payment (as defined in the Mexican Business SAPA);

h.     The proceeds of any tax refunds owed to the Debtors;[8]

i.     All excess cash collateral in connection with unused letters of credit and surety bonds purchased to serve as collateral for the Debtors' various insurance programs, including but not limited to (i) the letter of credit issued as collateral in connection with the Debtors' workers' compensation program, and (ii) the surety bond issued in connection with the Debtors' self-insurance program for bodily injury and property damage liability;

j.     Debtors' books and records, including computer equipment and software, including the Debtors' AS/400 operating system (collectively, "Remaining Records");

---

[8]     All recoveries of IRG Tax Assets shall be subject to IRG's lien on its fees due and payable in connection with the recovery such IRG Tax Assets.

       k.      All of the Debtors' intellectual property and trademarks; and

       l.      All amounts contained in the Interest Reserve Account (as defined in the Prepetition Term Loan Agreement).

40.    Title to the Remaining Collateral will be transferred to Luminus, as the designee of the Prepetition Term Loan Agent and DIP Agent, under the Settlement Agreement and 9019 Order.[9]  The recovery or monetization of the Remaining Collateral will require time, effort, and funding, which following the implementation of the Settlement Agreement, the Secured Creditors will fund.  As further explained below, even under ideal circumstances, the Debtors, Prepetition Term Loan Agent, Secured Creditors, DIP Agent, and Committee believe the value of the Remaining Collateral will not exceed the Debtors' remaining outstanding obligations under the Prepetition Term Loan Agreement and DIP Obligations.

**F.    Preference Action Analysis**

41.    With respect to preference actions, the DIP Agent obtained a lien on, and the Prepetition Term Loan Agent obtained an adequate protection lien on, the proceeds of preference actions, which include any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other analogous provisions of applicable state, federal, or foreign law (including any other avoidance actions under section 547 the Bankruptcy Code) ("Preference Actions").  The DIP Agent, Prepetition Term Loan Agent, the Committee, and the Debtors conducted due diligence to determine (i) the amount of preference liability that the Debtors may be able to collect, (ii) the likelihood of success to negotiate, litigate, and recover potential

---

[9]    The designation of Luminus as the Prepetition Term Loan Agent's designee is conditioned upon the execution of a separate agreement between the Prepetition Term Loan Agent and Luminus (the "Blue Torch/Luminus Agreement") prior to the entry of the 9019 Order (the "Effective Date"); to the extent the Blue Torch/Luminus Agreement is not executed by the Effective Date, then the Prepetition Term Loan Agent, or its designee, as may be permitted under the Loan Documents (as defined in the Prepetition Term Loan Agreement) shall receive the Transferred Assets for the benefit of the Secured Creditors.

preferential transfers, (iii) and the costs and time that would need to be expended to prosecute and monetize such Preference Actions, including the administrative expenses to continue these Chapter 11 Cases ("Preference Action Due Diligence").

42.    Following their investigations, the DIP Agent, Prepetition Term Loan Agent, Luminus, the Committee, and the Debtors believe that the proceeds of Preference Actions after the deductions for fees, costs and expenses, would not exceed the amount of the Secured Creditors' Prepetition Term Loan Adequate Protection Lien.[10]

43.    Thereafter, the Debtors, DIP Agent and Secured Creditors engaged in negotiations with the Committee to discuss waiving the Committee's challenge and withdrawing with prejudice the Standing Motion, in exchange for the Debtors' and the Secured Creditors' waiver of their right to pursue Preference Actions.  The terms of this exchange, which the Parties believe are adequate and fair, are the subject of the Settlement Agreement.

**G.    Committee's Challenge and Standing Motion**

44.    On March 2, 2020, the Committee filed the *Motion of Official Committee of Unsecured Creditors for Entry of an Order (I) Granting Standing and Authority to Prosecute and Settlement Claims on Behalf of the Debtors' Estates, and (II) Further Extending the Challenge Period Upon Showing of Cause* [D.I. 641 (sealed); 643] (the "Standing Motion"), which sought, among other things, derivative standing to prosecute certain claims, to avoid certain liens of the Prepetition Term Loan Agent, and an extension of the Committee's challenge period, upon a showing of cause.

---

[10]    The Debtors note that any potential preference liability related to The Goodyear Rubber & Tire Company (collectively with its affiliates, "Goodyear"), among other claims and rights (including amounts of outstanding accounts receivable and title to certain retreaded tires), is the subject of a separate stipulation (the "Goodyear Stipulation"), which the Debtors have submitted by motion to the Court for approval under Bankruptcy Rule [*see* D.I. 1506].

45.     The Committee has played an active role in these Chapter 11 Cases and has conducted substantial due diligence of the Debtors' prepetition debt obligations, the Debtors' available assets, and the Debtors' ability to pursue Preference Actions.

46.     In addition to the Committee's Preference Action Due Diligence (described above), the Committee determined after conducting further due diligence that there are no other meritorious causes of action that could generate proceeds that would (taking into consideration the value of the Remaining Collateral) exceed the debts owed under the Prepetition Term Loan Agreement and DIP Obligations.

47.     After conducting due diligence into the Debtors' assets, the Committee has acknowledged that aside from the Remaining Collateral, the Debtors have exhausted all available means to generate additional proceeds and do not believe there are any remaining assets of material value to monetize for the benefit of the Debtors' unsecured creditors.

**H.     The Settlement Agreement and 9019 Motion**

48.     Following extensive, good faith, arm's-length discussions regarding exit strategies for the Debtors to conclude these Chapter 11 Cases, the Parties entered into the Settlement Agreement, of which the Debtors' seek approval immediately in advance of approval of this Motion.  The Settlement Agreement is significant, among other things, as it provides the following benefits to the Debtors' estates:

     a.     effectuates the transfer of all of the Remaining Collateral (the "Transferred Assets"), such that there are no longer assets to administer or monetize in Debtors' estates;

     b.     satisfies the Debtors' obligations under the Prepetition Term Loan Agreement and DIP Obligations by transferring the Transferred Assets to Luminus, as the Prepetition Term Loan Agent's designee, free and clear of all liens, claims or other encumbrances, including successor liability;

18

c.    provides for the Prepetition Term Loan Agent's and DIP Agent's waiver of any potential preference claims held by the estates, in exchange for the Committee's withdrawal with prejudice of the Standing Motion and waiver of its challenge rights;

d.    provides for mutual releases in favor of Prepetition Term Loan Agent, Luminus, the Committee and the Debtors; and

e.    provides for a wind down budget (the "Wind Down Budget") for certain wind down fees and expenses, and an additional Carve-Out for the fees and expenses of estate Professionals to wind down these Chapter 11 Cases, payment of U.S. Trustee fees, and any amounts agreed to be paid in connection with any settlement of WARN Act claims asserted against the Debtors.

49.    Upon the approval of the Settlement Agreement and transfer of the Transferred Assets to Luminus, as the Prepetition Term Loan Agent's designee, the Prepetition Term Loan Agent will have recovered approximately $75 million on its debt under the Prepetition Term Loan Agreement and will still be owed not less than $45 million on account thereof.  However, upon approval and implementation of the Settlement Agreement, the Prepetition Term Loan Agent and DIP Agent will deem the obligations under the Prepetition Term Loan Agreement and DIP Obligations fully satisfied.

**I.    Claims Bar Date and Interim Compensation Procedures**

50.    On March 30, 2020, the Court entered the *Order (I) Establishing Deadlines for Filing Proofs of Claim, Including Section 503(b)(9) Claims, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [D.I. 794] (the "Bar Date Order").  Pursuant to the Bar Date Order, the Court, among other things: (i) set April 30, 2020 at 4:00 p.m. (prevailing Eastern Time) as the General Bar Date, by which all persons and entities, including holders of 503(b)(9) claims, but excluding governmental units, needed to file proofs of claim; (ii) set June 5, 2020 at 4:00 p.m. (prevailing Eastern Time) as the Governmental Bar Date, by which all

governmental units needed to file proofs of claim; and (iii) established procedures for setting the rejection damages claims bar date for counterparties to rejected contracts.

51.     Throughout these Chapter 11 Cases, the Debtors continued to evaluate all known and asserted administrative expense claims (both through formal Court process and informal demands) and pay certain valid claims for services rendered in the ordinary course with cash collateral at their disposal and subject to an Approved Budget.  Through the Carve-Out, the Debtors have paid professional fees, which are being administered under the Court's order establishing procedures for interim compensation of estate professionals [D.I. 208] (the "Interim Compensation Order") and ordinary course professionals [D.I. 369] (the "OCP Order") (with the duly retained professionals of the Debtors, the Committee, and ordinary course professionals being henceforth referred to as "Professionals").

52.     As it became clear over the last couple months that the Debtors would not be able to develop a confirmable plan of liquidation, the Debtors determined that it was not in the estates' best interest or cost-effective to establish a bar date for administrative expense claims (and thereby incur significant costs in pursuit thereof).  Upon approval of the 9019 Motion, the Debtors will have exhausted all available means to generate unencumbered cash proceeds, and the Debtors and the Committee do not believe there are any remaining assets of material value to monetize for the benefit of the Debtors' unsecured creditors.

**J.     The Debtors' Books and Records and Other Preserved Computer Equipment**

53.     As of the Petition Date, the Debtors maintained voluminous books and records, including, without limitation, hard copies of (a) accounting and financial documents and other financial information including financial reports, tax returns, and other related documents, (b) contracts, leases, insurance policies, and other contractual agreements of the Debtors, and related

20

information, (c) human resource and other employment related documents (which may include personal information), (d) sales transaction and related information, (e) customer information, (f) vendor transactions and related agreements and information, (g) corporate governance documents, including minutes and board resolutions, (h) litigation files, and (i) marketing information (collectively, the "Documents and Records") at the Debtors' various properties.  As properties were sold, the Documents and Records were moved to the Debtors' former headquarters facility.  On January 7, 2021, the Court entered that certain *Order Authorizing the Debtors to Destroy or Abandon Documents and records and Obsolete IT Equipment* [D.I. 1412] (the "Abandonment Order"), pursuant to which the Debtors' Documents and Records were abandoned to the Department of Justice and the Obsolete IT Equipment (as defined in the Abandonment Order) was destroyed.

54.    The Debtors continue to maintain custody of their AS/400 operating system, electronic files, and certain laptops and hard drives, which are being preserved in accordance with the terms of the Deferred Prosecution Agreement.  The AS/400 continues to be housed at the Debtors' former headquarters facility.  These items have little to no value but will require ongoing maintenance costs.  If the Settlement Agreement is approved, the Debtors will transfer these assets to Luminus, as the Prepetition Term Loan Agent's designee, or if agreed by the Prepetition Term Loan Agent, or its designee, abandon the remaining Documents and Records to the Department of Justice, pursuant to section 105(a) and 554 of the Bankruptcy Code and Bankruptcy Rule 6007, to be preserved pending the disposition of the Department of Justice's litigation involving two of the Debtors' former employees.

**K.      Adversary Proceedings**

55.      Since the Petition Date, five adversary proceedings have been filed against the Debtors.

56.      The following three adversary proceedings have been dismissed, with prejudice, by stipulation between the parties:  (i) *TA Dispatch, LLC vs Celadon Trucking Services, Inc., et al.*, Adv. Pro. No. 20-50117; (ii) *TA Dispatch vs MidCap Funding IV Trust*, Adv. Pro. No. 20-50430; and (iii) *Celadon Trucking Services, Inc. v. Triangle Recovery Services, LLC et al*., Adv. Pro. No. 20-50453.

57.      The following adversary proceeding *Sheryl and Kirk Ray v. Myron Kent Wilson, Celadon Trucking Services, Inc*., Adv. Pro. No. 20-50693, has been resolved but not yet dismissed. Prior to March 31, 2021, a dismissal should be entered for such adversary proceeding.

58.      The Debtors have been in the process of settling the adversary proceeding *Class Action Adversary Proceeding Complaint by Latoria Johnson v. Celadon Group, Inc. et al.*, Adv. Pro. No. 19-51147 (the "WARN Act Class Action").  Through mediation, the Debtors have actively negotiated with the WARN Act Class Action plaintiffs.  The Debtors expect to enter into a settlement agreement, for which the Debtors will seek approval by separate motion.  Upon approval of such motion, the WARN Act Class Action shall be dismissed.

## DISMISSAL PROCEDURES

59.      The Debtors propose to dismiss and close these Chapter 11 Cases pursuant to the following Dismissal Procedures:

          a.      **Final Fee Applications**.  Professionals retained by the Debtors or the Committee in these Chapter 11 Cases will have filed their respective final fee applications for services rendered and the reimbursement of expenses incurred in these Chapter 11 Cases (each, a "Final Fee Application") through March 31, 2021, so that such Final Fee Application is also heard at the hearing on this Motion scheduled for March 25, 2021.  The hearing to

consider approval of such Final Fee Applications shall be on March 25, 2021, immediately following this Court's consideration of this Motion. All allowed, known, and valid fees and expenses of the Professionals ("Professional Fees"), approved by the Court on a final basis, shall be paid as part of the Carve-Out pursuant to the Wind Down Budget prior to March 31, 2021.

b.    **Payment of Professional and U.S. Trustee Fees and Filing of All Requisite Reports**.  Prior to closing these Chapter 11 Cases as of March 31, 2021, the Debtors shall pay approved all Professional Fees and all U.S. Trustee fees and shall file all reports required by the U.S. Trustee.

c.    **Closing of the Debtors Chapter 11 Cases**.  Effective as of March 31, 2021, the Debtors' Chapter 11 Cases shall be closed.

## RELIEF REQUESTED

60.    By this Motion, sections 105(a), 305(a), 327, 330, 350(a), 554 and 1112(b) of the Bankruptcy Code, Bankruptcy Rules 1017, 2002, 2016, 3022 and 6007, and Local Rules 3002-1 and 9013-1, the Debtors request entry of an order, substantially in the form of the Proposed Order attached hereto as **Exhibit A**, (i) approving the Dismissal Procedures; (ii) dismissing these Chapter 11 Cases; (iii) closing each of these Chapter 11 Cases effective as of March 31, 2021; and (iv) granting further relief.

61.    To be clear, in accordance with the Dismissal Procedures, the Debtors will pay all U.S. Trustee fees, any amounts owed in connection with any settlement of WARN Act claims asserted against the Debtors and Professional Fees on or prior to March 31, 2021.  To the extent that there are any funds remaining with the estates after payment of approved Professional Fees, U.S. Trustee fees, and any amounts in connection with any settlement of WARN Act claims asserted against the Debtors, such funds shall be distributed to Luminus, as the Prepetition Term Loan Agent's designee, consistent with the terms of the Settlement Agreement.

**BASIS FOR RELIEF**

A.     **Dismissal of these Chapter 11 Cases is Appropriate and Should be Approved as the Debtors Demonstrate "Cause" to Warrant Dismissal.**

62.     Section 1112(b) of the Bankruptcy Code governs the dismissal of a chapter 11 case, providing that, upon the request of a party in interest, following notice and a hearing, "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause…." 11 U.S.C. § 1112(b)(1). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") changed the statutory language with respect to conversion or dismissal from permissive to mandatory. *See* H.R. Rep. No. 109-31(I), at 442, *reprinted in* 2005 U.S.C.C.A.N. 88, 94 (stating that the Act "mandate[s] that the court convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause, absent unusual circumstances."); *see also Nester v. Gateway Access Solutions, Inc.* (*In re Gateway Access Solutions, Inc.*), 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (stating, "The amendments to section 1112 limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause.") (citing *In re 3 Ram, Inc.*, 343 B.R. 113, 118 (Bankr. E.D. Pa. 2006)); *accord In re TCR of Denver, LLC*, 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal, such that this Court has no choice, and no discretion, in that it 'shall' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4).").

63.     The amendments to section 1112 of the Bankruptcy Code thus limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause. *See In re 3 Ram, Inc.*, 343 B.R. at 119 ("Under new § 1112 when cause is found, the court *shall* dismiss or convert unless special circumstances exist that establish that the requested conversion or dismissal

24

is not in the best interests of creditors and the estate.") (emphasis in original); *see also In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007).  For the reasons set forth herein, the Debtors submit that the Court should dismiss these Chapter 11 Cases because cause exists. Further, dismissal— rather than conversion to cases under chapter 7—is in the best interests of the Debtors, their creditors, and their estates.

**B.    The Debtors Meet the Elements of "Cause" to Dismiss these Chapter 11 Cases Because the Debtors Ceased Business Operations More Than One Year Ago and Have Insufficient Unencumbered Assets to Confirm a Plan of Liquidation.**

64.    Whether "cause" exists is determined on a case-by-case basis, and the decision to dismiss a chapter 11 case rests in the sound discretion of the court.  *See In re Preferred Door Co.*, 990 F.2d 547, 549 (10th Cir. 1993) (noting that the bankruptcy court has broad discretion to dismiss a bankruptcy case for several causes, including the debtor's inability to effectuate a plan); *In re Nugelt, Inc.*, 142 B.R. 661, 665 (Bankr. D. Del. 1992) (noting that "[c]ourts have wide latitude in determining whether cause exists to convert or dismiss" a chapter 11 bankruptcy case); *In re Young*, 76 B.R. 376, 378 (Bankr. D. Del. 1987) (holding that section 1112(b) permits the court in its discretion to dismiss a chapter 11 case, and that the determination of whether cause has been shown must be made on a case-by-case basis).

65.    Section 1112(b)(4) of the Bankruptcy Code outlines a non-exhaustive list of sixteen grounds constituting "cause" for dismissal of a chapter 11 case. 11 U.S.C. § 1112(b); *see In re Gateway Access Solutions*, 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (*quoting First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 572 (3d Cir. 1991)); *In re 3 Ram, Inc.*, 343 B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11

case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, [and] not exhaustive has not.") (citation omitted).

66.     One such ground is that the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A). A "'reasonable likelihood of rehabilitation" has been interpreted as "debtor's ability to restore the viability of its business." *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 516 (8th Cir. 2004) ("Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation.") (internal citations omitted).  Here, the Debtors ceased operations over a year ago, in December 2019.  The Court has approved the Sales of the Debtors' only going concern businesses and has also approved the Sales of substantially all of the Debtors' assets.  Therefore, the Debtors have no business to rehabilitate or assets to restructure around.

67.     In addition to the non-exhaustive list outlined by section 1112(b)(4) of the Bankruptcy Code, a court may consider the "totality of the circumstances" in determining whether sufficient cause exists.  *See In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999) (noting that the factors enumerated in section 1112(b)(4) are "not exhaustive and . . . a court may consider whether other facts and circumstances qualify as 'cause.'").  Courts found sufficient cause where a debtor is unable "to effectuate a plan" or where a "reasonable possibility of a successful reorganization within a reasonable period of time" does not exist.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 161, 162 n. 10 (3d Cir. 2012) (holding that "the 'inability to effectuate a plan' remains a viable basis for dismissal because the listed examples of cause [in section 1112(b)] are not exhaustive."); *see also Bronson v. Thompson* (*In re Bronson*), 2013 WL 2350791, at *8 (B.A.P. 9th Cir. May 29, 2013) ("When it becomes apparent to the court that the debtor will not be able to

confirm and effectuate a plan within the foreseeable future, the bankruptcy court should exercise its discretion under § 1112(b) to dismiss or convert.").

68.    A debtor is unable to effectuate a plan when it cannot "formulate a plan or carry one out" or where the core for a workable plan of reorganization does not exist.  *Preferred Door*, 990 F.2d at 549 (citing *Hall v. Vance*, 887 F.2d 1041, 1043 (10th Cir. 1989)).  As explained above, the Debtors will not be able to satisfy secured claims in these Chapter 11 Cases, let alone pay in full administrative or priority claims as required by section 1129(a)(9).  It is without question that the Debtors cannot formulate or carry out a plan in these Chapter 11 Cases.  Accordingly, the Debtors submit that "cause" exists to dismiss the remaining open Chapter 11 Cases pursuant to section 1112(b)(4) of the Bankruptcy Code and related relevant case law.

**C.      Dismissal is in the Best Interests of the Debtors' Estates and their Creditors.**

69.    Once a court determines that cause exists to dismiss a chapter 11 case, the court must evaluate whether dismissal is in the best interests of the debtor's creditors and its estate.  *See* 11 U.S.C. § 1112(b); *In re Mazzocone*, 183 B.R. 402, 411 (Bankr. E.D. Pa. 1995).  Here, multiple factors demonstrate that it is in the best interest of the Debtors' estates and their creditors to dismiss these Chapter 11 Cases.

> ***i.    The circumstances of these Chapter 11 Cases weigh in favor of dismissal rather than conversion***

70.    First and foremost, dismissal is appropriate where the parties with economic stakes in the available assets have reached an accord – such as evidenced here by the Settlement Agreement – to dismiss these chapter 11 cases.

71.    Courts may consider a variety of factors in determining whether to dismiss a chapter 11 case or convert to a chapter 7 case, including the following:

a.     Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.

b.     Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.

c.     Whether the debtor would file a further case upon dismissal.

d.     The ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors.

e.     In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise.

f.     Whether any remaining issues would be better resolved outside the bankruptcy forum.

g.     Whether the estate consists of a "single asset."

h.     Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests.

i.     Whether a plan has been confirmed and whether any property remains in the estate to be administered.

j.     Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*See, e.g.*, *In re Ramallo Bros. Printing Inc.*, No. 14-01948, 2015 WL 3862970, at *2 (Bankr. D.P.R. Jun. 22, 2015) (citing *In re Costa Bonita Beach Resort*, 513 B.R. 184, 200–01 (Bankr. D.P.R. 2014)); *In re Helmers*, 361 B.R. 190, 196 (Bankr. D. Kan. 2007).

72.     A number of these factors weigh in favor of dismissal of these Chapter 11 Cases. First, the Debtors have not made preferential payments to certain creditors throughout these Chapter 11 Cases. Rather, the Debtors have only made payments in accordance with orders of this Court. Further, as described above, the Debtors cannot satisfy any claims except for the Prepetition

Term Loan Lenders' claims through the Settlement Agreement.  Accordingly, conversion would not serve any beneficial purpose here with respect to the equality of distribution.

73.     Second, the Debtors will not file a further case upon dismissal; dismissal is the end goal of an orderly wind down and exit from bankruptcy.  Given that the Debtors have consummated the sales of substantially all of their assets and ceased operations shortly after the Petition Date, there is no substantive estate to seek further relief under the Bankruptcy Code.

74.     Third, through these Chapter 11 Cases, the Debtors have engaged sophisticated professionals to assist with, among other things, tax consultation services, accounts receivable services, and rolling stock recovery services.  While the Debtors are sure that a chapter 7 trustee would be competent in her efforts, such chapter 7 trustee would not be able to monetize any further assets that would exceed the value of the Secured Creditors' debt under the Prepetition Term Loan Agreement; rather, conversion to chapter 7 would simply contribute to the accrual of additional administrative expenses and delay.

75.     Lastly, the Debtors have not engaged in any misconduct during these Chapter 11 Cases, nor is a trustee necessary to protect the interests of any party or address environmental or safety concerns.  Accordingly, these factors weigh heavily in favor of dismissal, as opposed to conversion.

### ii.   Dismissal is in the best interests of the Debtors' creditors

76.     Creditor preference is also relevant in determining whether dismissal or conversion is appropriate.  *See, e.g.*, *In re Camden Ordinance Mfg. Co. of Ark., Inc.*, 245 B.R. 794, 802 (E.D. Pa. 2000) (approving creditors' request to convert case and noting that "creditors are the best judge of their own best interests.").  The Debtors have consulted with the Prepetition Term Loan Agent, DIP Agent, Secured Creditors, and the Committee regarding the dismissal of these Chapter 11

Cases, and all parties have agreed that they support dismissal rather than conversion to chapter 7. Indeed, approval of the dismissal of these Chapter 11 Cases is a requirement of the Settlement Agreement.

77.    For the reasons set forth above, the Debtors submit that a dismissal pursuant to section 1112 of the Bankruptcy Code is in the best interest of the Debtors' creditors and their estates.  Under these circumstances, authorizing dismissal as contemplated by this Motion and the Dismissal Procedures will allow the Debtors to implement a smooth, consensual exit solution.

**D.     Alternatively, Because Dismissal Would Better Serve the Interest of Creditors and the Debtors, Dismissal is Permitted Under Section 305(a) of the Bankruptcy Code.**

78.    Section 305(a) of the Bankruptcy Code permits dismissal at any time "if the interest of creditors and the debtor would be better served by such dismissal."  11 U.S.C. § 305(a)(1). Dismissal under section 305(a) of the Bankruptcy Code requires that both creditors and debtors benefit from dismissal, rather than applying a balancing test to determine whether dismissal is appropriate under the circumstances.  *See, e.g.*, *In re Globao Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 255 (Bankr. S.D.N.Y. 2004) (citing *In re Eastman*, 188 B.R. 621, 624–25 (9th Cir. B.A.P. 1995)).

79.    For the myriad of reasons set forth above, dismissal is not only in the interests of the Debtors, but in the interests of their creditors.  Under the circumstances, conversion to chapter 7 would impose additional administrative costs with no corresponding benefit to the Debtors' creditors or their estates.  Pursuant to the Settlement Agreement, the Secured Creditors and Committee agree with the Debtors that dismissal of these Chapter 11 Cases provides the most efficient, cost-effective method of effectuating the wind down of the Debtors' estates, and ensures payment of all U.S. Trustee's fees.

**E.     Dismissal is Both Permissible and Appropriate in these Chapter 11 Cases.**

*80.*      None of the relief sought is controversial or unusual.  If the dismissal sought herein

constitutes a structured dismissal, it is both permissible and appropriate.  *See Official Comm. of*

*Unsecured Creditors v. CIT Grp. / Business Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173,

181 (3d Cir. 2015); *see also, e.g.*, *In re L.K. Bennett U.S.A., Inc.*, No. 19-1070 (JTD) (Bankr. D.

Del. Aug. 19, 2019) [D.I. 253]; *Endeavour Operating Corp.*, No. 14-12308 (KJC) (Bankr. D. Del.

Dec. 7, 2015) [D.I. 1088].   As the Third Circuit explained in its recent holding in *In re Jevic*

*Holding Corp.*, "Structured dismissals are simply dismissals that are preceded by other orders of

the bankruptcy court," including orders approving settlements and granting releases, and that the

Bankruptcy Code "does not strictly require dismissal of a chapter 11 case to be a hard reset." *Id.* at

181.  Additionally, absent a showing that the Debtor is using a structured dismissal to circumvent

the procedural protections and safeguards of the plan confirmation or conversion processes, a

bankruptcy court has the discretion to order such a disposition. *Id.*

81.      Dismissal is appropriate in these Chapter 11 Cases as the Debtors are not using the

dismissal process to circumvent the procedural protections and safeguards of the plan confirmation

or conversion processes.  With respect to plan confirmation, as explained above, the Debtors are

unable to develop or confirm a plan of reorganization or liquidation and, as the Debtors' have

consummated the sales of substantially all of their assets and ceased operations over a year ago,

there is no business is left to reorganize.  Further, the Debtors are not using dismissal to evade

conversion.  Rather, dismissal, as opposed to conversion, is in the best interests of the Debtors'

estates and creditors, as it will avoid a costly and time-consuming chapter 7 process that will only

serve to create additional administrative expenses and not provide any incremental return to

creditors.

82.     Accordingly, for the reasons set forth above, dismissal of these Chapter 11 Cases is not only permissible but is the option most likely to provide the maximum recovery to as many creditors as possible at minimum expense.

**F.     The Court Should Close these Chapter 11 Cases as of March 31, 2021 Because They Have Been Fully Administered.**

83.     Section 350(a) of the Bankruptcy Code provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case."  Bankruptcy Rule 3022, which implements section 350 of the Bankruptcy Code, further provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case."

84.     The term "fully administered" is not defined in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules.  However, the Advisory Committee Note to Bankruptcy Rule 3022 (the "Advisory Committee Note") sets forth the following non-exclusive factors to be considered in determining whether a case has been fully administered:

> a.     whether the order confirming the plan has become final;
>
> b.     whether deposits required by the plan have been distributed;
>
> c.     whether the property proposed by the plan to be transferred has been transferred;
>
> d.     whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan;
>
> e.     whether payouts under the plan have commenced; and
>
> f.     whether all motions, contested matters and adversary proceedings have been finally resolved.

FED. R. BANKR. P. 3022, Advisory Committee Note.

85.     Courts in this District and others adopt the view that "these factors are but a guide in determining whether a case has been fully administered, and not all factors need to be present before the case is closed." *In re SLI, Inc.,* No. 02-12608, 2005 WL 1668396, at *2 (Bankr. D. Del. June 24, 2005) (citing *In re Mold Makers, Inc.,* 124 B.R. 766, 768–69 (Bankr. N.D. Ill. 1991)); *see also In re Kliegl Bros. Universal Elec. Stage Lighting Co.,* 238 B.R. 531, 542 (Bankr. E.D.N.Y. 1999) (recognizing that bankruptcy courts weigh the factors contained in the Advisory Committee Note when deciding whether to close a case); *In re Jay Bee Enters., Inc.,* 207 B.R. 536, 538 (Bankr. E.D. Ky. 1997) (same); *Walnut Assocs. v. Saidel,* 164 B.R 487, 493 (E.D. Pa. 1994) ("[A]ll of the factors in the Committee Note need not be present before the Court will enter a final decree.").

86.     First, the Debtors have not and will not confirm a plan.  Second, the Debtors do not have available unencumbered funds to pay unsecured claims or future administrative expenses, other than for the Professional Fees set forth in the Wind Down Budget, which shall be paid from cash collateral.  Third, subject to the approval of the Settlement Agreement and this Motion, prior to March 31, 2021, these Chapter 11 Cases shall be "fully administered" within the meaning of section 350 of the Bankruptcy Code as all of the following have occurred:

    a.     the Debtors shall have paid or have provided for the payment of all approved and allowed Professional Fees;

    b.     all U.S. Trustee fees under 28 U.S.C. § 1930 will have been paid; and

    c.     all adversary proceedings shall have been resolved and dismissed.

87.     The Advisory Committee Note advises that "[t]he court should not keep [a] case open only because of the possibility that the court's jurisdiction may be invoked in the future." FED. R. BANKR. P. 3022, Advisory Comm. Note (1991).  Importantly, entry of and order closing these Chapter 11 Cases is without prejudice to the rights of the parties in interest to petition the Court to reopen any of the Debtors' Chapter 11 Cases pursuant to section 350(b) of the Bankruptcy

Code, if necessary, including to adjudicate any dispute arising in connection with the collection of the Transferred Assets. Indeed, the Dismissal Order which the Debtors seek contains such a provision to reopen the case to the extent necessary to deal with a dispute relating to a Transferred Asset.

88.    For the foregoing reasons, the Debtors submit that the Court should enter the Proposed Order closing each of these Chapter 11 Cases effective as of March 31, 2021.

**G.    The Court Should Authorize the Termination of Claims and Noticing Services.**

89.    The Debtors request that as of March 31, 2021, the claims and noticing services (the "Claims and Noticing Services") provided by Kurtzman Carson Consultants LLC ("KCC") pursuant to the *Order, Pursuant to 28 U.S.C. § 156(c), Approving the Retention and Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors, Effective as of the Petition Date* [D.I. 127] (the "KCC Retention Order") be terminated.  Upon such termination, and except as otherwise provided in this Motion, KCC shall have no further obligations under the KCC Retention Order to the Court, the Debtors or any other party in interest with respect to the Claims and Noticing Services in these Chapter 11 Cases.

90.    Pursuant to Local Rule 2002-1(f)(ix), within 14 days of entry of the and order closing these Chapter 11 Cases, KCC will (a) forward to the Clerk of the Court an electronic version of all imaged claims, (b) upload the creditor mailing list into CM/ECF and (c) docket a final combined claims register in the Debtors' lead case (19-12606) (the "Lead Case") containing claims filed in each of the Chapter 11 Cases.  KCC will also box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, Pennsylvania 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

34

**H.    All Prior Releases, Stipulations, Settlements, Rulings, Orders and Judgments Should Remain Binding and Should Continue to Have Full Force and Effect.**

91.    The dismissal of a chapter 11 case ordinarily vacates all orders previously entered by the bankruptcy court and restores all parties to the prepetition status quo. See 11 U.S.C. § 349(b).  A bankruptcy court may, however, "for cause, order[] other-wise . . . ." *Id*. Courts in this jurisdiction have regularly allowed orders, including those approving releases and settlements, to be given continued effect after a dismissal, notwithstanding section 349 of the Bankruptcy Code. *See, e.g., In re RM Wind-Down Holdco LLC*, No. 18-11795 (MWF) (Bankr. D. Del. 11795) [D.I. 721] (giving continued effect to orders entered throughout the pendency of effect to orders entered throughout the pendency of the chapter 11 cases); *In re Old Towing Co.*, Case No. 17-10249 (LSS) (Bankr. D. Del. May 30, 2017) [D.I. 381] (giving continued effect to 363 sale order and any releases, injunctions and successor liability provisions provided for in such sale); *In re TAH Window, Inc.*, Case No. 16-11599 (MFW) (Bankr. D. Del. Jan. 13, 2017) [D.I. 408] (giving orders, releases, and injunctions continuing effect); *In re City Sports, Inc.*, Case No. 15-12054 (KG) (Bankr. D. Del. Mar. 4, 2016) [D.I. 647] (giving continued effect to previously entered orders).

92.    Given the circumstances and posture of these Chapter 11 Cases, the Debtors submit that ample cause exists to allow all prior orders, releases, stipulations, settlements, rulings, and judgments entered by the Court in connection with these Chapter 11 Cases to be given continued effect, notwithstanding the requested dismissal.

93.    Notwithstanding the foregoing, and in addition to the relief requested herein to terminate the Claims and Noticing Services, the Debtors request that the Court terminate each Professional's retention, effective as of March 31, 2021, without the need for further action on the part of this Court, the Debtors, or such Professionals.  Furthermore, the Debtors request that the

Court authorize the termination of all remaining independent contractors of the Debtors as of March 31, 2021.

## **NOTICE**

94.    Notice of this Motion will be provided to:  (i) the U.S. Trustee; (ii) the United States Attorney for the District of Delaware; (iii) counsel to the Committee; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) counsel to Luminus; (vii) Schulte Roth & Zabel LLP and Landis Rath & Cobb LLP, co-counsel to Blue Torch Finance, LLC; (viii) Goldberg Kohn Ltd. and Morris, Nichols, Arsht & Tunnell LLP, co-counsel to MidCap Funding IV Trust; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002.

95.    In addition, the Debtors are serving a separate notice (the "Dismissal Notice") by first-class United States Mail to all creditors, as provided in Bankruptcy Rule 2002(a)(4).  The Dismissal Notice includes specific information regarding how to obtain a copy of this Motion free of charge and the procedures for filing objections to this Motion.  The Debtors submit that, under the circumstances, no other or further notice in connection with this this Motion is required.

*[Remainer of Page Intentionally Left Blank]*

EAST\179285357.14

**WHEREFORE**, the Debtors respectfully request that this Court enter the Proposed Order, attached to this Motion as **Exhibit A**, granting the relief requested in this Motion, and grant such other and further relief as this Court deems just and proper.

Dated:  March 3, 2021
        Wilmington, Delaware

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Stuart M. Brown*
Stuart M. Brown (DE 4050)
Matthew S. Sarna (DE 6578)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@us.dlapiper.com
      matthew.sarna@us.dlapiper.com

-and-

Richard A. Chesley (admitted *pro hac vice*)
Jamila Justine Willis (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
Email:  richard.chesley@us.dlapiper.com
      jamila.willis@us.dlapiper.com

*Counsel to the Debtors*

EAST\179285357.14